# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISON

| | |
|---|---|
| C. Jackson Hoover; Matthew S. Greiner; Heather Greiner; Edward William Spratt, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>Strategic Capital Partners, LLC; Ricky B. Novak; James Freeman; Bridge Capital Associates, Inc.; Morris Manning & Martin, LLP; Timothy Pollock; Nelson Mullins Riley & Scarborough LLC; Jon R. Langford, CPA, PC; John R. Langford; Bennett Thrasher, LLC; Van Sant and Wingard, LLC; Martin H. Van Sant; Thomas F. Wingard; Clark~Davis, PC; Claud Clark III; Atlantic Coast Conservancy, Inc.; Robert D. Keller; Georgia-Alabama Land Trust, Inc. f/k/a Georgia Land Trust, Inc.; AquaFusion, Inc.; Credo Financial Services, LLC; and Oxygen Financial, Inc.<br><br>*Defendants*. | CASE NO. _____<br><br><br><br><br>**ORIGINAL CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br>**JURY DEMANDED** |

## ORIGINAL CLASS ACTION COMPLAINT

1.      This case involves a multi-year fraudulent scheme by a group of supposedly independent and respected professionals.  The tax-savings strategy at the heart of the scheme involved the donation of inflated real estate for purported conservation purposes—the Syndicated Conservation Easement Strategy (the "<u>SCE Strategy</u>").  The Defendants used the same SCE Strategy to effect numerous conservation easement transactions that differed in name and location but not in substance.  These professionals aggressively promoted and sold numerous SCE Strategy transactions to Plaintiffs and other Class members, who were told the transactions were legal and an entirely legitimate way to serve the environment and reduce their tax bill.  Because this complex scheme has been widespread, occurred over a number of years, and involved numerous transactions, Plaintiffs describe the scheme in this Complaint by way of two representative transactions:  (a) the DeSoto tract in Shelby County, Alabama ("<u>DeSoto Syndicate Transaction</u>"), and (b) the Turtle River tract in Glynn County, Georgia (the "<u>Turtle River Syndicate Transaction</u>").

2.      Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  Indeed, part of the sales pitch to Plaintiffs and Class Members was the noble goal of preserving valuable land for the greater public good.  When ***properly*** valued and implemented, conservation

1

easements can and do confer legitimate tax advantages to the donor in additional to environmental benefits to the public.  When such easements are placed on property *__in strict compliance__* with Section 170(h) of the Internal Revenue Code (the "<u>Code</u>"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.

3.     The SCE Strategy, however, was not properly and legitimately valued or implemented and was never intended to be.  Rather than guide Plaintiffs through a legitimate conservation easement transaction, the Defendants utilized a prepackaged collection of bogus, grossly inflated appraisals,[1] donations of easements that lacked a valid conservation purpose, deficient form documents, and faulty conservation easement deeds, all delivered via a mountain of misrepresentations and omissions to promote, sell, and implement the SCE Strategy and the tax savings it allegedly would legally provide.  Beneath these complex structures and financial shenanigans hid the truth (which was purposefully obscured from Plaintiffs, other Class members, and the Internal Revenue Service ("IRS")): the SCE Strategy was simply an attempt by Defendants to convey a substantial real

---

[1]  These appraisals included numerous intentional misrepresentations and deficiencies, many of which emanate from a tortured interpretation of "fair market value" that ignores the IRS's valuation standard.  The value of the donated easement must meet the definition of fair market value as defined by Treasury Regulation § 1.170A-1(c)(2):  The fair market value is the price at which the property could change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

estate interest to a co-conspiring charity, after fraudulently and grossly inflating its value, and sell the corresponding tax deduction to Plaintiffs and other clients for lucrative professional fees.

4.    As its name indicates, the SCE Strategy involves the syndication of a conservation easement transaction (or a conservation fee simple transaction) to multiple investors, which allows those who would be unable to individually participate in an otherwise capital-intensive transaction to do so.  While syndication is not problematic *per se*, many unscrupulous professionals like Defendants found ways, such as the SCE Strategy, to exploit for their own gain the tax deductions that could be generated from syndicated conservation easement transactions.

5.    As described further below, Defendants are a group of conservation easement professionals and other advisors and consultants who deliberately banded together to give only the appearance of legitimacy to the SCE Strategy for their own financial gain.  There were several reasons why the SCE Strategy presented an attractive money-making opportunity for Defendants.  The 2008-2009 recession left a rampant oversupply of devalued real estate, along with a group of underemployed real estate appraisers, at least some of whom were eager and willing to provide favorable valuations in exchange for the right sum.  This unproductive real estate could be purchased at a discount and sold to investors at a premium for the purported purpose of placing a conservation easement that would generate tax deductions that,

3

due to provisions in the Code, could substantially reduce the individual participant's tax liability.[2] And because the rules and transactions involved were highly technical, they could not be understood by laypersons such as Plaintiffs and the Class who were unlikely to question the advice being offered by reputable professionals (including blue-chip law firms and accounting firms) who purported to be experts in this area.

6.    Defendants sought to capitalize on their respective expertise in conservation easements and related tax matters to lure successful individuals to participate in what they represented to be *bona fide* conservation easement transactions and thereby generate substantial fees and land interests for themselves. To do so effectively, each of the Defendants knew they needed the coordinated participation of various role players, including a sponsor, appraiser, mining or

---

[2] The deduction for a qualified conservation easement under Code § 170(h) is a noncash charitable contribution deduction, which unlike most itemized deductions, is not subject to the alternative minimum tax ("AMT"). Without the risk of AMT, the tax benefits flowing from a § 170(h) deduction are especially valuable. For example, a taxpayer with $500,000 of adjusted gross income could use a § 170(h) deduction to reduce his tax to $25,000, thereby enabling the taxpayer to claim an effective tax rate of 5%. In addition to federal tax benefits, some states like Georgia offered a state tax credit for conservation easements, which would provide participants a dollar-for-dollar reduction of tax.

development consultant, attorney, land trust, accountant, and "Other Participants,"[3] involved in every step of the SCE Strategy.  Defendants deliberately sought out and agreed to work with only those whom they knew through preexisting relationships and/or industry reputation to be willing partners in this improper endeavor.  Often, as here, the same or substantially similar group of professionals and advisors ended up working together to promote, sell, and implement SCE Strategy transactions.

7.     Once the IRS began scrutinizing the fraudulent appraisals and other defects, they determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations.  Now that the United States government has begun peeling back the layers of fraud underpinning the SCE Strategy, it has initiated enforcement actions and conducted criminal prosecutions related to nearly identical transactions implemented by other promoters of the SCE Strategy.  *See, e.g., United States v. Zak, et al.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers—including Defendant Claud Clark III—challenging SCE

---

[3] "Other Participants" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, and others not named as Defendants herein who assisted in the design, promotion, sale, and/or implementation of the SCE Strategy.

Strategy transactions not at issue here, and seeking permanent injunctions halting these transactions and disgorgement of ill-gotten gains);[4] *United States v. Stein Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20-CR-129 (W.D.N.C.) (same).

8.     As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and interest, and have paid significant professional fees in connection with the IRS disputes.  The Defendants also convinced what is believed to be over 1,000 other clients to execute the SCE Strategy.  For these Class Members, the IRS has now indicated it will disallow the charitable deductions and, in fact, has already begun disallowing the deductions at the partnership level.

9.     Unbeknownst to Plaintiffs and the Class, Defendants had preplanned and predetermined each step of the SCE Strategy to generate large but improper tax deductions, as detailed further below.  From the outset, Defendants identified and purchased real estate, not for an actual investment or conservation purpose, as they had represented to potential SCE Strategy participants, but to syndicate as many

---

[4] Nancy Zak, a prominent promoter of SCE Strategy transactions, recently settled the civil enforcement action against her after agreeing to leave the business permanently.

conservation easement transactions as possible to generate outlandish fees and significant land interests for themselves.   Defendants then worked together to promote and implement each syndication, including by drafting and preparing various transactional documents needed to execute a conservation easement that could be claimed as a charitable contribution deduction.   These documents were crucial to making the scheme appearance legitimate and legal, when, in fact, the Defendants knew the scheme was fraudulent and the documents contained numerous misrepresentations and material omissions.   Plaintiffs and Class members, on the other hand, reasonably believed that the documents supported the SCE Strategy transactions and could not have recognized the misrepresentations and omissions because the documents' content and the applicable IRS Code provisions and regulations were highly technical.

10.   Although Defendants were well aware of the IRS's clear warnings to them and other conservation easement professionals and advisors that the SCE Strategy, as structured and implemented, could not generate legitimate tax deductions, they advised their trusting clients the complete opposite. Defendants chose to continue to market, sell, and profit from the SCE Strategy, believing that they could evade or overcome any IRS scrutiny. And when the IRS began to zero in on the SCE Strategy as an abusive tax scheme, Defendants either minimized or deliberately kept silent about the IRS's unequivocal position that it would disallow

the tax benefits promised to Plaintiffs and the Class. In fact, the IRS now has made clear that it will disallow these SCE Strategy deductions at the partnership level and has indicated its intent to disallow them at the individual level.

11.    This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to the assessment of back-taxes, interest and penalties from the IRS, and incur additional accounting and legal fees and expenses to deal with the IRS fallout. These damages are all the result of Plaintiffs and the Class entering into the SCE Strategy and claiming charitable contribution deductions on their federal and state tax returns based on the defective SCE Strategy as well as Defendants' advice, recommendations, and assistance in connection therewith.

12.    There were only minor, if any, variations in Defendants' wrongful actions and resulting harm to Plaintiffs and the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and the concerted action and fraudulent misrepresentations by the Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate. Plaintiffs allege a common and mutual scheme for tax fraud, in which Defendants knew the SCE Strategy, as structured and implemented, would fail if challenged by the IRS despite Defendants' representations and actions the contrary.

# I.
## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §
1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction
upon this Court, as at least one member of the proposed Class (named or unnamed)
is a citizen of a state that is different from at least one Defendant's state of
citizenship; in fact, the class is currently known to include citizens of Georgia,
Louisiana, North Carolina, South Carolina, and Tennessee.  Moreover, based on
SEC filings, the Defendants solicited participants from over 25 states, including, but
not limited to Alabama, Arkansas, California, Colorado, Florida, Georgia, Hawaii,
Indiana, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Mississippi, Missouri,
Nebraska, New Hampshire, North Carolina, North Dakota, Oklahoma,
Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and
West Virginia.  Further, the aggregate amount in controversy exceeds $5,000,000.
In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. §
1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the
Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*; and
29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims,
including common-law fraud and conspiracy claims.

14.    Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. § 1965(b) and (d).

15.    Without limiting the generality of the foregoing, each Defendant (directly or indirectly) has:

(a)    transacted business in Georgia;

(b)    contracted to supply or obtain services in Georgia;

(c)    availed themselves intentionally of the benefits of doing business in Georgia;

(d)    produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

(e)    caused tortious damage by act or omission in Georgia;

(f)    caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(g)     committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Georgia to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(h)     engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

(i)     otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require the Defendants to come to Court to defend this action.

16.     Venue is proper under 28 U.S.C. § 1391(b)(2)-(3), because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of the Defendants' fraud and wrongful conspiracy were felt in, among other places, this District and, alternatively, because at least one defendant is subject to personal jurisdiction in this District.  In addition, venue is proper under 18 U.S.C. § 1965 because at least one Defendant resides in this District and the ends of justice require that the other Defendants be brought before the Court.

17.    Venue in this Division is proper under LR 3.1 because at least one Defendant resides in this Division.

## II.
## PARTIES

1.    Plaintiff C. Jackson Hoover ("<u>Hoover</u>") is an individual and a citizen of Cobb County, Georgia. This Plaintiff resides in Marietta, Georgia within this District.

2.    Plaintiff Matthew S. Greiner is an individual and a citizen of Cobb County, Georgia.  This Plaintiff resides in Marietta, Georgia within this District.

3.    Plaintiff Heather Greiner is an individual and a citizen of Cobb County, Georgia.  This Plaintiff resides in Marietta, Georgia within this District.  Matthew and Heather Greiner are collectively referred to herein as the "<u>Greiner Plaintiff</u>s."

4.    Plaintiff Edward William Spratt ("<u>Spratt</u>") is an individual and a citizen of Cobb County, Georgia.  This Plaintiff resides in Powder Springs, Georgia within this District (Hoover, the Greiner Plaintiffs, and Spratt are collectively referred to herein as the "<u>Plaintiffs</u>").

5.    Defendant Strategic Capital Partners, LLC ("<u>Strategic</u>") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1072 W. Peachtree Street NW #78646 Atlanta, Georgia 30357. Strategic, Novak, and Freeman are collectively referred to herein as the "<u>Strategic Defendants</u>."  This Defendant may be served with process through its registered

agent:  Strategic Investment Holdings, LLC, 1072 W. Peachtree Street NW #78646 Atlanta, Georgia 30357.

6.     Defendant Bridge Capital Associates, Inc. ("Bridge Capital") is a corporation incorporated in Georgia with its principal place of business at 127 Main Street NW, Lilburn, GA 30047.   Bridge Capital, Novak, and Freeman are collectively referred to herein as the "Bridge Capital Defendants."  This Defendant may be served with process through its registered agent:  Caroline Wisniewski, 127 Main Street NW, Lilburn, GA 30047.

7.     Defendant Ricky B. Novak ("Novak") is an individual and, upon information and belief, resides at 5217 Lake Forrest Dr., Atlanta, GA 30342-2220, Georgia.  This Defendant is or was during the relevant period a principal of Strategic and Bridge Capital.

8.     Defendant James W. Freeman ("Freeman") is an individual and, upon information and belief, resides at 5388 Redfield Dr. Dunwoody, GA 30338-3733. This Defendant is or was during the relevant period a principal of Strategic and Bridge Capital.

9.     Defendant Morris, Manning & Martin, LLP ("MMM") is a limited liability partnership organized and existing under the laws of Georgia with its principal place of business at 1600 Atlanta Financial Center, 3343 Peachtree Road NE, #1600, Atlanta, Georgia 30326.

10.     Defendant Timothy Pollock ("Pollock") is an individual and, upon information and belief, resides at 3827 Rockhaven Court, Marietta Georgia 30066. This Defendant is or was during the relevant period a partner in MMM.  MMM and Pollock are referred to herein as the "MMM Defendants."

11.     Defendant Nelson Mullins Riley & Scarborough LLC ("Nelson Mullins") is a limited liability company organized and existing under the laws of South Carolina with its principal place of business at Meridian, 17th Floor, 1320 Main Street, Columbia, SC 29201.  Nelson Mullins also maintains an office in this District at Atlantic Station, 201 17th Street NW, Suite 1700, Atlanta, GA 30363. This Defendant may be served with process through its registered agent: CT Corporation System, 2 Office Park Court, Suite 103 Columbia, SC 29223.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This

Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

12.     Defendant Jon R. Langford, CPA, PC ("Langford PC") is a professional corporation incorporated in Georgia with its principal place of business at 300 Plantation Chase, St. Simons Island, GA 31522. This Defendant may be served with process through its registered agent:  Jon R. Langford at the address mentioned above.

13.     Defendant Jon R. Langford is an individual and, upon information and belief, resides at 505 Palm Harbor Road, St. Simons Island, GA 31522. This Defendant is or was an employee or principal of Jon R. Langford, CPA, PC. Langford PC and Langford are collectively referred to herein as the "Langford Defendants."

14.     Defendant Bennett Thrasher, LLC ("Bennett Thrasher") is a limited liability company organized and existing under the laws of Georgia with its principal

place of business at 3625 Cumberland Blvd., Suite 1000, Atlanta, GA 30339.  This

Defendant can be served with process through its registered agent:  Thomas Raines,

PC, 3740 Da Vinci Court, Suite 430, Norcross, Georgia 30092.

15.     Defendant Van Sant and Wingard, LLC ("Van Sant and Wingard") is a

limited liability company organized and existing under the laws of South Carolina

with its principal place of business at 7222 S Lake Marion Circle, Columbia, SC

29223.  This Defendant may be served with process through its registered agent:

Martin H. Van Sant, at the address mentioned above.  This Court has personal

jurisdiction over this Defendant pursuant to the Constitution and laws of the United

States and the State of Georgia. At all relevant times, this Defendant has done and is

doing business in the State of Georgia, maintains a regular place of business, and

maintains a designated agent upon whom service may be made in this civil action.

As described hereafter, this Defendant has contracted with a Georgia resident, and

either party was to perform the contract in whole or in part in the State of Georgia.

Additionally, this Defendant has committed torts, in whole or in part, in the State of

Georgia, including intentional tortious acts directed at a resident of the State of

Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State

of Georgia has been committed by officers, directors, employees, and/or agents of

this Defendant acting within the scope of their employment or agency. This

Defendant has purposefully availed itself of the benefits and protections of the laws of

16

the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

16.     Defendant Martin H. Van Sant ("Van Sant") is an individual who, upon information and belief, resides at 168 Lillian Street, Gilbert, SC 29054-9779. This Defendant is or was an employee or principal of Van Sant and Wingard. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional

notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

17.     Defendant Thomas F. Wingard ("Wingard") is an individual who, upon information and belief, resides at 2408 Quinine Lane, Columbia, SC 29204. This Defendant is or was an employee or principal of Van Sant and Wingard. Van Sant and Wingard, Van Sant, and Wingard are collectively referred to herein as the "Van Sant and Wingard Defendants." This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair

play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

18.     Defendant Clark~Davis, PC ("Clark Davis") is a professional corporation incorporated in Alabama with its principal place of business 1124 Palmetto St., Mobile, AL 36604. This Defendant may be served with process through its registered agent: Claud Clark III at the address mentioned above. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably

anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

19.     Defendant Claud Clark III ("Clark") is an individual who, upon information and belief, resides at 646 River Route, Magnolia Springs, AL 36555. This Defendant is or was an employee or principal of Clark Davis. Clark Davis and Clark are collectively referred to herein as the "Clark Defendants." This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional

notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

20.     Defendant Atlantic Coast Conservancy, Inc. ("ACC") is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business at 72 South Main Street, Jasper, Georgia 30143. This Defendant may be served with process through its registered agent: Robert D. Keller at the address noted above.

21.     Defendant Robert D. Keller ("Keller") is an individual who, upon information and belief, resides at 4805 Highway 53 West, Jasper, Georgia 30143. This Defendant is or was during the relevant period an employee and/or principal of ACC. ACC and Keller are referred to herein as the "ACC Defendants."

22.     Defendant Georgia-Alabama Land Trust, Inc. f/k/a Georgia Land Trust, Inc. ("GALT") is a corporation incorporated in Georgia with its principal place of business in 226 Old Ladiga Road, Piedmont, AL 36272. This Defendant may be served with process through its registered agent Tammy Morrow at 521 John Hand Road, Cedartown, Georgia 30125. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a

21

designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and  either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of  Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State  of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws  of the State of Georgia and could reasonably anticipate being subject to the  jurisdiction of courts of the State of Georgia.  This suit against this Defendant will  not offend traditional notions of fair play and substantial justice and is consistent  with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

23.     Defendant  AquaFusion,  Inc.  ("AquaFusion")  is  a  corporation incorporated in Virginia with its principal place of business at 10711 Samaga Dr. Oakton,  VA  22124.   This Defendant  may  be  served  with  process  through  its registered agent:  David R. Buss at the address mentioned above. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has

done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

24. Defendant Credo Financial Services, LLC ("Credo") is a limited liability company organized and existing under Georgia law with its principal place of business at 3800 Mansell Road, Suite 150, Alpharetta, Georgia 30022. This Defendant may be served with process through its registered agent: Daniel Kenneth Lucas at 125 N Clublands Ct., Johns Creek, GA 30022.

25.    Defendant Oxygen Financial, Inc. ("Oxygen") is a corporation incorporated in Georgia with its principal place of business at 35 Old Canton Street Alpharetta, GA 30009.  Defendant may be served with process through its registered agent:  Theodore M. Jenkin at the address mentioned above.

<strong>III.</strong><br><strong>FACTUAL BACKGROUND</strong>

26.    Plaintiffs, on their own behalf and on behalf of the Class, seek the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy by bringing claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, violations of the Georgia RICO statute, O.C.G.A. § 16-4-1, *et seq*., fraud, breach of fiduciary duty, professional malpractice, negligence, negligent misrepresentation, and civil conspiracy.    Plaintiffs and the Class seek compensatory and punitive/enhanced damages against Defendants for damages arising from the SCE Strategy that the Defendants and Other Participants jointly and in concert developed, promoted, sold, and implemented.

**A.    The history and purpose of conservation easements.**

27.    A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

28.     In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property.  The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

29.     A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes.  Before a deduction can be claimed, however, certain criteria must be met.  As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**B.     The IRS warns the Defendants regarding potential abuses of syndicated conservation easements.**

30.     As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122).  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  And because of the subjective nature of valuation, tax shelter promoters could promote and sell

transactions that claim excessive charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS. Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

31.    Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA").  DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under § 170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under § 170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

32.    The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA § 155(a).  The relevant regulation reiterates that no deduction under IRC § 170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met.  These Treasury Regulations require

a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

33.     Professional advisors and promoters/sponsors of conservation easements, but not laypersons, would have read these regulations to mean that the failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

34.     In 2004,[5] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues.  At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

35.     In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be

---

[5] *See* IRS Notice 2004-41 (July 12, 2004).

consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

36.    Even in the face of these warnings, the Defendants and the Sponsors continued to aggressively promote and heavily profit from conservation easements. In fact, Defendants eventually moved into syndicated conservation easements, which greatly expanded the "market" for these Defendants by now making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

37.    In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and that taxpayers who claimed disallowed deductions would pay a heavy price.  In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions.  Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.  Although the MMM Defendants did not advise Plaintiffs that they anticipated the IRS would designate the SCE Strategy as a listed transaction, in December 2016, after the Notice was issued, the MMM Defendants, and specifically

Tim Pollock, indicated that the "listed transaction announcement was always anticipated."

38.     By 2019, the IRS added syndicated conservation easement transactions (like the SCE Strategy) to its "Dirty Dozen" list of tax scams to avoid.  *See* https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid.

39.     Most recently, on June 25, 2020, the IRS stated in IR-2020-130 that it "will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

**C.     Defendants jointly develop, promote, sell, and implement the SCE Strategy.**

40.     In the face of IRS warnings and escalating government scrutiny, Defendants were undeterred in their commitment to develop, promote, sell, and implement the SCE Strategy.  Defendants believed, erroneously, that they could use their collective expertise to structure and implement the SCE Strategy in a way that would evade or at least overcome IRS scrutiny.  To that end, Defendants agreed to a particular structure for the SCE Strategy and to each carry out their assigned roles in implementing the SCE Strategy.

1.    **The structure of the SCE Strategy.**

41.    The SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (*i.e.*, the "Syndicates").   To achieve this end, Defendants formed the Syndicates as limited liability companies ("LLCs")[6] under state law, which are taxed as a partnership (*i.e.* a pass-through entity) for federal tax purposes.   The Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate in a conservation easement transaction.

42.    An entity taxed as a partnership (like an LLC) is not liable for income tax.   Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to the partners from the partnership.   Under the Code, charitable contributions are one item that flow through to the individual partners.

43.    Although a partnership does not pay federal income tax, it still has filing and reporting requirements.   Specifically, a partnership is required to file an annual

---

[6] Though uniformly employed in the SCE transactions, the LLCs used here were not essential to the conservation easement transactions, which could have been structured differently, such as by using "fractional undivided interests" in the eased real estate. *See Clamping Down on Conservation Easement Shelters*, TAX NOTES (Sept. 8, 2020) ("A partnership is a handy vehicle to whack up ownership of a parcel of land into smaller salable pieces. But there's nothing in a conservation easement shelter that requires a partnership. …. Investors could just as easily accomplish the goal using an agent, or as tenants in common in the parcel.").

return on Form 1065 that reports the partnership's income, deductions, gain, losses, etc.   The partnership is also required to furnish statements, called K-1s, to its members (with copies to the IRS) that report *inter alia* each member's distributive share of partnership income or loss and separately stated items.

44.     The members are then required to report on their individual tax returns their share of the partnership income, loss, and/or separately stated items as they are contained on the K-1s provided to them by the partnership.   In the case of the SCE Strategy, the Plaintiffs and the Class (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the K-1 they received from the respective Syndicate in which they were a member, as required by law.   Certain co-conspiring accountants and accounting firms prepared the Syndicate returns and the K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants and the Other Participants.

## 2.     The steps of the SCE Strategy.

45.     The Defendants planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in virtually every material way:

(a)     A "Sponsor" (including but not limited to the Strategic Defendants or a Strategic-owned affiliate) obtains a majority interest in property from a third party ("Landowner").   This is accomplished through a

series of steps: (1) the Sponsor creates a limited liability company ("PropCo");
(2) at the time PropCo is formed, Landowner is the 100% owner of PropCo
and Landowner then deeds land into PropCo; and (3) the Sponsor (or its
affiliate) purchases a majority interest (usually around 98%) in PropCo from
Landowner.[7]

(b)     Depending on the size of the property or properties, these
Defendants agree to subdivide or combine the properties to create multiple
parcels of several hundreds of acres each so that each parcel can be used in its
own SCE Strategy transaction and multiple SCE Strategy transactions can be
promoted from a single piece of property.

(c)     Once the property is identified and agreement obtained from the
landowner, the Sponsor purports to conduct a "due diligence" period, the true
purpose of which is to put together the information and documents necessary
to promote the SCE Strategy (the "Promotional Materials").  Among the tasks
include:

i.     The Sponsor obtains an initial appraisal ("Initial
Appraisal") of the land from one of its hand-picked appraisers (the
"Appraiser") to assess the land for its alleged intended purpose, as

---

[7] In some instances, as described in more detail below, the Strategic Defendants did
not employ the extra step of using a PropCo; rather, they purchased the property
through a single LLC, which owned the land and sold interests to investors.

explained below.  The Initial Appraisal purports to provide a valuation based on the Highest and Best Use (also referred to as the "HBU") of the land.  But the Sponsor predetermines and directs the Appraiser to provide a valuation that will equal an amount that will generate tax savings in excess of the amounts invested by the Syndicate members. The Appraiser uses his expertise to manipulate applicable rules and concepts for land appraisals to reach the desired valuation.   The Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs and members of the Class.

ii.     The Sponsor engages consultants (*e.g.,* a land development or mining consultant) to purportedly assess the property for possible development.  The development plan is a ruse, intended to substantiate the overstated HBU conveyed to the Syndicate members in the Initial Appraisal and for Defendants to deceive the IRS as to a purportedly legitimate land-use option.

iii.    The hand-picked tax attorney prepares a tax opinion letter affirming the legality of the SCE Strategy and the promised tax benefits.  The attorney also prepares and assists with the preparation of

the necessary corporate, real estate, and other transactional documents needed to implement the SCE Strategy.[8]

iv.      The Sponsor (or its affiliate), in most cases, forms a second limited liability company (the "Syndicate") and sends glossy marketing materials for distribution to potential participants. These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy. In the Promotional Materials, the Defendants also specifically tout the tax benefits of a conservation easement for potential participants, promising them a legal return of more than 2.5 times the amounts paid into the Syndicate.

(d)     The Sponsor, either directly or through a trusted local professional who agrees to refer SCE Strategy participants to the Sponsor, promotes the SCE Strategy and sends the jointly prepared Promotional Materials and other communications to convince potential participants to undertake the transaction.

(e)     The Sponsor obtains for the Syndicate the subject property from the Landowner in a series of steps and usually through the use of a PropCo.

---

[8] For some of the Syndicates, the Sponsor also had another law firm prepare a "due diligence report" for each Syndicate member purporting to analyze and identify any issues with the opinion letter and appraisal.

(f)     After the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but a small portion of its interest in PropCo to the Syndicate in exchange for cash.  The end-result is PropCo (which holds the critical property) is owned mainly by the Syndicate and partially by the Sponsor (or its affiliate) and Landowner.

(g)     The Sponsor prepares a purported development plan for the property and presents it to the Syndicate members.  The Syndicate members are asked to vote on whether to pursue a development plan or a conservation plan.  Based on material misrepresentations by the Defendants, the fact that only the conservation plan offers an immediate return that requires no additional capital outlay, and the bogus Initial Appraisal's valuation of the easement donation, the Syndicate members vote in favor of the conservation plan.

(h)     The following Defendants finalize the necessary implementation documents for the SCE Strategy, all purportedly on behalf of the Syndicate:

       i.     The Appraiser prepares an allegedly qualified appraisal, which supports the decision in favor of the conservation plan and determines the value of the conservation easement.  The Appraiser represents that the qualified appraiser meets certain requirements in the

Code and IRS regulations when, in fact, it does not and the Appraiser knows that fact.

   ii.  The Defendants prepare a Conservation Easement Deed.

   iii.  The Defendants prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

 (i)  PropCo (or the Syndicate in some cases) then donates a conservation easement or a fee simple interest in the land with the easement already attached to a land trust (the "Land Trust"), thus allowing the Sponsor to not have any continuing obligation with respect to the remaining partnership assets.

 (j)  The Conservation Easement Deed is executed by the grantor and grantee and recorded with the relevant State.

 (k)  The Land Trust issues to the Syndicate or PropCo a contemporaneous written acknowledgment of the conservation easement donation and represents that no goods or services were provided in exchange.

 (l)  A hand-pick accountant prepares the Syndicate's tax return, reporting the donation of the conservation easement as a charitable contribution deduction and representing its value (the purported decrease in

the property's appraised value resulting from the restriction placed on the property by the conservation easement) according to the Appraisal.   The accountant allocates this deduction to each Syndicate member on a Schedule K-1 based on his respective ownership interest in the Syndicate and directs each Syndicate members to report their allocated deduction on their individual tax return.

### 3.    The SCE Strategy "players."

46.    The Sponsor: The Strategic Defendants.  The Strategic Defendants, and specifically Novak and Freeman, were the developer and sponsor of SCE Strategy transactions at issue in this lawsuit.

47.    Novak and Freeman are the managing partners of the Strategic Group of Companies, which includes Strategic.   Over the years, Novak and Freeman purport to have marketed tax solutions that promote green, sustainable, and socially responsible initiatives.   Freeman and Novak advertised that they have served numerous banks, investors, and Fortune 500 companies.

48.    Novak earned a degree from Georgia Institute of Technology and a JD from Emory University's School of Law with a concentration in tax and real estate law.  He previously worked at top-notch accounting firms like Arthur Andersen and Deloitte & Touche.  Novak worked on numerous tax-deferred like-kind exchanges under Section 1031 and was, thus, familiar with tax-advantaged real estate deals.

49.     Freeman earned a degree from the University of North Carolina at Chapel Hill as well as a Master of Accounting from North Carolina's Keenan-Flagler School of Business with a concentration in tax and real estate.  He later received an MBA from Duke University's Fuqua School of Business.  He is a licensed CPA in various states.  He, like Novak, previously worked at Arthur Andersen and Deloitte & Touche.

50.     As the Sponsor, the Strategic Defendants worked on every aspect of each Syndicate's transaction, including:   the acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants, including advising Novak and Freeman's referral sources (among others Credo and Oxygen) to refer clients to the Strategic Defendants and communications with potential participants and/or their advisors to convince the potential client to participate; preparation of legal opinions issued to Syndicates; review and approval of the reports from AquaFusion and other consultants; preparation of the structure of the conservation easement; preparation of the Conservation Easement Deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, HBU, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and

review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

51.     The Strategic Defendants also helped assemble the cast of professionals that would purport to advise and guide Plaintiffs and the Class through the SCE Strategy.

52.     Each Syndicate paid Strategic two consulting fees—one for developing the SCE Strategies and the second for management consulting services for five years.  Each Syndicate also paid Strategic a percentage of operating reserves for Strategic's ongoing escrow services.  In addition, each Syndicate reimbursed the Strategic Defendants for certain expenses incurred in the development and implementation of the Syndicate.

53.     <u>The Placement Agent:  The Bridge Capital Defendants</u>.  The Strategic Defendants used their affiliate entity, Bridge Capital, to act as the placement agent for the Strategy.  Novak and Freeman are or were principals of Bridge Capital.  The Bridge Capital Defendants helped prepare the Promotional Materials and coordinated the investment by Plaintiffs and other Class Members in the Syndicates.

54.     Each Syndicate paid Bridge Capital a commission based on the gross proceeds of the investment, which in most cases amounted to hundreds of thousands of dollars.  The principals of Bridge Capital, including Novak and Freeman, were entitled to receive the bulk of these commission.  Bridge Capital also received an

interest in the Syndicate upon closing and could sell that interest or assign it to Bridge Capital principals, including Novak and Freeman.

55.    <u>The Attorneys:  The MMM Defendants and Nelson Mullins</u>.   The MMM Defendants had multiple roles and responsibilities in the SCE Strategy but were also architects of the SCE Strategy.

(a)    <u>The MMM Defendants</u>.   In approximately 2008, Pollock, a partner of MMM at the time, developed a tax product that used a partnership with third-party members to monetize deductions and state tax credits from the donation of a conservation easement on real estate owned by the partnership.  This product was the SCE Strategy.  According to Pollock, "if a land owner does not have taxable income sufficient to utilize the full benefit of a conservation easement, the unused deductions and state tax credits can be converted into cash by creating a partnership with third-party investors or admitting investors into an existing partnership that owns the land and specially allocating the deductions and credits to the investors."

(b)    After developing the SCE Strategy, the MMM Defendants aggressively promoted it at seminars and workshops around the country to landowners, professional advisors who could serve as referral sources, and potential participants.  The MMM Defendants became the "go to" law firm for the SCE Strategy.  Their early promotional efforts spawned an entire

industry and a robust market for the SCE Strategy. These efforts also generated large revenues for MMM from 2009 through 2018.

(c)     Pollock also personally participated in the SCE Strategy through transactions offered by promoters other than Strategic. In fact, he was a member of several Syndicate alongside other members whom he played a role in convincing to participate. Despite this clear conflict of interest, Pollock did not disclose to participants of the SCE Strategy that he was also a participant in other similar transactions.

(d)     For many of the Syndicates, the MMM Defendants prepared a legal opinion letter, which purported to provide the legal justification for the SCE Strategy. The MMM Defendants also served as legal counsel for certain Syndicates. In this role, the MMM Defendants provided legal advice and services to the Strategic Defendants and members of the Syndicates (*i.e.*, Plaintiffs and Members of the Class) regarding the SCE Strategy, including structuring and implementing the transaction, preparing and reviewing transactional documents, and providing other due diligence on the bona fides of the purported tax benefits of the SCE Strategy. The MMM Defendants also served as the escrow agents for investment funds wired by certain Plaintiffs and Members of the Class.

(e)    MMM was paid a flat fee for each Syndicate for its role in helping develop the Strategy, its due diligence services, and its legal opinion letter.  In most cases, this flat fee amounted to over $100,000.  MMM was also paid an hourly fee for the time it spent provided additional legal services.

(f)    <u>Nelson Mullins</u>.   Nelson Mullins had multiple roles and responsibilities in the SCE Strategy.  For the DeSoto Syndicate, Nelson Mullins prepared a due diligence report, which acted as a second legal opinion letter for the Strategy.  This due diligence report was prepared for each of the individual investors in that Syndicate.  Although it purported to identify issues with the main opinion letter and Appraisal, it failed to disclose material facts to the clients, including the central issue of the Appraisal's overvaluation. Instead, Nelson Mullins hid behind various assumptions that it knew to be false and purported to disclaim any knowledge or responsibility for those assumptions in direct violation of its duties to its clients.  Upon information and belief, Nelson Mullins issued due diligence reports for other Syndicates in which Class Members participated.

(g)    For other Syndicates in which Class members participated but that are not specifically detailed in this Complaint, Nelson Mullins prepared the main legal opinion letter, which purported to provide the legal justification for the SCE Strategy.  When it functioned as the main legal opinion letter

writer, Nelson Mullins simply copied large portion of the opinion letters written by the MMM Defendants without disclosing that fact to the clients and while charging the clients or Syndicate as if they had prepared the letter from scratch.  Upon information and belief, Nelson Mullins issued legal opinion letters for other Syndicates in which Class Members participated.

(h)     Nelson Mullins was paid a flat fee for each Syndicate for its role in helping develop the Strategy, its due diligence services, and its legal opinion letters.  In the case of their due diligence reports (as described later in the Complaint), the applicable Syndicate paid Nelson Mullins their fee out of the proceeds from the transaction closing.  Nelson Mullins was also paid an hourly fee for the time it spent provided additional legal services.

56.     The SCE Appraisers:  The Van Sant Defendants and the Clark Defendants.  The SCE Appraisers include but are not limited to the Van Sant Defendants and the Clark Defendants (the Van Sant Defendants and the Clark Defendants are collectively the "Appraisal Defendants").

57.     The Appraisal Defendants provided the following services to each Syndicate: prepared the appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates); permitted the front-line promoters of the SCE Strategy to utilize their appraisals in the Promotional Materials

for the purpose of convincing potential participants that the SCE Strategy provided legal and legitimate tax savings through the contribution of a conservation easement; and signed the Appraisal Summary (Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction in the years in which their appraisal was used to support the charitable contribution deduction provided by the SCE Strategy.

58.   The Appraisal Defendants received substantial fees for their appraisal work and their work on the Forms 8283.

(a)   The Clark Defendants.   Clark is an Alabama-based real estate appraiser.   Clark advertises that he and his firm has completed over 200 conservation easement appraisals.   He promotes his services through speaking engagements and conservation easement seminars.

(b)   In recent years, the Clark Defendants have come under heavy scrutiny from the federal government over their role as Appraisers for the SCE Strategy.   For example, the United States government filed a lawsuit against Clark (and other SCE Strategy sponsors and promoters), seeking to enjoin them from organizing, promoting, or selling SCE Strategies that inflate the appraised value of the underlying real estate.  *See United States v. Zak, et al.*, No. 1:18-cv-5774-AT, in the United States District Court for the Northern District of Georgia, Atlanta Division.   The lawsuit, filed in this Court, alleges

that since 2009, Clark organized, promoted, or sold (or assisted in the organization, promotion, or sale) of 70 SCE Strategy transactions that resulted in over $3 billion worth of federal tax deductions.  The lawsuit also alleges that Clark's average fee was over $43,000 per conservation easement appraisal, which amounts to over $3 million in fees for the 70 SCE Strategy transactions identified by the lawsuit.

(c)    On or about January 11, 2019, the Alabama Real Estate Appraiser Board filed a disciplinary action against Clark related to his appraisal for a conservation easement syndicate located in Alabama.  *See In the Matter of the Complaint against Claud Clark, III*, No. AB 16-15, State of Alabama Real Estate Appraiser Board.  The disciplinary complaint alleged that he made a number of egregious errors in his appraisal, including, *inter alia*:  (a) improperly using a Discounted Cash Flow Analysis for the "before" valuation to overstate the value of the real estate, (b) failing to use comparable sales of real estate in the area as a method of valuation, and (c) failing to consider the amount of capital needed to extend existing sewer/public utilities and roads to the property.  On or about May 16, 2019, Clark voluntarily surrendered his Alabama real estate appraiser license in response to the disciplinary action and in lieu of a hearing on the action.

(d)     On or about February 27, 2020, the Florida Real Estate Appraisal Board revoked Clark's license based on the Alabama disciplinary proceeding and voluntary surrender of his license there.

(e)     The Van Sant and Wingard Defendants.   The Van Sant and Wingard Defendants are no strangers to litigation regarding conservation easements.   Van Sant and Wingard have both testified to inflated values of conservation easements in United States Tax Court which were roundly discredited and rejected by the Tax Court.

(f)     In *Plateau Holdings, LLC, et al. v. Commissioner*, Docket No. 12519-16, Van Sant and Wingard submitted a joint report and testimony at trial regarding the value of the conservation easements at issue in that action. Consistent with their falsely inflated Appraisal at issue in this action, Van Sant and Wingard selected four purportedly "comparable" properties, only one of which was located in the same state as the subject property.   Tax Court Memo 2020-93, filed June 23, 2020.   The Tax Court noted that "Messrs. Wingard and Van Sant adjusted [the] sales prices [of the comparable properties] to reflect the differences between the four properties and the subject Property in terms of location, size, road frontage, topography, and other factors."   It went on to conclude that "[m]ost of these adjustments appeared subjective and arbitrary, lacking any solid support in market data."   Van Sant and Wingard

asserted that the comparable properties were inferior to the subject property. The Tax Court concluded that such an assertion was unfounded.  Van Sant and Wingard further ignored a 98.99% change in ownership in the entity that owned the subject property which was effectively a sale of the property shortly before the conservation easements at issue were donated, which transaction should have been considered as a sale of the subject property.  But Van Sant and Wingard never included that sale in their Appraisal.  Van Sant also admitted that he was aware of prior sales of acreage included withing the subject property but excluded them from his analysis.  In completely rejecting their analysis, the Tax Court stated that [w]e give no weight to the opinion of [Van Sant and Wingard]", noted that they were aware of the prior sales but addressed none of them, and that "[w]e found their explanations for that failure to be wholly unpersuasive."  It further noted that "[t]hree of the properties that Messrs. Wingard and Van Sant chose as comparables were anything but comparable" and that their price adjustments were "mostly beneficial to the petitioner" and "struck the Court as subjective and arbitrary, lacking any solid basis in market data."

(g)    In *TOT Property Holdings, LLC, et al. v. Commissioner*, Docket No. 5600-17, Wingard submitted a report and testimony at trial regarding the value of the conservation easement at issue in that action.  Wingard asserted

in *TOT Property Holdings* that that the highest and best use of the subject property was "low density, destination mountain resort residential development."  Order dated December 13, 2019 adopting Bench Opinion dated November 22, 2019.  However, the Tax Court stated that "[t]he evidence in the record contradicts Mr. Wingard's conclusion regarding the property's use", explaining that "[t]he evidence—including the photographs in his own report—showed that the subject land is not mountainous and has no significant physical features such as vistas or lake views that would lend itself to such a purpose."  The Tax Court rejected Wingard's comparisons to his chosen "comparables".  Further, the Tax Court noted critically that Wingard was aware of a change in ownership of 99 percent of the entity that owned the subject property days before the contribution of the conservation easement, but did not take that sale into consideration when determining the value of the subject property.  Rejecting Mr. Wingard's valuation, the Tax Court stated that "[w]e found his valuation to be greatly inflated."

59.    <u>The Land Trusts:  The ACC Defendants and GALT</u>:  The Land Trusts—who include but are not limited the ACC Defendants and GALT—are nonprofit organizations that accepted the conservation easement or fee simple donations and prepared or coordinated preparation of various transactional

document necessary to substantiate the SCE Strategy (the ACC Defendants and GALT are collectively the "Land Trust Defendants").

60.     The ACC Defendants had a long-standing relationship with the MMM Defendants.  Based on information and belief, ACC's business from approximately 2010 through 2018 was almost exclusively related to conservation easement syndications.  Pollock had hand-picked Keller and ACC to work on Pollock's team. This relationship, and later the relationship between the ACC Defendants and the Strategic Defendants was highly lucrative for ACC.  Keller has been labeled by one national publication as the "[m]ost prominent among the renegade land-trust leaders" as well as someone known to accept easements that other groups had refused due to excessive valuations.[9] That same publication indicates that "ACC oversees 80,000 acres of conserved land in 11 states" and that "a sampling of deal documents suggests it took easements and land donations responsible for as much as $1 billion in write-offs in 2017."  ACC's application to become an accredited member of the Land Trust Alliance—a Washington DC-based association of old-guard land trusts who are critical of syndicated transaction—was withdrawn. In the words of Keller himself, he withdrew the application because "it was clear 'they were not going to let us through,'" due to disagreements about ACC's failures to

---

[9]  *See* "The Billion-Dollar Loophole" (December 20, 2017) at https://www.propublica.org/article/conservation-easements-the-billion-dollar-loophole/amp (written in collaboration with *Fortune*) ("Billion Dollar Loophole").

question appraisers about excessive valuations being done in a short period time on easements ACC had been accepting.[10]

61.    The ACC Defendants and GALT provided the following services to each Syndicate:

(a)    worked with the Strategic Defendants as well as the MMM Defendants, Nelson Mullins, and other legal counsel to prepare the Conservation Easement Deeds;

(b)    prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of the "conservation purposes" defined under § 170 of the Code;

(c)    allowed the other Defendants to use the conclusions reached in these preliminary studies in the Promotional Materials sent to potential participants;

(d)    worked with the Strategic Defendants as well as the MMM Defendants, Nelson Mullins, and other legal counsel to prepare the Baseline Documentation Reports, which were filed with each Syndicate's Appraisal Summaries (Form 8283) and tax return;

---

[10] The Billion Dollar Loophole.

(e)     provided a letter to each Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated; and

(f)     countersigned the Appraisal Summaries (Form 8283) verifying that the charitable contribution deduction complied with Code Section 170(h) of the Code.

62.    The ACC Defendants and GALT received the conservation easement donations, fee simple donations, and, in some cases, stewardship fees for their role in the scheme.

63.    <u>The Return Preparers: The Langford Defendants and Bennett Thrasher</u>. The Return Preparers—who include but are not limited to the Langford Defendants and Bennett Thrasher—are the accounting firms and accountants who prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns (the Langford Defendants and Bennett Thrasher are collectively the "<u>Return Preparer Defendants</u>").  These firms and accountants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming

charitable contribution deductions from the SCE Strategy on their individual tax returns.

64.     Bennett Thrasher was no stranger to the SCE Strategy when it began preparing returns for the Syndicates at issue in this lawsuit.  Indeed, Bennett Thrasher had previously and aggressively referred many of its existing clients to participate in SCE Strategy transactions with a different sponsor than Strategic by misusing the clients' confidential financial information to identify potential targets. For those transactions, Bennett Thrasher emphasized to its clients that it had performed purported due diligence on the SCE Strategy and concluded that the Strategy complied with applicable laws and that the deductions generated were specifically allowed by the Tax Code.  Bennett Thrasher also provided advice and recommendations to the other sponsor about how to structure the transaction and value the underlying mineral assets used to improperly inflate the appraisals.

65.     The Langford Defendants and Bennett Thrasher were paid substantial fees by the Syndicates for their accounting work.

66.     The Consultants: AquaFusion.  The Consultants—who include but are not limited to Defendant AquaFusion—are the professionals and firms that purportedly completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of conservation of each such parcel and/or to Support the HBU for the property (which would be used in the Appraisals and for

determining the value of the conservation easement). They purported to provide consulting services assessing the property to determine if there were valid conservation purposes and advising on the feasibility of such purposes.

67.    The Local Promoters:  Oxygen and Credo.  These are the professional firms who worked with the Strategic Defendants and other Defendants to identify and refer their clients to Strategic for participation in an SCE Strategy transaction. These firms leveraged their trusted status as a long-time advisor to these clients in order to dupe them into undertaking an SCE Strategy.  In many cases, the clients would not have undertaken an SCE Strategy without the recommendation and blessing of these Local Promoters.  Specifically, Oxygen referred the Greiners to Strategic for the Turtle River Syndicate and other transactions, and Credo referred Spratt to Strategic for the Turtle River Syndicate and other transactions.  Upon information and belief, Oxygen and Credo referred other clients to the Strategic Defendants for SCE Strategy transactions.

68.    Credo was paid referral fees or other consideration for its referrals.

69.    The PropCos.  These are the entities that, in some Syndicates, purchased the real estate used in the SCE Strategy.  All of the PropCos were originally formed by the Strategic Defendants or their affiliates.  DeSoto Holdings, LLC (property in Shelby County, Alabama) was the PropCo for one of the SCE Strategy transactions described herein.  For some of the Syndicates, such as the

Turtle River Syndicate, the Strategic Defendants did not use a separate PropCo but instead used the Syndicate to purchase and hold the real estate.

70.    The Syndicates.  These are the entities through which Plaintiffs and the Class participated in the SCE Strategy.  All of these Syndicates were originally formed by the Strategic Defendants or one of their affiliates.  The Syndicates for the transactions in which the Plaintiffs participated were DeSoto Investors, LLC and Turtle River Properties, LLC.

71.    The Managers.  These were all entities created by, affiliated with, and controlled by the Strategic Defendants or one of its affiliates to act as managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effectuate the steps of the SCE Strategy.  The Managers for the transactions in which the Plaintiffs participated were Strategic Red Mountain, LLC and Strategic Fund Manager, LLC (for the DeSoto Syndicate), and MM Bulldawg Manager, LLC (for the Turtle River Syndicate).

72.    In accordance with their pre-planned scheme, the Defendants and Other Participants worked together to promote and sell the SCE Strategy to potential clients, including Plaintiffs and the Class Members, and then jointly worked together to execute the steps of the SCE Strategy.  The Defendants and the Other Participants never disclosed to Plaintiffs that they had conspired to fraudulently, recklessly, or

negligently design, promote, sell, and implement the SCE Strategy.  Nor did they

disclose to the Plaintiffs that they were in no way independent from each other.

**D.     The Plaintiffs engage in the SCE Strategy.**

**1.     Hoover engages in the DeSoto Syndicate Transaction in 2016.**

73.     The Strategic Defendants were the chief promoters of the DeSoto

Syndicate Transaction, who marketed and coordinated all aspects of the transaction.

The individuals and entities listed below were part of Strategic's "team" (and co-

conspirators with the Strategic Defendants) to the Transaction and undertook the

following roles:

| Defendants | Role |
|---|---|
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| ACC Defendants | Accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deeds of conservation easement, signed the Form 8283, and acknowledge acceptance of the donation. |
| The Clark Defendants | Provided an appraisal of the property for the conservation easement donation, which appraisal included the conclusions from AquaFusion's |

| | consulting report regarding the feasibility of developing the property for mining. |
|---|---|
| MMM Defendants | Provided due diligence, reviewed transactional structures, and issued a legal opinion letter purporting to support the bona fides of the transaction. |
| Nelson Mullins | Provided alleged "due diligence" and issued a report for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected. |
| Bennett Thrasher | Provided tax preparation services in connection with the transaction. |
| AquaFusion | Prepared a feasibility report supporting the development of the property into a limestone mine, which was used by the Clark Defendants to support their conclusion that mining was the highest and best use of the property. |

### a. The Defendants market the DeSoto Syndicate Transaction to Hoover and members of the Class.

74.     As part of its promotional pitch, Novak held a conference call on or about November 2, 2016, with Hoover and Hoover's CPA.  During this call, Novak discussed the SCE Strategy, including the basic steps of the transaction and how it was implemented.  He indicated that a specific Tax Code provision provides for a charitable deduction when a conservation easement is structure and implemented in full compliance with the requirements of that provision.  Novak stated that Strategic and its "team" are experts in and very experienced and successful with the SCE Strategy.  He explained that his team included not only the experts at Strategic, but also law firms, accounting firms, appraisers, and other consultants who have specific expertise and substantial experience with the SCE Strategy.  As a result of this team of experts, he explained that Strategic's SCE Strategy transactions were structured and implemented to meet each and every requirement of the Tax Code.

75.     Novak explained that Strategic and its team had already done approximately eighty syndicates and of those, there had only been approximately ten audits, several of those audits ending in "no change" and none with an adjustment in excess of 17%.  In addition, he indicated that because of the structure and implementation of the SCE Strategy, a participant in an SCE Strategy would not incur any penalties.  (Of course, ultimately here, the IRS Final Partnership

Administrative Adjustment ("FPAA") has mandated a 100% adjustment—wiping out any deductions for the clients—and assessed significant penalties.)

76.    Novak also emphasized that Strategic got two completely independent appraisals for each Syndicate.  Further, Novak indicated that Strategic got these two appraisals because it wanted to make sure two independent appraisers had appraisal values that were very close to one another, which would be evidence that the appraisal used for the syndicate was a legitimate, competent appraisal that would provide strong support for any audit and, if ever audited, the two appraisals would result in the deductions holding up in an audit.  (Of course, in the case of DeSoto Syndicate Transaction, Hoover was unaware of any second appraisal [beside that of the Clark Defendants] and as noted, the IRS FPAA has mandated a 100% adjustment, wiping out any deductions for the clients.)

77.    Novak also emphasized that Strategic obtains two legal opinions from prominent law firms for each Syndicate.  (Here, there was no second tax opinion letter, just the Nelson Mullins "comfort letter", which states on its face that "[a] fully-reasoned legal conclusion…is beyond the scope of this report….").

**b.    The Strategic and Bridge Capital Defendants send Hoover Promotional Materials.**

78.    Hoover received Promotional Materials and other solicitations described in detail below from the Strategic and Bridge Capital Defendants in the last quarter of 2016 about participating in the SCE Strategy through DeSoto

Investors, LLC (the "DeSoto Syndicate"), a company formed and managed by Strategic or a Strategic-affiliated entity.

79.    The Promotional Materials were designed to convince potential participants that the SCE Strategy provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.    The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the DeSoto Syndicate, thus generating enormous fees for the Defendants and Other Participants.

80.    Novak sent Hoover a follow-up email to the conference call on November 2, 2016, attaching a "Frequently Asked Questions" .pdf concerning SCE Strategies.  The Frequently Asked Questions attachment contained a number of false representations, including that:

(a)    That "Federal benefits [of SCEs] are typically priced between a 3.5-to-1.0 and a 4.5-to-1.0 ratio," and

(b)    That the increased risk of audit from participating in an SCE is not substantial and that if an audit occurs, these factors will mitigate any risk:

       i.       Strategic's "tax attorneys and CPAs ensure that taxpayers are provided complete, accurate documentation for their tax returns"; and

       ii.      Strategic's "projects undergo a two-step valuation process which includes having a qualified, experienced, and knowledgeable conservation appraiser prepare the valuation and then have that appraisal reviewed by a second outside conservation valuation expert."

81.    The Strategic Defendants knew that these representations in the Frequently Asked Questions document were false and omitted material information. For example, they knew that if the IRS audited the transaction it would disallow the promised tax benefits.  Moreover, the Strategic Defendants knew that an audit was a near certainty because of the way they and the other Defendants inflated the appraised value of the property on the face of the Appraisal Summary.  They also knew that none of the purported mitigation factors would actually decrease the odds of an audit and would not actually mitigate against the risk that the IRS would disallow the deductions.

82.    Novak sent another email to Hoover on December 12, 2016, (i) attaching a glossy brochure entitled, "DeSoto Investors, LLC Offering Summary,"

and (iii) providing instructions for how to complete the investment.  The brochure falsely informed Hoover and other members of the Class that:

> (a)   The business of DeSoto Holdings, LLC was to "hold, mine, and operate real property," even though the LLC had been formed in October 2016, held no properties at the time, and once it acquired the DeSoto property (which did not occur until December 2016) the Strategic Defendants never intended to develop the property into a mine; and

> (b)   The Strategy would result in "greater free cash," and philanthropic goodwill from the conservation of natural resources," as well as "mitigate[] [a taxpayer's] overall effective tax rate and tax payments," when the Strategic Defendants knew that none of these results would actually occur.

83.   The Offering Summary and Case Study also falsely represented that a participant would be entitled to the following tax benefits if they joined the DeSoto Syndicate even though the Strategic Defendants knew the IRS would likely audit and disallow the deductions claimed by Plaintiffs and the other Class members:

| Investment and Benefit Summary | | | | | |
|---|---|---|---|---|---|
| UNITS | INVESTMENT | ALLOCATED FEDERAL DEDUCTION | ESTIMATED CASH VALUE | ESTIMATED CASH RETURN | ESTIMATED NOMINAL RETURN |
| INVESTMENT | | | | | |
| 190 Class A | ($5,415,000) | $22,884,697 | $9,840,420 | $4,425,420 | 82% |
| PER UNIT INVESTMENT | | | | | |
| 1 Class A | ($28,500) | $120,446 | $51,792 | $23,292 | 82% |

84.     Also on December 12, 2016, Strategic sent an email to Novak on that included a DocuSign link for Hoover to review and sign certain documents in a Private Placement Subscription package.  The package of documents provided to Hoover included at least the following documents:

- A Private Placement Memorandum with various transactional agreements attached;

- A Private Placement Offering; and

- A Subscription Agreement.

85.     The Private Placement Memorandum purported to describe the DeSoto Syndicate Transaction in detail.  The Private Placement Memorandum informed Hoover and other Members of the Class that the DeSoto Syndicate could choose from one of four options for use of the subject property: (1) establish a limestone quarry on the property, (2) market the property for sale for mining development, (3) hold the property for long-term investment, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust allegedly resulting in a charitable contribution deduction equal to $25,341,000 for the Syndicate (which would be equal to almost five times the total investment) (*i.e.*, the conservation easement option).

c.   **The Promotional Materials include an Initial Appraisal drafted by the Clark Defendants.**

86.   The Private Placement Memorandum attached various other transactional documents, including an Initial Appraisal drafted by the Clark Defendants dated December 9, 2016, purportedly supporting the "options" for use of the Property.  The Clark Defendants and the other Defendants knew and intended that the potential investors in the DeSoto Syndicate, including Hoover, would rely on this Initial Appraisal letter and the later Qualified Appraisal Report in deciding to undertake the SCE Strategy.

87.   The Initial Appraisal letter indicated they had estimated the value of a conservation donation of 146.63 acres of the Shelby County property to be $25,341,000, valuing the real estate at its purported HBU of limestone mining. However, the Clark Defendants and the other Defendants knew that this appraisal was grossly overstated and based on a HBU that was never intended to occur.

88.   As further support for their valuation, the Strategic Defendants and the Clark Defendants incorporated AquaFusion's mineral feasibility and engineering report dated November 30, 2016, for the purpose of purportedly supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.   AquaFusion's report was prepared by Yvonne Sanders, PE, and David R. Buss, PhD, PG of AquaFusion.  AquaFusion sent this report via email or U.S. mail on or around November 30, 2016.

89.     This report and the Clark Defendant's Initial Appraisal, however, cited the inaccurate conclusion that the HBU of the Shelby County property would be as a quarry for mining of limestone, although the property could be used for timber harvesting, hunting, and agricultural endeavors. They further indicated that the property was in the process of being preliminarily permitted for limestone mining operations and that it was "reasonably likely" that rezoning of the property and permitting for mining could be obtained, which was never even attempted. The report also falsely and materially represented that "[t]his feasibility analysis demonstrates that a financially viable construction aggregate operation is possible for the DeSoto Holdings site" when, in fact, mining was neither practically nor economically feasible under the circumstances.  According to that feasibility report, the value that a limestone quarry might offer was estimated to be $25,790,000. These consultants were employed to buttress the bogus findings of the Clark Defendants that mining was a physically and economically viable option, though it wasn't.  These consultants were paid by DeSoto Holdings or another Strategic-affiliated entity.

### d.     The MMM Defendants issue a legal opinion letter.

90.     In December 2016, the MMM Defendants prepared and issued a draft legal opinion letter by email or U.S. mail to the DeSoto Syndicate.  In the letter, the

MMM Defendants made multiple misrepresentations and omission of material fact, including but not limited to:

(a)    "In rendering the opinions set forth below, we have made the following assumptions (and, to our knowledge and based on our review of the Documents, there are no facts inconsistent with these assumptions): … "The Appraisal was prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(11) of the Code." (The MMM Defendants knew that the Appraisal was grossly and fraudulently inflated and was not prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(II) of the Code);

(b)    "Assuming the conclusions in the Baseline Report are accurate, the Property Owner's execution and delivery of the Easement Deed to the Land Trust will qualify as a Qualified Conservation Contribution in accordance with Section 170(h) of the Code" (the MMM Defendants knew that the contribution would not be in accordance with Section 170(h) of the Code, *inter alia*, because the donor impermissibly retained rights in the property subject to the conservation easement including to use the property for solar and windmills);

(c)    "we cannot opine on whether the value determined in the Appraisal reflects the fair market value of the Conservation Easement" (The

MMM Defendants knew that the Appraisal was grossly and fraudulently inflated);

(d)   "we do not express an opinion as to the dollar amount of any deduction attributable to the grant of the Conservation Easement to the Land Trust" (The MMM Defendants knew that the value of the deduction attributable to the grant of the Conservation Easement to the Land Trust was dependent upon the value of the property in the Appraisal, which was grossly and fraudulently inflated);

(e)   It was more likely than not that "the Appraiser will be treated as a Qualified Appraiser for purposes of Section 170(f)(11)(E) of the Code" (The MMM Defendants knew that Clark was not a Qualified Appraiser); and

(f)   "in the course of our representation, nothing has come to our attention that would cause us to question the accuracy of the facts assumed for our opinions" (the MMM Defendants knew, *inter alia*, that the Appraisal was grossly and fraudulently inflated, that the Appraisal's stated highest and best use of a mine and quarry for the property was not feasible, and that the Clark Defendants were not independent and derived their valuation of the property based upon the desired value identified by the Strategic Defendants).

91.   The letter makes a number of other assumptions and states "to our knowledge and based upon review of the Documents, there are no facts inconsistent

with these assumptions" when, in fact, the MMM Defendants knew that these assumptions were either false or unreasonable and that there were inconsistent facts that should have been disclosed to the investors.

92.     These representations and omissions in the letter were not simply opinions. The MMM Defendants knew when they wrote their letter that it contained materially false statements and omitted key facts, including about the near certainty of an audit and disallowance of the claimed deductions as well as the high likelihood of the IRS imposing penalties and interest on Hoover and other members of the Class.

### e.     Hoover undertakes the DeSoto Syndicate Transaction.

93.     Based on the Promotional Materials (including the Initial Appraisal) and the Defendants' advice and representations, Hoover paid $135,000 to purchase an interest in the DeSoto Syndicate.  According to the instructions given in the Promotional Materials by the Strategic Defendants and the Bridge Capital Defendants, Hoover wired the funds to an IOLTA account held by Schulten Ward Turner & Weiss, a law firm hired to advise the Strategic Defendants.

94.     In order to complete the investment in the DeSoto Syndicate, the Strategic Defendants and Bridge Capital Defendants sent certain transaction documents to Hoover and other Class Members via email or U.S. mail in late 2016. The Strategic Defendants and Bridge Capital Defendants instructed Hoover and

other Class Members to use DocuSign to electronically (and through the wires) fill out and execute the necessary transactional documents.  Hoover and the other Class Members completed the transactional documents and executed them using DocuSign as they had been instructed.

### f.    DeSoto Holdings acquires the property.

95.    On or about December 20, 2016, the Strategic Defendants (through DeSoto Holdings, LLC ("DeSoto Holdings"), a Strategic-affiliated entity) acquired 161.14 acres of unimproved real estate located in Shelby County, Alabama for $709,207.  This acquisition occurred months after the Strategic Defendants and other Defendants marketed the transaction and only days before DeSoto Holdings donated the conservation easement to ACC.

### g.    The Strategic and Bridge Capital Defendants purport to disclose Notice 2017-10 but omit key facts and make numerous misrepresentations.

96.    On or around December 26, 2016, Novak (on behalf of the Strategic Defendants and the Bridge Capital Defendants) emailed Hoover and other members of the Class a supplement to the Private Placement Memorandum.  The email purported to disclose to the DeSoto Syndicate members IRS Notice 2017-10, which designated certain conservation easement transactions as listed transactions subject to disclosure requirements.  The email and supplemental Private Placement Memorandum significantly and intentionally downplayed the impact of this IRS

Notice on the DeSoto Syndicate Transaction and contained the numerous materially false or misleading representations and omissions. These fraudulent misrepresentations and omissions included, but are not limited to, the following:

(a)    "Please note that this listed transaction guidance <u>does not</u> invalidate any compliant conservation easement donation or change the tax or conservation benefits; rather, the IRS has chosen to designate already highly disclosed charitable contributions as <u>possible</u> 'tax avoidance transactions.' This is based on the IRS incorrectly asserting that anyone conserving property is likely inflating appraisals, combined with a partisan view that the President-elect has inappropriately benefitted from conservation donations" (when, in fact, the Defendants knew at the time that the DeSoto Syndicate Transaction did not comply with the law or IRS regulations and was, in fact, using inflated appraisals);

(b)    "As a reminder, this project not only hired independent, well-experienced conservation appraisers, but also retained a second independent appraiser to perform a peer review of that appraisal. This two-step, checks-and-balances process helps to ensure that the value being claimed in the appraisal is both accurate, supportable, and defendable" (when, in fact, the appraiser was not independent and there was no independent peer review of

the appraisal, nor to Hoover's knowledge was there any second appraisal as to the DeSoto Syndicate transaction); and

(c)     "Further, a reputable law firm provided a tax opinion after their diligence followed by another reputable law firm providing investor comfort letters to further diligence the project" (when, in fact, the law firm was not independent, and its opinion letters would not protect the investors from the IRS assessing back taxes, penalties, and interest, nor to Hoover's knowledge was there any second opinion letter in the case of DeSoto Syndicate that actually rendered any tax conclusions).

97.     The Strategic Defendants and Bridge Capital Defendants then asked Hoover and the other members of the Class to acknowledge receipt of the supplemental Private Placement Memorandum and elect to either (a) "rescind and withdraw" their subscription or (b) "waive rescission and reaffirm" their subscription. The members were only given two days to respond. The Strategic Defendants and Bridge Capital Defendants never intended for any member to actually rescind the transaction as evidence by (a) the short time window, (b) the false representations and omissions contained in the email and supplemental Private Placement Memorandum, and (c) Novak's statement in his email that "[a]fter this issue is addressed, we will go forward expeditiously with either conserving or mining the property."

98.     Further, the Strategic Defendants downplayed the effect of IRS Notice 2017-10 by soliciting investments in additional transactions for 2017 within days or weeks of the Notice.  (For example, in early 2017, Novak and Freeman sent out a letter to Hoover and other members of the Class in which they both discussed Notice 2017 and touted their 2017 projects that they would "begin offering…starting in late April/early May").

99.     In reliance on the materially false and misleading representations and omissions contained in the fall 2016 emails and supplemental Private Placement Memorandum, Hoover and the other members of the Class reaffirmed their subscription to the DeSoto Syndicate Transaction.

100.    Being woefully underinformed for the various reasons set forth herein, the DeSoto Syndicate, pursuant to a notice dated December 23, 2016, voted to place a conservation easement on the real estate and to donate the conservation easement to ACC.  Prior to this date, Hoover and the other members of the Class had never been informed *inter alia*:

(a)     That the Property sold to the members of the DeSoto Syndicate for over $5 million and now being valued at over $25 million for purposes of the conservation easement had been purchased only a few days before for the price of $709,207.00;

(b)     That the purported HBU of limestone mining for the Property was neither practical nor economic and was never intended to be pursued by the Defendants;

(c)     That the Clark Defendants were not, for the reasons stated herein, a qualified appraiser and their "appraisal" was not a qualified appraisal;

(d)     That the fact that the DeSoto Transaction had been declared a "listed transaction" by the IRS made it a virtual certainty that the Transaction would be audited;

(e)     Of the disposition of the 14.5 acres that were not being included in the conservation easement;

(f)     That even before the DeSoto Transaction had been declared a "listed transaction" by the IRS, there was a high likelihood of such an audit; and

(g)     That the predictions in the Clark Defendants' appraisals and the AquaFusion Survey that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]" were wrong for numerous reasons, including: if there were truly environmentally sensitive features of the Property such as to justify a conservation easement on this parcel (such as discussed in the Deed and the

72

Baseline Documentation Report), the permitting process might be much longer and permitting may not occur at all.

      **h.**    **The Strategic, MMM, and ACC Defendants prepare and approve the Conservation Easement Deed.**

101.   The Conservation Easement Deed, dated on or about December 29, 2016, was jointly prepared and approved by the Strategic, MMM, and ACC Defendants and sent for filing via email or U.S. mail.  The Conservation Easement Deed was verified and signed by Robert Lewis of Strategic (as the grantor) and by the CEO of ACC (on behalf of ACC).  This was approximately a week after the Strategic Defendants learned of the impending issuance of IRS Notice 2017-10 and the fact that the DeSoto Syndicate Transaction, because of the way it was structured, was now a "listed transaction."

102.   The Deed conveyed 146.63 acres of the Property to ACC on December 29, 2016.  The Deed states in relevant part:

> WHEREAS, the Property in its present state is undeveloped and possesses significant agricultural, scenic vistas, open space, and aquatic habitat features to include hydric soils, converted wetlands associated with Old Glade Swamp, and water quality enhancement and protection. The Property has no dwellings or structures, and is predominantly composed of agricultural lands on flat Southern Limestone/Dolemite Valleys and Low Rolling Hills subregion lands of the Ridge & Valley ecoregion leading two first-order freshwater streams (Walthall Branch and its unnamed tributary) (collectively, and together with the preceding sentence, the "Conservation Values") that are of great importance to the Conservancy, the people of Shelby County, and the people of the State of Alabama and are worthy of preservation; and

WHEREAS, the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, meets the conservation purpose of Section 170(h)(4)(A)(ii) of the Internal Revenue Code of 1986, as amended (the "Code")….

103.    Among the numerous rights that the Deed reserved for the grantor was the ability to develop and maintain facilities for the generation of renewable power, which included solar arrays and windmills.  The Deed permitted renewable power facilities on up to 20 acres of the total ground coverage.  This broad renewable power reservation violated IRS Regulation § 1.170A-14(g)(1) because it was inconsistent with the conservation purpose of the donation.  Future construction of solar arrays and windmills would undoubtedly kill wildlife (especially the birds identified in the Baseline Documentation Report) and impact scenic views.  The Strategic, MMM, and ACC Defendants knew or should have known that this broad reservation could and would result in disallowance of the conservation easement contribution deduction but chose to include it regardless.

### i.    The ACC Defendants provide DeSoto Holdings with a letter confirming the donation and falsely representing that the donation is "fully tax deductible."

104.    Also, on December 29, 2016, Keller, on behalf of ACC, provided DeSoto Holdings with a letter via email and/or U.S. mail documenting the conveyance and advising the DeSoto Holdings that its contribution to ACC "is fully tax deductible."  The ACC Defendants also knew that they had not attempted to

question or verify the Clark Defendants' appraisal, in gross disregard of industry standards.

**j.     Nelson Mullins prepares Due Diligence Reports for the members of the DeSoto Syndicate.**

105.   On December 29, 2016, Nelson Mullins issued their "Due Diligence Report"[11] for members of the Class who had participated in the DeSoto Syndicate via email or U.S. mail.

106.   The stated goal of the Report was to "identify any material issues that may exist with respect to the Transaction's legal agreements and tax structure and propose solutions to the extent any identified risks may be mitigated."  The Report, however, did not do this in many material respects.   Instead, it made misrepresentations and omissions of material fact, including but not limited to:

(a)     "we do not see anything out of the ordinary in the Appraisal, and the methodology that was used seemed reasonable" (when Nelson Mullins knew that the $25,341,000 value of the donation claimed in the appraisal was grossly and fraudulently inflated);

(b)     "Nor can we opine on the feasibility or probability of the Property being developed as a mine and quarry in the absence of the

---

[11] Much like the various SCE Strategy transactions themselves, the Nelson Mullins' due diligence reports (which were often referred to by the Strategic Defendants as "comfort letters") seem to be "cookie cutter" with large portions of each being "copied and pasted."

conservation easement being place [sic] on the Property" (when Nelson Mullins knew that it was not feasible to develop the property as a mine and quarry);

(c)    "The Appraisal found the 'before' value of the Property to be $25,824,825 and the 'after' value of the Property to be $483,420" (when Nelson Mullins failed to disclose that the "before" value of the Property was grossly and fraudulently inflated); and

(d)    "the Appraiser concludes on page 61 of the Appraisal that development of the property as a mine and quarry is highly probable" (when Nelson Mullins knew that it was not feasible to develop the property as a mine and quarry).

(e)    "the Tax Opinion [referring to the MMM Opinion, although the Report curiously refers to the Tax Opinion writer only as 'an experienced tax lawyer with a prominent lawyer in Atlanta'] indicates that the Appraisal meets the requirements of a 'qualified appraisal' for tax purposes" (when Nelson Mullins knew that the Appraisal would not be considered as such by the IRS because the Appraisal did not follow applicable appraisal standards and grossly inflated the value of the easement).

107.   Although the Report recommended that the Tax Opinion letter include a discussion and analysis of Notice 2017-10, it did not conclude, as Nelson Mullins

76

knew or should have known, that the Notice meant a near certain chance of audit and disallowance by the IRS.  Instead, the Report advised that,

> this potential investment is well documented and appears to be properly structured. While the Notice raises the possibility of an IRS review of the Transaction, many aspects of the Transaction are supported by the Tax Opinion, which was prepared by a tax attorney at a reputable law firm with specific experience structuring conservation easement transactions.

But Nelson Mullins knew that the MMM opinion letter was fatally flawed.

108.   Although the Report was supposed to come from an independent law firm, it acknowledged that Nelson Mullins (a) had done work for Strategic and Bridge Capital on other conservation easement transactions and had issued similar opinion letters for those transactions (*i.e.,* Strategic and Bridge Capital were important and valuable clients of the firm), and (b) was being paid out of the closing proceeds from the closing of the Transaction.   These two facts destroyed any independence that Nelson Mullins had, and thus, any penalty protection the Report might have purported to offer Hoover and the Class members.  It also meant that Nelson Mullins' fee was contingent on the closing of the DeSoto Syndicate Transaction, which fee would not have been paid in its entirety if some or all of the members had decided to back out of the Transaction.

    **k.**    **The ACC Defendants prepare a Baseline Documentation Report.**

109.   On December 30, 2016, Keller on behalf of ACC prepared and provided a Baseline Documentation Report ("BDR") to DeSoto Holdings, which was verified as accurate by ACC. ACC was paid $9,356.25 for preparation of the BDR, the purpose of which is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose. ACC set out the conditions on the property that would allegedly be preserved by the conservation easement and concluded that these conditions met the conservation purpose of § 170 of the Code. ACC concluded in this report that it is in the best interest of DeSoto Holdings to place a conservation easement on the property and to donate the easement as a charitable gift to ACC, in part due to the following (in language echoing that of the Deed):

> The Property in its present state is undeveloped and possesses significant agricultural, scenic vistas, open space, and aquatic habitat features to include hydric soils, converted wetlands associated with Old Glade Swamp, and water quality enhancement and protection. The Property has no dwellings or structures, and is predominantly composed of agricultural lands on flat Southern Limestone/Dolemite Valleys and Low Rolling Hills subregion lands of the Ridge & Valley ecoregion leading two first-order freshwater streams (Walthall Branch and its unnamed tributary) (collectively, and together with the preceding sentence, the "Conservation Values") that are of great importance to the Conservancy, the people of Shelby County, and the people of the State of Alabama and are worthy of preservation; and
> The protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, meets the conservation purpose of Section

170(h)(4)(A)(ii) of the Internal Revenue Code of 1986, as amended (the "Code")….

110.   As a result of the transaction described above, charitable contribution deductions flowed through and were allocated to each of the participants in the DeSoto Syndicate (including Hoover) in proportion to their relative ownership interest in the DeSoto Syndicate.

### I.   The Clark Defendants prepare an Appraisal Summary, which is verified by ACC.

111.   On or about May 18, 2017, the Clark Defendants prepared the Appraisal Summary (Form 8283).  Clark (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Clark Defendants and the ACC Defendants represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the property to protect the property.

112.   The Appraisal Summary represented that DeSoto Holdings had acquired the property by deed on December 20, 2016 and had a cost basis of $709,207 but that the conservation easement donation (which had occurred only 9 days after the acquisition of the property by DeSoto Holdings) had a fair market value of over $25 million—a 35X appreciation in value in a little over a week.[12] The

---

[12] The Defendants attempted to get around this issue by tacking on the acquisition date by the previous owner who acquired the property in 2010 and by being vague about whether it was they or the previous owner who had paid the $709,207

Clark Defendants and ACC Defendants (with knowledge by the other Defendants) then advised Hoover that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow him to claim the charitable contribution deduction on his individual tax returns.

113.   The Appraisal Summary falsely represented that the appraised fair market value of the conservation easement was $25,334,000, when, in fact, no independent appraiser would have appraised the easement at such a high value.

> **m.   The Clark Defendants prepare the final Qualified Appraisal Report.**

114.   The Clark Defendants prepared and sent the final Qualified Appraisal Report to DeSoto Holdings on or around June 15, 2017, via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members of the DeSoto Syndicate, including in connection with tax filings.

115.   This Qualified Appraisal, unlike the one included in the Promotional Materials, contained the full Qualified Appraisal, rather than simply the summary cover letter.

116.   The Qualified Appraisal falsely and materially stated that the fair market value of a conservation donation of 146.63 acres of the Shelby County property was $25,341,000.

117.   The Qualified Appraisal falsely and materially represented that the Clark Defendants were qualified appraisers under IRS regulations and that "[m]y

compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. "  In fact, the Defendants had instructed the Clark Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirator Defendants would not have continued to use the Clark Defendants if they had not come to the specific value requested by the co-conspirators.

118.   The Qualified Appraisal falsely and materially represented that "I am a Qualified Appraiser as defined under Section 170(f)(11)(E)(ii)…. [and] [t]he attached report is a 'qualified appraisal report' as that term is defined in applicable Internal Revenue Service regulations (Section 170(f)(11)(E)(ii) ) and was prepared for your use."  In fact, the Clark Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser."  Moreover, the opinions and conclusions offered by the Clark Defendants in the Qualified Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested.

119. The certification in the Qualified Appraisal also contained numerous false statements, including but not limited to:

(a)   "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, unbiased professional analysis, opinion, and conclusion" (when, in fact, the Clark Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

(b)   "[W]e have no personal interest or bias with respect to the parties involved" (when, in fact, the Clark Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators); and

120. The Qualified Appraisal again relied heavily on AquaFusion's November 30, 2016 Preliminary Aggregate Valuation and Quarry Feasibility Analysis for the property.

121. Further, both the Clark Defendants' appraisals and the AquaFusion Survey state that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]." This fails to take into account that if there are truly environmentally sensitive features of the Property such as to justify a conservation easement on this parcel (such as discussed in the Deed and the BDR), the permitting process might be much longer and permitting may not occur at all.

**n.     Bennett Thrasher prepares the Syndicate's tax return and corresponding K-1s for the members, which Hoover uses to prepare his tax return.**

122.   On or about June 23, 2017, Bennett Thrasher prepared the tax return for the DeSoto Syndicate.  The tax return reported a charitable contribution deduction from the donation of the conservation easement of $25,334,000.   As required, Bennett Thrasher attached to the DeSoto Syndicate's return a copy of the Clark Defendants' Appraisal, the Appraisal Summary (Form 8283), the BDR, and the ACC letter confirming the donation.  Thus, Bennett Thrasher adopted and incorporated the misrepresentations described above.

123.  In addition, Bennett Thrasher prepared a K-1 for each of the participants in the DeSoto Syndicate, including Hoover, which reported the amount of charitable contribution deduction allocated to each of the members of the DeSoto Syndicate.  Bennett Thrasher sent or caused to be sent these K-1s to the members of the DeSoto Syndicate via email or U.S. mail at some point shortly after completing the Syndicate's tax return.  The charitable contribution that was allocated to Hoover was more than 4 times the amount he paid into the DeSoto Syndicate.  The K-1 prepared for Hoover reported a charitable contribution deduction of $421,799. Bennett Thrasher advised Hoover to report this charitable contribution deduction on his individual tax returns for 2016.

83

124.   Hoover followed the advice of the Defendants and reported the charitable contribution deductions set forth above on his individual tax returns for 2016.

**o.    The Strategic Defendants send a photo book of the property and transaction, which contains additional misrepresentations.**

125.   On or about October 3, 2017, Freeman and Strategic sent via email or U.S. mail a "photo book" of the DeSoto property to members of the Class who had participated in the DeSoto Syndicate.  In addition to the colorful pictures, the book contained these misrepresentations and omissions:

(a)    That a "desk audit review of the [Clark Defendants'] appraisal was performed….conclud[ing] the appraisal is reasonable and in compliance with the IRS and US Treasury guidelines."  Who performed this alleged review was never identified, nor were members of the Class ever furnished a copy, despite this alleged second appraisal being frequently touted by the Strategic Defendants.

(b)    The disposition of the 14.5 acres not encumbered by the conservation easement was still not identified.

(c)    Although the book touts that "[conservation easement]s have been widely used for decades and are well recognized by many government authorities," no mention is made of IRS Notice 2017-10 and its likely

84

impact—that this conservation easement and all others are now almost certain to be audited.

> **p.**     **The 2016 DeSoto Holdings tax return is audited and the IRS disallows the charitable contribution deduction at the partnership level.**

126.   Thereafter, DeSoto Holdings, via its Tax Matters Partner ("TMP") DeSoto Investors, received an IRS Notice indicating that DeSoto Holdings' partnership tax return for the 2016 tax year was selected for audit.

127.   In August 2020, the IRS made its final determination, via the issuance of an FPAA, that DeSoto Holdings' partnership tax return for the 2016 tax year suffered from *inter alia* the following defects: (i) failure to make a charitable contribution in compliance with all of the requirements of Code § 170 and corresponding regulations, thus leading to disallowance of the *entire* deduction for the conservation easement; and (ii) a gross valuation misstatement (resulting in a 40% penalty) or alternatively a substantial valuation misstatement (resulting in a 20% penalty.

128.   The TMP has filed a lawsuit in Tax Court to contest the IRS's conclusions, which lawsuit is now pending.

> **2.**     **Spratt and the Greiner Plaintiffs engage in the Turtle River Syndicate Transaction in 2013.**

129.   The Strategic Defendants were the chief promoters of the Turtle River Syndicate Transaction, who marketed and coordinated all aspects of the transaction.

The individuals and entities listed below were part of Strategic's "team" (and co-conspirators with the Strategic Defendants) to the Transaction and undertook the following roles:

| Defendants | Role |
|---|---|
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| GALT Defendants | Accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deed of conservation easement, signed the Form 8283, and acknowledge acceptance of the donation. |
| Van Sant and Wingard Defendants | Provided an appraisal of the property for the conservation easement donation. |
| MMM Defendants | Provided due diligence and was the law firm that "handled the transaction". |
| Langford Defendants | Provided tax preparation services in connection with the transaction. |
| Defendant Credo | Referred Spratt to Strategic, helped convince him to do the deal, and misrepresented the tax savings that Spratt would obtain from the deal. |

| Defendant Oxygen | Referred the Greiner Plaintiffs to Strategic, helped to convince them to do the deal, and misrepresented the tax savings that the Greiner Plaintiffs would obtain from the deal. |
| --- | --- |

### a.   Background on the Turtle River Property.

130.   In 2013, the Strategic Defendants and the Bridge Defendants, either directly or through their affiliates including Defendant Credo and Defendant Oxygen, approached individuals about participating in the SCE Strategy through Turtle River Properties, LLC (the "Turtle River Syndicate"), a company formed and managed by Strategic or a Strategic-affiliated entity.  The Turtle River Syndicate owned real estate located in Glynn County, Georgia (the "Turtle River Property").  The Turtle River Property was 380 acres of land, 370 acres of which were made subject to a conservation easement and 10 acres that was retained by the Turtle River Syndicate for development.

131.   Turtle River's 380 acres started out as a portion of a larger property called St. Andrews Plantation.  Parcels that made up St. Andrews Plantation were previously purchased in 2003 – 2,500 acres for $9.1 million (approximately $3,600 per acre) and in 2005 – 1,000 acres for $3 million (approximately $3,000 per acre).  The Strategic Defendants and the Bridge Defendants subdivided this property into at least seven different syndicates: including Habitat Green, Green Creek, Cabbage

Bluff, Georgetown Rivermont, Salt Marsh Holdings, College Creek, and (described further below) Turtle River.   In all, 3,500 acres of property that were purchased in 2003 and 2005 for $12.1 million were subdivided into syndicates which had gross offering prices (purchase prices for members) totaling $37 million and which generated an incredible $141 million in fraudulently inflated deductions for their members based upon fraudulently inflated appraisals.

### b.   Steps of the Turtle River Syndicate Transaction.

### i.   Marketing of the Syndicate.

132.   In 2013, the Strategic Defendants (through Turtle River Properties, LLC, a Strategic-affiliated entity) obtained an Initial Appraisal of an interest in real estate Turtle River Properties, LLC owned located in Glynn County, Georgia from the Van Sant and Wingard Defendants dated December 15, 2013, which was sent by the Van Sant and Wingard Defendants to the Turtle River Syndicate via U.S. mail and/or email on or about December 15, 2013.

133.   The Strategic Defendants, either directly or through its referral sources, approached individuals about participating in the SCE Strategy through Turtle River Syndicate, a company formed and managed by Strategic or a Strategic-affiliated entity.[13]

---

[13] The Strategic Defendants used the Turtle River Syndicate as both the PropCo and InvestCo.  This, however, did not functionally impact the way the transaction worked or how the fraud was perpetrated on Plaintiffs and the Class.

134.   Defendant Credo Financial Services, LLC was Plaintiff Spratt's financial advisor.  On October 29, 2013, Dan Lucas of Credo (an accountant and employee or principal of Credo) sent an email to Spratt and other Credo clients soliciting their participation in the Strategic SCE Strategy.  Credo represented through Lucas that taxpayers could obtain "a $130,000 tax write off (both federal and state) for a purchase price of $37,500", that the deal had "[n]o catch or gimmicks", and that Lucas and Credo had "done these with many other clients".  Credo thereafter obtained Spratt's signature on a confidentiality agreement with Strategic, which Lucas forwarded to Brooke Freeman of Strategic via email on December 5, 2013, and sent Spratt an article titled Allocating Charitable Conservation Easement Deductions to Equity Investors via email on December 5, 2013.

135.   On December 17, 2013, Lucas sent an email to Spratt on behalf of Credo again urging his participation in the Strategic SCE Strategy and stating "[w]e are still comfortable with all the projects that we are putting our clients in and are ready to move forward".

136.   Credo urged Spratt to purchase an interest in the Turtle River Syndicate by email from Lucas to Spratt dated December 26, 2013, wherein it stated "[a]ll projects are closed with the exception of one, 'Turtle River'".  Lucas explained that a $28,500 investment would result in "a tax deduction of $121,125."

137.   On December 27, 2013, Brooke Freeman of Strategic emailed Lucas of Credo and stated that Spratt did not respond to emails from Strategic regarding another Strategic SCE Strategy and noted that Strategic might be able to put Spratt into Turtle River or another Strategic SCE Strategy.  Lucas immediately emailed Spratt on behalf of Credo asking "what's the deal…let me know" and stating "I'm working hard here to get you in these but you need to step up brother…. I'd love to see you knock out a majority of your 2013 and 2014 tax bill right now and make a big profit while doing it".  Lucas continued, "[t]his stuff is no joke and they have a long waiting list so if you don't close, they just move on."

138.   Spratt also had multiple telephone communications with Dan Lucas of Credo prior to purchasing an interest in the Turtle River Syndicate.  The first call took place in or about October 2013.  In that call, Lucas represented that Spratt's investment in a conservation easement Syndicate through the Strategic Defendants would yield a federal tax benefit of three to four times the amount of Spratt's investment.  Lucas further told Spratt that he had done "lots" of conservation easement deals with the Strategic Defendants and that "lots" of prominent people were doing them.  He also told Spratt that Defendant Novak of Strategic "knows what he is doing" with respect to conservation easements.

139.  Lucas and Spratt had at least two additional calls at the end of December 2013.  In those calls, Lucas told Spratt that Spratt could benefit from the

tax deductions offered by the SCE Strategy because of Spratt's growing business. Lucas pressured Spratt to agree to the Turtle River Syndicate and pressured Spratt to invest or lose out.  Lucas also explained, falsely, that the tax benefits from the Turtle River Syndicate would occur because the property would continue to be appraised at higher values and return tax benefits over time.

140.   Credo either knew or should have known that the Strategic SCE Strategy was based upon fraudulently inflated appraisals and that the promised tax benefits would fail if challenged by the IRS.  In the alternative, Credo failed to properly vet and investigate the Strategic SCE Strategy, including but not limited to Turtle River, as required by its professional responsibilities before recommending them to its clients.

141.   Defendant Oxygen Financial, Inc. was the Greiner Plaintiffs' financial advisors.  Oxygen also solicited its clients to participate in the Strategic SCE Strategy, including but not limited to the Greiner Plaintiffs.  On Tuesday, December 17, 2013, Christina Briboneria of Oxygen emailed Defendants Novak and Freeman of Strategic, stating "Matt and Heather Greiner… are also my clients" and asked "[d]o you have any land conservation easements available for them/that we could use?".  Freeman responded that same day via email on his own behalf and on behalf of Strategic and stated "[w]e would love to help them" and asked whether the

Case 1:21-cv-01299-SDG   Document 1   Filed 03/30/21   Page 93 of 192

Greiners were accredited investors. Briboneria responded that same day via email and described the Greiners' net worth.

142.  Later on December 17, Freeman, on behalf of himself and Strategic, emailed Briboneria, stating that the Greiners' $28,500 investment would yield them "an estimated $120,000 in charitable contribution deduction subject to 50% AGI limitation", and to "[l]et us know if that will work". That same day, Briboneria, on behalf of Oxygen, forwarded Freeman's email to the Greiners, stating that "[t]he project below will give us a $120k deduction, which could potentially save ~$45k in taxes(state and federal)" and that "[y]ou would have to invest $26k to purchase the easement, but it would still net ~$20k in savings".

143.  On December 19, 2013, Briboneria, on behalf of Oxygen, emailed the Greiners and stated "I just want to follow up on this email that I forwarded you [from Freeman and Strategic] on Tuesday" and asked "[L]et me know if you are open to moving forward".

144.  On December 20, 2013, Briboneria, on behalf of Oxygen, sent the Greiners a Land Conservation Easement Strategy illustration which Oxygen prepared. Among other things, the illustration falsely represented that the Greiner Plaintiffs' $28,500 investment in Turtle River would yield a deduction of $120,650.

145.  On December 22, 2013, Brooke Freeman of Strategic sent an email attaching subscription documents and instructions on how to view additional

information to Briboneria and Oxygen and asked Briboneria to forward them the Greiners.

146.   On December 23, 2013, Briboneria, on behalf of Oxygen, forwarded Freeman's email and its attachments to the Greiners via email, stating "[s]ee attached paperwork", that "[i]f we decide to move forward, then you would sign both documents and have to wire cash to the named account", and that "I'll give you a call at 9:30 to discuss".

147.   The Greiner Plaintiffs also had multiple in-person and telephone communications with Christina Briboneria of Oxygen regarding the Strategic SCE Strategy in general and specifically regarding the Turtle River Syndicate during the last quarter of 2013.  During an in-person meeting in the fall 2013, Briboneria falsely told the Greiner Plaintiffs that Oxygen had vetted the Strategic SCE Strategy, that Oxygen had been doing them for a long time, and that they were a perfectly legal strategy.  Briboneria further reiterated these statements in a subsequent phone call in the Fall 2013 with the Greiner Plaintiffs that the Strategic SCE Strategy is a completely legitimate strategy, that Strategic had been in business for a long time, and that Oxygen would not recommend Strategic if Oxygen had not "fully vetted" Strategic.  Briboneria coordinated with Novak of Strategic either during the call or sometime thereafter, and Briboneria, Novak, or someone else from Strategic then falsely represented that the Strategic SCE Strategy is safe and completely accepted.

148.   On or about December 10, 2013, the Greiner Plaintiffs had a telephone call with Briboneria during which Briboneria discussed the Turtle River Syndicate. Briboneria represented during that call that Oxygen had "fully vetted" (which was false) the Turtle River Syndicate transaction and that Strategic had done this type of transaction "over-and-over again".  Briboneria falsely stated that the Turtle River Syndicate transaction was "legitimate", "completely on the up and up", and said that she recommended it to the Greiner Plaintiffs.

149.   Oxygen either knew or should have known that the Strategic SCE Strategy was were based upon fraudulently inflated appraisals and that the promised tax benefits would fail if challenged by the IRS.  In the alternative, Oxygen failed to properly vet and investigate the Strategic SCE Strategy, including but not limited to Turtle River, as required by its professional responsibilities before recommending them to its clients.

150.   On December 26, 2013, the Greiner Plaintiffs received an email from Brooke Freeman on behalf of the Strategic Defendants, which attached the First Supplement to the Turtle River Private Placement Memorandum, dated December 23, 2013.

151.   On December 27, 2013, Spratt received an email from Brooke Freeman of Strategic, which attached the First Supplement to the Turtle River Private Placement Memorandum.

152.   The First Supplement to the Turtle River Private Placement Memorandum stated that Turtle River Properties, LLC owned a real estate property in Glynn County, Georgia consisting of approximately 370 acres and was offering an opportunity to invest in order to raise a total of $6,127,500.

153.   The First Supplement to the Turtle River Private Placement Memorandum, which was prepared jointly by the Strategic Defendants, Bridge Defendants, and MMM Defendants, informed Plaintiffs that the Turtle River Syndicate could use the property for timber harvesting, hunting, and residential housing or that it could sell the property to one or more developers.   The First Supplement also falsely stated that the Turtle River Syndicate could conserve the majority of the property (all but approximately 10 acres, which would be retained by the Turtle River Syndicate) by contributing a conservation easement to a tax-exempt land trust resulting in a charitable contribution deduction equal to $28.5 million for the Syndicate.   The Strategic Defendants, Bridge Capital Defendants, and MMM Defendants knew at the time they made this statement that the contribution deduction was fraudulently inflated.

154.   The First Supplement also represented that "value of the conservation donation under consideration has been estimated at $28,500,000."   The Strategic Defendants, Bridge Capital Defendants, and MMM Defendants knew at the time

they made this statement that the conservation donation was far less than $28,500,000 and that such estimate was fraudulently inflated.

155.   The First Supplement also included an Initial Appraisal prepared by the Van Sant and Wingard Defendants and personally signed by Van Sant and Wingard, dated December 15, 2013, which was sent to the Strategic Defendants via U.S. mail and/or email on or about December 15, 2013, and which was approved by the Strategic Defendants.  The Van Sant and Wingard Defendants knew and intended that the Initial Appraisal would be sent to all potential Turtle River Syndicate members, including the Greiner Plaintiffs and Spratt and that the potential members would rely on this Initial Appraisal and the later Qualified Appraisal Report in deciding to undertake the SCE Strategy.  Among other things, the Initial Appraisal falsely stated that:

- The fair market value of the Turtle River property before placement of the conservation easement was $29,260,000,

- The fair market value of the Turtle River property after placement of the conservation easement was $760,000,

- The fair market value of the conservation easement was $28,500,000,

- That the report was a "qualified appraisal as defined in US Treasury Regulation §1.170A-13(c)(3)", and

- That the Van Sant and Wingard Defendants "appl[ied] the appropriate valuation methodologies and techniques".

156. The foregoing documents were designed to convince potential participants that the SCE Strategy, through the Turtle River Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code. The sole purpose of the materials was to convince potential participants to participate in the SCE Strategy through the Turtle River Syndicate, thus generating enormous fees for the Defendants and Other Participants.

> ii. **In reliance on Defendants' recommendations and advice, the Greiner Plaintiffs and Spratt agree to purchase an interest in the Turtle River Syndicate and vote for the Turtle River SCE Strategy.**

157. In reliance upon the recommendations and advice of the Strategic Defendants, Credo (for Spratt), and Oxygen (for the Greiner Plaintiffs) regarding the Turtle River Syndicate and Defendants' representations in the First Supplement to the Turtle River Private Placement Memorandum, the Conservation Appraisal Summary, and elsewhere, the Greiner Plaintiffs and Spratt executed subscription documents and purchased an interest in the Turtle River Syndicate in late December 2013. Spratt and the Greiner Plaintiffs each paid a total of $28,500 into the Turtle River Syndicate. According to the instructions given in the subscription documents by the Strategic Defendants and the Bridge Capital Defendants, Spratt and the

Greiner Plaintiffs each wired $28,500 to an escrow account held by the MMM Defendants.  Bridge acted as the placement agent for the Turtle River Syndicate.

158.   In reliance upon the Strategic Defendants' recommendations in favor of the Turtle River Syndicate and SCE Strategy and in reliance upon Defendants' representations in the First Supplement to the Turtle River Private Placement Memorandum, the Conservation Appraisal Summary, and elsewhere, the Greiner Plaintiffs and Spratt voted for the Turtle River SCE Strategy.

### iii.   Defendant GALT accepts the conservation easement donation and represents that it is valid.

159.   On or about December 31, 2013, GALT prepared a Conservation Easement Baseline Documentation Report and provided it to the Turtle River Syndicate via U.S. mail and/or email.  The Report was verified as accurate by GALT and later filed with the Turtle River Syndicate's tax return.  GALT set out the conditions on the property that would be preserved by the conservation easement and falsely misrepresented that these conditions met the conservation purpose of § 170(h) of the Code.

160.   Turtle River Syndicate conveyed the conservation easement to GALT on December 31, 2013.  The Deed of Conservation Easement, dated December 31, 2013, was jointly prepared by the Strategic Defendants, Bridge Defendants, MMM Defendants, and GALT and was sent for filing on or about December 31, 2013, electronically and/or via U.S. mail.  The Deed of Conservation Easement was

verified and signed by Stephen Stutts, GALT's Board President, on December 31, 2013, on behalf of GALT and attested by Katherine Eddins, GALT's Board Secretary.

161. On December 31, 2013, GALT issued a letter to the Turtle River Syndicate acknowledging receipt of the Turtle River conservation easement on December 31, 2013 which was sent via U.S. Mail and/or email. GALT knew and intended that the letter would be forwarded to all members in the Turtle River Syndicate, which it was by email and/or U.S. mail on or about December 31, 2013. Despite knowing that the members would rely upon its letter acknowledging receipt of the conservation easement, GALT was aware but did not disclose that the purported values of the Turtle River property and easement in the Conservation Appraisal Summary were fraudulently inflated and that the members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs, were expecting tax deductions from the donation of the conservation easement that were fraudulently inflated and invalid and would not withstand IRS scrutiny. GALT also knew but did not disclose that the conservation easement fails to protect the conservation purpose in perpetuity as required by as required by § 170(h)(5)(A) of the Code.

162. On April 9, 2014, GALT signed the Appraisal Summary (Form 8283) for Turtle River, verifying that it was a qualified organization under § 170(c) of the

Code, that it received the donation of a conservation easement that was qualified under § 170(h) of the Code (which it knew was false), and that the appraised fair market value of the property was $28,500,000 (despite knowing that the appraised amount was fraudulently inflated).[14]   On or about April 9, 2014, GALT sent its signed copy of the Appraisal Summary via U.S. mail and/or email to the Turtle River Syndicate and/or its accountants, the Langford Defendants, for filing with Turtle River's tax return.

163.   As a result of the donation of the conservation easement, charitable contribution deductions flowed through and were allocated to each of the participants in the Turtle River Syndicate, including Spratt and the Greiner Plaintiffs, in proportion to their relative ownership interest in the Turtle River Syndicate.

164.   The charitable contributions that were allocated to Spratt and the Greiner Plaintiffs were more than four times the amounts they paid into the Turtle River Syndicate.

> **iv.    The Van Sant and Wingard Defendants issue a final appraisal for the Turtle River property and sign the Appraisal Summary.**

165.   The Van Sant and Wingard Defendants sent a final Qualified Appraisal Report to Turtle River Properties, LLC on or about January 24, 2014, via U.S. mail

---

[14] As set for the below, the Van Sant and Wingard Defendants also signed the Appraisal Summary and verified their $28,500,000 appraised value of the property therein.

or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Turtle River Syndicate, including but not limited to the Spratt and the Greiner Plaintiffs.  Wingard and Van Sant jointly prepared the Appraisal and signed it on behalf of Van Sant and Wingard, LLC (as indicated on the cover page).  The Strategic Defendants selected the Van Sant and Wingard Appraisal to support a charitable contribution deduction for the Turtle River Syndicate.

166.   This Appraisal, unlike the one included in the First Supplement to the Turtle River Private Placement Memorandum, contained the full Appraisal, rather than simply the summary cover letter.  The Appraisal falsely and materially stated that the Turtle River property had a fair market value of $29,260,000 prior to the placement of the conservation easement.  The Appraisal falsely and materially stated that the conservation easement had a fair market value of $28,500,000, or an incredible $77,027 per acre – over 22 times the value of the property just a decade before.  In fact, no independent appraiser would have appraised the property or the easement at such high values.

167.   The Van Sant and Wingard Defendants' Qualified Appraisal Report was falsely inflated at the instruction of the Strategic Defendants (and with the knowledge of the other Defendants) in order to meet their pre-determined "value" for the Turtle Rive property.  *Inter alia*, the Qualified Appraisal Report, which listed

the property's highest and best use as "multi-use development," was falsely and fraudulently, or in the alternative negligently, inflated and attempted to conceal this fact by failing to consider relevant information and by deviating from the applicable standard of care (including USPAP), including but not limited to the following:

(a)     The Appraisal Report states that "[a]ccording to Glynn County public records, the conveyance of the subject property occurred on December 18th, 2013 [just days before the conservation easement donation] and the total consideration/sale price was reported as $10.00, however no real estate excise tax was delineated so a consideration was not available.  Additionally, there is no affidavit for the true consideration of the conveyance."  The Appraisal Report makes a substantially similar statement regarding a December 27, 2013 conveyance of 59.00 acres that were also part of the subject property. USPAP Standards Rules required an appraiser to analyze all sales of the subject property that occurred within three years prior to the effective date of the appraisal.  If sales history information is unattainable, USPAP Standards Rules further require an appraiser to include a commentary on the efforts taken by the appraiser to obtain the information.  By failing to require the Turtle River Syndicate and the other Defendants to provide the sales prices of the foregoing conveyances, the Van Sant And Wingard Defendants hid the sales price.  The Van Sant and Wingard Defendants were further ethically required

to withdraw from the engagement if the Turtle River Syndicate refused to provide the sales price information and failed to do so.

(b)     In violation of USPAP Standards Rules, the Appraisal states that "[t]he submitted plat on the subject property does not delineate the location of any jurisdictional wetlands on the subject property."   In fact, the Baseline Documentation Report (which the Appraisal acknowledges Van Sant and Wingard Defendants had) shows that 31 percent of the property is wetlands or marsh that could not be developed.   The Appraisal did not have any adjustment for these wetlands and the property was instead valued as a developable property in its entirety.

(c)     The Appraisal Report utilized grossly dissimilar comparable sales in violation of USPAP Standards Rules because, among other things: (1) only one of the "comparable" sales is in Georgia, the other five were instead in Florida and South Carolina; (2) the Turtle River Property (appraised for multi-use development) lacked water and sewer utilities while four of the five comparables had utilities; (3) unlike the Turtle River Property, two of the comparable sales were bordered by boulevards that comprised four lanes and one of them was nearby to "heavy commercialization," one of the comparable sales was near the Orlando airport, and another comparable sale was in proximity to an established residential area, all of which made those properties

more viable and valuable as multi-use development; (4) the adjustments to the prices of the comparables should have been proven by graphs or paired sales that occurred and are widely dissimilar – for example, at $122,958 per acre unadjusted sale number 2 is 3.12 times more per acre than sale number 4.

168.    The Appraisal further falsely and materially represented that the Van Sant and Wingard Defendants "engagement in this assignment was not contingent upon developing or reporting predetermined results," when, in fact, the Defendants had instructed the Van Sant and Wingard Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Van Sant and Wingard Defendants if they had not come to the specific value requested by the co-conspirators.  The Appraisal falsely and materially represented that the report "is considered a qualified appraisal as defined in US Treasury Regulation § 1.170A-13(c)" and that "[a]s defined in the US Treasury Regulation § 1.170A-13(c)(5), we are qualified appraisers …" (when, in fact, the Van Sant and Wingard Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.")  Moreover, the opinions and conclusions offered by the Van Sant and Wingard Defendants in the Appraisal

did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested.

169.   The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions," (when, in fact, the Van Sant and Wingard Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment," (when, in fact, the Van Sant and Wingard Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators); and

- "my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrent of a subsequent event directly related to the intended use of this appraisal,"

(when, in fact, the Van Sant and Wingard Defendants were conspiring with the other Defendants to come to a predetermined appraisal value).

170.    On April 2, 2014, Defendants Van Sant and Wingard each also signed the Appraisal Summary (Form 8283) for Turtle River on behalf of the themselves and Defendant Van Sant and Wingard, verifying the false and fraudulent gross overstatement of the value of the property listed in the Appraisal Summary - $28,500,000 - and representing, *inter alia*, that "I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and abetting the understatement of tax liability)" and that "I understand that I may be subject to a penalty under section 6695A if I know, or reasonably should know, that my appraisal is to be used in connection with a return or claim for refund and a substantial or gross valuation misstatement results from my appraisal".   The Appraisal Summary was sent by the Van Sant and Wingard Defendants to the Turtle River Syndicate and/or its accountant, Langford, on or about April 2, 2014 via U.S. mail and/or email and which was filed with Turtle River's tax return for 2013.

### v.      The Langford Defendants issue fraudulent K-1s.

171.    On or about April 9, 2014, the Turtle River Syndicate's manager, Joseph N. McDonough of MM Bulldawg Manager LLC sent a letter via email and/or U.S. mail to each member of the Turtle River Syndicate, including but not limited

to the Spratt and the Greiner Plaintiffs, enclosing the member's copy of the Turtle River 2013 Schedule K-1. The K-1's were prepared by the Langford Defendants in or about April 2014 and sent by the Langford Defendants to the Turtle River Syndicate's manager in or about April 2014 via one or more U.S. mailings and/or emails with their knowledge and intent that they would be forwarded to and relied upon by the members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs. For each member's investment of $28,500 in Turtle River, the member was allocated a conservation easement donation charitable deduction of $120,333 and a charitable deduction of $35 in cash. As the Strategic Defendants acknowledged in Brooke Freeman's March 4, 2014 email to Turtle River's members on behalf of the Strategic Defendants, including but not limited to Spratt and the Greiner Plaintiffs, Strategic reviewed the K-1s for accuracy and provided their sign-off prior to having them sent to Turtle River's members, thereby reiterating the false statements therein. The Langford Defendants also prepared the Turtle River Syndicate's federal tax return for 2013.

172.    The Langford Defendants and Strategic Defendants knew that the conservation easement charitable deduction listed in each of the K-1s the Langford Defendants prepared was based upon a fraudulently inflated appraisal and was therefore invalid. The members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs, relied upon the accuracy and legitimacy

107

of the deductions listed in the K-1s and each claimed the deductions on their individual tax returns for 2013.

173.   Defendant Oxygen prepared the Greiner Plaintiffs' 2013 tax return, which claimed the deductions in the Greiners' K-1.  Despite knowing that the conservation easement charitable deduction listed in the Greiners' K-1 was based upon a fraudulently inflated appraisal and was therefore invalid, Oxygen included that deduction in the Greiners' tax return, signed the return on April 24, 2014, forwarded it to the Greiners via U.S. mail and/or email on or about April 24, 2014, recommended that the Greiners file the return and K-1 with the IRS, and filed it for the Greiners via efile.  The Greiner Plaintiffs relied upon the accuracy and legitimacy of the deductions listed in the K-1 and on their tax return in filing the tax return with the IRS.

174.   Defendant Credo prepare Spratt's 2013 tax return, which claimed the deductions in Spratt's K-1.  Despite knowing that the conservation easement charitable deduction listed in the Spratt K-1 was based upon a fraudulently inflated appraisal and was therefore invalid, Credo included that deduction in Spratt's tax return, signed the return, and filed it electronically with the IRS via efile, and sent it to Spratt via U.S. mail and/or email in or about October 2014.  Spratt relied upon the accuracy and legitimacy of the deductions listed in the K-1 and on his tax return.

c.   **The IRS disallows the Turtle River Syndicate's charitable contribution deduction.**

175.   On or about April 17, 2017, the IRS sent the manager of the Turtle River Syndicate a notice of FPAA regarding Turtle River's 2013 tax return. The FPAA concluded that the conservation easement charitable contribution deduction did not meet all of the requirements of § 170 of the Code and disallowed the Turtle River Syndicate's $28,500,000 conservation easement deduction in its entirety and imposed a gross valuation misstatement 40% penalty and a substantial valuation misstatement 20% penalty in the alternative.

d.   **Defendants continue their fraud.**

176.   Following Turtle River's donation on the Conservation easement at the end of 2013 and the distribution of Turtle River K-1's to its members in April 2014, Defendants continued their fraudulent communications and scheme. For instance, on May 12, 2017, Turtle River sent a letter to the Turtle River Members discussing the IRS' audit and recent FPAA and the legal strategy on how to proceed. The letter was cc'd to Strategic and to MMM lawyers Timothy Pollock and Lillian Martin. In fact, the letter was drafted by the Strategic Defendants and the MMM Defendants. The letter noted that the IRS denied the entire Turtle River conservation easement deduction based "on a disagreement over the valuation of the Conservation Easement" and on the IRS' position that here may be other technical issued that would cause the value of the allowable deduction to be 'zero'". The letter further

stated that "we strongly disagree with the IRS' determination and we suggest that you not be overly alarmed". Although the Strategic Defendants and MMM Defendants knew that the claimed value for the conservation easement was fraudulently inflated, they fraudulently concealed and failed to advise the Turtle River Members of this fact in the letter.

177. A memorandum from the MMM Defendants to the Turtle River members dated May 12, 2017 regarding the audit was also attached to the foregoing letter. Though the MMM Defendants knew that the claimed value for the conservation easement was fraudulently inflated and that the conservation easement would not survive IRS scrutiny, they fraudulently concealed and failed to advise the Turtle River Members of this fact in the memorandum.

178. On November 2, 2017, Strategic's Chief Operating Officer, Mike Fields sent an email on behalf of the Strategic Defendants to the Turtle River members which attached a letter from Turtle River's Tax Matters Partner. The email and letter updated the members regarding the retention of litigation counsel and the filing of Turtle River's Tax Court petition. Although Strategic knew that the claimed value for the conservation easement was fraudulently inflated and that the conservation easement would not survive Tax Court scrutiny, Strategic fraudulently concealed and failed to advise the Turtle River Members of this fact in its email.

### e. The Tax Court holds that the IRS properly disallowed Turtle River's conservation easement deduction.

179.    The Turtle River Syndicate filed a Tax Court petition on June 30, 2017, where the case remains pending.  By order dated June 30, 2020, the Tax Court entered a partial summary judgment order holding that the Deed of Conservation Easement fails to protect the conservation purpose in perpetuity as required by as required by § 170(h)(5)(A) of the Code and that the IRS therefore properly disallowed the Turtle River conservation easement deduction.

### E. The SCE Strategy was fatally flawed.[15]

180.    The IRS has concluded that the SCE Strategy was fatally flawed from the outset.    The Defendants prepared documents for the structure and implementation of the SCE Strategy that were strewn with errors (as discussed previously and in detail below) and, thus, failed to meet the specific requirements set out in the Code.  These critical documents included but were not limited to the Appraisals, Conservation Easement Deeds, and Baseline Documentation Reports. As purported experts in their respective fields, each of the Defendants and Other Participants was aware or should have been aware of the plethora of

---

[15] In addition to asserting these arguments and other deficiencies with the SCE Strategy discussed herein, the IRS has also more recently challenged conservation easement transactions on the grounds that  the partnerships created for the SCE Strategies lacked both business purpose and economic substance and were therefore "shams" under Federal tax law.  Such arguments are made, for example, in the *Agee* criminal case mentioned *supra*.

misrepresentations, defects and errors that existed in virtually every aspect of the SCE Strategy.

> **1.** **The SCE Strategy used sham appraisals that violated USPAP and the Code in numerous respects.**

181.  The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's HBU, defined as the ***reasonable and probable use*** that supports the highest present value of the property.

182.  The Defendants and Other Participants, including the SCE Appraisers and the Appraisal Defendants themselves, represented to the Plaintiffs and the Class that the SCE Appraisers were professional appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the HBU for each subject property.

183.  The Appraisals were a complete sham.  Upon information and belief, the Strategic Defendants (with knowledge and approval by the other Defendants) hand-picked the SCE Appraisers, who would send drafts of each Appraisal for the Strategic Defendants to review, revise, and approve.  The Strategic Defendants, in particular, reviewed every aspect of the Appraisals and made revisions to the Appraisal as they deemed necessary.  Then, the Strategic Defendants would approve the Appraisal.  No Appraisal was considered final and usable until the Strategic

Defendants reviewed and approved it.   In these regards, the SCE Appraisers completely shirked their professional duties and obligations.   None of the Defendants and Other Participants ever disclosed to the Plaintiffs and the Class the SCE Appraisers' conflicts of interest and complete dereliction of their professional duties and obligations.

184.   To satisfy the Defendants, and particularly the Strategic Defendants, the SCE Appraisers were grossly negligent and intentionally deceitful in each of the Appraisals by making inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements, as determined by the IRS.   These inflated values, in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy.   By way of example, each of the SCE Appraisers committed *inter alia* the following errors in the Appraisals prepared from 2013-2019:

(a)     Utilizing "comparable sales" that were not in fact comparable, including property listing rather than sales and properties that were thousands of miles away or that were already fully functional;

(b)     Inaccurately reporting the data from the comparable sales that were used;

(c)     Failing to conduct any financial feasibility analysis, supply and demand analysis, or reasonable probability analysis as required by applicable Code provisions and related regulations;

(d)     Failing to address the additional requirement that the HBU be "reasonably probable";

(e)     Failing to consider or verify existing legal or regulatory restrictions on the development and/or use of the subject property;

(f)     Failing to properly apply the principle of substitution in valuing the land at its HBU;

(g)     Violating numerous standards set by the USPAP; and

(h)     Improperly acting as an advocate rather than as an independent appraiser, such as by failing to disclose unfavorable facts, comparables, and limitations.

185.   With these numerous errors, the SCE Appraisers, including but not limited to the Appraisal Defendants, overstated the fair market value of the conservation easements by millions of dollars, which in turn resulted in the Plaintiffs and the Class unknowingly grossly overstating their tax deduction.

186.   In light of the SCE Appraisers' purported professional experience and education, they knew or should have known that the manner in which they performed the Appraisals and, ultimately, valued the conservation easements was contrary to

114

the regulations promulgated by the IRS, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements they appraised.

187.   Under Section 170(f)(11) of the Code, a charitable contribution deduction from the donation of a conservation easement must be supported by a "qualified appraisal."  A "qualified appraisal" is one that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed."  The numerous egregious errors identified above sufficiently demonstrate that the Appraisals had no chance of satisfying the requirements for a "qualified appraisal."  And the Defendants knew or should have known that the IRS would take the position that the charitable contribution deductions generated from the SCE Strategy should be disallowed on that basis alone.

188.   In sum, the SCE Appraisers knowingly performed and prepared the Appraisals for use by the Defendants in marketing and selling the SCE Strategy to participants (*i.e.*, Plaintiffs and the Class) and knowingly allowed the Defendants to improperly guide and direct the SCE Appraisers in performing and preparing the Appraisals for this purpose.  The SCE Appraisers knew that the Syndicates and the SCE Strategy participants would attach their Appraisals to the tax returns of the Syndicates and participants, as required by the Code, to substantiate the charitable

contribution deductions reported by the Syndicates and ultimately claimed by the Plaintiffs and the Class Members on their individual tax returns.

**2.    Many of the Conservation Easement Deeds violated the Code's specific requirements.**

189.   The Conservation Easement Deeds were prepared by the Defendants with full knowledge of the requirements of the Code and related Regulations for a legal and legitimate conservation easement donation.  Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related Regulations, the Defendants failed to prepare the many of the Conservation Easement Deeds to conform to the Code and applicable Regulations. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for the Plaintiffs and the Class.

190.   In order for a conservation easement donation to comply with the Code, it must be perpetual, as required by Reg. Section 1.170A-14(g)(6)(i).  Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed.  Here, many of the Conservation Easement Deeds for the Syndicates involved in the Plaintiffs' SCE Strategy transactions permitted retained uses by the landowners that were inconsistent with the stated conservation purposes and, thus, on this basis alone, failed to satisfy the perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively

for conservation purposes.  For example, as previously mentioned above, the Conservation Easement Deed in the DeSoto Syndicate Transaction included a broad reservation of the right to construct renewable energy facilities on up to 20 acres of surface land.

191.   A conservation easement donation can also fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, the Land Trusts) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation.  In drafting many of the Conservation Easement Deeds for the SCE Strategy, the Defendants made critical errors by deviating from the specific requirements of the IRS regulation and providing that the Land Trusts would get too little of the sales proceeds in the event of a sale.  This resulted in another failure to meet the perpetuity requirement.

192.   The Defendants all worked closely together to draft the language of the Conservation Easement Deeds.  They were aware that the Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction.  And Defendants were no doubt aware (or should have been aware) of the perpetuity requirement under the Code and the various ways discussed above by which this requirement could be violated.  The Plaintiffs and the Class relied on the

Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

193.   Upon information and belief, many SCE Strategy transaction in 2013 and others suffered from a perpetuity defect that rendered the charitable contribution deduction from the SCE Strategy improper.

### 3.   Many of the Baseline Documentation Reports were grossly deficient.

194.   Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.

195.   Many of the Baseline Documentation Reports prepared by the Land Trusts for SCE Strategy transactions from 2013 through 2019 (with the direct assistance and guidance of the other Defendants) were deficient in numerous respects and failed to satisfy the IRS's requirements.  These deficiencies include (1) relying on Appraisals that the Defendants knew were a sham to support the conservation value of the subject property and (2) failing to sufficiently substantiate an exclusive conservation purpose.  Based on the Defendants' expertise in their related fields and knowledge of the sham nature of the Appraisals and the numerous

problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for the Defendants' failure to properly prepare the Baseline Documentation Reports other than an intentional or grossly negligent act of deceit.  Defendants knew these deficiencies would result in the Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid and disallow.

## IV.
## CONSPIRACY ALLEGATIONS

196.   As set out more fully throughout this Complaint and specifically in the Section III.C.3. and the charts in Section III.D.1-2., each of the Defendants and the Other Participants (collectively, the "Co-Conspirators") involved in the SCE Strategy executed by Plaintiffs and the Class conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees (the "Co-Conspirators' Arrangement").  The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. Further, the amount of fees earned by the Co-Conspirators was not tied to or reflective of the amount of time and effort they expended in providing professional advice and services.  The Co-Conspirators designed and structured the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

197.   Each of the Co-Conspirators had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy.  Each of their roles was related to the common purpose of misrepresenting the basis, terms and consequences of the SCE Strategy or obscuring the defects in it and were directed to the Plaintiffs and members of the Class.  The Defendants shared relationships with each other that included referring and sharing clients as well as producing work product for other Defendants to use when creating promotional materials, producing reports, creating transactional documents, and filling out IRS forms and deeds.  These relationships also had a longevity of several years and involved a similarity in actions and omissions throughout that time period.  The Defendants' coordination therefore rises far beyond the level of mere coincidence and plausibly indicates an agreement by the Defendants to act in concert and thereby join the fraudulent conspiracy alleged herein.

198.  The Co-Conspirators each had a financial, business and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes.   Further, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a significant pecuniary interest in the advice and professional services they rendered.

199.   The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team—with each team member assigned certain roles and responsibilities—to develop, market, sell, and implement the SCE Strategy.

200.   Here, the Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy.   In addition, the Co-Conspirators authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators.  Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy.

201.   The Strategic Defendants spearheaded the recruitment and organization of the team members necessary to carry out the development, promotion, sale, and implementation of the SCE Strategy.  The Strategic Defendants, Credo, and Oxygen also utilized their connections and networks to identify potential clients as "targets" for the SCE Strategy.

202.   In accordance with the pre-planned scheme, the Strategic Defendants effectively owned and/or controlled all PropCos, InvestCos, and Managers.  Despite this common ownership and control, the Strategic Defendants either directly or through an affiliate paid fees to each of these entities.

121

203.   As part of this pre-planned scheme, MMM and/or Nelson Mullins, Strategic and Bridge Capital Defendants worked together to form each of the Syndicates used in the SCE Strategy.  At times, however, each of them also formed Syndicates independently of the others.

204.   The Strategic Defendants recruited the MMM Defendants and Nelson Mullins to do due diligence on SCE Strategy, prepare and review certain transactional documents, and draft legal opinion letters and/or due diligence reports.

205.   The Strategic Defendants also recruited the SCE Appraisers for their critical role in the SCE Strategy.  Although each of the SCE Appraisers purported to act independently and provide a good faith valuation of the parcels at issue in accordance with applicable professional standards, each of the SCE Appraisers were aware that the Co-Conspirators would use the Appraisals in the promotion, sale, and implementation of the SCE Strategy.  Thus, the SCE Appraisers were in no way independent and willingly joined into the Co-Conspirators' Arrangement.

206.   As part of the pre-planned scheme, the Strategic Defendants also recruited the Land Trusts to accept the donation of the easements and/or fee simple interests in connection with the SCE Strategy.

207.   The Land Trusts knew that the purpose of these donations was to implement the SCE Strategy.  The Land Trusts also knew that the SCE Strategy, as structured and implemented, would not and could not serve its intended purpose of

providing a legitimate and legal tax deduction, but nonetheless stood willing and ready to fulfill their role in the Co-Conspirators' Arrangement and benefited by receipt of the contributed properties.

208.   The Return Preparer Defendants prepared the necessary tax returns and corresponding K-1s that reflected the tax deductions that had been represented to be legal and legitimate.   These firms and accountants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns

209.   The Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Land Trusts, and Return Preparers worked closely with the other Defendants regarding all aspects of the design and development of the SCE Strategy, the structuring of each Syndicate and transaction, tax compliance, and the purported due diligence on the SCE Strategy and each SCE Strategy transaction in which they participated with the Strategic Defendants.   These Defendants also drafted and/or approved the SCE transaction documents beginning with the purchase of property from Landowners, continuing with the Promotional Materials provided to potential participants, and all the documents necessary to complete the SCE Strategy and execute the donations to the Land Trusts, including the Conservation

Easement Deeds, Baseline Documentation Reports, Appraisals, Appraisal Summaries (Form 8283), Syndicate tax returns, and the K-1s issued to each Plaintiff and member of the Class.

## V.
## CLASS ACTION ALLEGATIONS

210.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class Members," the "Class") defined below against all Defendants:

> All Persons, from January 1, 2012 to the present, inclusive, (i) who have been assessed back-taxes, penalties, and/or interest (via a settlement with the IRS, an amended tax return renouncing the SCE deduction accepted by the IRS, a final Tax Court decision, or a Notice of Computational Adjustment from the IRS) or (ii) for which the IRS has made its final determination (via a Statutory Notice of Deficiency or FPAA) that the Person (or the entity through which they participated in the SCE Strategy) is liable for back-taxes, penalties, and/or interest, as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed sold, implemented or managed by the Strategic Defendants.  Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions; federal governmental entities; the Other Participants; and the Other Participants' parents, subsidiaries, affiliates, partners, and employees.

211.   Plaintiffs believe the Class consists of over 1,000 Class Members geographically dispersed throughout the United States such that joinder is impracticable. These Class Members may be identified from information and records maintained by the Defendants or third parties.

212.   The Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

213.   The claims of the Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Defendants.

214.   The Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same unlawful acts as each class member.

215.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

216.   The claims and remedial theories pursued by the Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

217.   There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

(a)     Whether the Defendants and the Other Participants defrauded Plaintiffs by advising and recommending that Plaintiffs and members of the

125

Class engage in an illegal and abusive tax shelter, the SCE Strategy and then implementing same;

(b)      Whether the Defendants and the Other Participants defrauded Plaintiffs and the Class by representing that they had obtained a Qualified Appraisal from a Qualified Appraiser and that the valuation of the subject property and conservation easement donation provided therein was legitimate;

(c)      Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

(d)      Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the charitable contribution deductions from the SCE Strategy would comply with Section 170(h) of the Code and therefore would reduce the taxable income of Plaintiffs and the Class;

(e)      Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(f)   Whether the Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

(g)   Whether the Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Georgia's RICO statute ("Georgia RICO"), codified at O.C.G.A. §16-4-1, *et seq.,* based on the unlawful acts alleged herein and incorporated by reference;

(h)   Whether the Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in or proximately caused and continues to directly cause injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

(i)   Whether the Defendants' and Other Participants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and/or wire fraud; and

(j)   Whether the Defendants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

218.   The Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which could establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. The Plaintiffs also allege questions of law and fact applicable to the Class that predominate over individual questions and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

219.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

220.  The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

221.  The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex litigation, including class litigation, involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

222.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

223.  The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.
## ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

224.  Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and O.C.G.A. § 16-14-6(c).

225.   At all times relevant hereto, each of Plaintiffs and the Defendants and Other Participants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

A.   **Enterprise**

226.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

227.   In this case, the enterprise ("Enterprise") for RICO and Georgia RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that associated for the shared goal of soliciting persons to participate in the fraudulent SCE Strategy for the purpose of generating and sharing fees and commissions derived from the SCE Strategy and alleged tax liability reduction it purported to provide.

228.   These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy qualified as a *bona fide* conservation easement entitling Plaintiffs and members of the Class to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.  In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code and the SCE Strategy, as structured, could not support the promised tax benefits.  The SCE Strategy and the

Co-Conspirators' Arrangement to design, promote, sell, and implement it by means of the numerous fraudulent acts and omissions set out herein, were devised solely to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the Class). The Defendants and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

229.   Defendants sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants and Other Participants then capitalized on the Co-Conspirators' Arrangement to convince the clients, by means of the numerous fraudulent acts and omissions set out herein, to execute the SCE Strategy, for the primary purpose of providing significant revenue for Defendants. Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

230.   The Defendants and the Other Participants engaged in a common fraudulent plan, transaction and course of conduct, as described herein, in connection with the design, promotion, sale and implementation of the SCE Strategy.  The Defendants and the Other Participants knowingly or recklessly engaged in acts,

transactions, practices and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

231. In connection with their involvement in the SCE Strategy, the Defendants and Other Participants shared a purpose, relationship, and longevity sufficient to permit them to pursue the Enterprise's purpose. Specifically, the purpose of the Enterprise was for Defendants and the Other Participants to generate and share fees and commissions generated from the SCE Strategy. They accomplished this purpose by, among other things, rendering services to Plaintiffs in connection with designing, promoting, selling, and implementing the SCE Strategy irrespective of whether the SCE Strategy complied with applicable laws, rules, and professional standards.

232. The Strategy Defendants shared relationships with each of the other Defendants and Other Participants. These relationships enabled all of the Defendants and Other Participants to, among other things, (1) promote the SCE Strategy to new clients, (2) organize and operate the LLC entities necessary to implement the SCE Strategy, (3) advise Plaintiffs on the steps necessary to implement the SCE Strategy, (4) advise Plaintiffs on the tax treatment and purported benefits of the SCE Strategy, (5) obtain appraisals for the property interests donated

as part of the SCE Strategy, (6) prepare tax returns, K-1s, and other tax forms for the SCE Strategy, and (7) advise Plaintiffs on how to respond to IRS scrutiny of the SCE Strategy.   The Enterprise also had longevity.   It lasted from at least 2013-2020, during which time the Enterprise committed, among other things, the predicate acts described more fully in Section III above.

233.   While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

234.   Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

235.   Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.     Operation of the RICO Enterprise**

236.   Each of the Defendants were vital to the implementation of the SCE Strategy, played an important role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the

Enterprise; thus, each had some part in directing the enterprise's affairs, not just their own, as detailed above in Section III.

237.  Each of the Defendants were involved in either or both of the following: (i) in marketing the SCE Strategy to Plaintiffs and the Class or (ii) in providing incomplete and misleading legal opinions, tax returns, appraisals and other documents designed to promote or implement the SCE Strategy. Further, they were not merely performing ordinary business services.  Rather, the Defendants were part of the operation and direction of the Enterprise because they performed tasks they do not ordinarily perform.  These tasks include, among other things, providing false or misleading information for (or omitting material information from) promotional pitches of the Syndicates; inserting false conservation purposes into the Baseline Documentation Reports and other documents; commissioning and preparing fraudulent business plans for development or mining; commissioning and preparing grossly inflated appraisals; signing IRS Appraisal Summaries and other IRS filings that reflect these grossly inflated appraised values; and prioritizing fees and director compensation over land conservation.  A further description of the role each played is set forth above in Section III.

238.  The Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of the SCE Strategy because the IRS has made it clear to professional advisors, including the Defendants,

that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented, as further set out in detail herein. Defendants' conduct was not consistent with ordinary lawful business practices because Defendants' conduct violated IRS guidance, federal law, and professional standards such as USPAP appraisal standards. Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

239. Unfortunately, the IRS has disallowed the charitable deductions at the partnership (*i.e.*, the Syndicate) level and made clear its intent to also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties. Moreover, Plaintiffs and the Class have incurred and will continue to incur substantial amounts of accounting and legal fees in connection with the audits and tax court proceedings regarding their individual tax returns and their related partnership tax returns.

240. Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like the Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions for themselves. Plaintiffs trusted they were being advised, counseled and directed by those professionals who represented themselves as experts who were

highly experienced with these types of transactions.  However, Defendants and their co-conspirators received large amounts of fees and commissions for personal use/gain, while at all times assuring Plaintiffs that they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

## C.    Predicate acts

241.   With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators and with knowledge that such conduct was unlawful.  Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

242.   With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.   In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

243.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not

named as Defendants herein, to violate 18 U.S.C. §1962(c) and O.C.G.A. §16-4-4(b), all in violation of 18 U.S.C. §1962(d) and Georgia law.  Each Defendant agreed and conspired with each other Defendant and their co-conspirators to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants and their co-conspirators were not entitled.

244.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants and their co-conspirators designed to defraud the Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.  The acts that caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

245.   In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*. *See also* O.C.G.A. §16-4-3(5)(C).

246.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States

Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

247. Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

**D.    Violations of 18 U.S.C. §§ 1341 and 1343.**

248. Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

249. For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

250. The Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 and acts taken by mail and/or wire in support of these violations are too numerous to list. Upon information and belief, the Defendants and Other Participants engaged in predicate act violations as early as 2014, and Plaintiffs will obtain evidence of such violations through discovery in this case. However, by way of illustration but not limitation, Plaintiffs provide representative examples below of

predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations of which they currently have knowledge.  These predicate acts are further detailed in Section III above.

251.  Each of the documents that Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and members of the Class served one of two roles in the Enterprise (if not both).  First, many of these documents, standing alone, were fraudulent.   Defendants   and   their   co-conspirators   knew   the   tax   treatment contemplated   by   their   communications   was   inaccurate.    Second,   all   of   these documents were used to advance the fraudulent scheme that Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.

252.  Defendants'   and   their   co-conspirators'   efforts   in   executing   or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).

253.  In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and   1343.   These   various   communications   are   related   to   the   purpose   of

misrepresenting the basis, terms and consequences of the SCE Strategy and were directed to the Plaintiffs and members of the Class; further, the similarity in the misrepresentations over a period of time plausibly indicates participation by the Defendants in the fraudulent enterprise. These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C). Defendants' and their co-conspirators' fraudulent statements and omissions include but are not limited to the following:

(1)     Orchestrating from a tax standpoint the design, development, implementation, operation, and management of the SCE Strategy;

(2)     Advising Plaintiffs and the members of the Class to engage in the SCE Strategy in order to receive favorable tax benefits;

(3)     Advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter;

(4)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy was an illegal and abusive tax shelter;

(5)     Failing to disclose existing published authority that indicated the purported tax benefits of the SCE Strategy were improper and not allowable for federal income tax purposes because of the failure of the SCE Strategy to strictly conform to Code Section 170(h);

(6)     Advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(7)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(8)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not meet the strict requirements for a qualified conservation easement under Section 170(h) of the Code;

(9)     Advising Plaintiffs and the members of the Class that the donations of the conservation easements met the requirements of Section 170(h) of the Code and therefore provided lawful and legitimate tax benefits for the Plaintiffs and the Class;

(10)     Failing to advise Plaintiffs and the members of the Class that the donations of the conservation easements did not meet the requirements of Section 170(h) of the Code and therefore did not provide lawful and legitimate tax benefits for the Plaintiffs and the Class;

(11)     Advising Plaintiffs and members of the Class that they would receive substantial tax advantages in the form of charitable contribution deductions by engaging in the SCE Strategy;

(12)     Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to disallow the tax benefits that were promised from the SCE Strategy;

(13)     Advising Plaintiffs and members of the Class that the SCE Strategy complied with Section 170(h) of the Code and therefore the donations of conservation easements would provide legal and allowable tax deductions;

(14)     Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to conclude that the SCE Strategy did not comply with Section 170(h) of the Code and therefore the donations of conservation easements would not provide legal and allowable tax deductions;

(15)     Failing to advise Plaintiffs and members of the Class that the Appraisals were significantly inflated, thereby grossly inflating the Section 170(h) deduction;

(16)     Advising Plaintiffs and members of the Class that the Appraisals complied with Section 170(h) of the Code, applicable tax laws and regulations, USPAP and other appraisal industry standards, regulations, and rules;

(17)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Section 170 of the Code, applicable tax laws

and regulations, and USPAP and other appraisal industry standards, regulations and rules;

(18)    Advising Plaintiffs and the members of the Class to sign and file tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants, reporting the tax deductions and benefits of the SCE Strategy;

(19)    Failing to advise Plaintiffs and the members of the Class not to sign and file tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants, reporting the tax deductions and benefits of the SCE Strategy because the IRS had expressed its clear intent to disallow them as improper and illegal;

(20)    Advising, instructing, and assisting in the preparation of the tax returns for Plaintiffs and members of the Class that reported the donations of the conservation easements as charitable contribution deductions;

(21)    Failing to advise Plaintiffs and members of the Class not to report the donations of the conservation easements as charitable contribution deductions;

(22)    Advising Plaintiffs and members of the Class that their tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants which reported the charitable contribution deductions, were

prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(23)     Failing to advise Plaintiffs and members of the Class that their tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants, which reported the charitable contribution deductions, did not comply with IRS guidelines and established legal authorities;

(24)     Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that reported the charitable contribution deductions, the IRS would take the position that Plaintiffs and members of the Class would be liable for taxes, penalties and/or interest, if audited;

(25)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed, if audited;

(26)     Making and endorsing the statements and representations contained in the Defendants' and their co-conspirators' written advice, instructions, and recommendations; and

(27)     Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy, a strategy that largely depended upon the IRS not auditing a particular transaction for it be successful.

254.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing. The Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

255.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material.   Plaintiffs and the Class were injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

256.   The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.   In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

257.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy and subsequently filing tax returns based on the Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

258.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

259.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' and their co-conspirators' overt acts and racketeering activities.

### E.   Pattern of racketeering activity

260.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

261.   As set forth above, the Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and

O.C.G.A. §16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute). Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

262.    The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4). Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4). Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs.

263.   Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended for at least 8 years (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicate offenses are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes. Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

264.   As to open-ended continuity for example, the Strategic Defendants have continued to promote their conservation easement transactions.  For example, Defendant Novak sent an email dated September 27, 2016, on behalf of the Strategic Defendants to prior investors in Strategic conservation easement projects, seeking their participation in conservation easement projects in 2016.  The email stated, "[a]s you are likely aware, our projects sold out much earlier than anticipated in 2015, and we expect an even greater demand in 2016" and that "[o]ur first projects are anticipated to begin closing in mid-late October, with additional closings taking place monthly through the balance of the year."  Strategic also sent an email dated April 10, 2020, to Spratt and other Strategic clients stating that "[t]he Strategic Group is a boutique investment firm that focuses primarily on investment strategies

that also provide tax benefits as a source of returns" and that they were looking for "landowners looking to conserve their land to promote 'green, sustainable, and socially responsible' land ownership" – *i.e.*, to agree to sell their land to be used in a syndicated conservation easement.  As of the date of filing of Plaintiffs' Original Complaint, Defendant Novak's biography on the Strategic Defendants' website, https://thestrategicgroup.com/our-team/, states that he "specializes in niche areas of tax planning and works directly with high-net-worth investors, family offices, and their trusted advisors.   His expertise focuses on tax-deferred 1031 exchanges, Delaware Statutory Trust (DSTs), tax-deferred Opportunity Zone funds, **conservation easements**, and numerous federal and state-sponsored tax mitigation strategies." (emphasis added).

265.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint.  More specifically, Defendants' misrepresentations and material omissions described in this Complaint, expressed both directly and indirectly with the Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and members of the Class, induced Plaintiffs and members of the Class both to enter into the transactions and professional relationships that make up the SCE Strategy and to take positions with the IRS regarding the tax and financial implications of the

SCE Strategy.  But for Defendants' misrepresentations and omissions, Plaintiffs and members of the Class would not have entered into the SCE Strategy and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategy.  And as a direct result of entering into the SCE Strategy and taking positions with the IRS that the Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS.

## VII.
## PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY, THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

266.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

267.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

268.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

269.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein shortly before the filing of this lawsuit.

270.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE Strategy complied with all applicable tax laws and regulations and would be accepted by the IRS.  In making these representations and providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.  In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants at an earlier date.  Defendants and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

271.   Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through the filing of this Complaint.

272.   In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

## VIII.
## CAUSES OF ACTION

### COUNT I.
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)

### (By All Plaintiffs And The Class Against All Defendants)

273.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

274.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

275.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

276.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

277.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint.  Through the fraudulent and wrongful conduct

described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

278.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

279.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, *et seq.* as set forth more fully above.

280.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

281.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

## COUNT II.
## VIOLATIONS OF RICO 18 U.S.C. §1962(D)
## BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)

### (By All Plaintiffs and The Class Against All Defendants)

282.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

283.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

284.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

285.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

286.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

287.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or

participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

288.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, including but not limited to the Other Participants.

289.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

290.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

291.   The Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have generated and continue to generate

income or proceeds received by Defendants from such pattern of racketeering activity, including:

(a)     Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

(b)     Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

(c)     Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

292.   As a proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

### COUNT III.
### VIOLATIONS OF GEORGIA RICO

### <u>(By All Plaintiffs And The Class Against All Defendants)</u>

293.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

294.   O.C.G.A. §§ 16-14-4(a) and (b) provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money" and "it shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

295.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

296.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

297.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

298.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

299.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

300.   Therefore, Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of Georgia RICO.

301.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above in an amount in excess of $5 million.

## COUNT IV.
## CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. §16-14-4(C))

### (By All Plaintiffs And The Class Against All Defendants)

302.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

303.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

304.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

305.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

306.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

307.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

308.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

309.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

310.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate the Georgia racketeering statute, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

311.   The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from

such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully above.

312.   As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein in an amount in excess of $5 million.

## COUNT V.
## PROFESSIONAL MALPRACTICE

**(By All Plaintiffs and the Class Against The Strategic Defendants, Van Sant and Wingard Defendants, Clark Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Oxygen, and Credo)**

313.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

314.   As professional advisors who provided professional services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, as set forth herein, the Strategic Defendants, Van Sant and Wingard Defendants, Clark Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Oxygen, and Credo (collectively, the "Professional Defendants") owed Plaintiffs and the members of the Class a duty to comply with their respective applicable standards of care and the applicable provisions of their respective codes of professional responsibility.

315.   In any event, regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the

information was intended, either directly or indirectly, and thus a duty was owed by each of the Professional Defendants.

316.   The Professional Defendants failed to meet those applicable standards of care.

317.   The Professional Defendants' failures to meet the applicable standards of care constitute negligence.

318.   The Professional Defendants' actions rise to the level of gross negligence.

319.   Plaintiffs and the members of the Class seek punitive/exemplary damages against the Professional Defendants, jointly and severally.

320.   The Professional Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

321.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5

million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT VI.**
**NEGLIGENCE**
**(By All Plaintiffs And The Class Against the ACC Defendants, GALT, and AquaFusion)**

322.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

323.   As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the ACC Defendants, GALT, and AquaFusion (the "Negligence Defendants") owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care.

324.   In any event, regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Negligence Defendants.

325.   The Negligence Defendants failed to meet their applicable standards of care.

326.   The Negligence Defendants' failures to meet the applicable standards of care constitute negligence.

327.   The Negligence Defendants' actions rise to the level of gross negligence.

328.   Plaintiffs and members of the Class seek punitive/exemplary damages against the Negligence Defendants, jointly and severally.

329.   The Negligence Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.   In reasonable reliance on the Negligence Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

330.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VII.
## NEGLIGENT MISREPRESENTATION

### (By All Plaintiffs And The Class Against
### All Defendants, In The Alternative To The Fraud Claim)

331.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

332.   During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count IX below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.   In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

333.   Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

334.   As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants owed Plaintiffs and the members of the Class a duty to correctly state all facts regarding the SCE Strategy.  Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

335.   Plaintiffs and members of the Class reasonably relied upon the Defendants' misrepresentations and advice.

336.   The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2) paid substantial fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

337.   The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid  significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

338.   As a proximate cause of the foregoing, Plaintiffs and the members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT VIII.
## BREACH OF FIDUCIARY DUTY AND DISGORGEMENT

### (By All Plaintiffs and the Class Against The Strategic Defendants, Van Sant and Wingard Defendants, Clark Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Oxygen, and Credo)

339.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

340.   As professional advisors who provided services and advice to Plaintiffs and the members of the Class, the Professional Defendants (as defined in Count V above) became fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, these Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  These Defendants breached these duties and caused Plaintiffs and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

341.   The Professional Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.  In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class:  (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants

and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) failed to file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

342.    The Professional Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

343.    As a proximate cause of the foregoing, Plaintiffs and the members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

344.   Further, as a result of the Professional Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

345.   Accordingly, the Professional Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount far in excess of $5 million.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT XI.
## FRAUD

### (By All Plaintiffs And The Class Against All Defendants)

346.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

347.   In order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants and the Other Participants, Defendants directly and indirectly—through the Other Participants—made numerous knowingly false affirmative misrepresentations and

intentional omissions of material fact to Plaintiffs and members of the Class, as set forth above and the following:

(1)     Misstating, in light of published authorities, the tax treatment Plaintiffs and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

(2)     Advising Plaintiffs and members of the Class that the donation of the conservation easement is fully tax deductible as a qualified charitable contribution deduction;

(3)     Advising Plaintiffs and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

(4)     Failing to advise Plaintiffs and members of the Class that the alleged value of the conservation easement and associated tax benefits in the SCE Strategy constituted a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

(5)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

(6)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

(7)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(8)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants did not comply with §170 of the Code and regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(9)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

(10)    Providing false valuation statements to Plaintiffs and members of the Class, including the fair market value of the conservation easement;

(11)    Failing to advise the Plaintiffs and members of the Class that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the conservation easement could be modified;

(12)     Failing to advise Plaintiffs and members of the Class that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

(13)     Failing to advise Plaintiffs and members of the Class that the Syndicates did not properly document the condition of the property at the time of the donation;

(14)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

(15)     Advising Plaintiffs and members of the Class that the Syndicates donated a "qualified real property interest";

(16)     Advising Plaintiffs and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

(17)     Advising Plaintiffs and members of the Class that the SCE Appraisers were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

(18)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

(19)      Failing to advise Plaintiffs and members of the Class that the SCE Appraisers incorrectly reached unsupportable and/or predetermined HBU conclusions;

(20)      Failing to advise Plaintiffs and members of the Class that the SCE Appraisers arrived at the unsupportable HBUs by ignoring local zoning rules and other legal restrictions on purported developments, physical and financial feasibility, market conditions, and market data;

(21)      Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the sale or donation of conservation easements in the area of the property in determining the value of the conservation easement;

(22)      Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the proceeds received by the Syndicate by its sale of membership interests to investors in determining the fair market value of the conservation easement contribution;

(23)      Failing to advise Plaintiffs and members of the Class that the SCE Appraisers failed to employ recent, local or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method";

(24)      Advising Plaintiffs and members of the Class that the Appraisals conformed with USPAP;

(25)      Failing to advise Plaintiffs and members of the Class that the Appraisals did not follow the USPAP because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

(26)      Advising Plaintiffs and members of the Class that the Appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(27)      Failing to advise Plaintiffs and members of the Class that the Appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(28)      Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

(29)      Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

(30)      Advising Plaintiffs and members of the Class that the property has specific conservation values that satisfy the Code;

(31)       Failing to advise Plaintiffs and members of the Class that the property did not have specific conservation values that satisfy the Code;

(32)       Advising Plaintiffs and members of the Class that the conservation easement restrictions complied with the Code requirement that they must be perpetual;

(33)       Failing to advise Plaintiffs and members of the Class that the conservation easement restrictions did not comply with the Code requirement that they must be perpetual;

(34)       Advising Plaintiffs and members of the Class that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

(35)       Failing to advise Plaintiffs and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code;

(36)     Advising Plaintiffs and members of the Class that the Appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(37)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(38)     Advising Plaintiffs and members of the Class that the HBU of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it was not;

(39)     Advising Plaintiffs and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (a) used an incorrect and unsupportable HBU conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

176

(40)     Failing to advise Plaintiffs that the "before value" is hypothetical and unreasonable and is not an estimate of the fair market value of the land at its HBU as of the date of the valuation before the easement conveyance;

(41)     Advising Plaintiffs and members of the Class that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the Syndicate which resulted in an inflated fair market value of the conservation easement;

(42)     Advising Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on the income tax return was proper;

(43)     Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

(44)     Failing to advise Plaintiffs and members of the Class that the subject of valuation was not financially feasible and, therefore, improper;

(45)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

(46)     Failing to advise Plaintiffs and members of the Class that the Appraisals were not qualified appraisals under §170 of the Code because the

HBU was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

(47)   Failing to advise the Plaintiffs and members of the Class that the Appraisals were not "qualified appraisals" under §170 of the Code because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's HBU;

(48)   Advising Plaintiffs and members of the Class that the conservation easement substantiated a valid conservation purpose;

(49)   Advising Plaintiffs and members of the Class that the Deed of Conservation Easement substantiated a valid conservation purpose;

(50)   Failing to advise Plaintiffs and members of the Class that the Deed of Conservation Easement did not substantiate a valid conservation purpose;

(51)   Advising Plaintiffs and members of the Class that the Baseline Documentation Report supported a valid conservation purpose on the property;

(52)   Failing to advise Plaintiffs and members of the Class that the Baseline Documentation Report did not support a valid conservation purpose on the property;

(53)     Advising Plaintiffs and members of the Class that the Deed of Conservation protected the land in perpetuity and therefore qualified for a federal charitable deduction;

(54)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation did not protect the land in perpetuity and therefore did not qualify for a federal charitable deduction;

(55)     Advising Plaintiffs and members of the Class that the Deed of Conservation permits activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

(56)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid conservation purpose and therefore did not qualify for a federal charitable deduction;

(57)     Advising Plaintiffs and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

(58)     Failing to advise Plaintiffs and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

(59)     Advising Plaintiffs and members of the Class to report the charitable contribution deduction on their individual tax returns;

(60)     Advising Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was proper and accurate and should be used to report the deduction on their individual return;

(61)     Failing to advise Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

(62)     Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based on the fair market value of the conservation easement determination in the appraisal;

(63)     Advising Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be allowed if audited;

(64)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed if audited;

(65)     Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was different and

distinguishable from other SCE Strategies that the IRS and/or Tax Court had disallowed;

(66)     Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was not different and distinguishable from other SCE Strategy that the IRS and/or Tax Court had disallowed;

(67)     Advising Plaintiffs and members of the Class that they should challenge the IRS in the audits and/or Tax Court proceedings because Plaintiffs and members of the Class would prevail and the SCE Strategy would be allowed;

(68)     Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in audits and/or Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the SCE Strategy would be disallowed;

(69)     Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

(70)     Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one

another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy.

(71)     Failing to disclose, at least in the case of the FG River and Industrial Syndicate, that the tract of real estate being syndicated was part of a much larger tract and that development or mining on any portion of that larger tract might destroy or reduce the ability to place a conservation easement on the individual tracts.

348.   The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and the Other Participants.   In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and Other Participants.

349. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy, paid

substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy.

350. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

351. As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could

have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

352.   As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X.
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

### (By All Plaintiffs And The Class Against All Defendants)

353.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

354.   As described more fully through this Complaint, each of the Defendants aided and abetted the breaches of fiduciary duty of each of the other Defendants and Other Participants.  Each aiding Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

355.   Each of the aiding Defendants acted to procure the breach of the other Defendants' fiduciary duties through improper conduct and without privilege.  Each of the aiding Defendants did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty.  Each of the aiding Defendants also acted purposely and

with malice and the intent to injure.  Each of the Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty and each of the aiding Defendants' tortious conduct proximately caused damage to the Plaintiffs.

356.  As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

357.  As a direct and proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.  Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial, but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

358.  Further, as a result of these Defendants' aiding and abetting the breach of fiduciary duties by others, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other

Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

## COUNT XI.
## RESCISSION

### (In the Alternative, By All Plaintiffs And The Class Against All Defendants)

359.   Plaintiffs and members of the Class reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

360.   In connection with the SCE transactions, Plaintiffs and members of the Class were provided by Defendants (the "Rescission Defendants") with documents purporting to disclaim or limit the rights of Plaintiffs and members of the Class (collectively "Purported Disclaimers").   In deciding to engage in the SCE transactions, Plaintiffs and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact the Rescission Defendants made to Plaintiffs and members of the Class, including but not limited to those set forth (or incorporated) in Count IX.  Had the Rescission Defendants not made those misrepresentations or omissions, Plaintiffs and members of the Class would not have engaged in the SCE transactions.  The Rescission Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them.   Further, the concealment is of intrinsic qualities of the features of the SCE Strategy (such as,

highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE satisfied Code 170 and regulations promulgated thereunder) which the Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to Federal tax consequences, under well-established law had no duty to seek to discover. Alternatively, the Recission Defendants had a duty to disclose these matters.

361. Thus, the Rescission Defendants fraudulently induced Plaintiffs and members of the Class to enter into the SCE transactions in furtherance of the conspiracy between and among the Rescission Defendants, the Other Defendants, and the Other Participants.

362. Plaintiffs and members of the Class seek rescission of all agreements they entered into and all documents they received in connection with entering into the SCE transactions, including the Purported Disclaimers.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs. Collectively, there is more than $5 million at issue.

363. Plaintiffs had no duty to rescind before filing, nor to restore any consideration because it would be unreasonable to require them to do so, if not impossible, given disposition of all of the assets of the PropCos/LLCs and the years of tax returns already filed and under audit.

## COUNT XII.
## CIVIL CONSPIRACY

### (By All Plaintiffs And The Class Against All Defendants)

364.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

365.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement the SCE Strategy.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class.   In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

366.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and Members of the Class and to breach fiduciary duties owed to Plaintiffs and Members of the Class all for the purpose of convincing Plaintiffs and members of the Class to participate in the

SCE Strategy and pay substantial fees.  The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

367.   The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

368.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to Plaintiffs and members of the Class as previously set forth herein.

369.   As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented

in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

370. Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## IX.
## PRAYER FOR RELIEF

371. Based upon the foregoing, Plaintiffs request that Defendants be summoned to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

(a) actual, consequential, and incidental damages;

(b) rescission and disgorgement as sought herein;

(c) pre- and post-judgment interest at the highest legal rate allowed by law;

(d) all attorneys' fees and costs in pursuing this matter;

(e) punitive and/or enhanced damages in an amount to be determined at trial; and

(f) such other and further relief, both at law and in equity, to which Plaintiffs and the Class may show themselves to be justly entitled.

Respectfully submitted,

/s/ *Jeven R. Sloan*
David R. Deary (*pro hac vice* motion to be filed)
davidd@lfdrlaw.com
W. Ralph Canada, Jr. (*pro hac vice* motion to be filed)
ralphc@ldsrlaw.com
Jeven Sloan (GA Bar No. 652727)
jevens@ldsrlaw.com
Wilson E. Wray, Jr. (*pro hac vice* motion to be filed)
wilsonw@ldsrlaw.com
John McKenzie (*pro hac vice* motion to be filed)
johnm@ldsrlaw.com
Donna Lee (*pro hac vice* motion to be filed)
donnal@ldsrlaw.com
Tyler M. Simpson (*pro hac vice* motion to be filed)
tylers@ldsrlaw.com
**LOEWINSOHN DEARY SIMON RAY LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile

Edward J. Rappaport (GA Bar No. 594841)
erappaport@saylorlaw.com
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone

*Attorneys for Plaintiffs*