UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

C. JACKSON HOOVER et al., on
behalf of themselves and others
similarly situated,

           Plaintiffs,

      v.

STRATEGIC CAPITAL
PARTNERS, LLC, et al.,

           Defendants.

CIVIL ACTION NO.

1:21-CV-1299-SEG

## O R D E R

This case is before the Court on Defendants' motions to dismiss Plaintiffs' First Amended Complaint ("FAC"). Pursuant to a briefing schedule set by the Court (Doc. 137), Defendants have filed a joint motion to dismiss brief (Doc. 168), and most Defendants have also filed separate briefs, either individually or with a group of related entities (Doc. 181, 184, 186, 187, 191, 192, 193, 194, 197, 198, 199, 200, 201, 202, 206, 207, 230, 234). Also before the Court is Plaintiff's Motion to Exclude or Disregard Extrinsic Evidence (Doc. 263), which addresses the admissibility of various documents filed by Defendants in connection with their motions to dismiss. On March 1, 2023, the Court heard oral argument on the motions to dismiss. (Doc. 363.) On March 26, 2023, the Court stayed the motions to dismiss pending the submission of additional briefing on select issues. (Doc. 364.) At points, the

parties have also filed additional briefing regarding supplemental authority. (Doc. 303, 307, 308, 309, 316, 317, 318, 352, 355, 378, 379.)

The Court now decides the pending motions to dismiss, having carefully considered the pleading, the parties' original and supplemental briefing, the extrinsic material which the Court is permitted to consider, and the arguments of counsel before the Court.  The results are mixed; Plaintiffs have plausibly pled some of their causes of action against some Defendants but not against others.  The warnings and disclaimers Plaintiffs signed matter, but at this stage they do not serve as an absolute bar to every cause of action.  The parties are referred to the conclusion of this order for a table containing the disposition of each motion to dismiss.

The Court has before it a pleading of about 350 pages asserting twelve causes of action against some 30 defendants.  There are hundreds of pages of briefing on the record.  And there are more than 1,200 pages of extrinsic documentary material that Defendants have sought to introduce in connection with their joint briefing, plus additional exhibits that certain Defendants have attached to their individual motions.  This is an unusual amount of material for a case that has not yet proceeded to discovery.  But then again, Plaintiffs have brought an unusually large case, and the FAC refers to many of the documents Defendants seek to have considered in full.  The Court has carefully reviewed the allegations in the FAC, the briefing, and the extrinsic materials

it has considered pursuant to its rulings below. In a case of this complexity and sheer bulk, some preliminary remarks about the structure of this order and other matters of importance are necessary.

First, as the parties are aware, this case is one of several pending in this district related to syndicated conservation easements ("SCEs") and, more specifically, what Plaintiffs call the "SCE Strategy." Some of this case's Defendants are or were involved in other related actions as well. This case's closest cousins are *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279 (N.D. Ga. 2021), and *Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258 (N.D. Ga. 2022), *reconsideration denied*, No. 1:20-CV-2815-AT, 2023 WL 2359692 (N.D. Ga. Feb. 13, 2023). Those cases share much with the one before this Court. The Court's order here owes much to Judge Totenberg's work in untangling the knotty legal issues that these cases present. The Court draws frequently on the *Lechter* and *Turk* opinions in the analysis that follows. Still, this Court's rulings will sometimes differ from those issued in *Lechter* and *Turk*—this is after all a distinct case with distinct allegations, many new parties, and its briefing has some different points of emphasis, perhaps because it was written with the benefit of the *Lechter* and *Turk* opinions.

Second, the Court underscores that the following analysis is based on the well-pled allegations of fact in the FAC, which the Court assumes to be true for the purposes of this motion. Many Defendants insist that what Plaintiffs

characterize as a fraudulent conspiracy is merely ordinary professionals working on a series of risky transactions. Fact development may eventually show that to be the case. But at this stage, Plaintiffs' view, where supported by well-pled factual allegations, controls. What the evidence shows is a matter for another day.

Finally, the Court has endeavored to structure its opinion so as to avoid repetition of issues that have relevance to multiple claims, while at the same time giving due attention to individual Defendants' arguments about issues specific to their individual conduct. The order begins with an overview of the alleged fraudulent scheme and the allegations concerning the transactions in which Plaintiffs invested. The Court then addresses several preliminary issues, including personal jurisdiction, Article III standing, Defendants' disclaimer-based arguments, and statute of limitations issues. Then the Court proceeds to the federal and Georgia RICO and RICO conspiracy claims. Finally, the Court considers the remaining array of state law claims.

In the end, the Court dismisses a few of Plaintiffs' state law claims outright, while Plaintiffs' federal RICO, Georgia RICO, RICO conspiracy, and some of the state law claims survive as to certain Defendants.

# Table of Contents

I. BACKGROUND ................................................................................. 8

A.  Introduction ................................................................................. 8

B.  Overview of the Syndicated Conservation Easement Strategy .............. 10

C.  Plaintiffs' Transactions .................................................................. 17
   1.  The DeSoto Syndicate Transaction (2016) ................................... 22
   2.  The Turtle River Syndicate Transaction (2013) ........................... 31
   3.  The Bear Creek Syndicate Transaction (2016) ............................ 35
   4.  The Rock Spring Syndicate Transaction (2016) .......................... 42
   5.  The Vista Hill Syndicate Transaction (2015) .............................. 47

D.  Class Allegations ......................................................................... 54

E.  Plaintiffs' Claims ......................................................................... 55

II. LEGAL STANDARDS ..................................................................... 57

A.  Rule 12(b)(1) ............................................................................... 57

B.  Rule 12(b)(2) ............................................................................... 57

C.  Rule 12(b)(6) ............................................................................... 59
   1.  Rule 8 ................................................................................. 59
   2.  Rule 9(b) ............................................................................. 60

III. DISCUSSION ............................................................................... 62

A.  Plaintiffs' Motion to Exclude or Disregard Extrinsic Evidence ............ 62

B.  Personal Jurisdiction .................................................................... 70
   1.  Foothills .............................................................................. 70
   2.  Dantin Defendants ................................................................ 74

C.  Article III Standing ...................................................................... 80
   1.  Injury in Fact ....................................................................... 81
   2.  Langford Defendants' Traceability Arguments ........................... 84
   3.  The ACC Defendants' and Foothills' Standing Arguments ............ 86

D.  Disclaimers and the Fraud-Based Claims ......................................... 87

    **1.** **Effect of the No-Reliance Clauses on Plaintiffs' Fraud-Based Claims** 89
       **a.** **The No-Reliance Clauses** ................................................ 89
       **b.** **Can Defendants Enforce the Clauses?** ........................... 90
       **c.** **The Effect of the No-Reliance Clauses** ......................... 93
    **2.** **Disclaimer Language in the PPMs** ..................................... 95

**E.** **Statute of Limitations and Tolling** ........................................ **105**
    **1.** **Common Law Claims Accrual** .............................................. 106
    **2.** **Tolling of State Law Claims** ............................................... 108

**F.** **Federal and Georgia RICO Claims** ....................................... **116**
    **1.** **Substantive RICO Claims (Counts I and III)** ..................... 117
       **a.** **Pattern of Racketeering Activity** .................................. 119
          **i.** **Preliminary Issues Regarding Fraud Pleading** ....... 122
          **ii.** **The Strategic Defendants** ..................................... 127
          **iii.** **Bridge Capital** ...................................................... 129
          **iv.** **MMM Defendants** .................................................. 131
          **v.** **Nelson Mullins** ...................................................... 135
          **vi.** **AquaFUSION** ......................................................... 137
          **vii.** **The Land Trust Defendants** .................................. 138
          **viii.** **The Langford Defendants and Frazier & Deeter** ...... 142
          **ix.** **Bennett Thrasher** .................................................. 145
          **x.** **The Appraiser Defendants** ..................................... 148
          **xi.** **The Local Promoters** ............................................. 154
          **xii.** **Relatedness and Continuity** ................................. 155
          **xiii.** **Conclusion** ........................................................... 157
       **b.** **Enterprise** ...................................................................... 158
       **c.** **Conduct** .......................................................................... 169
       **d.** **Proximate Cause** .......................................................... 174
       **e.** **PSLRA Bar** .................................................................... 180
       **f.** **Conclusion** ...................................................................... 192
    **2.** **Conspiracy to Violate Federal and Georgia RICO (Counts II and IV)** 192
       **a.** Bridge Capital ................................................................. 196
       **b.** **Nelson Mullins, Bryan Cave, and the PCLG Defendants** ........ 198
       **c.** **The Langford Defendants, F&D, and Cherry Bekaert** ........ 199
       **d.** **The ACC Defendants** ................................................... 199
       **e.** **GALT and Foothills** ..................................................... 201
       **f.** **The Local Promoters** ................................................... 202

**G.** **State Common Law Claims** .................................................... **202**
    **1.** **Fraud (Count IX)** ................................................................ 202

**2. Civil Conspiracy (Count XII)** ....................................................... 205

**3. Breach of Fiduciary Duty (Count VIII)** ................................. 206

    **a. The Return Preparer, Attorney, and Appraiser Defendants** ......... 210

    **b. The Strategic Defendants** ............................................................. 214

    **c. The Local Promoters** ..................................................................... 216

**4. Negligent Misrepresentation (Count VII)** ............................. 217

    **a. Bridge Capital** ................................................................................ 220

    **b. The Attorney Defendants** ............................................................. 221

    **c. The Return Preparer Defendants** ................................................. 226

    **d. The Land Trust Defendants** ......................................................... 228

    **e. The Local Promoters** ..................................................................... 228

**5. Professional Malpractice (Count V)** ......................................... 230

    **a. The Strategic Defendants** ............................................................. 232

    **b. The Attorney Defendants** ............................................................. 233

    **c. The Return Preparer Defendants** ................................................. 233

    **d. The Appraiser Defendants** ........................................................... 236

    **e. The Local Promoters** ..................................................................... 237

**6. Negligence (Count VI)** ................................................................. 237

**7. Aiding and Abetting Breaches of Fiduciary Duty (Count X)** ............. 239

**8. Rescission (Count XI)** .................................................................. 242

**IV. CONCLUSION** ................................................................................. **245**

**APPENDIX A: REMAINING DEFENDANTS AND CAUSES OF ACTION** ... **250**

# I. Background

## A. Introduction

Plaintiffs, who sue on their own behalf and on that of a class, claim to have been fraudulently induced to participate in certain syndicated conservation easement ("SCE") transactions, which they allege formed part of a multi-year fraudulent scheme carried out by the Defendants.[1]  (Doc. 109, FAC ¶¶ 1-2.)  The basic idea is that the Plaintiffs were led to believe that these transactions were legitimate tax-savings strategies, when in fact the defendants knew that they were based on fraud.  Plaintiffs purchased interests in LLCs used to carry out the tax strategy, and they subsequently claimed tax deductions on their individual tax returns resulting from the LLCs' donation of a conservation easement to a land trust.  But the IRS has disallowed Plaintiffs' deductions, rendering their investments worthless and forcing them to spend money defending themselves against IRS action and paying back taxes.  Plaintiffs allege that, unbeknownst to them, the value of the easements was fraudulently inflated, their tax deductions were certain to be subject to IRS scrutiny, and when the deductions were scrutinized, they were certain to be disallowed.  At root, Plaintiffs' case puts forward two alternative theories of

---

[1] The Court's discussion is based on the allegations in Plaintiffs' First Amended Complaint.  For the purposes of the motion to dismiss, the Court accepts the well-pled allegations as true and construes them in the light most favorable to Plaintiffs.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

recovery from the Defendants, who comprise a large group of professionals that each worked on one or more of the five SCE transactions in which one of the six Plaintiffs invested. The first theory, which underlies Plaintiffs' RICO, fraud, and conspiracy claims, is that Plaintiffs were intentionally lured into a fraudulent scheme: Defendants, Plaintiffs say, knew about the inflated deductions and the certainty of IRS scrutiny but defrauded Plaintiffs into thinking they were investing in a legitimate, lucrative tax product. A second theory, played in the minor key, is essentially a negligence-based one. This theory underlies Plaintiffs' claims for negligent misrepresentation, professional malpractice, and so forth. The idea here is that Defendants had duties to discover various alleged falsehoods disseminated to the Plaintiffs (*e.g.,* the value of the easements), but failed to do so. Across the whole swath of defendants, the two theories are not incompatible; Plaintiffs might have adequately alleged fraud by some parties, but they might only have adequately alleged negligence by others.

This is a big case: there are six Plaintiffs and, at present, 30 Defendants. Plaintiffs' pleading has twelve counts, which—once one accounts for the fact that some counts are not brought against every defendant—means there are about 300 distinct causes of action. Many of these require an individualized, defendant-by-defendant analysis. The Court begins with the allegations in the FAC.

## B. Overview of the Syndicated Conservation Easement Strategy

Plaintiffs' allegations revolve around a tax-savings strategy they call the Syndicated Conservation Easement Strategy or "the SCE Strategy." (Doc. 109, FAC ¶ 1.)  Generally speaking, the SCE Strategy is about generating tax deductions for individuals through a partnership entity, like an LLC, that places a conservation easement on a piece of real property and then donates the easement to a land trust.

A conservation easement is an agreement between a landowner and another party, usually a land trust or government agency, that permanently restricts the use of real estate in the interest of achieving certain conservation goals.  (*Id.* ¶ 65.)  The Internal Revenue Code ("Tax Code") has, for some time, provided that a landowner's conveyance of a conservation easement to a "qualified organization" that promises to enforce it is a tax-deductible charitable donation.  *See Pine Mt. Preserve, LLLP v. Comm'r of Internal Revenue*, 978 F.3d 1200, 1203 (11th Cir. 2020) (citing I.R.C. § 170(h)).  Conveyances of conservation easements must meet certain criteria to be considered "qualified conservation contributions" under the Tax Code.[2]

---

[2] Tax deductions are not generally permitted for donations of partial interests in property, but the Internal Revenue Code makes an exception for such "qualified conservation contributions."  These are defined as the donation of (1) "a qualified real property interest," (2) "to a qualified organization," (3) "made exclusively for conservation purposes."  I.R.C. § 170(h)(1).

In the simplest case, a single landowning taxpayer might claim a charitable deduction after donating an easement on a piece of land that she owns.  But there are almost certainly more people seeking lighter tax burdens than there are people who already own, or have the means to independently acquire, conservation-worthy real estate.  The *syndicated* conservation easement transaction, on which the SCE Strategy is based, meets this demand.  An SCE transaction involves the donation of an easement through land owned collectively by the members of a partnership entity, like an LLC.  Partnership entities are taxed as pass-through entities under federal law, meaning that the entity itself pays no taxes; instead, its tax liabilities and credits "flow through" to the individual partners.  (Doc. 109, FAC ¶¶ 79-80.)  Such entities do still file annual tax returns, however, and they are also required to provide both the IRS and the individual members with annual statements called "K-1s" that report the individual members' shares of the partnership's income and losses. (*Id.*)  The individual members must then report their shares of such income and losses on their own tax returns.  (*Id.*)  Charitable contribution deductions are among the items that flow through from the LLC to its members.  (*Id.* ¶ 80.)  This means, in essence, that a charitable deduction accruing to an LLC will be claimed by the members on their individual tax returns in an amount proportional to their interest in the partnership.  (*Id.* ¶ 82.)

But the road to claiming that individual deduction through the SCE Strategy involves much preparatory work performed by a small army of professionals.  The Defendants are selected from among these professionals.  Here, Plaintiffs purchased interests in five different LLCs—the Plaintiffs sometimes refer to them as "the Syndicates"—that each undertook an SCE transaction between 2013 and 2016.  Collectively, these are referred to as the "Representative Transactions."[3]  Plaintiffs describe each of these transactions in the FAC.  According to Plaintiffs, Defendants orchestrated their SCE transactions—and others like them—and did so in a way that was "uniform across the Plaintiffs and the Class in virtually every material way."[4]  (Id. ¶ 83.)  So, while the Court recounts the pertinent allegations regarding the individual transactions below, it will first give a schematic overview of the SCE Strategy.

According to Plaintiffs, each SCE transaction followed certain steps.  Each transaction also involved many professionals who played certain

---

[3] In the FAC and in this order, the transactions are denominated according to names given to the properties by the transactions' promoters.  These are (a) the DeSoto tract in Shelby County, Alabama ("DeSoto Syndicate Transaction"); (b) the Turtle River tract in Glynn County, Georgia (the "Turtle River Syndicate Transaction"); (c) the Bear Creek tract in Coweta County, Georgia (the "Bear Creek Syndicate Transaction"); (d) the Rock Spring tract in Morgan County, Alabama (the "Rock Spring Syndicate Transaction"); and (e) the Vista Hill tract in Chatham County, North Carolina (the "Vista Hill Syndicate Transaction").

[4] Some defendants are implicated in every transaction, but some defendants are implicated only in one or a few transactions, as discussed below.

relatively fixed roles in the SCE Strategy.  At the root of the alleged SCE Strategy is the "Sponsor."  The Sponsor defendants in this case are the "Strategic Defendants": Strategic Capital Partners, LLC; Ricky B. Novak; and James Freeman.  (The fact that these defendants are central to Plaintiffs' theory of the case is shown by the fact that the proposed Rule 23 class is defined by participation in an SCE transaction "designed, marketed, sold, implemented, or managed by the Strategic Defendants.")  (*Id.* ¶ 463.)  In brief, the allegations suggest that it is the Sponsor who creates the syndicates, markets them to potential investors (such as the plaintiffs), and coordinates the SCE transaction with the other professionals.

To do this, the Sponsor begins by creating an LLC (a "PropCo") and uses it to acquire the subject property.  (*Id.* ¶ 83(a).)  In some cases, the Sponsor might purchase a large tract of land and subdivide it into multiple parcels that could each be used for a separate SCE transaction.  (*Id.* ¶ 83(b).)  The Sponsor then conducts a "due diligence" period during which it assembles information and documents necessary to promote the SCE Strategy.  (*Id.* ¶ 83(c).)  This information includes an initial appraisal of the land obtained from one of the "Appraiser" defendants.  (*Id.* ¶ 83(c)(i).)  The initial appraisal provides a valuation of the land based on its "highest and best use" ("HBU").  (*Id.*)  The Sponsor would also engage consultants to assess the property for possible development uses, such as a possible site of mining operations, to substantiate

the HBU valuation.  (*Id.* ¶ 83(c)(ii).)  The Sponsor would also engage a tax attorney to prepare a tax opinion letter "affirming the legality of the SCE Strategy" and to assist in preparing the various transactional documents needed to implement the strategy.  (*Id.* ¶ 83(c)(iii).)  Then the Sponsor would form a second LLC (the "Syndicate") and begin to distribute the "Promotional Materials," which described the risks and benefits of the SCE transaction, to potential SCE Strategy investors.  (*Id.* ¶ 83(c)(iii).)  The Sponsor would then promote the SCE Strategy directly (through its own marketing efforts) or indirectly (through local professionals).  (*Id.* ¶ 83(d).)

Once enough investors had joined a given Syndicate, the Sponsor would sell its interest in the PropCo to the Syndicate in exchange for cash.  (*Id.* ¶ 83(f).)  The Syndicate members would then vote on how to dispose of the property, choosing between several plans prepared by the Sponsor, including a "development plan" and a "conservation plan," the latter of which involved donating a conservation easement on the property.  (*Id.* ¶ 83(g).)  In each of the representative transactions, the relevant Syndicate chose the conservation plan.  According to Plaintiffs, conservation was the only real choice all along, for it was represented as the only option that "offer[ed] an immediate return [and] that require[d] no additional capital outlay."  (*Id.*)

Once the Syndicate officially decided to conserve the land, another round of paperwork would be generated.  The Appraiser would prepare a new

appraisal determining the value of the conservation easement. (*Id.* ¶ 83(h)(i).) Several Defendants would then prepare a Conservation Easement Deed, and a land trust organization (the "Land Trust") would prepare a Baseline Documentation Report ("BDR"), which contained information relevant to the conservation value of the property and its condition at the time of its donation. (*Id.* ¶ 83(h)(ii)-(iii).) The Syndicate, either itself or via the PropCo, would then donate a conservation easement to the "Land Trust".[5] (*Id.* ¶ 83(i).) An accountant would later prepare the Syndicate's tax return, reporting a charitable contribution deduction based on the donation of the conservation easement. (*Id.* ¶ 83(l).) The deduction's value would be derived from the decrease in the property's appraised value following the donation of the conservation easement. (*Id.*) Finally, the Syndicate's members would claim their share of the resulting deduction—as reported on Schedule K-1 forms prepared by the Syndicate's accountant—on their individual tax returns. (*Id.*)

While Plaintiffs do not allege that all conservation easement transactions are inherently fraudulent, they allege that certain aspects of the transactions in which *they* invested—the transactions sponsored by the Strategic Defendants—involved fraud or misrepresentation designed to make

---

[5] In some cases, the Syndicate would donate a fee simple interest in the property rather than an easement, but this makes no material difference to the structure of the transaction or its tax consequences. (Doc. 109, FAC ¶ 83(i).)

the SCE Strategy seem both legal and extremely lucrative, and thus an attractive tax-savings strategy for investors.  But in fact, Plaintiffs allege, Defendants either knew or should have known that it was neither.  At the core of Plaintiffs' theory is the allegation that the appraisals of the land were grossly inflated, and that Defendants knew this but obscured it from Plaintiffs. (*Id.* ¶¶ 9-12; 435-442.)  In addition, Plaintiffs allege that the conservation easement deeds failed to substantiate that the properties in question had a valid conservation purpose under the meaning of the IRS regulations.[6]  (*Id.* ¶¶ 443-47.)  As a result of these deficiencies, Plaintiffs also contend that they were misled about the likelihood, and probable consequences, of IRS scrutiny of their SCE-derived charitable deductions.

Plaintiffs contend that since as early as 1984 the IRS has taken the position that overvaluation of charitable contributions in conservation easement transactions "was improper and would not be tolerated." (*Id.* ¶ 68) (citing IRS News Release, IR-81-122).  A particular concern was the idea that the promoters of conservation easement transactions could pitch conservation

---

[6] This aspect of Plaintiffs' allegations has been deemphasized in their briefing, evidently because the so-called "extinguishment proceeds regulation" that provided one of the grounds on which the IRS disallowed Plaintiffs' deductions has since been invalidated by a decision of the Eleventh Circuit. *See Hewitt v. Comm'r*, 21 F.4th 1336, 1350 (11th Cir. 2021).  Under the old regulation, deficiencies in the conservation easement deeds had provided one basis for disallowing conservation easement deductions.  See Part III(C) below for the Court's discussion of Defendants' standing arguments based on *Hewitt*.

easement transactions with inflated valuations to potential investors and evade detection from the IRS by relying on an "audit lottery." (*Id.*)  In other words, if the partnership's tax returns did not get audited, then the promoters would not get caught.

In 2004 and 2006, the IRS issued notices indicating that it would increase scrutiny of conservation easement charitable deductions and laying out standards for appraisals of the easements' value. (*Id.* ¶¶ 72-73) (citing IRS Notice 2004-41 (July 12, 2004)).  And in 2016, the IRS issued Notice 2017-10, which designated certain kinds of syndicated conservation easements as "listed transactions." (*Id.* ¶ 75.)  Under Treasury regulations, a listed transaction is "a transaction that is the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction."  26 C.F.R. § 1.6011-4(b)(2).  Notice 2017-10 specifically designated as listed transactions any transaction in which the Promotional Materials offered potential investors the possibility of claiming a charitable contribution deduction worth at least 2.5 times their initial investments in the syndicate. (Doc. 109, FAC ¶ 75.)

### C. Plaintiffs' Transactions

The FAC describes five representative SCE transactions involving distinct syndicates and properties: the DeSoto, Turtle River, Bear Creek, Rock

Spring, and Vista Hill transactions. At least one named plaintiff took part in each representative transaction. And each defendant or group of defendants allegedly played a role in one or more of the representative transactions. For ease of reference, the Court provides a table below that contains an overview of the alleged role of each defendant or defendant group and the transaction(s) they took part in. Since the Court will discuss most defendants as part of smaller groups (comprising, for example, an accountant and his firm), the table also indicates how the Court will refer to these groups. The summaries of the allegations that appear in the table are intended to help sort out, at a high level, who is alleged to have done what. They do not stand for the Court's complete view of the allegations in the 350-page FAC.

| Defendant Group | Transactions | Role | Alleged Function and Relevant Actions |
|---|---|---|---|
| Strategic Defendants (Strategic Capital Partners, LLC, Ricky B. Novak, James W. Freeman) | All | Sponsor | The "Sponsor" and alleged "architect" of the SCE Strategy. Assembled the team that executed each transaction, reviewed and approved the documents for each transaction, and performed other roles such as subdividing the properties at issue, and forming and managing the LLCs. |
| Bridge Capital Defendants (Bridge Capital Associates, Inc., Ricky B. Novak, James W. Freeman) | All | Placement Agent | The "Placement Agent." Helped prepare the Promotional Materials and coordinated Plaintiffs' investments. |

| | | | |
|---|---|---|---|
| ACC Defendants (Atlantic Coast Conservancy, Inc. and Robert D. Keller) | DeSoto, Bear Creek | Land Trust | One of the "Land Trust Defendants" that accepted property donations from the syndicates and helped prepare certain transactional documents. ACC allegedly was "hand-picked" by the Strategic Defendants because of its reputation for accepting easements other land trusts would not. |
| AquaFUSION, Inc. | DeSoto, Bear Creek, Rock Spring | Mining Consultant | A mining consultant that prepared reports for subject properties purporting to establish that mining them was legally and economically feasible. These reports were incorporated into the Promotional Materials and used to support the appraisals prepared by the appraisers. |
| Bennett Trasher, LLC | DeSoto, Rock Spring | Return Preparer | One of the "Return Preparer Defendants" that prepared partnership tax return and K-1s for DeSoto and Rock Spring syndicates. Had a history of working with SCE transactions with other sponsors. |
| Bryan Cave Leighton Paisner LLP ("Bryan Cave") | Vista Hill | Legal Advisor | One of the "Attorney Defendants" that prepared a legal opinion letter for the Vista Hill Syndicate. |
| Cherry Bekaert LLP (f/k/a Conexus) | Vista Hill | Return Preparer | One of the "Return Preparer Defendants" that prepared partnership tax return and K-1s for the Vista Hill Syndicate. |
| Clark Defendants (Clark Davis, PC and Claud Clark III) | Desoto, Rock Spring | Appraiser | One of the "Appraisal Defendants" that prepared appraisals of the property for use in the Promotional Materials and for executing the SCE transactions and substantiating the charitable |

| | | | |
|---|---|---|---|
| | | | contribution deductions. The Clark Defendants have allegedly come under scrutiny from the Alabama Real Estate Appraiser Board and the federal government for their appraisal work on SCE transactions. |
| Credo Financial Services, LLC | Turtle River | Financial Advisor | One of the "Local Promoters" that referred Plaintiff Spratt to Strategic to participate in the Turtle River Syndicate and received a referral fee for doing so. |
| Dantin Defendants (Dantin Financial, LLC and Chris A. Dantin) | Bear Creek, Vista Hill | Financial Advisor | A Baton Rouge-based financial advisor and one of the "Local Promoters" that referred Plaintiffs Agnew and Hebert to Strategic. Financial advisor to Plaintiff Hebert. |
| Foothills Land Conservancy, Inc. | Rock Spring | Land Trust | A land trust that accepted property donations from the syndicates and helped prepare certain transactional documents. |
| Frazier & Deeter ("F&D") | Bear Creek | Return Preparer | One of the "Return Preparer Defendants" that prepared partnership tax return and K-1s for the Bear Creek Syndicate. |
| Georgia-Alabama Land Trust, Inc. ("GALT") | Turtle River | Land Trust | A land trust that accepted property donations from the syndicates and helped prepare certain transactional documents. |
| Langford Defendants (Jon R. Langford, CPA, PC, and Jon R. Langford) | Turtle River | Return Preparer | One of the "Return Preparer Defendants" that prepared partnership tax return and K-1s for the Turtle River Syndicate. |
| MMM Defendants (Morris, | DeSoto, Turtle River, | Legal Advisor | One of the "Attorney Defendants" that developed the SCE Strategy as a tax product and turned it into |

| Manning & Martin, LLP and Timothy Pollock) | Bear Creek | | a lucrative line of business, becoming the "go to" law firm for such transactions. Prepared legal opinion letters for the DeSoto, Turtle River, and Bear Creek Syndicates and served as the escrow agents for investment funds wired by some plaintiffs. |
|---|---|---|---|
| Nelson Mullins Riley & Scarbrough LLC ("Nelson Mullins") | DeSoto, Bear Creek, and Rock Spring | Legal Advisor | One of the "Attorney Defendants" that provided a "Due Diligence Report" to investors in the DeSoto and Bear Creek Syndicates; reviewed the tax bona fides of the transactions; and offered an additional opinion on top of the primary legal opinion letters. Nelson Mullins also issued the primary legal opinion letter for the Bear Creek Syndicate. |
| Oxygen Financial, Inc. | Turtle River | Financial Advisor | A financial advisor to the Greiner Plaintiffs and one of the "Local Promoters." Solicited the Greiners to participate in the SCE Strategy. |
| PCLG Defendants (Private Client Law Group, Aaron Kowan, Sean Honeywill)[7] | Vista Hill | Legal Advisor | One of the "Attorney Defendants" that prepared a "Due Diligence Report" for investors in the Vista Hill Syndicate; reviewed the tax bona fides of the transactions and offered an additional opinion on top of the primary legal opinion letters. |

---

[7] Sean Honeywill, allegedly the attorney with PCLG who prepared the Due Diligence Report for the Vista Hill Syndicate, has filed a separate motion to dismiss. (Doc. 192.) Honeywill's motion incorporates the arguments of the PCLG Defendants' individual briefs, and it also advances a handful of arguments unique to him. The essence of Honeywill's unique arguments is the contention that he played only a minor role in the events alleged in the FAC, for he was an associate at PCLG at the time. Many of Honeywill's individual arguments are moot, given that the Court dismisses most of the claims against the PCLG Defendants on other grounds. But to the extent that they are not, Honeywill's motion essentially asks the Court to take notice of factual matters

| VSW Defendants (Van Sant and Wingard, LLC, Thomas F. Wingard, Martin H. Van Sant) | Turtle River, Bear Creek, Vista Hill | Appraiser | One of the "Appraisal Defendants" that prepared appraisals of the property for use in the Promotional Materials and for executing the SCE transactions and substantiating the charitable contribution deductions. |
|---|---|---|---|

The Court now turns to the representative transactions.

## 1. The DeSoto Syndicate Transaction (2016)

The DeSoto Syndicate Transaction involved a 161-acre tract (the "DeSoto Property") located in Shelby County, Alabama.  The DeSoto Property was subdivided from a larger, 500-acre tract, from which a total of three SCE Strategy tracts were derived.  (Doc. 109, FAC ¶ 115.)  All three of these SCE tracts derived from two contiguous properties that had previously been owned by Merrell Brothers, a farming corporation.  (*Id.*)  Merrell had acquired both properties for a total of $2,400 per acre in 2010.  (*Id.*)

In 2009, White Rock Quarries, a mining firm, had acquired a 900-acre property located 4.5 miles from the DeSoto Property.  (*Id.* ¶ 116.)  It intended to mine the property for limestone.  (*Id.*)  After a lengthy permitting process

---

not alleged in the complaint and to draw inferences adverse to Plaintiffs.  For these reasons, the Court treats Honeywill as one of the "PCLG Defendants" rather than independently for the purposes of this motion.  The asserted factual distinctions between Honeywill's role at PCLG and in the alleged scheme may, of course, warrant different treatment for Honeywill later.

involving litigation, White Rock Quarries had not yet been able to begin mining on the property in 2016.  (*Id.*)

On November 2, 2016, Plaintiff Hoover joined a conference call hosted by Defendant Novak.  (*Id.* ¶ 117.)  On the call, Novak explained the SCE Strategy, and represented that he and his "team" were experts at executing the strategy so as to meet every requirement of the tax code.  (*Id.*)  That team, Novak said, included not only the experts at Strategic, but also law firms, accounting firms, appraisers, and other consultants who had specific expertise and substantial experience with the SCE Strategy.  (*Id.*)  Novak stated that Strategic and its team had facilitated approximately 80 SCE transactions and incurred only ten audits, none of which resulted in more than a 17% adjustment to the claimed deduction.  (*Id.* ¶ 118.)  Novak also said that Strategic got two independent appraisals and two legal opinions from prominent law firms for each transaction.  (*Id.* ¶¶ 119-20.)

After the conference call, on November 2, 2016, Novak emailed Hoover a "Frequently Asked Questions" document that contained various representations about the SCE Strategy.  (*Id.* ¶ 123.)  The document said, among other things, that the "[f]ederal benefits [of SCEs] are typically priced between a 3.5-to-1.0 and a 4.5-to-1.0 ratio," and that there was minimal increased audit risk from participating in the transactions, but that any risk was mitigated by the work of Strategic's tax attorneys, CPAs, and "two-step

valuation process" involving two sets of appraisers.  (*Id.*)  Plaintiffs allege that the Strategic Defendants knew that these representations were false, because they knew that an audit "was a near certainty" and that an audit would result in a complete disallowance of the tax benefit.  (*Id.* ¶ 124.)

On December 12, 2016, Novak sent Hoover another email on behalf of Strategic Capital and Bridge Capital.  (*Id.* ¶ 125.)   The email provided instructions for how to complete the SCE Strategy investment, and it included a glossy brochure entitled, "DeSoto Investors, LLC Offering Summary."  (*Id.*) The brochure represented that the business of Desoto Holdings, LLC—which had been formed in October 2016 and held no properties—was to "hold, mine, and operate real property."  (*Id.*)  It reiterated the various purported benefits of the SCE Strategy, which Plaintiffs allege "caused Hoover and the Class members to participate unwittingly in the audit lottery."  (*Id.*)

On the same day, the Strategic and Bridge Capital Defendants emailed Hoover a DocuSign link, which provided him with documents to review and sign, including a Private Placement Memorandum, a Private Placement Offering, and a Subscription Agreement.  (*Id.* ¶ 127.)  The Private Placement Memorandum ("PPM") described the DeSoto SCE transaction in detail and represented that the DeSoto Syndicate would be able to choose from four options for using the property:   (1) establish a limestone quarry on the property, (2) market the property for sale for mining development, (3) hold the

property for long-term investment, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust, which would result in a charitable contribution deduction equal to $25,341,000 for the Syndicate. (*Id.*) The last option was called the "conservation easement option." (*Id.*)

The PPM incorporated by reference a document called a "Preliminary Greenfield Property Aggregate Valuation and Quarry" that had been prepared by Defendant AquaFusion. (*Id.* ¶ 129.) Plaintiffs allege that this report formed the basis for the HBU valuation of the DeSoto Property. (*Id.* ¶ 131.) AquaFusion sent the report to the Clark Defendants, who relied on it in their appraisals. (*Id.* ¶ 130.) The AquaFusion report allegedly contained "numerous undisclosed and gross deficiencies," as well as outright fraud. These included, among others: (1) failure to disclose the neighboring SCE transaction tracts and their impact on the legal and economic feasibility of using the DeSoto Property for mining; (2) the statement that it was "reasonably likely" that rezoning and permitting for mining could be obtained in two years, despite the fact that White Rock Quarries had struggled for years to secure it; (3) an unwarranted assumption that the required local infrastructure to support a mining operation was in place; (4) unsupported assumptions about the volume of crushed limestone that the property could produce within a few years; (5) the conclusion that the report's "analysis demonstrates that a financially viable construction aggregate operation is possible for the DeSoto Holdings

site"; (6) seriously flawed discounted cash flow calculations that produced an inflated estimate of the discounted value of a limestone quarry on the DeSoto Property.  (*Id.* ¶¶ 131-32.)  The result was a proposed HBU that was "purely speculative," or, at best, overstated the actual value of the mining operation by between 40% and 70%.  (*Id.* ¶ 133.)

Attached to the PPM was an "Initial Appraisal" summary letter prepared by the Clark Defendants that purported to support the four options for use of the DeSoto Property.  (*Id.* ¶ 134.)  The Initial Appraisal estimated the value of a conservation easement donation of 146.63 acres of the property at $25,341,000, or about $173,000 per acre.  (*Id.* ¶ 135.)  Plaintiffs allege that the "Clark Defendants and the other Defendants knew that this appraisal was grossly overstated, did not comply with USPAP [Uniform Standards of Professional Appraisal Practice] or IRS fair market value principles, and was based on a HBU that was never intended to occur and speculative in nature." (*Id.*)  The Initial Appraisal incorporated AquaFusion's report, and thus is allegedly based on many of the same flaws described above.  (*Id.* ¶ 136.)

In December 2016, the MMM Defendants issued a draft opinion letter by email or mail to the DeSoto Syndicate.  (*Id.* ¶ 138.)  The letter expressed various opinions related to the legal viability of a conservation easement contribution by the DeSoto Syndicate that Plaintiffs allege were knowingly false, largely because the MMM Defendants knew or recklessly disregarded

the fact that the appraisal was "grossly and fraudulently inflated," the HBU analysis was legally insufficient, and the proposed contribution would not actually comply with I.R.C. § 170(h). (*See* Doc. 109, FAC ¶ 138-39.) Hoover and the class members allegedly relied on this letter. (*Id.* ¶ 140.)

In reliance on representations in the Strategic Defendants' Promotional Materials, Hoover bought an interest in the DeSoto Syndicate for $135,000.[8] (*Id.* ¶ 141.) On December 16, 2016, the Strategic Defendants acquired the DeSoto Property through DeSoto Holdings, LLC for $709,207. The DeSoto Property was then sold to the Syndicate for $5 million, and it was later valued at about $25 million for the purposes of the conservation easement. (*Id.* ¶ 148(a).)

On December 26, 2016, Novak emailed Hoover and other syndicate members a supplement to the PPM that discussed IRS Notice 2017-10. (*Id.* ¶ 144.) The email, however, allegedly falsely suggested that the DeSoto Syndicate Transaction complied with the law, and that its appraisals were supported by two independent appraisers (one initial appraiser, the Clark Defendants, and one "peer reviewing" appraiser, who allegedly did not exist). (*Id.*) The DeSoto Syndicate members were given two days to either "rescind

---

[8] The FAC does not specify the precise date of Hoover's investment. (*See* Doc. 109, FAC ¶ 140.)

and withdraw" or to "waive rescission and reaffirm" their subscriptions.  (*Id.* ¶ 145.)  Hoover reaffirmed his decision to participate.  (*Id.* ¶ 147.)

Thereafter,[9] the DeSoto Syndicate voted to encumber the property with a conservation easement and donate the easement to Defendant ACC.  (*Id.* ¶ 148.)  The Conservation Easement Deed, dated December 29, 2016, was jointly prepared and approved by the Strategic, MMM, and ACC Defendants.  (*Id.* ¶ 149.)  The deed conveyed a conservation easement on 146.63 acres of the DeSoto Property to ACC.  (*Id.* ¶ 150.)  It contained representations about the conservation value of the property and stated that it met the "conservation purpose" requirement of I.R.C. § 170(h)(4)(A)(ii).  (Doc. 109, FAC ¶ 150.)  The ACC Defendants provided DeSoto Holdings with a letter confirming the donation and stating that it was "fully tax deductible," although they allegedly knew that it was not.  (*Id.* ¶ 152.)

On December 29, Defendant Nelson Mullins issued a "Due Diligence Report" to DeSoto Syndicate members via email or mail.  (*Id.* ¶ 153.)  The letter stated, among other things, that Nelson Mullins "did not see anything out of the ordinary in the Appraisal," and that "the methodology that was used

---

[9] The FAC states that the vote was taken "pursuant to a notice dated December 23, 2016," but it discusses the vote after the December 26 disclosure email and states that the Syndicate voted in part in reliance on that email.  (Doc. 109, FAC ¶ 148.)  It is thus unclear to the Court when precisely the DeSoto Syndicate's vote took place.

seemed reasonable." (*Id.* ¶ 154.)  Plaintiffs allege that Nelson Mullins knew or recklessly disregarded the fact that the $25 million value of the donation was inflated, that the Clark Defendants had impermissibly relied upon the AquaFusion report uncritically, and that the HBU analysis was legally deficient.  (*Id.*)  Plaintiffs also allege that Nelson Mullins failed to disclose that IRS Notice 2017-10 "meant a near certain chance of audit or disallowance by the IRS," which it knew or should have known.  (*Id.* ¶ 155.)  The Due Diligence Report disclosed that Nelson Mullins had worked with the Strategic and Bridge Defendants on past SCE transactions, had issued similar letters for those transactions, and was being paid from the proceeds of the DeSoto Syndicate Transaction.  (*Id.* ¶ 156.)

On December 30, 2016, ACC provided a "Baseline Documentation Report" ("BDR") to DeSoto Holdings.  (*Id.* ¶ 157.)  The language in the BDR echoed the allegedly deficient statement of the property's conservation purpose that was found in the Conservation Easement Deed, and also allegedly omitted important information, making it inadequate to its purpose of documenting the conservation value of the land at the time of the conveyance.  (*Id.* ¶¶ 158-63.)  On May 18, 2017, the Clark Defendants prepared the Appraisal Summary (Form 8283), which was "verified" by the ACC Defendants.  (*Id.* ¶ 164.)  The Clark and ACC Defendants advised Hoover that the Appraisal Summary would substantiate his charitable contribution deduction.  (*Id.*)  In June 2017,

the Clark Defendants sent a Qualified Appraisal Report to DeSoto Holdings by email or mail for use in their tax filings.  (*Id.* ¶ 167.)  The Qualified Appraisal represented that the Clark Defendants were qualified appraisers under IRS regulations, that the Clark Defendants' appraisal was not derived to coincide with a value desired by their client, and that the Clark Defendants were independent.[10]  (*Id.* ¶¶ 170-74.)

On June 23, 2017, Bennett Thrasher prepared the DeSoto Syndicate's tax return and K-1s for the Syndicate members, including Hoover.  (*Id.* ¶¶ 175-76.)  Attached to the Syndicate's tax return were the Clark Defendants' Appraisal, the Appraisal Summary, the BDR, and the ACC letter confirming the donation.  (*Id.* ¶ 175.)  The K-1 prepared for Hoover reported a charitable contribution deduction of $421,799.  (*Id.* ¶ 176.)  Hoover reported this deduction on his tax return.

On October 3, 2017, Defendant Freeman and Strategic sent a photo book of the DeSoto Property to the DeSoto Syndicate members.  (*Id.* ¶ 178.)  The book contained photos of the property and represented, among other things, that a "desk audit" of the Clark Defendants' appraisal had found it to be compliant with the relevant regulations.  (*Id.*)

---

[10] Plaintiffs allege that the Clark Defendants' lack of independence is shown by the coincidence between the appraisal values they reached and the returns promised by the Strategic Defendants in their promotion of the SCE Strategy. (*See, e.g.*, Doc. 109, FAC ¶ 170.)

Eventually, the DeSoto Syndicate received an IRS notice indicating that its partnership tax return was selected for an audit. (*Id.* ¶ 180.) The IRS's final determination, rendered in August 2020, found that the charitable contribution donation failed to comply with I.R.C. § 170(h), and it disallowed the entire deduction. (*Id.* ¶ 181.) It also assessed a "gross valuation misstatement" penalty of 40% or, in the alternative, a "substantial valuation misstatement" penalty of 20%. (*Id.*) The DeSoto Syndicate's tax matters partner is currently challenging the IRS's conclusions in the United States Tax Court. (*Id.* ¶ 182.)

### 2.  The Turtle River Syndicate Transaction (2013)

Plaintiff Spratt and the Greiner Plaintiffs participated in the Turtle River Syndicate Transaction in 2013. (*Id.* ¶ 184.) The transaction centered on the Turtle River Property, a 380-acre tract in Glynn County, Georgia. The Strategic and Bridge Capital Defendants subdivided the Turtle River Property from a much larger tract of 3,500 acres that they had acquired for a total of $12.1 million in two transactions, one in 2003 and one in 2005. (*Id.* ¶ 185.)

On December 15, 2013, the Strategic Defendants obtained an Initial Appraisal of the Turtle River Property from the VSW Defendants. (*Id.* ¶ 186.) Defendant Freeman communicated with Defendant Credo Financial Services, LLC, who was then Plaintiff Spratt's financial advisor, soliciting  his participation in the Strategic Defendants' SCE Strategy, encouraging Spratt

to participate in multiple emails and calls, and touting the benefits of the SCE Strategy and the Strategic Defendants' expertise. (*Id.* ¶¶ 188-93.) Plaintiffs allege that Credo either knew or should have known that the SCE Strategy was fraudulent, or that it failed to investigate it in derogation of its professional responsibilities. (*Id.* ¶ 194.) Defendant Oxygen Financial, the Greiners' financial advisor, played a similar solicitation role with respect to the Greiners. (*Id.* ¶¶ 195-203.)

On December 26 and December 27, 2013, Spratt and the Greiners received emails from the Strategic Defendants containing the "First Supplement to the Private Placement Memorandum"[11] for the Turtle River Syndicate. (*Id.* ¶¶ 204-05.) That document, prepared jointly by the Strategic, Bridge Capital, and MMM Defendants, represented that the Turtle River Property could be used for timber harvesting, hunting, and residential housing, or that it could be sold to one or more developers, or that it could be conserved pursuant to the SCE Strategy. (*Id.* ¶ 207.) The estimated value of the conservation donation was said to be $28.5 million. (*Id.* ¶ 208.) The First Supplement also included the VSW Defendants' Initial Appraisal that

---

[11] The name of this document is not explained in the FAC. It is unclear if there was a prior Turtle River PPM—none is mentioned—or whether the "First Supplement" was the first such document received by the Turtle River Plaintiffs. (*See* Doc. 109, FAC ¶¶ 204-10.) The "First Supplement" plays the same role in the Turtle River allegations as do the PPMs in the other representative transactions.

estimated the fair market value of the Turtle River Property (before conservation) at about $29.3 million – a value that, as detailed below, Plaintiffs now claim was grossly inflated.

In late December 2013, Spratt and the Greiners executed the subscription documents for Turtle River. (*Id.* ¶ 211.) Each paid $28,500 into the Turtle River Syndicate. (*Id.*) The three voted to pursue the SCE Strategy, which the Turtle River Syndicate then did. (*Id.* ¶ 212.) On December 31, 2013, Defendant GALT provided the Conservation Easement BDR for the Turtle River Syndicate to the Syndicate members. (*Id.* ¶ 213.) On the same date, the Conservation Easement Deed, jointly prepared by Strategic, MMM, Bridge Capital, and GALT, was sent for filing and signed by GALT officials. (*Id.* ¶ 214.) On April 9, 2014, GALT signed the Appraisal Summary (Form 8283) for the Turtle River Property, and sent it to the Syndicate. (*Id.* ¶ 216.) The Summary reported the value of the conservation easement at $28.5 million. (*Id.*)

On January 24, 2014, the VSW Defendants sent a final Qualified Appraisal Report to the Turtle River Syndicate. (*Id.* ¶ 219.) The appraisal reported the fair market value of the property as $29.26 million, or about $77,027 per acre, an appreciation by a factor of 22 over its value 10 years before. (*Id.* ¶ 220.) The appraisal determined that the HBU associated with this valuation was as a "multi-use development." Plaintiffs allege that the

appraised value of the property was inflated to meet a pre-determined value set by the Strategic Defendants. (*Id.* ¶ 221.) In particular, the appraisal allegedly failed to comply with applicable professional appraisal standards, despite representing that it was a "Qualified Appraisal"; ignored the fact that the property is 31% undevelopable wetlands, despite that fact being reported in the Turtle River BDR to substantiate the land's conservation value; and used "grossly dissimilar" sales comparators. (*Id.* ¶¶ 221-23.)

The Langford Defendants prepared the Turtle River Syndicate's tax return and K-1s in April 2014. (*Id.* ¶ 225.) Each syndicate member's investment of $28,500 yielded a charitable contribution deduction of $120,333. (*Id.* ¶ 226.) The Strategic Defendants reviewed and signed off on the K-1s. (*Id.* ¶ 227.) Oxygen prepared the Greiners' individual tax return on April 24, 2014, and Credo did the same for Spratt in October 2014. (*Id.* ¶¶ 228-29.)

On April 17, 2017, the IRS sent the Turtle River Syndicate a notice indicating that the Syndicate's conservation easement charitable deduction did not meet the requirements of the Tax Code, would be disallowed in its entirety, and would be assessed a 20% or 40% valuation misstatement penalty. (*Id.* ¶ 230.)

On May 12, 2017, following this notice from the IRS, the Turtle River Syndicate sent a letter drafted by Strategic and MMM to the Syndicate members discussing the audit. (*Id.* ¶ 231.) The letter stated, among other

things, that "we strongly disagree with the IRS' determination and we suggest that you not be overly alarmed[.]" (*Id.*)   A memorandum from the MMM Defendants was attached to this letter.   (*Id.*)   Plaintiffs allege that these communications were fraudulent because they failed to disclose the fact, known to Strategic and MMM, that the claimed value of the conservation easement was fraudulently inflated. (*Id.* ¶ 232.)  In November 2017, Strategic sent a subsequent letter to the Turtle River Syndicate members updating them on the retention of counsel and the filing of a Tax Court petition (on June 30, 2017) to challenge the audit.  (*Id.* ¶ 233-34.)  The litigation remained pending as of the filing of the FAC.  (*Id.* ¶ 234.)  The Tax Court did, however, grant partial summary judgment to the IRS on June 30, 2020, based on deficiencies in the Conservation Easement Deed.[12]  (*Id.*)

### 3.  The Bear Creek Syndicate Transaction (2016)

In 2016, the Strategic Defendants facilitated the acquisition of 185 acres of land in Coweta County, Georgia (the "Bear Creek Property").  (*Id.* ¶ 236.) The land was acquired by a Strategic-affiliated entity and is located adjacent to two other parcels of land owned by Strategic-affiliated entities that were also used in SCE Strategy transactions.  (*Id.* ¶¶ 237-238.)  Also adjacent to

---

[12] The Treasury Regulation on which this ruling was based has since been invalidated, the significance of which is discussed below.  See Part III(C)(1) below.

those properties are large tracts owned by individuals living in high-end homes. (*Id.* ¶ 238.)

In the second half of 2014, Plaintiff Hebert met with Defendant Dantin at the offices of Hebert's business in Louisiana. (*Id.* ¶ 243.) Dantin had previously been a financial advisor to Hebert in the 1990s. (*Id.* ¶ 242.) At this meeting, Dantin "pitch[ed]" the Strategic Defendants' SCE Strategy to Hebert, describing how the strategy worked, representing that he had "fully vetted" the strategy, and stating that the strategy was legal and usually led to "$4 in tax savings for every $1 invested." (*Id.* ¶ 243.) He also "touted" Strategic's reputation and the team it had assembled, including CPA and appraisal firms and lawyers. (*Id.* ¶ 244.) He offered Hebert marketing brochures from Strategic, including one describing the Turtle River Syndicate transaction and one describing Strategic's general experience with conservation tax credits and other tax credits. (*Id.* ¶¶ 245-46.) The brochure referred to Strategic's "expert team of CPAs, MBAs, attorneys, wealth managers, and investment bankers." (*Id.* ¶ 246.) Hebert, at Dantin's request, agreed to host a meeting with other potential SCE Strategy investors where Strategic representatives would provide more information about the SCE Strategy. (*Id.* ¶ 250.) The meeting took place "a couple of months" later, with Dantin, Defendant Novak, and other Strategic representatives present. (*Id.* ¶ 251.) At that meeting, the Strategic representative made various allegedly misleading or false representations

about the SCE Strategy.  For example, the Strategic representative repeated the 4:1 tax savings-to-investment ratio, omitted that the appraisals would be "fraudulently premised on a hypothetical HBU in a manner" contrary to the Tax Code, and stated that audits were unlikely and would not result in disallowance, or at least not total disallowance.  (*Id.*)  Hebert decided to invest based on these representations and Dantin's.  (*Id.* ¶ 252.)  He thus undertook an SCE Strategy transaction in 2014.

Later, Hebert undertook a second SCE Strategy transaction—the Bear Creek Syndicate Transaction—"[b]ecause the 2014 transaction had seemingly been successful and based on the prior misrepresentations made to him by Strategic and the Dantin Defendants[.]"  (*Id.* ¶ 253.)  In the fourth quarter of 2015, Hebert received Promotional Materials and other solicitations regarding the Bear Creek Syndicate from the Strategic and Bridge Capital Defendants.  (*Id.* ¶ 254.)  One glossy brochure received by email described the business of the Bear Creek Syndicate as being to "hold, mine, and operate real property," and represented that an investment of $27,000 would yield a federal tax deduction of $114,444.  (*Id.* ¶ 257.)

On December 20, 2016, Hebert received the Bear Creek Syndicate subscription documents via email, including the PPM, a Private Placement Offering, and a Subscription Agreement.  (*Id.* ¶ 259.)  The PPM incorporated a preliminary analysis by AquaFUSION regarding the feasibility of operating a

gneiss quarry on the property, which report was relied upon in the VSW Defendants' appraisals "without examination" and which contained similar alleged deficiencies as the AquaFUSION report described in connection with the DeSoto Syndicate Transaction.  (*See id.* ¶¶ 261-264.)  Here, the analysis allegedly ignored nearby residential tracts and their likely effects on the legal permissibility or economic feasibility of operating a quarry on the Bear Creek Property, and it made various unsupported or implausible assumptions regarding the feasibility of the Bear Creek Syndicate's establishment of a profitable quarry in a brief time.  (*See id.* ¶ 263.)

The Bear Creek Promotional Materials incorporated VSW Defendants' Initial Appraisal, which included language stating that it was "intended for your [*i.e.*, Hebert's] discussion and/or use with your partners, tax attorney and accountants[.]"  (*Id.* ¶ 265.)  The Initial Appraisal stated that the conservation easement had a "Fair Market Value" of $24,329,000, which the FAC alleges the VSW and other Defendants knew was "grossly overstated and based on a HBU that was never intended to occur."  (*Id.* ¶ 266.)  As noted above, the Initial Appraisal allegedly incorporated and relied upon AquaFUSION's quarry feasibility analysis.  (*Id.* ¶ 267.)

Relying on the Promotional Materials, Hebert purchased an ownership interest in the Bear Creek Syndicate for $54,000 on December 20, 2016.  (*Id.* ¶ 270.)

In December 2016, the MMM Defendants issued a draft legal opinion letter to the Bear Creek Syndicate.  (*Id.* ¶ 272.)  The FAC alleges that the letter contained knowingly and "materially false statements and omitted key facts, including about the near certainty of an audit and disallowance of the claimed deductions."  (*Id.* ¶ 273.)  On December 30, 2016, Defendant Nelson Mullins issued its "Due Diligence Report," which was emailed to Hebert.  (*Id.* ¶ 276.)  The Due Diligence Report said that Nelson Mullins "did not see anything out of the ordinary in the Appraisal, and the methodology that was used seemed reasonable," although it declined "to opine on the feasibility or probability of the Property being developed as a mine or quarry."  (*Id.* ¶ 277.)  The Report acknowledged that Nelson Mullins "had done work for Strategic and Bridge Capital on other conservation easement transactions and had issued similar opinion letters for those transactions" and that it "was being paid out of the closing proceeds from the closing of the Transaction." (*Id.* ¶ 279.)    Plaintiffs allege that Nelson Mullins nevertheless did not  explain that these issues "destroyed any independence" that it had.  (*Id.* .)

On December 28, the managers of the Bear Creek Syndicate (Defendant Freeman and non-party Harold Barry) sent a notice to the Syndicate members recommending that the Syndicate pursue a conservation easement strategy as outlined in the PPM.  (*Id.* ¶ 280.)  The members then voted on whether to pursue this or another strategy, and Hebert voted in favor of the SCE Strategy.

(*Id.* ¶ 281.)  All other Syndicate members also did so, and the Syndicate pursued the SCE Strategy.  (*Id.*)  The Bear Creek Property had been purchased for $1.3 million, sold to the Syndicate members for over $5 million, and was valued at $24 million for purposes of the conservation easement.  (*Id.* ¶ 282.)

Next, the ACC Defendants prepared a BDR and provided it to the Bear Creek Syndicate on December 30, 2016.  (*Id.* ¶ 283.)  The ACC Defendants, along with the Strategic and MMM Defendants, "jointly prepared and approved" the Conservation Easement Deed, and the conservation easement was conveyed to ACC on December 30, 2016.  (*Id.* ¶ 284.)  The deed contained alleged deficiencies, the likely consequences of which—IRS disallowance and tax penalties—Plaintiffs allege that the Strategic, MMM, and ACC Defendants knew or recklessly disregarded.  (*Id.* ¶ 285.)  On the same date, ACC sent a letter to the Bear Creek Syndicate documenting the conveyance and stating that the contribution of the easement to ACC was "fully tax deductible[.]"  (*Id.* ¶ 286.)

In August 2017, the VSW Defendants prepared the Appraisal Summary (Form 8283) and sent it to Bear Creek LH Holdings, LLC.  Defendant Keller, on behalf of ACC, and Defendants Wingard and Van Sant verified the Appraisal Summary as accurate.  (*Id.* ¶ 289.)  The F&D, VSW, and ACC Defendants advised Hebert that the Appraisal Summary would substantiate his individual charitable contribution deduction.  (*Id.* ¶ 290.)

40

The VSW Defendants sent the final Qualified Appraisal Report to Bear Creek LH Holdings, LLC on September 9, 2017, allegedly intending that it be shared with and relied upon by Bear Creek Syndicate members. (*Id.* ¶ 293.) The Qualified Appraisal represented, among other things, that the conservation easement had a fair market value of $24,329,000; that the VSW Defendants were qualified appraisers under IRS regulations; that the VSW Defendants' "engagement in this assignment was not contingent upon developing or reporting predetermined results"; and that the appraisers had "no bias with respect to the property that is the subject of this report or to the parties involved with this assignment[.]" (*Id.* ¶¶ 294-98.) The Qualified Appraisal relied upon AquaFUSION's report. (*Id.* ¶ 299.) Like that report, the Qualified Appraisal allegedly omitted facts about potential legal and economic obstacles to mining the property, as well as information about comparable properties elsewhere in the state that had faced difficulties securing legal permission to develop mines or quarries. (*Id.* ¶¶ 300-05).

In September 2017, the F&D Defendants prepared the partnership tax return for the Bear Creek Syndicate. The F&D Defendants attached the VSW Appraisal, the Appraisal Summary (Form 8283), and the ACC letter confirming the donation. (*Id.* ¶ 306.) The FAC alleges that the F&D Defendants "knew and intended" that the Bear Creek Syndicate would file the tax return with the IRS and that the Syndicate members would claim their

proportionate share of the resulting charitable contribution deduction on their individual returns.  (*Id.*)  The F&D Defendants also prepared a K-1 for each member of the Bear Creek Syndicate, including Hebert.  (*Id.* ¶ 307.)  Hebert's K-1 reported a charitable contribution deduction of $228,887.  (*Id.*)  Hebert claimed this deduction on his individual tax return for 2016.  (*Id.* ¶ 309.)

On July 20, 2020, the IRS disallowed the Bear Creek Syndicate's charitable contribution deduction at the partnership level for several reasons, including that the transaction failed to satisfy the requirements of I.R.C. § 170(h) and corresponding Treasury Regulations, and that the value of the charitable contribution was not established.  (*Id.* ¶ 310.)  The IRS imposed a 40% penalty.  (*Id.*)  The Bear Creek Syndicate filed a Tax Court petition on October 14, 2020, challenging these determinations, and as of the filing of the FAC, the case remained pending.  (*Id.* ¶ 311.)

### 4. The Rock Spring Syndicate Transaction (2016)

The Rock Spring Syndicate Transaction involved a 121-acre tract in Morgan County, Alabama (the "Rock Spring Property").  (*Id.* ¶ 313.)  Plaintiff Douget, who owns and operates a day care franchise, learned of the SCE Strategy through a presentation given by Defendant Novak at a franchise conference in Key West on October 17, 2016.  (*Id.* ¶ 314.)  During the presentation, Novak described the SCE Strategy and "emphasized that his team of professionals and outside appraisers, lawyers, accountants, and

consultants had a proven track record of doing SCE Strategy transactions." (*Id.* ¶ 315.) Douget received Promotional Materials regarding the Rock Spring Syndicate from the Strategic and Bridge Capital Defendants in the last quarter of 2016. (*Id.* ¶ 316.) On December 28, 2016, Douget received other Promotional Materials from Strategic, as well as the PPM, Private Placement Offering, and Subscription Agreement for the Rock Spring Syndicate. (*Id.* ¶¶ 320-21.) A Strategic representative instructed Douget to sign the documents and wire her payment the same day "to ensure prompt closing." (*Id.* ¶ 320.)

Like the DeSoto and Bear Creek Transactions, the Rock Spring Transaction involved an AquaFUSION report purporting to support the feasibility of the Rock Spring Property as a mine, in this case for limestone. (*Id.* ¶¶ 323-328.) The AquaFUSION report allegedly contained substantially the same deficiencies as the other such reports described above. (*See id.*) It was dated November 23, 2016. (*Id.* ¶ 323.)

The Rock Spring Promotional Materials included an Initial Appraisal prepared by the Clark Defendants and dated December 2, 2016. (*Id.* ¶ 329.) The Initial Appraisal estimated the value of the fee simple donation of the Rock Spring Property to be $23,560,000 ($194,710 per acre), in light of its purported HBU of limestone mining. (*Id.* ¶ 330.) The Initial Appraisal incorporated the AquaFUSION report, on which it "relied wholesale and without examination," and allegedly contained many of the same deficiencies and misrepresentations

43

as the appraisals in the transactions described above.  (*Id.* ¶¶ 331-33.)  For example, the appraisal allegedly failed to suggest any reasonable basis for accepting the AquaFUSION report's analysis, made unexplained assumptions about the feasibility of mining or securing permitting for mining, and ignored comparable sales of mines in Alabama.  (*Id.* ¶ 331.)

The Rock Spring Promotional Materials contained a document that "purported to disclose IRS Notice 2017-10" to the Rock Spring Syndicate, but the document allegedly "significantly downplayed the impact of this IRS Notice."  (*Id.* ¶ 334.)  Subsequent communications from Strategic to Douget— on January 13 and May 9, 2017—also downplayed the significance of the IRS Notice and reassured syndicate members about the continuing viability of the SCE Strategy, even though Defendants allegedly knew that the transactions did not comply with the law and that the appraisals were inflated.  (*Id.* ¶¶ 335-337.)

In December 2016, Nelson Mullins issued a draft legal opinion letter to the Rock Spring Syndicate.  (*Id.* ¶ 338.)  The letter concluded, among other things, that "the Investor Members . . . should be entitled to an allocation of the income, gain, loss, deduction (including the Contribution Deduction) and credit of the Investment Company."  (*Id.*)  Plaintiffs allege that Nelson Mullins knew this was false and misleading because it knew "that there was a substantially greater than 50% chance that the contribution deduction would

44

be audited and disallowed by the IRS." (*Id.*) They allege that the letter contained other materially false and misleading representations and omitted material facts, and that Nelson Mullins intended the letter to be relied upon by Plaintiff Douget and other syndicate members. (*Id.* ¶¶ 339-342.) Plaintiffs further allege that the letter failed to make any disclosure of Nelson Mullins' lack of independence in the Rock Spring Syndicate Transaction, although the firm had made such disclosures in its letter for the DeSoto Syndicate Transaction. (*Id.* ¶ 343.)

On December 22, 2016, the Strategic Defendants facilitated the acquisition of the Rock Spring Property by an entity called Rock Spring, LLC. (*Id.* ¶ 345.) Plaintiff Douget purchased 1.5 units in the Rock Spring Syndicate on December 29, 2016, for $39,750. (*Id.* ¶ 346.) She did so "based on the Promotional Materials (including the Initial Appraisal) and the Defendants' advice and representations." (*Id.*) On the same day—December 29—the Rock Spring Syndicate conveyed the Rock Spring Property to Foothills. (*Id.* ¶ 347.) The Limited Warranty Deed, jointly prepared by the Strategic Defendants, Nelson Mullins, and Foothills, represented that the appraised market value of the donation was $23,560,000. (*Id.*) Plaintiffs allege that the preparers of the deed knew that this value was false. (*Id.*)

In May or June 2017, the Clark Defendants prepared an Appraisal Summary (Form 8283), which represented that Rock Spring, LLC had acquired

the Rock Spring Property on December 22, 2016, for $839,554, but that its fair market value on December 29, 2016, was over $23 million.  (*Id.* ¶ 349.) Plaintiffs allege that "[t]he Clark Defendants and Foothills . . . then advised Douget that the Appraisal Summary would substantiate the charitable contribution deduction[.]" (*Id.*)  The Appraisal Summary was provided to the Rock Spring Syndicate for filing with its tax returns.  (*Id.* ¶ 351.)

The Clark Defendants sent the final Qualified Appraisal to Rock Spring, LLC on August 10, 2017.  (*Id.* ¶ 352.)  The Appraisal stated that its "intended users" were "the donors and the IRS for the purpose of estimating the fair market value of a 121-acre tract donated to" Foothills.  (*Id.*)  The Qualified Appraisal allegedly contained the same misrepresentations and deficiencies as the Initial Appraisal.  (*Id.* ¶¶ 353-357.)  Among other things, the Qualified Appraisal allegedly misrepresented that the Clark Defendants were unbiased, when in fact the SCE Strategy required that they appraise the property at a value within a predetermined range.  (*Id.* ¶ 356.)

In August 2017, Defendant Bennett Thrasher prepared the Rock Spring Syndicate's tax return and the Schedule K-1 forms for each of the syndicate members, including Douget.  (*Id.* ¶¶ 358-360.)  Bennet Thrasher sent a letter to Douget along with the K-1, and the letter instructed her to enter the information on the K-1 on her tax return and listed certain documents she should file with her return.  (*Id.* ¶ 361.)  Douget "followed [this] advice" and

reported a charitable contribution deduction of $168,114 on her 2016 tax return.  (*Id.* ¶ 362.)

On October 3, 2017, the Strategic Defendants sent a photo book of the Rock Spring Property to the Rock Spring Syndicate members, including Douget.  (*Id.* ¶ 363.)  The book stated that a "desk audit review" of the Clark Defendants' appraisal had affirmed its reasonableness and compliance with IRS and Treasury guidelines.  (*Id.*)

On August 7, 2020, the IRS issued a Final Partnership Administrative Adjustment ("FPAA") for Rock Spring, LLC's 2016 tax return.  (*Id.* ¶ 365.)  The IRS disallowed the contribution entirely and imposed a 40% penalty on the entity.  (*Id.*)  The Rock Spring Syndicate and Rock Spring, LLC filed a Tax Court petition on November 9, 2020, where the case remained pending as of the filing of Plaintiffs' FAC.

### 5.  The Vista Hill Syndicate Transaction (2015)

The Vista Hill Syndicate Transaction involved a 112.46-acre tract in Chatham County, North Carolina (the "Vista Hill Property").  (*Id.* ¶ 368.)  The tract was carved out of a parent tract of 607.13 acres, which had been acquired by previous owners in 2011 for a total of $2,238,000, or about $3,686 per acre. (*Id.*)  The Strategic Defendants eventually subdivided the parent tract into five different tracts that were transferred to five syndicates.  (*Id.* ¶ 369.) Conservation easements were placed on each of the four other tracts in 2012

and 2014, prior to the Vista Hill Syndicate Transaction. (*Id.*) The appraised fair market value of the tract as reported on the Vista Hill Syndicate's Form 8283 would eventually come to $200,875 per acre, while comparable sales of neighboring tracts averaged $3,266 per acre. (*Id.* ¶ 371.)

In the second half of 2014, Defendant Dantin organized a meeting at the offices of Environmental Technical Sales, Inc., the company for which Plaintiff Agnew served as vice president. (*Id.* ¶ 372.) At the meeting, a Strategic representative described the SCE Strategy and represented that the federal tax benefits were usually $4 in tax savings for every $1 invested. (*Id.* ¶ 373.) He made other alleged misrepresentations comparable to those described above in connection with the presentation attended by Plaintiff Hebert. (*Id.*) Based on the representations made at this meeting and Dantin's endorsement of the SCE Strategy, Agnew undertook his first SCE Strategy transaction in 2014. (*Id.* ¶¶ 374-75.)

In the second half of 2015, a Strategic representative called Agnew to ask if he would like to participate in another SCE Strategy transaction, and Agnew agreed. (*Id.* ¶ 376.) Subsequently, Agnew received Promotional Materials and other solicitations from the Strategic and Bridge Capital Defendants. (*Id.* ¶ 377.) These included a glossy brochure that represented that an investment of $50,000 in the Vista Hill Syndicate would result in an allocated federal tax deduction of over $220,000. (*Id.* ¶ 380.)

48

In October or November 2015, the Strategic and Bridge Capital Defendants emailed Agnew a package of documents including the Vista Hill PPM, Private Placement Offering, and Subscription Agreement. (*Id.* ¶ 381.) The PPM contained representations analogous to those described in connection with the PPMs in the other transactions above—for example, it offered several alleged options for the Syndicate to pursue in disposing of property, including a conservation option that would give rise to a deduction totaling $22,505,000. (*See id.* ¶ 382.) The PPM also incorporated a "Valuation of Aggregate Resources" report dated July 9, 2015, that had been prepared by McCalip & Company, Inc.[13] (*Id.* ¶ 383.) The report purported to substantiate the conclusion that the HBU of the Vista Hill Property was for use as an aggregate mine. (*Id.* ¶ 385.) Plaintiffs allege that the report contained "undisclosed deficiencies, if not outright frauds" such as (1) a failure to examine the impact of adjoining tracts, some of which were encumbered with conservation easements, on the legal feasibility of mining the property; (2) a failure to justify market demand expectations; (3) an exaggerated estimate of the mine's likely future probability; (4) an unreasonably low discount rate; and (5) an unreasonably low adjustment for operating risk. (*Id.* ¶ 385.) These deficiencies

---

[13] McCalip & Company was originally a defendant in this action, but Plaintiffs voluntarily dismissed it on January 21, 2022. (Doc. 240.)

allegedly rendered the report "purely speculative" and caused it to "wholly fail[
]" to support the viability of the HBU of mining.  (*Id.* ¶ 386.)

Attached to the PPM was a summary of an Initial Appraisal prepared by
the VSW Defendants, who allegedly knew that Agnew and other potential
investors would rely on it in deciding to undertake the SCE Strategy.  (*Id.* ¶¶
387-88.)   The Initial Appraisal represented that the VSW Defendants had
estimated the value of a conservation donation of 112.46 acres of the Vista Hill
Property to be $22,498,000, but Plaintiffs allege that the VSW Defendants
knew that this appraisal was grossly overstated.  (*Id.* ¶ 388.)   The VSW
Defendants' appraisal "relied wholesale and without examination" on
McCalip's report and failed to state a basis for doing so, which Plaintiffs allege
violates professional standards applicable to appraisers.  (*Id.* ¶389.)  Plaintiffs
identify other alleged flaws in the Initial Appraisal, including a failure to use
fair market value analysis, a failure to identify comparable mines in North
Carolina to use in a sales comparison approach, and a failure to demonstrate
any competency in appraising mining or mineral properties.  (*Id.*)

On October 22, 2015, Defendant Sean Honeywill, on behalf of Defendant
PCLG, sent a "Due Diligence Report" to Agnew and the other investors in the
Vista Hill Syndicate transaction by email.  (*Id.* ¶ 402.)  The Due Diligence
Report was addressed to the syndicate members and began with "per your
request."  (*Id.*)   Plaintiffs allege that the PCLG Defendants had authored

numerous due diligence reports in connection with SCE Strategy transactions between 2013 and 2016, and had a "longstanding relationship" with MMM, "the developers of the SCE Strategy." (*Id.* ¶ 401.) The stated goal of the Due Diligence Report was to "identify any material issues" with respect to the Vista Hill Transaction's "legal agreements and tax structure" and to propose solutions for mitigating those risks. (*Id.* ¶ 403.) Plaintiffs allege that the letter contained various deficiencies and misrepresentations that rendered its conclusions "fraudulent" and "in violation of IRS Circular 230, which governed [such] tax opinion letters." (*Id.*) For example, the letter concluded that the appraisal methodology was reasonable, the geology report was reasonable, and that the transaction "appear[ed] to satisfy" legal requirements, despite—as Plaintiffs allege—that the PCLG Defendants knew the contrary of each of these statements to be true. (*Id.* ¶ 405.) The Due Diligence Report allegedly failed to acknowledge that the PCLG Defendants were not independent because they had worked with Strategic and Bridge Capital on other conservation easement transactions, so Strategic and Bridge were important clients to PCLG. (*Id.* ¶ 406.)

In reliance on the Promotional Materials, including the Initial Appraisal, Agnew paid $50,000 to buy an interest in the Vista Hill Syndicate. (*Id.* ¶ 392.) Agnew executed the transactional documents on October 27, 2015, using DocuSign. (*Id.* ¶ 393.)

In early December, the Conservation Easement Deed for the Vista Hill Property was jointly prepared by the Strategic Defendants and the Triangle Land Conservancy;[14] the deed granted an easement over the entire property to Triangle.  (*Id.* ¶ 398.)

In December 2015, Defendant Bryan Cave issued a draft legal opinion letter to the Vista Hill Syndicate.[15]  (*Id.* ¶ 394.)  The letter contains alleged misrepresentations and omissions of material fact detailed in the FAC.  (*See id.*)  For example, Plaintiffs allege that Bryan Cave knew that if audited, the transaction was not likely to be upheld because it knew that the appraisal was fraudulently inflated and not prepared in accordance with accepted appraisal standards.  (*Id.*)  The letter contains a disclaimer that states that it is provided "solely for the benefit" of the Vista Hill Syndicate and could not be relied upon by anyone else, including the Syndicate members, without Bryan Cave's consent.  (*Id.* ¶ 395.)  Plaintiffs, however, allege that Bryan Cave knew and intended that others would rely on the letter because they knew and intended that the Strategic and Bridge Defendants would refer to the opinion letter in

---

[14] Triangle Land Conservancy was originally a defendant in this action, but Plaintiffs voluntarily dismissed it on January 21, 2022.  (Doc. 241.)

[15] The FAC alleges that Bryan Cave sent the opinion letter, or an earlier version of it, to the Vista Hill Syndicate and the PCLG Defendants at least two months before, since the Promotional Materials and PCLG's Due Diligence Report reference this letter.  (Doc. 109, FAC ¶ 394.)

the Promotional Materials and marketing presentations to bolster the legitimacy of the SCE Strategy.  (*Id.* ¶ 395.)

On December 1, 2015, the VSW Defendants prepared an Appraisal Summary (Form 8283) for the Vista Hill Syndicate Transaction.  (*Id.* ¶ 411.) The summary represented that the Vista Hill Property had appreciated in value from $712,631 to $22,498,000 in a period of six months.  (*Id.* ¶ 412.)  The VSW Defendants "then advised Agnew that the Appraisal Summary . . . would substantiate the charitable contribution deduction and allow him to claim" a corresponding deduction on his individual tax return.  (*Id.*)  On March 24, 2016, the VSW Defendants sent the final Qualified Appraisal to the Vista Hill Syndicate.  (*Id.* ¶ 414.)  Plaintiffs allege that they intended it to be shared with and relied upon by members of the Vista Hill Syndicate.  (*Id.*)  The Qualified Appraisal allegedly contained knowing misrepresentations, such as those about the value of the Vista Hill Property and the independence of the VSW Defendants, who had allegedly "agreed to produce an appraisal value to roughly coincide with the amount of tax deduction sought by the Strategic Defendants[.]" (*Id.* ¶ 417.)   It relied on McCalip's conclusions about the feasibility of mining without examining them, and it contained a variety of alleged violations of the standards governing professional appraisals.  (*See id.* ¶¶ 418-422.)

In April 2016, Conexus prepared the tax return for the Vista Hill Syndicate. (*Id.* ¶ 423.) Conexus also prepared a K-1 for each of the members of the Vista Hill Syndicate, including Agnew. (*Id.* ¶ 424.) "Conexus advised Agnew to report this charitable contribution deduction on his individual tax returns for 2015," which he did. (*Id.* ¶¶ 424, 426.)

On September 8, 2016, Strategic sent a photobook of the Vista Hill Property to Agnew and other members of the class analogous in content to the other photobooks described above. (*See id.* ¶¶ 427-429.)

The IRS audited the Vista Hill Syndicate's tax return, and on June 24, 2019, the IRS issued an FPAA disallowing the charitable contribution deduction at the partnership level and imposing a 20% or 40% penalty. (*Id.* ¶¶ 430-31.) This determination is being contested in Tax Court, and the case remained pending as of the filing of Plaintiffs' FAC. (*Id.* ¶ 432.) On May 27, 2021, the Tax Court granted partial summary judgment to the IRS regarding the failure of the conservation easement deed to protect the purported conservation purpose in perpetuity. (*Id.* ¶ 433.)

### D. Class Allegations

Plaintiffs seek to bring this action on their own behalf and on behalf of a Rule 23 class defined as follows:

> All Persons, from January 1, 2012 to the present, inclusive, (i) who have been assessed back-taxes, penalties, and/or interest (via a settlement with the IRS, an amended tax return renouncing the

SCE deduction accepted by the IRS, a final Tax Court decision, or a Notice of Computational Adjustment from the IRS) or (ii) for which the IRS has made its final determination (via a Statutory Notice of Deficiency or FPAA) that the Person (or the entity through which they participated in the SCE Strategy) is liable for back-taxes, penalties, and/or interest, as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed sold, implemented, or managed by the Strategic Defendants. Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions; federal governmental entities; the Other Participants; and the Other Participants' parents, subsidiaries, affiliates, partners, and employees.

(*Id.* ¶ 463) (footnote omitted).

### E. Plaintiffs' Claims

Plaintiffs filed their original complaint on March 30, 2021, and they filed the First Amended Complaint on June 25, 2021. They bring the following claims:

- Count I.  Violations of 18 U.S.C. § 1962(c) (substantive RICO violations)
- Count II.  Violations of 18 U.S.C. § 1962(d) (RICO conspiracy)
- Count III.  Violations of Georgia RICO, O.C.G.A. § 16-14-4(a), (b)
- Count IV.  Conspiracy to Violate Georgia RICO, O.C.G.A. § 16-14-4(c)
- Count V.  Professional Malpractice
- Count VI.  Negligence
- Count VII.  Negligent Misrepresentation (in the alternative to the fraud claims)
- Count VIII.  Breach of Fiduciary Duty and Disgorgement
- Count IX.  Fraud
- Count X.  Aiding and Abetting Breaches of Fiduciary Duty
- Count XI.  Rescission
- Count XII.  Civil Conspiracy

Not all of Plaintiffs' claims are brought against every defendant, and the FAC therefore divides the defendants into subgroups. Counts I and III, Plaintiffs' state and federal substantive RICO claims, are brought against the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D (the "RICO Defendants"). Counts II and IV, Plaintiffs' RICO conspiracy claims, are brought against every defendant.

Counts V and VIII, Plaintiffs' professional malpractice claim and breach of fiduciary duty claims, are brought against the Strategic Defendants, the MMM Defendants, Nelson Mullins, the Langford Defendants, Bennett Thrasher, the VSW Defendants, the Clark Defendants, Credo, Oxygen, Conexus, the PCLG Defendants, Bryan Cave, the Dantin Defendants, and F&D (the "Professional Defendants").

Count VI, Plaintiffs' negligence claim, is brought against the Bridge Capital Defendants, the ACC Defendants, GALT, AquaFUSION, and Foothills (the "Negligence Defendants").

Counts VII, IX, X, XI, and XII are brought against all defendants.

## II. Legal Standards

### A. Rule 12(b)(1)

Rule 12(b)(1) allows for dismissal of a case when the court "lack[s] subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously ensure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2002). A Rule 12(b)(1) motion may present either a facial or a factual attack on the complaint. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). A facial attack, such as some defendants' challenges to Plaintiffs' Article III standing here, is based on the allegations in the complaint. In evaluating such challenges, the Court takes the allegations in the complaint as true. *Id.* at 1529

### B. Rule 12(b)(2)

A plaintiff's complaint is subject to dismissal if there is a lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). A plaintiff bears the burden of establishing personal jurisdiction over the defendants in this Court. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010). "In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-

57

resident defendant." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). Plaintiff may establish a prima facie case by presenting sufficient evidence to withstand a motion for directed verdict. *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *Allegiant Physicians Serv., Inc. v. Sturdy Memorial Hosp.*, 926 F. Supp. 1106, 1112 (N.D. Ga. 1996). A party presents enough evidence to withstand a motion for directed verdict by putting forth "substantial evidence . . . of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Walker v. NationsBank of Fla.*, 53 F.3d 1548, 1554 (11th Cir. 1995); *see also Polskie Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (noting that, if the defendant makes a showing of the inapplicability of the long-arm statute, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint."). The Court construes the well-pled jurisdictional allegations in the complaint as true to the extent that they are uncontroverted by a defendant's evidence. *Morris*, 843 F.2d at 492; *Allegiant Physicians*, 926 F. Supp. at 1112; *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1207 n.10 (N.D. Ga. 1995).

58

## C. Rule 12(b)(6)

### 1. Rule 8

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6), in turn, provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief may be granted."  *Id.* 12(b)(6).  When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." *Id.* (citing *Twombly*, 550 U.S. at 557).  The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of a cause of

action's elements"—it must allege facts that "raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## 2. Rule 9(b)

To survive a Rule 12(b)(6) motion, Plaintiffs' fraud allegations, including their allegations of mail and wire fraud and negligent misrepresentation, must comply with the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010); *Lechter*, 565 F. Supp. 3d. at 1318; *see Burgess v. Relig. Tech. Ctr., Inc.*, 600 F. App'x 657, 663 (11th Cir. 2015) (noting that "like any other fraud action, a [Georgia] RICO claim based on fraud must be pleaded with specificity"); *Quashie v. Olympus Am., Inc.*, 315 F. Supp. 3d 1329, 1340 (N.D. Ga. 2018) (Rule 9(b) applies to negligent misrepresentation claims). Plaintiffs must therefore "state with particularity the circumstances constituting" the mail and wire fraud. *Am. Dental*, 605 F.3d at 1291 (quoting Fed. R. Civ. P 9(b)). Rule 9(b) applies equally to claims based on fraudulent omissions and claims based on affirmative misrepresentations. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019). The rule provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

To satisfy Rule 9(b)'s particularity requirement, "a plaintiff must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.'" *Am. Dental*, 605 F.3d at 1291 (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).  In short, Plaintiffs must set forth "the who, what, when[,] where, and how" circumstances of the fraud.  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted).  The Eleventh Circuit has acknowledged that this requirement "may be relaxed for allegations of 'prolonged multi-act schemes.'" *Burgess*, 600 F. App'x at 662-63 (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002)); *see Lechter*, 565 F. Supp. at 1318; *Turk*, 593 F. Supp. 3d at 1301.  "The relaxed standard permits a plaintiff to plead the overall nature of the fraud and then to allege with particularity one or more illustrative instances of the fraud." *Burgess,* 600 F. App'x at 663.  "Even under the relaxed requirement, however, a plaintiff is still required to allege at least some particular examples of fraudulent conduct to lay a foundation for the rest of the allegations of fraud." *Id.*  Additionally, "[i]n a case involving multiple defendants, the complaint must not lump together all of the defendants, as 'the complaint should inform each defendant of the nature of his alleged

participation in the fraud.'" *Kivisto v. Miller, Canfield, Paddock and Stone, PLC*, 413 F. App'x 136, 139 (11th Cir. 2011) (quoting *Ambrosia Coal & Constr. Co. v. Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007)).

## III. Discussion

### A. Plaintiffs' Motion to Exclude or Disregard Extrinsic Evidence

Before addressing the motions to dismiss, the Court must address Plaintiffs' motion to exclude or disregard extrinsic evidence, which concerns numerous documents Defendants seek to introduce in connection with their briefing.  (Doc. 263.)  Most central are the exhibits attached to the Defendants' joint motion to dismiss.  (Doc. 168-2.)  These include Private Placement Memoranda ("PPMs") and Subscription Agreements associated with Plaintiffs' SCE transactions, which are introduced as attachments to a declaration by Brian Underwood, a lawyer with Defendant Bryan Cave.  Plaintiffs also argue that the Court should disregard certain exhibits introduced in connection with some of the individual motions to dismiss.

Ordinarily, the evidence the Court considers on a motion to dismiss should be limited to the four corners of the complaint; otherwise, the Court must convert the motion into one for summary judgment pursuant to Rule 12(d).  *See* Fed. R. Civ. P. 12(d); 5C Charles Allen Wright et al., Federal Practice and Procedure § 1366 (3d ed. 1998).  But the Eleventh Circuit recognizes the "incorporation by reference" doctrine, "under which a document

attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). A document is "undisputed" when its authenticity is unchallenged. *Id.*

Plaintiffs concede that the PPMs and tax opinion letters introduced by the law firm defendants are "central" to their complaint and of undisputed authenticity and that they therefore may be considered by the Court at this juncture. (Doc. 301 at 11.) Plaintiffs dispute only that the Court may consider the Subscription Agreements.[16] Plaintiffs argue, first, that these agreements are not central to their claims, for the claims do not depend on these documents and the documents are mentioned in the FAC only in passing.

---

[16] Plaintiffs' motion also argues that it is improper for the Court to consider the documents because Brian Underwood does not have personal knowledge of the documents attached his declaration. The Court finds this argument without merit with respect to the PPMs and the Subscription Agreements themselves, whose centrality and authenticity are unaffected by anything to do with Mr. Underwood. *Turbyfill v. Scottsdale Indem. Co.*, No. 3:14CV283-RV/EMT, 2016 WL 741657, at *3 (N.D. Fla. Feb. 24, 2016) ("Plaintiff ignores the reality that filing documents [pre-trial] pursuant to attorney declaration is a well established practice."). Of course, the Court could not consider the contents of the Underwood declaration itself. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (calling "affidavits attached to a motion to dismiss . . . clearly the sort of evidentiary material that is not appropriate at the 12(b)(6) stage") (discussing *Ware v. Associated Milk Producers, Inc.*, 614 F.2d 413, 414 (5th Cir. 1980)). At any rate, the affidavit is little more than a table of contents for the various documents attached to it.

The Court is unpersuaded that the Subscription Agreements are not, in fact, central to Plaintiffs' claims.  As Defendants argue and as Judge Totenberg observed with respect to equivalent documents in *Turk*, "the Investor Agreements are the very means by which Plaintiffs purchased their LLC interests that led to the claimed charitable deductions." *Turk*, 593 F. Supp. 3d at 1288.  Plaintiffs may not extensively discuss these agreements in the FAC, but the FAC does make clear that each plaintiff signed an agreement to buy their syndicate interest.   (Doc. 109, FAC ¶¶ 142, 211, 271, 393, 320-21.) Plaintiffs' motion does not actually dispute that the agreements in question were the Subscription Agreements introduced by Defendants.  And, tellingly, Plaintiffs bring an alternative claim for rescission of "all agreements and all documents they received in connection with entering into the SCE Strategy transactions." (*Id.* ¶ 630.)  Plaintiffs argue that the documents do not form the basis of any of their claims except the rescission claim, but that cannot be right. Investing in the syndicates is the better part of what Plaintiffs allege they were defrauded into doing—and they invested in the syndicates by executing the Subscription Agreements.  Together, these considerations make clear that the Subscription Agreements are "central" to the claims under Eleventh Circuit precedent.  *See Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) (in case alleging fraud and negligent misrepresentation, considering "purchase agreement" introduced on motion to dismiss, although

it was not mentioned in or attached to complaint, for "contracts such as the one in this case are central to a plaintiff's claim"); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Turk*, 593 F. Supp. 3d at 1288 (reaching the same result in a case very similar to the instant one).

Plaintiffs also argue that "there is a dispute as to whether the Agreements are authentic" because only two of the proffered agreements are signed, and three of the proffered agreements are incomplete as introduced by Defendants.  (Doc. 301 at 8; *see* Doc. 263 at 19-20.)  Defendants argue, and the Court agrees, that these are not true challenges to the authenticity of the documents.  As noted, Plaintiffs' FAC alleges that Plaintiffs signed agreements to invest in the syndicates (Doc. 109, FAC ¶¶ 142, 211, 271, 393, 320-21), and Plaintiffs do not argue that the proffered Subscription Agreements are substantively different from the agreements they signed.  *Cf. Horsley*, 304 F.3d at 1135 (finding debate transcripts were of disputed authenticity where the plaintiff contended that neither was "the transcript referred to in his complaint" and their contents directly contradicted his allegations).  With respect to completeness, the Court finds these objections insufficient to create an issue of the *authenticity* of the agreements.  If Plaintiffs maintained that they signed different agreements than those introduced by Defendants, or that some important language did not appear in the copies introduced by Defendants, then the matter of the Subscription Agreements' authenticity

65

might weigh against their consideration at this stage.  But that does not appear to be the case.  For example, it is true that only two pages of  the Turtle River Subscription Agreement signed by Plaintiffs Spratt and the Greiner Plaintiffs appear in Defendants' exhibits.  (Doc. 168-2 at 1212-13.)  But the complete Turtle River Subscription Agreement does appear in the record, albeit in an unsigned form.  More to the point, Plaintiffs do not suggest that the contents of the documents they signed were different than those appearing in the complete agreement.  (*Id.* at 1223-1229.)  So Plaintiffs' objections appear to be quite formalistic.  *See O'Halloran v. First Union Bank of Fla.,* No. 8:01-CV-1779-T-17EAJ, 2007 WL 9723484, at *5 (M.D. Fla. Sept. 28, 2007), *aff'd sub nom. O'Halloran v. First Union Nat. Bank of Fla.*, 322 F. App'x 900 (11th Cir. 2009) ("If Plaintiff's copy differed from the copy produced by Defendant, Plaintiff could have established a genuine challenge to authenticity by stating those differences.   The test for authenticity is not high. It requires only evidence sufficient to support a finding that the matter in question is what the proponent claims. Direct testimony or an affidavit is not always necessary to authenticate documents. A document's appearance, contents, substance,

internal patterns, or other characteristics, taking in conjunction with the circumstances, permit a finding that it is authentic.").[17]

In arguing for an alternative conclusion, Plaintiffs rely on the Sixth Circuit's decision in *Ouwinga v. Benistar*, 694 F.3d 783, 796-97 (6th Cir. 2012), but it is not to the point. There, the court held it was error for the district court to rely on disclaimers to dismiss a plaintiff's claims where there were "issues of fact regarding the validity and enforceability of the disclaimers." *Id.* at 797. That holding is persuasive as far as it goes. But the *Ouwinga* decision did not say that the court could not consider the extrinsic materials containing the disclaimers, only that the disclaimers did not warrant dismissal under the circumstances. Here, Plaintiffs raise similar arguments about the legal effect of the disclaimers in their briefing on the motions to dismiss, and the Court

---

[17] *Horsley v. Feldt*, which Plaintiffs cite, is distinguishable. There the plaintiff pointed to specific statements it alleged were made and which were missing from the transcripts introduced by the defendant:

> In his response to the motion for judgment on the pleadings, however, Horsley disputes the authenticity of those transcripts; he says that neither one is the transcript referred to in his complaint. Moreover, according to the amended answer itself, the attached transcripts contain only "excerpts of Ms. Feldt's actual statements." They do not contain the statements the complaint insists that Feldt made, and for all we know at this stage those statements were left out of the excerpts. Because the authenticity of the transcripts attached to the amended answer is disputed, and because they are not complete transcripts of all of Ms. Feldt's statements in the broadcast, they may not be considered in deciding the Rule 12(c) motion for judgment on the pleadings.

*Horsley*, 304 F.3d at 1135.

considers them below.  But those arguments do not go to the preliminary question of whether the documents may be considered at this stage.  Thus, the Court finds that the Subscription Agreements are central to Plaintiffs' claims and of undisputed authenticity.  It will consider them along with the PPMs and Tax Opinion letters.[18]

Plaintiffs also argue that the Court should disregard exhibits attached to certain Defendants' individual motions to dismiss.  These include the declaration of Cristina Briboneria and a contract attached to Defendant Oxygen Financial's motion (Doc. 197-1); the declaration of Aaron Kowan attached to the PCLG Defendants' motion along with a copy of an email (Doc. 197-2); the declaration of Eric P. Schroeder attached to the Bryan Cave motion, which attaches the Bryan Cave opinion letter (Doc. 187-2); exhibits to the declaration of Dr. Robert D. Keller attached to the ACC motion (Doc. 207-7; Doc. 207-8); portions of the declaration of William C. Clabough, attached to the Foothills motion (Doc. 203); and an engagement agreement attached to the

---

[18] Plaintiffs also urge the Court to disregard the PPMs and the Subscription Agreements because Defendants rely on them for purposes of an affirmative defense.  The Court rejects this argument for the same reason Judge Totenberg did so in *Turk*: these documents "also inform whether Plaintiffs reasonably relied on Defendants' representations and omissions, which is an element of Plaintiffs' common law fraud and negligence claims." *Turk*, 593 F. Supp. 3d at 1288.  The Court agrees with Plaintiffs that, in principle, the reliance question could present fact issues rendering dismissal on that basis improper.  But, again, that does not affect what extrinsic materials the Court may *consider* at this stage; it just goes to their consequences for the Rule 12(b)(6) analysis itself.

Bennett Thrasher motion to dismiss (Doc. 230-4).  Plaintiffs also dispute assertions made in some of the motions themselves, arguing that Defendants improperly seek to introduce their own versions of the facts.

Plaintiffs are correct that many of the exhibits listed above are not properly considered on a motion to dismiss.  Defendant Foothills, for example, introduces an affidavit in which its representative simply controverts factual allegations made in the FAC and the inferences the Court is asked to draw from them.  (*See* Doc. 203 at 26-30.)  That is not how Rule 12 motions work. Any affidavits asserting facts that seek to supplement or contradict the allegations in the FAC may not be considered at this stage.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d  1280.  The Court disregards these.  The same goes, naturally, for any factual assertions made in Defendants' motions.

It is not necessary that the Court deal specifically with each of these matters at the outset, since most of the individual motions can be resolved on other grounds, or else their disposition would be unaffected by the Court's consideration of the extrinsic materials.  Where such documents might be relevant to the Court's analysis, the Court notes below whether it has considered them.  Where no such consideration of extrinsic documents is specifically noted, it can be assumed that the same did not occur.  The Court accepts the allegations in the FAC as true and makes all reasonable inferences

in the Plaintiffs' favor, despite any contradictory factual assertions from Defendants.

In all, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion to exclude or disregard extrinsic evidence. (Doc. 263). The Court denies the motion with respect to the PPMs and the Subscription Agreements, which it will consider. Unless otherwise noted below, the Court grants the motion insofar as it asks the Court to disregard other extrinsic evidence that relies on or seeks to introduce facts outside the four corners of the FAC.

## B. Personal Jurisdiction

Both Foothills and the Dantin Defendants argue that Plaintiffs' claims against them should be dismissed because they are not subject to personal jurisdiction in this Court in connection with this action.

### 1. Foothills

Foothills is a Tennessee corporation whose alleged torts and RICO violations arise out of the Rock Spring transaction, which involved a property based in Alabama. Foothills argues that the extent of its alleged activity directed at Georgia—its "mere preparation of a letter to the [Georgia] LLC, accepting the LLC's fee simple donation of the Property" (Doc. 203 at 20)—is insufficient to subject it to specific personal jurisdiction here, and that it does not have sufficient, ongoing contacts with the state of Georgia such that it is

70

subject to general jurisdiction in the state.  Plaintiffs respond that Foothills is subject to both general and specific jurisdiction in Georgia in connection with this action.[19]

Plaintiffs' general jurisdiction theory depends on the fact that Foothills is registered to do business in Georgia and "has maintained a registered agent in Georgia since at least May 15, 2013."  (Doc. 247 at 14.)[20]  Since the Georgia Supreme Court's decision in *Allstate Ins. Co. v. Klein*, 422 S.E.2d 863 (Ga. 1992), it has been the law in Georgia that such registration and appointment of an agent for service of process amounts to consent to general jurisdiction in the state.  *See id.* at 864-65.  The Georgia Supreme Court addressed *Klein* most recently in *Cooper Tire & Rubber Co. v. McCall*, 863 S.E.2d 81, 90 (Ga. 2021)

---

[19] Plaintiffs also contend that the federal RICO statute's nationwide service of process provision should apply, for they bring federal RICO claims against all defendants.  However, "[w]hether a basis exists for exercising personal jurisdiction under RICO depends on whether [Plaintiffs have] stated a 'colorable' RICO claim."  *Courboin v. Scott*, 596 F. App'x 729, 732 (11th Cir. 2014) (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)).  As explained below, Plaintiffs have failed to plead colorable RICO claims as to Foothills, and without viable claims, they cannot avail themselves of the statute's nationwide service of process provision.  *See Courboin*, 596 F. App'x at 733-34; *Don't Look Media, LLC v. Fly Victor Ltd.*, No. 19-61555-CIV, 2020 WL 7481448, at *2 (S.D. Fla. Feb. 5, 2020), *aff'd*, 999 F.3d 1284 (11th Cir. 2021).

[20] The registration, of which the Court may take judicial notice, is available at https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=1829274&businessType=Foreign%20Nonprofit%20Corporation&fromSearch=True.

71

(discussing "*Klein*'s holding that corporate registration in Georgia is consent to general jurisdiction in Georgia"). There, faced with an invitation to overrule *Klein* in light of intervening developments in the U.S. Supreme Court's personal jurisdiction jurisprudence, the Georgia Supreme Court declined to do so. *See id.* at 87-91.

At the time *McCall* was decided, it was a debatable question whether this "'consent by registration' theory of general personal jurisdiction," *McCall*, 863 S.E.3d at 89, comported with constitutional due process principles. *McCall* reasoned that, although Georgia's personal jurisdiction regime had come under pressure from recent U.S. Supreme Court decisions regarding personal jurisdiction, "consent by registration" remained rooted in Supreme Court case law that had never been formally overruled—in particular, *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Min. & Mill. Co.*, 243 U.S. 93 (1917), as well as *Robert Mitchell Furniture Co. v. Selden Breck Construction Co.*, 257 U.S. 213 (1921). *See McCall*, 863 S.E.2d at 88-89. Although the *McCall* court suggested that the Georgia legislature modify the state's personal jurisdiction regime to avoid the uncertainty that could be created by a later overruling of *Pennsylvania Fire*, it nevertheless reaffirmed *Klein* as both good law in Georgia and consistent with constitutional due process principles. *See id.* at 87-91.

The constitutional uncertainty acknowledged in *McCall* has since been resolved in favor of Georgia's regime. In *Mallory v. Norfolk S. Ry. Co.*, 143 S.

72

Ct. 2028 (2023), the U.S. Supreme Court—noting a disagreement between the Pennsylvania Supreme Court and the Georgia Supreme Court's decision in *McCall*—reaffirmed the validity of *Pennsylvania Fire* and upheld Pennsylvania's consent-by-registration regime against a due process challenge. *Mallory*, 143 S. Ct. at 2044 & n.11.

The primary difference between Georgia's regime and Pennsylvania's is that, while Pennsylvania's registration statute expressly notifies registrants that they consent to general jurisdiction in the state, Georgia's regime depends on court decisions interpreting state statutes.  The difference is immaterial. Under *Pennsylvania Fire* and *Robert Mitchell Furniture Co.*, "whether appointing an agent for service of process subjects a foreign defendant to general personal jurisdiction in the forum depends upon the state statutory language and state court decisions interpreting it." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1319 (11th Cir. 2018).  Here, the Georgia Supreme Court's decision in *Klein*—the primary state court decision interpreting the relevant statutory language—predates Foothills' registration in Georgia and appointment of an agent for service of process by more than two decades.  *See Klein*, 422 S.E.2d at 864-65.  That decision, as the Georgia Supreme Court has noted "does notify out-of-state corporations that their corporate registration will be treated as consent to general personal jurisdiction in Georgia[.]" *McCall*, 863 S.E.2d at 90  Foothills is subject to general personal jurisdiction

in this state.  It is therefore subject to personal jurisdiction in this court in connection with this action.

## 2. Dantin Defendants

The parties agree that the Louisiana-based Dantin Defendants are not subject to general jurisdiction in Georgia.  (Doc. 300 at 10 n.8.)  The Court therefore evaluates whether the exercise of personal jurisdiction over the Dantin Defendants in this case would comport with the Georgia long-arm statute and the Due Process Clause of the Fourteenth Amendment.[21]

The Georgia long-arm statute authorizes jurisdiction over an out-of-state defendant who (1) "[t]ransacts any business within this state," O.C.G.A. § 9-10-91(1); (2) "[c]ommits a tortious act or omission within this state, except as

---

[21] As with Foothills, Plaintiffs contend that the federal RICO statute's nationwide service of process provision should apply to the Dantin Defendants. However, as noted above, "[w]hether a basis exists for exercising personal jurisdiction under RICO depends on whether [Plaintiffs have] stated a 'colorable' RICO claim." *Courboin*, 596 F. App'x at 731 (citing *Repub. of Panama.*, 119 F.3d at 942).  For the sake of organizational convenience, the Court does not conduct a separate RICO analysis here; instead, it addresses Plaintiffs' RICO allegations regarding the Dantin Defendants below, along with those regarding the other Local Promoters.  *See* Parts III(F)(1)(a)(xi) and III(F)(2)(f) below.  Based on its analysis there, the Court concludes that Plaintiffs have not alleged colorable RICO claims against the Dantin Defendants.  *See Courboin*, 596 F. App'x at 731–33 (conducting a merits analysis of the defendants' federal RICO claims as part of the personal jurisdiction analysis, and concluding "that Courboin's allegations under RICO do not rise to the level of a colorable federal controversy," so "Courboin cannot . . . take advantage of the nationwide service-of-process provision in RICO as a basis for exercising personal jurisdiction over the defendants").

to a cause of action for defamation of character arising from the act," *id*. § 9-10-91(2); or (3) "[c]ommits a tortious injury in this state caused by an act or omission outside this state" if the Defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state," *id*. § 9-10-91(3).

Whether the exercise of specific jurisdiction over a nonresident defendant is consistent with the Due Process Clause is evaluated under a three-part inquiry. The Court must ask (1) "whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws"; (2) "whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum"; and (3) "whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 474-75 (1985)). The plaintiff bears the burden of satisfying the first two elements. "[I]f the plaintiff does so," the burden shifts to the defendant to show that the exercise of jurisdiction in the forum state would violate traditional notions of fair play and substantial justice. *Id*. For due process purposes, "the constitutional touchstone remains whether the defendant purposefully

75

established 'minimum contacts' in the forum." *Burger King*, 471 U.S. at 474 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).   [F]or plaintiffs to meet their initial burden, they must show that the defendant's "suit-related conduct" created "a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010) ("Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation.").

The Dantin Defendants argue that they (Chris A. Dantin and Dantin Financial) are Louisiana residents whose alleged conduct involves interactions in Louisiana with Plaintiffs Hebert and Agnew, who are both Louisiana residents, and that the FAC lacks any well-pled factual allegations concerning the Dantin Defendants' activities in Georgia.  (*See* Doc. 109, FAC ¶¶ 28-29, 243-53, 372-75.)  They contend that there is, therefore, "no nexus between these admittedly non-resident defendants, the forum state, and the litigation that would warrant exercising personal jurisdiction over the Dantin Defendants."  (Doc. 234-1 at 7.)

Plaintiffs argue that the Dantin Defendants are subject to specific jurisdiction in Georgia because (1) they "acted as a conduit between Strategic,

76

the Georgia-based sponsor of the SCE Strategy, and Louisiana clients" (Doc. 300 at 10); and (2) because Georgia recognizes a "conspiracy theory of personal jurisdiction" under which the in-state acts of a co-conspirator can be imputed to an out-of-state co-conspirator for the purposes of Georgia's long-arm statute, *see Nextel Corp. v. Ace Wholesale, Inc.*, No. 1:12-cv-02902-JEC, 2014 WL 688134, at *7 (N.D. Ga. Feb. 21, 2014).

As an initial matter, the Court finds that the conspiracy-based theory of personal jurisdiction necessarily fails because, as explained below, Plaintiffs have failed to plausibly allege the Dantin Defendants' agreement to participate in a fraudulent conspiracy. Thus, what remains are Plaintiffs' substantive Georgia RICO and non-conspiracy state law claims against the Dantin Defendants.

The Court finds that, once the RICO and conspiracy claims are set aside as implausibly pled, Plaintiffs have not pled facts sufficient to show that the Georgia long-arm statute authorizes the exercise of personal jurisdiction over the Dantin Defendants. None of the state law claims against the Dantin Defendants is based on tortious acts or omissions committed in Georgia, and none alleges a tortious injury in Georgia. As the Dantin Defendants point out, both they and Plaintiffs Hebert and Agnew are citizens of Louisiana, and no allegations suggest that these parties had any interactions in Georgia or that Hebert's and Agnew's injuries were felt in Georgia. All that is left, then, is the

question of whether the Dantin Defendants "[t]ransact[ ] any business within" the state of Georgia.  O.C.G.A. § 9-10-91(1).  Plaintiffs allege that the Dantin Defendants "promot[ed] to Louisiana clients a strategy developed in Georgia by a Georgia company," that they arranged meetings in Louisiana between representatives of that Georgia company—Strategic—in order to refer their clients to it, and that they provided brochures from Strategic to Plaintiffs.  The Court is unpersuaded that these activities amount to transacting business in Georgia as the phrase has been interpreted by the courts.

Under the "transact any business" prong of the Georgia long-arm statute, "literally transacting business within Georgia remains a precondition to long-arm jurisdiction that is independent from the dictates of due process." *Knieper v. Forest Group USA, Inc.*, No. 4:15-CV-0222-HLM, 2016 WL 9450454, at *6 (N.D. Ga. Mar. 3, 2016) (quoting *Diamond Crystal Brands, Inc.*, 593 F.3d at 1260).  Transacting business can, to be sure, involve "intangible acts"; a defendant need not have physically entered Georgia.  *Diamond Crystal*, 593 F.3d at 1264.  Courts consequently "examine all of a nonresident's tangible and intangible conduct and ask whether it can fairly be said that the nonresident has transacted any business within Georgia."  *Id.*  In addition to showing that the defendant transacted business in Georgia, the "[p]laintiff must also show that its cause of action arises out of those transactions."  *Id.*

Two problems arise.  First, the Court doubts that "it can fairly be said that [the Dantin Defendants have] transacted any business within Georgia" through their contacts with the Strategic Defendants and their alleged promotion in Louisiana of the Strategic Defendants' tax products.  It is not alleged, for example, that the Dantin Defendants agreed to promote Strategic's transactions in exchange for fees paid by Strategic, as was allegedly the case with the Credo Defendants.  (*See* Doc. 109, FAC ¶¶ 108-09.)  It is therefore not clear in what sense the Dantin Defendants' receipt of brochures from a Georgia-based firm or their arrangement of meetings with that firm in Louisiana amount to "transact[ing] business" in Georgia.

Second, even if these contacts did amount to transacting business in Georgia, none of Plaintiffs' causes of action can fairly be regarded as arising out of those transactions, at least once the conspiracy claims are set aside. Plaintiffs Agnew and Hebert allege, in essence, that the Dantin Defendants knowingly or negligently encouraged them to invest in a fraudulent tax scheme and touted its supposed benefits.  But nothing underlying these claims can be characterized as a business transaction in Georgia.   Instead, the events underlying the claims all took place in Louisiana—the arrangement of meetings, the passing along of brochures, the making of representations.  Any transaction between the Dantin Defendants and the Strategic Defendants is essentially incidental to Agnew and Hebert's claims against the Dantin

Defendants.  In other words, Plaintiffs Agnew and Hebert complain they were injured by the Dantin Defendants' interactions with them—not by the Dantin Defendants' interactions with Strategic.  The Court finds, therefore, that Georgia's long-arm statute does not authorize it to exercise personal jurisdiction over the Dantin Defendants, and the Court **DISMISSES** Plaintiffs' claims against them.

## C. Article III Standing

Although Defendants' joint motion does not raise arguments about Article III standing, several Defendants' individual motions raise claims regarding the Plaintiffs' standing to sue them.[22]  To have Article III standing, a plaintiff must show an "'injury in fact,' that the party's injury is fairly traceable to the challenged action of the defendant, and that the injury would 'likely' be 'redressed by a favorable decision.'"  *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1379 (11th Cir. 2019).  The Court addresses these arguments here, beginning with the question of Plaintiffs' injuries, and then passing to separate standing arguments advanced by the Langford Defendants and two of the Land Trust Defendants.

---

[22] Here the Court only addresses the question of constitutional standing. Plaintiffs bring RICO claims, and both the federal and Georgia RICO statutes have statutory standing requirements that are more stringent, in that they require, in essence, a plaintiff's injury to have been proximately caused by the alleged RICO violations.  *See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).

### 1. Injury in Fact

Several Defendants' individual motions to dismiss argue that Plaintiffs have failed to allege an injury in fact that is anything but speculative. This argument is based on the Eleventh Circuit's decision in *Hewitt v. Comm'r*, 21 F.4th 1336 (11th Cir. 2021). *Hewitt* held an IRS interpretation of 26 C.F.R. § 1.170A-14(g)(6)(ii) to be invalid, for the court found that the interpretation was not promulgated in compliance with the Administrative Procedure Act. *Id.* at 1350. That regulation—the Court will refer to it as the "Extinguishment Proceeds Regulation," as the parties do—was promulgated to implement I.R.C. § 170(h)(5), which requires that a qualified charitable contribution protect its conservation purpose "in perpetuity." The regulation provides for the required terms on which sale proceeds should be distributed between donor and donee in the event of a judicial extinguishment of a conservation easement. *See Hewitt*, 21 F.4th at 1344. The Commissioner interpreted the regulation to require the application of a particular formula for allocating such proceeds—one that prevented donors from receiving the benefits of improvements to the land made after the donation of the conservation easement. *See id.*

For present purposes, what matters is simply that a conservation easement deed providing for a different extinguishment proceeds formula would, in the view of the IRS, not comply with the protected-in-perpetuity requirement of I.R.C. § 170(h)(5). *See TOT Prop. Holdings, LLC v. Comm'r*, 1

F.4th 1354, 1363 (11th Cir. 2021).   If a deed did not comply with the Extinguishment Proceeds Regulation, it could not support a valid charitable contribution deduction.   Such was the case with the Turtle River Syndicate's claimed charitable deduction.   After receipt of the FPAA disallowing the LLC's charitable contribution deduction, the Turtle River Syndicate challenged the Commissioner's decision in the Tax Court, which later granted partial summary judgment to the Commissioner based on the deed's noncompliance with the Extinguishment Proceeds Regulation.[23]   (Doc. 109, FAC ¶ 234.)   But, since that Tax Court ruling was made, the Eleventh Circuit has rendered its decision in *Hewitt*.   Thus, according to Defendants, Plaintiffs cannot show any concrete injuries because the legal basis for the Tax Court's decision with respect to Turtle River—and the IRS's administrative disallowances for the other Syndicates—has been removed.   In the words of the Langford Defendants, any injury that remains is "too speculative" because it is "dependent on future agency and court action," and thus insufficiently concrete to constitute an "injury in fact."   (Doc. 295 at 8.)

The Court disagrees.   First, *Hewitt* concerned only the Extinguishment Proceeds Regulation, and although Plaintiffs do allege that some of the deeds were deficient, they allege that the "lynchpin" of the fraud was the inflated

---

[23] *See Habitat Green Inc. LLC v. Comm'r,* T.C. 14433-17 (June 30, 2020).

appraisals of the Subject Properties, not the deeds.  (Doc. 109, FAC ¶ 9.)  The FAC does not allege that the partnership-level deductions were disallowed solely because of deficiencies in the deeds' compliance with the Extinguishment Proceeds Regulation or even, more generally, the protected-in-perpetuity requirement of I.R.C. § 170(h)(5).  On the contrary, valuation issues are alleged to have been part of each disallowance.  (*See id.* ¶¶ 181, 230, 310, 365, 431.) Even in the case of the Turtle River Tax Court litigation, it appears that the effect of *Hewitt* will merely be to require litigation of the validity of the deduction on other grounds.

Second, the premise of a standing argument focused on the outcome of Tax Court litigation—that Plaintiffs' only injuries derive from actual or possible adverse decisions of the Tax Court—is contradicted by the allegations in the FAC.  Plaintiffs' alleged injuries, with respect to Turtle River or any other transaction, do not derive solely from the results of Tax Court litigation. Plaintiffs allege that they suffered injuries in that they "paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS." (Doc. 109, FAC ¶ 533.)  With the exception of the final items in that list, these alleged injuries do not depend on the outcome of subsequent Tax Court litigation.  Indeed, such litigation remained

pending in *Turk,* and in that case it was determined that Plaintiffs had standing to sue.  *See Turk*, 593 F. Supp. 3d at 1288-90.  The same result is due here.  At least at the pleading stage, *Hewitt* does not deprive Plaintiffs of standing to sue, and it does not compel the conclusion that their injuries are merely speculative.

## 2.  Langford Defendants' Traceability Arguments

The Langford Defendants also challenge Plaintiffs' standing to sue them on the basis of the "traceability" requirement.  (Doc. 181-1 at 9-13.)  They underscore that the factual allegations about their conduct involve only the preparation of the Turtle River Syndicate's tax return, which claimed the charitable contribution deduction in question and relied upon the allegedly fraudulent appraisal.  Then, pointing to the fact that the eventual Tax Court decision concerning the Turtle River contribution deduction turned not on problems with the appraisal but on defects in the conservation easement deed, they contend that no injury sustained by Plaintiffs is traceable to any act of their own.  *See Habitat Green Inc. LLC v. Comm'r,* T.C. 14433-17 (June 30, 2020).  The Langford Defendants rely principally on *8330 Tokyo Valentino, LLC v. City of Miami, Fla.*, 990 F. Supp. 2d 1327 (S.D. Fla. 2013).  There, the court found the traceability requirement unsatisfied where the plaintiff sought to challenge an ordinance preventing the operation of adult entertainment establishments, but the final administrative notice from the city had not relied

on that ordinance to deny the plaintiff's business license—although earlier, informal notices had done so.  *See id.* at 1329-30.

*Tokyo Valentino* is inapposite, however.  Here, the final administrative notice from the IRS—the Final Partnership Administrative Adjustment ("FPAA")—allegedly did disallow Plaintiffs' charitable contribution deduction based, at least in part, on the value of the deduction.  (Doc. 109, FAC ¶¶ 230-231.)  The Tax Court *affirmed* the disallowance based on issues with the deed. But that does not mean the FPAA itself was not the final decision of the Commissioner.  *See, e.g., Rocky Branch Timberlands LLC v. U.S.,* No. 1:21-CV-2605-MLB, 2022 WL 2209589, at *4 (N.D. Ga. June 21, 2022) (FPAA was "final agency action" of IRS).  And again, as noted above, it is important that one of the injuries Plaintiffs allege is that they "paid professional fees in connection with proceedings before the IRS." (Doc. 109, FAC ¶ 533.)  That injury, at least, is fairly traceable to the FPAA, regardless of subsequent decisions of the Tax Court.  The Langford Defendants prepared and filed the partnership tax returns that led to this denial, and thus these injuries are "fairly traceable" to them in the relevant sense.  Article III standing does not require that Plaintiffs plead injuries proximately caused by the Langford Defendants.  *See Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1251 n.23 (11th Cir. 1998) ("[N]o authority even remotely suggests that proximate

causation applies to the doctrine of standing.").[24]   Whether Plaintiffs have adequately pled the merits of their claims against the Langford Defendants is a separate question to be discussed below.

### 3.  The ACC Defendants' and Foothills' Standing Arguments

The ACC Defendants and Foothills contend that they had no direct dealings with Plaintiffs or any LLCs of which Plaintiffs were members, and that Plaintiffs have no standing to assert claims belonging to the entities these land trusts did deals with, which were subsidiaries of the syndicates of which Plaintiffs were members.   (See Doc. 207-1 at 7-8.)   Furthermore, these defendants argue, Georgia law does not allow the members of LLCs to bring claims directly on behalf of an LLC, *see* O.C.G.A. § 14-11-1107(j), and Plaintiffs have failed to satisfy the requirements for bringing a derivative claim under Georgia law.  In essence, these defendants contend that only the LLCs suffered injuries in fact, and that any injuries suffered by Plaintiffs themselves are not traceable to the ACC Defendants or Foothills.

As noted above, however, Plaintiffs assert claims arising out of alleged injuries to themselves, including the injuries caused by the erroneous tax

---

[24] For this reason, the Langford Defendants' citation of cases like *Dixon v. Burke County, Ga.*, 303 F.3d 1271 (11th Cir. 2002) and *Carruth v. Bentley*, 942 F.3d 1047 (11th Cir. 2019) in their reply is unavailing.  These cases do not concern the Article III "traceability" requirement, but the "causal relation" required to maintain a claim under 42 U.S.C. § 1983.

positions they took on their individual tax returns, not injuries to the LLCs. (Doc. 109, FAC ¶ 533.)   In addition, Plaintiffs allege that they were the intended and effective recipients of fraudulent statements allegedly made by the ACC Defendants and Foothills. (*See, e.g., id.* ¶¶ 149, 152, 347-49.)  Such allegations are sufficient to plead standing to sue the ACC Defendants and Foothills at this stage, although of course fact issues may later call for a different analysis.   The Court reiterates that traceability and proximate causation are not the same, and the latter is not a requirement of the Article III analysis.   *See Loggerhead Turtle*, 148 F.3d at 1251 n.23.   Proximate causation is relevant to the merits of many of Plaintiffs' claims, and this question is addressed below where appropriate.

### D.   Disclaimers and the Fraud-Based Claims

A significant portion of the parties' briefing on the joint motion to dismiss concerns the significance of disclaimer language to which Plaintiffs agreed in connection with their investment in the Syndicates.   Because so many of Plaintiffs' claims are based on fraud (or otherwise require reasonable reliance on some misrepresentation), Defendants' arguments that the disclaimers bar Plaintiffs' fraud-based claims have potentially far-reaching consequences.  The Court therefore addresses the issue near the beginning of its merits analysis. The disclaimers also have important consequences for Plaintiffs' argument

that they are entitled to tolling of the statute of limitations, but the Court considers that question in a subsequent section of the order.[25]

Defendants set up defenses on two distinct aspects of the extrinsic materials they introduced in connection with their motion to dismiss. They argue, first, that each Plaintiff signed a Subscription Agreement disclaiming reliance on any representations not made in the PPMs (packages of documents provided to Plaintiffs at the time of their investments), and thus that Plaintiffs cannot ground their fraud-based claims on any representations outside of the PPMs. Second (and more broadly), Defendants argue that disclaimer language in the PPMs, which they say warned Plaintiffs about the possibility of the losses of which they now complain, serves as a bar to Plaintiffs' reasonable reliance on any contrary representations, and thus bars Plaintiffs' fraud-based claims.

The Court first considers the no-reliance clauses in the Subscription Agreements, and then it turns to the risk disclosures and disclaimers in the PPMs.

---

[25] *See* Part III(E) below.

## 1. Effect of the No-Reliance Clauses on Plaintiffs' Fraud-Based Claims

### a. The No-Reliance Clauses

Defendants argue that in executing the Subscription Agreements, Plaintiffs disclaimed reliance on any representations not contained in the PPMs. Defendants' arguments refer to language in the Subscription Agreements such as the following:

> Subscriber has received, read, and understands the contents of the Memorandum, including the risks summarized therein, and any and all exhibits, attachments, amendments or supplements thereto which were supplied or made available to Subscriber. Subscriber has based Subscriber's investment decision solely upon the information provided in the Memorandum, or has relied upon the advice of Subscriber's advisors whose recommendation to invest in the Company is based solely upon the information provided in the Memorandum. Subscriber represents and warrants that Subscriber has not based Subscriber's investment decision, in whole or in part, on any information (oral or written) not contained in the Memorandum, and no oral or written representations or warranties have been made to Subscriber by or on behalf of the Company.

(Doc. 168-2 at 153 (Bear Creek Subscription Agreement); *see also id.* at 416 (identical language in DeSoto Subscription Agreement); *id.* at 679 (identical language in Rock Spring Subscription Agreement); *id.* at 872 (substantively identical language in Turtle River Subscription Agreement); *id.* at 1013 (substantively identical language in Vista Hill Subscription Agreement).)

Courts in Georgia generally uphold such clauses and find that they preclude reasonable reliance on representations not integrated into a written

agreement for the purposes of fraud claims. *See Tri-State Consumer Ins. Co.,*

*Inc. v. LexisNexis Risk Sols. Inc.*, 823 F. Supp. 2d 1306, 1320 (N.D. Ga. 2011)

(citing *Werner Enters., Inc. v. Markel Am. Ins. Co.*, 448 F. Supp. 2d 1375, 1382

(N.D.Ga.2006); *Ainsworth v. Perreault*, 563 S.E.2d 135, 137 (Ga. Ct. App.

2002); and *Herman Homes, Inc. v. Smith*, 547 S.E.2d 591, 593 (Ga. Ct. App.

2001)); *Landale Enterprises, Inc. v. Berry*, 676 F.2d 506, 508 (11th Cir. 1982).

### b.   Can Defendants Enforce the Clauses?

The parties dispute whether Defendants, none of whom was a party to

the Subscription Agreements,[26] can enforce the no-reliance clauses against

Plaintiffs. On this point, Plaintiffs rely on *Textile Rubber and Chem. Co., Inc.*

*v. Thermo-Flex Techs., Inc.*, 706 S.E.2d 728 (Ga. Ct. App. 2011). In *Textile*,

Textile entered a sales contract with Thermo-Flex to purchase a piece of

technology. That contract included language in which Thermo-Flex disclaimed

any warranties about the performance of the technology. Textile also brought

fraud and negligent misrepresentation claims against two other parties,

however, who had made pre-sale representations about how Textile should

expect the technology to perform. The Court of Appeals held that the

disclaimer in the contract did not bar claims based on those third-party

---

[26] The Subscription Agreements describe themselves as "made . . . by and
between" the LLCs and each investor—what the agreements refer to as "the
Company" and "the Subscriber." (*E.g.*, Doc. 168-2 at 149.)

representations.  It held that, to have standing to enforce a contract, "there must be a showing that the person was a third-party beneficiary," but no such showing had been made, so the third parties "had no standing to invoke or enforce the protections afforded by the Agreement in order to preclude the fraud and negligent misrepresentation cross-claims brought against them." *Id.* at 735.  The court noted cases in which "an agent of a contracting party" had been held to be "entitled to rely upon a disclaimer or merger clause contained in the contract to preclude claims against the individual agent for his or her alleged representations." *Id.*  But it distinguished such cases on the grounds that, in *Textile*, the party seeking to enforce the disclaimer language "was not simply acting as an agent for Thermo-Flex in his dealings with Textile.  Rather, "[he] also had a pre-existing relationship with Textile under which he was being paid $100,000 a year to serve as a consultant and expert to Textile on the very technology forming the basis for the Agreement." *Id.*

Here, Defendants argue that the circumstances precluding enforcement of the integration clause in *Textile* are not present.  They rely on the cases *Textile* distinguished.  *See Tampa Bay Fin., Inc. v. Nordeen*, 612 S.E.2d 856, 859-61 (Ga. Ct. App. 2005) (merger clause barred reasonable reliance on extra-contractual representations made by agent of contracting party); *Yee v. Barnwell*, 389 S.E.2d 392, 393-94 (Ga. Ct. App. 1989) (even where the defendant was not a third-party beneficiary to an agreement, a merger clause

barred the plaintiff's reasonable reliance on the defendant's extra-contractual representations where that defendant "was acting as agent for both the [contracting party] and for [the plaintiff]"). They also cite *Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 491-93 (11th Cir. 2009), in which the Eleventh Circuit, applying Georgia law, held that a no-reliance clause and a merger clause barred fraud-based claims against many defendants who were not party to the contract containing it. There, the Eleventh Circuit noted (1) that the agreement contained a no-reliance clause disclaiming reliance on statements by both parties to the agreement and "any advisor to any such other party" to the agreement, bringing the other defendants under its terms; and (2) that the merger clause itself did not, by its terms, apply only to parties to the contract. *See id.* at 493.

The Court agrees with Defendants that they are entitled to invoke the no-reliance clause in the Subscription Agreements. *Textile*, the sole case on which Plaintiffs rely, presented what the Court of Appeals described as "unique circumstances," and comparable circumstances are not present here. Here, unlike in *Textile*, Plaintiffs do not allege that they had paid fees to Defendants to cause them to act as their agents in their purchase of their LLC interests. Plaintiffs did pay consulting fees (and other fees) to Defendants, but under circumstances that clearly illustrate the distinction between this case and *Textile*. To the Strategic Defendants, for example, Plaintiffs paid "two

consulting fees"—but they did so *through the LLCs*, and thus only *after* executing the Subscription Agreements.  (Doc. 109, FAC ¶ 91.)  In *Textile*, the paid consulting arrangement was "a pre-existing relationship" that was created by a prior agreement.  *See Textile*, 706 S.E.2d at 735.  Without those "unique circumstances," the no-reliance clause in this case looks just like the clauses at issue in *Yee* and *Curtis*, where the clauses were invoked by third parties.[27]  Defendants may invoke them here to challenge the reasonableness of Plaintiffs' reliance.

### c.   The Effect of the No-Reliance Clauses

Plaintiffs next argue that other language in the Subscription Agreements contradicts the no-reliance clauses, thus raising factual questions about whether those clauses bar reliance as a matter of law.  Specifically, they point to language in each Subscription Agreement stating that:

> I [i.e., Plaintiff] have also been given an opportunity to ask questions of and receive answers from, management of the

---

[27] *Textile*, *Nordeen*, and *Yee* agree that the "agent of a contracting party may be entitled to rely upon a disclaimer or merger clause contained in the contract to preclude claims against the individual agent for his or her alleged representations[.]"  *Textile*, 706 S.E.2d at 735.  Plaintiffs plead that the LLCs— the contracting parties to the Subscription Agreements—were formed by "Defendants" and that "[t]he Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy[.]"  (Doc. 109, FAC ¶ 79.)  It is inconsistent for Plaintiffs to, in effect, insist on the independence of the LLCs as contracting entities for purposes of the Subscription Agreement disclaimers while treating them as mere appendages of Defendants or themselves in most other respects.  Indeed, in this action Plaintiffs bring a claim for rescission *against the Defendants*—not against the LLCs.

> Company concerning the terms and conditions of this offering and to obtain any additional information, to the extent the Company possesses such information, necessary to verify the accuracy of the information contained in the Confidential Private Placement Memorandums and related diligence documents.

(Doc. 168-2 at 1131, 1151, 1171, 1231; *see also id.* at 15, 279, 544, 803, 936 (substantively identical language in each PPM).)

With respect to the no-reliance clauses, the Court agrees with Defendants that the above-cited language does not contradict those clauses in any material way.  In fact this language arguably reaffirms that Plaintiffs had disclaimed reliance on representations outside the PPMs, since it contemplates that Plaintiffs would seek additional information "to verify the accuracy of the information contained in the" PPMs—thus underscoring that the PPMs were the representations on which the investment decision would have to be based. Thus, the Court concludes that the no-reliance clauses in the Subscription Agreements are effective.  *See, e.g., Curtis*, 341 F. App'x 487, 491-93.

It is, however, important to underscore what the no-reliance clauses actually say.  *Cf. United States v. Blankenship*, 382 F.3d 1110, 1134 (11th Cir. 2004) ("A contract is nothing more, and nothing less, than what it actually states.").   The no-reliance clauses do not broadly disclaim reliance, for whatever purpose, on any non-PPM representations made to Plaintiffs by anyone in connection with the SCE Strategy.  Instead, they state that Plaintiffs have only based their "investment decisions" on representations in the PPMs.

94

Plaintiffs claim to have been injured not only because they were induced to make their investments, but also because they were induced to "take erroneous tax positions" following their investments. (Doc. 245 at 11; *see, e.g.*, Doc. 109 ¶¶ 17, 177, 227.) They also allege that they were misled by communications made by Defendants *after* their investments. Whether these allegations are plausible in specific cases is a separate question to be considered later. But it cannot simply be said that the no-reliance clauses bar reliance on anything outside of the PPMs for any purpose whatsoever. The Subscription Agreements do what they say: they bar Plaintiffs from claiming to have relied on non-PPM representations in making their decisions to invest in the LLCs.

### 2.    Disclaimer Language in the PPMs

The Court now turns to Defendants' arguments regarding the warnings and disclaimers in the PPMs themselves. Defendants contend that the language in the PPMs could not have misled Plaintiffs because the PPMs contain numerous warnings about the risk of IRS audits and disavow any guaranteed return on Plaintiffs' investments in the form of tax benefits or otherwise. It is important to recognize how this argument differs from the one considered in the preceding section. The no-reliance clauses preclude Plaintiffs from claiming reliance, for certain purposes, on representations outside the PPMs, as the Court has just found. But some of the representations that Plaintiffs allege are fraudulent are incorporated into the PPMs, and others (as

noted above) were allegedly made *after* Plaintiffs purchased their LLC interests.  The disclaimers in the PPMs therefore have potentially broader consequences for all of Plaintiffs' claims that require reasonable reliance. Defendants contend, in essence, that the disclaimers and risk disclosures in the PPMs preclude Plaintiffs from claiming to have been misled by any alleged misrepresentations because they were warned of the harms of which they now complain.

For example, Defendants note that the PPMs for the Bear Creek, DeSoto, and Rock Spring transactions state that "[i]f the Conservation Strategy is implemented, Members should expect Propco to be audited by the IRS.  If the IRS audits Propco, Members should expect the IRS to challenge the amount of or valuation of the federal deduction arising out of the . . . donation."  (Doc. 168-2 at 37, 300, 565.)  The Turtle River and Vista Hill PPMs are more hesitant; they say that "[t]he Company's federal income tax returns may be audited by the IRS," and that "[a]ny audit of the Company could result in an audit of its Members' tax returns[.]"  (Doc. 168-2 at 815, 951.)

The PPMs also expressly disclaim any guarantee that the SCE Strategy participants would receive a tax benefit from their investment.  For example, the Bear Creek PPM states: "Prospective investors are cautioned that there can be no assurance as to any capital appreciation, return of capital, tax benefits, or liquidity of this investment."  (Doc. 168-2 at 30.)  The other PPMs

each contain language like the following, which is taken from the DeSoto PPM: "No assurances can be given as to the federal, state, or local income tax consequences resulting from an investment in the Company or the Company's acquisition of the Propco Units." (Doc. 168-2 at 284; *see also id.* at 549, 805, 940.)

In addition, the Appraiser Defendants point to the following language in the Bear Creek, DeSoto, and Rock Spring PPMs, which they say discloses the possibility that the appraisals would be deficient:

> The financial forecasts and appraisals provided to investors may be materially inaccurate. The financial forecasts contained herein are based upon a number of factual and legal assumptions. Additionally, the accuracy of any appraisal is not guaranteed. Generally an appraiser looks at valuing a subject using a cost approach, a discounted cash flow analysis, or a sales comparable approach. For raw land, the cost approach is not applicable and the appraiser is left to explore both the discounted cash flow and sales comparable methods. Where a property generates income, such as a hotel or the mining of minerals and ores, the discounted cash flow methodology is usually the most appropriate and accepted approach. Where a property does not generate income but has certain entitlements or structures, the sales comparable methodology is the most appropriate and accepted approach, dependent upon the appraiser's ability to find comparable properties. More information about valuation methodologies for appraisals can be found from information available from the Appraisal Institute. Any inaccuracies in financial forecasts or appraisals may materially and adversely affect the Company and the interests of investors.

(Doc. 168-2 at 42, 305, 569.)[28]

By the same token, Defendants also argue that Plaintiffs cannot rely on any allegedly inaccurate legal or tax advice in the PPMs, for the PPMs contained disclaimers warning against construing the PPMs as investment, legal, or tax advice: "Prospective investors are not to construe the contents of this Memorandum or any communication relating to this Offering as investment, legal, or tax advice."  (Doc. 168-2 at 14 (Bear Creek PPM); Doc. 168-2 at 278 (DeSoto PPM); Doc. 168-2 at 543 (Rock Spring PPM); Doc. 168-2 at 802 (Turtle River PPM); Doc. 168-2 at 935 (Vista Hill PPM)).  And each PPM contains language instructing investors to consult their own advisors: "Each investor should and is expected to consult his or her personal legal counsel, accountant, and other professional advisors as to legal, tax, economic, and related aspects of the investment described in this Memorandum and its suitability for such investor based on his, her, or its particular circumstances." (*Id.*)  Based on this language, Defendants argue that this case is analogous to *American Dental*, where the Eleventh Circuit held that the plaintiffs had failed

---

[28] Although the VSW Defendants say that this language appears in "each PPM," they cite only to the Bear Creek PPM.  (Doc. 193 at 10-11.)  The quoted passage does not appear, at least in the quoted form, in the Vista Hill or Turtle River PPMs, and no party has pointed the Court to comparable language in those documents.   The fact that the PPMs are not identical—although Defendants sometimes treat them as if they were—also counsels caution in the Court's treatment of their effect on Plaintiffs' claims at the pleading stage.

to allege how they were misled when language in the mailings and wires they relied on "notified them" about the practices they alleged were fraudulent.  *See Am. Dental Assoc. v. Signal Corp.,* 605 F.3d 1283, 1292 (11th Cir. 2010).

Plaintiffs dispute that the disclaimers in the PPMs preclude reasonable reliance as a matter of law.  They contend that the disclaimers merely create questions of fact regarding the reasonableness of their reliance not suited for disposition on the pleadings.

"[U]nder Georgia law, the mere presence of a disclaimer, regardless of whether or not the plaintiff saw it, can render . . . reliance unreasonable." *Middleton v. Int'l Bus. Machines Corp.*, 787 F. App'x 619, 622 (11th Cir. 2019) (quoting *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1183 (11th Cir. 2010)) (internal quotation marks omitted) (alteration adopted). *Middleton* held that a plaintiff had failed to state claims for fraud and negligent misrepresentation regarding representations made in a PowerPoint presentation when those representations were contradicted by disclaimer language in an agreement he signed.  *See id.* at 623.  His reliance on the PowerPoint statements was held to be unreasonable as a matter of law.  *Id.*

A similar result was reached in *Zarrella v. P. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1225 (S.D. Fla. 2010), where the court dismissed fraud-based claims predicated on representations about the favorable tax consequences of certain insurance policies.  There again, the written contract "specifically did not

guarantee any future tax or legal consequences," and it further instructed the plaintiffs to consult with their own attorneys or tax advisors; thus "any reliance on Pacific Life's alleged representations regarding future tax consequences was improper because Plaintiffs knew not to rely on Pacific Life for tax advice." *Id.* at 1225.

But, as Plaintiffs point out, questions of reliance on disclaimers or risk disclosures may not always be suitable for decision on the face of the pleadings. *See Lechter*, 565 F. Supp. 3d at 1322 ("[F]actual issues may prevent a court from determining at the pleading stage that the disclaimers would preclude any reasonable reliance as a matter of law[.]") (quotation marks omitted).  In *Raysoni v. Payless Auto Deals, LLC*, the Supreme Court of Georgia held that reliance on representations that a vehicle was undamaged was not unreasonable as a matter of law even where a sales contract stated that the vehicle "was announced having unibody damage at the auction[.]" *Raysoni v. Payless Auto Deals, LLC*, 766 S.E.2d 24, 27 (Ga. 2014).  Noting some potential ambiguities in that statement, the Georgia Supreme Court held that "[w]hether Raysoni understood this provision—and whether a reasonable car buyer would understand this provision—as squarely contradicting earlier and unequivocal oral and written representations that the vehicle never had been wrecked and was undamaged is not a question that courts should answer as a matter of law on the bare pleadings." *Id.*  The court also held that contractual

language "strongly recommend[ing]" that the plaintiff have his own mechanic inspect the vehicle did not render reliance on the same representations unreasonable as a matter of law. The court emphasized that the case came to it "only at the pleadings stage" and that its "analysis [was] driven in large part by the precise words used in this contract, as well as the arguable qualifications and contradictions that appear on the face of the contract." *Id.*

To be sure, if Plaintiffs' claims depended entirely on pre-investment promises that their tax deductions were guaranteed to succeed or that the appraisals were unimpeachable, then the PPM disclosures would present problems. The cases make clear that, as a matter of Georgia law, a plaintiff cannot claim to be defrauded by a prior representation that is later *unambiguously* disclaimed or contradicted in a contract to which the plaintiff agrees. *See Am. Dental,* 605 F.3d at 1292; *Middleton*, 787 F. App'x at 622; *see also Legacy Acad., Inc. v. Mamilove, LLC*, 771 S.E.2d 868, 871-72 (Ga. 2015) (holding reliance on oral representations regarding expected franchise earnings unreasonable as a matter of law where franchise agreement affirmed that plaintiff was not relying on any such representations); *Novare Group, Inc. v. Sarif*, 718 S.E.2d 304, 308 (Ga. 2011) ("[A] party who has the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature to the instrument based on oral representations that differ from the terms of the contract. Statements that directly contradict

the terms of the agreement or offer future promises simply cannot form the basis of a fraud claim[.]").

Plaintiffs, however, allege that they were induced to invest in an abusive tax shelter and to take erroneous tax positions when Defendants (or at least some of them) knew all along that the pivotal land appraisals were shams inflated to reach certain predetermined values and could not withstand scrutiny.  If Plaintiffs can prove that set of facts, the PPM disclaimers would hardly have "notified them," *Am. Dental,* 605 F.3d at 1292, about the practices they alleged were fraudulent.  Perhaps more unambiguous language might have done so.  But such language would have had to inform Plaintiffs that the appraisal values were fabrications  designed to fraudulently inflate the basis of their tax deductions, not that inaccuracy was a mere possibility.  *Cf. Raysoni*, 766 S.E.2d at 27-28 ("Perhaps different contractual provisions—for instance . . . a clear and direct disclaimer that "THIS VEHICLE IS DAMAGED" or "THIS VEHICLE HAS BEEN WRECKED"—would lead to a different result."). Warning Plaintiffs of the potential risks of their investment and the likelihood of an audit is different from informing them that Defendants—according to the allegations—knew the deductions could never survive IRS scrutiny because they were based on fraudulently inflated appraisal values.  A rigged game can be fraudulent if the player is led to believe that playing is merely risky when, in fact, it is known to be futile.  *Cf. Rombach v. Chang*, 355 F.3d 164, 173 (2d

102

Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").  It is, therefore, premature to find that the PPMs' risk disclosures and disclaimers serve as an absolute bar to Plaintiffs' theory that they were victims of fraud.

A secondary issue that precludes the disclaimers from being dispositive, at least at this stage, is that Plaintiffs allege multiple kinds of fraudulent representations, not all of which are warned against by the PPMs.  For example, the Appraiser Defendants point to language in some of the PPMs stating that "[t]he financial forecasts and appraisals provided to investors may be materially inaccurate."  (*E.g.*, Doc. 168-2 at 42 (Bear Creek PPM).)  But Plaintiffs also allege that the Initial Appraisal and subsequent Qualified Appraisal were fraudulent in that they represented that they complied with USPAP appraisal standards when, in fact, they did not.  That risk is not disclosed, and in fact the paragraph following the sentence just quoted arguably makes it sound as if the appraisals were carried out in accordance with generally accepted appraisal practices.  The blanket application of the disclaimers to all of Plaintiffs' fraud-based claims is thus not always

103

straightforward; it may often depend on the specific misrepresentations at issue or on issues not suited for disposition on the present record.

For the foregoing reasons, the Court finds that here, as in *Raysoni*, *Lechter*, and *Turk*, the disclaimers do not bar all of Plaintiffs' fraud-based claims at this stage in the case. As *Raysoni* says, the precise contract language matters. *See Raysoni*, 766 S.E.2d at 27-28. At this stage, the precise language of the PPMs is such that the Court declines to find that it precludes the possibility that Plaintiffs were defrauded or misled in at least some of the ways they say they were. In most cases, the question of the reasonableness of Plaintiffs' reliance on given representations that Plaintiffs allege were false is better suited for disposition on a fuller record.

To be sure, language in the PPMs is in some cases unequivocal enough that the Court will find that it does have legal consequences for some of Plaintiffs' claims against certain defendants. For example, the PPMs contain very clear language to the effect that the LLCs were not securing legal or tax advisors for Plaintiffs as individuals, and thus the Court finds below that Plaintiffs could not reasonably have believed that professionals hired by the Syndicates were engaged in independent confidential relationships with Plaintiffs as individuals.[29] Some Defendants have made strong arguments

---

[29] See Part III(G)(3)(a) below.

that specific contractual language warrants specific legal conclusions like this, given the allegations in the FAC and the law governing specific claims.  But, generally speaking, the Court rejects Defendants' efforts to cast the PPMs as broadly foreclosing the possibility that Plaintiffs were defrauded or misled in any manner.[30]  The Court cannot reach that conclusion at the pleading stage.

### E. Statute of Limitations and Tolling

Defendants' joint motion to dismiss argues that some of Plaintiffs' state law claims are time-barred, because each of Plaintiffs' common law claims are subject to a four-year statute of limitations.  O.C.G.A. § 9-3-31.  Plaintiffs filed their original complaint on March 30, 2021. In 2020, however, Georgia tolled statutes of limitations for 122 days due to COVID-19, so the relevant date for statute of limitations purposes is November 28, 2020 (*i.e.*, 122 days before March 30, 2021).[31]  Thus, Defendants argue, the following claims are time-barred: (1) all of Plaintiffs' professional malpractice claims associated with the

---

[30] Another example of this broad-strokes approach is Defendants' argument that the following language precludes Plaintiffs from *justifiably relying* on *anything* contained in the PPMs: "'Prospective investors are not to construe the contents of this Memorandum or any communication relating to this Offering as investment, legal, or tax advice.'"  (*See* Doc. 268 at 12.)  The Court is not persuaded by Defendants' proposed interpretation of the foregoing provision. After all, Defendants simultaneously argue that, in the Subscription Agreements, Plaintiffs agreed that they would not rely on anything *except* representations in the PPMs.

[31] *See Lewis v. Gwinnett Cnty.*, 885 S.E.2d 320, 321-22 (Ga. Ct. App. 2023).

Turtle River and Vista Hill transactions, and (2) the remaining state common law claims for the three Plaintiffs who invested prior to November 28, 2016, *i.e.*, Plaintiff Spratt, the Greiner Plaintiffs, and Plaintiff Agnew.  Plaintiffs dispute that the professional malpractice claims accrued when Defendants say they did.  And they argue that even if the claims did accrue when Defendants say, Plaintiffs are entitled to fraudulent concealment tolling of the statutes of limitations.

### 1. Common Law Claims Accrual

For each of Plaintiffs' state common law claims, "the period within which a suit may be brought is measured from the date upon which the plaintiff could have successfully maintained the action." *Armstrong v. Cuffie*, 860 S.E.2d 504, 507 (Ga. 2021) (quotation omitted).  This means that where an injury is one of the elements of a claim—as in the case of fraud or negligent misrepresentation—the claim does not accrue until the injury "is *actually* sustained by a plaintiff," for before that point "he does not have a cause of action." *Coe v. Proskauer Rose, LLP*, 878 S.E.2d 235, 242 (Ga. 2022).  Georgia law holds, however, that professional malpractice claims accrue on the date of the breach of duty.  The idea is that the bare breach gives rise to a right of nominal damages sufficient to satisfy that element of the claim, so the plaintiff is seen to have sustained an injury from the breach itself.  *See Armstrong,* 860 S.E.2d at 507-08; *Jankowski v. Taylor, Bishop & Lee*, 273 S.E.2d 16, 18 (Ga.

106

1980) ("In legal malpractice cases, this court has followed the doctrine that a right of action arises immediately upon the wrongful act having been committed, even though there are no special damages."); *Bryant v. Golden*, 691 S.E.2d 672, 674 (Ga. Ct. App. 2010) (same for accountant malpractice).[32]

Thus, Plaintiffs' malpractice claims accrued on the date of the alleged breaches, and their other common law claims accrued when Plaintiffs sustained their alleged first injuries caused by the alleged tortious acts. Plaintiffs allege that they were injured when "they paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS." (Doc. 109, FAC ¶ 533.) The earliest of these alleged injuries thus occurred when each Plaintiff invested in the syndicates. *See Turk*, 593 F. Supp. 3d at 1291 (absent tolling, claims accrued when "Plaintiffs purchased their interests in the Syndicates"). As Defendants point out, Plaintiff Spratt, the Greiner Plaintiffs, and Plaintiff Agnew invested

---

[32] Plaintiffs urge the Court to read a different rule for "tax advisors" under which the injury does not accrue until a final IRS determination, and they cite to cases from other states that Plaintiffs say have adopted that rule. But the Court has been shown no basis in *Georgia* law for adopting that rule here. First, such a rule would be contrary to the more general Georgia accrual rule for professional malpractice. Second, the Supreme Court of Georgia had the opportunity to adopt Plaintiffs' proffered rule in *Coe v. Proskauer Rose,* but it expressly declined to do so.  *See Coe*, 878 S.E.2d at 241 & n.14.

before November 28, 2016. (*Id.* ¶¶ 211, 392.)   In addition, Plaintiffs' malpractice claims pertaining to the Turtle River and Vista Hill Syndicates all pertain to alleged acts of malpractice that took place before November 28, 2016. (*See id.* ¶¶ 228-29, 423-24.)

Thus, the following common law claims will be time-barred absent an entitlement to tolling: all common law claims of Plaintiff Spratt, the Greiner Plaintiffs, and Plaintiff Agnew, including all malpractice claims alleged against PCLG, Bryan Cave, the Langford Defendants, Cherry Bekaert, Oxygen, and Credo, who worked exclusively on the Turtle River and Vista Hill partnerships.

### 2. Tolling of State Law Claims

The Court now turns to the tolling analysis.  Plaintiffs' tolling theory depends on the doctrine of fraudulent concealment.  Under Georgia law, "[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."  O.C.G.A. § 9-3-96.  Under this statute, "only actual fraud tolls the statute of limitations," meaning fraud that "involves moral turpitude and has the effect of debarring and deterring the plaintiff from his action." *Shipman v. Horizon Corp.*, 267 S.E.2d 244, 245 (Ga. 1980).  The Georgia Supreme Court

has explained that, in applying this rule, courts must distinguish between "two entirely different circumstances." *Id.* at 246.

First "is where the actual fraud is the gravamen of the action." *Id.* "In such cases the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered. No other independent fraudulent act is required to toll the statute. Silence is treated as a continuation of the original actual fraud[.]" *Id.*; *see also Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 507 S.E.2d 411, 413 (Ga. 1998) (same); *Rollins v. LOR, Inc.*, 815 S.E.2d 169, 179 (Ga. Ct. App. 2018) (same).

The second circumstance is "where the gravamen of the action is other than actual fraud," in which case there must be "a separate independent actual fraud involving moral turpitude which debars and deters the plaintiff from bringing his action." *Shipman,* 267 S.E.2d at 246.

In other words, to establish an entitlement to tolling under O.C.G.A. § 9-3-96, Plaintiffs must eventually prove three things: "(1) a defendant committed actual fraud; (2) the fraud concealed the cause of action from the plaintiff; and (3) the plaintiff exercised reasonable diligence to discover the cause of action." *My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 797 (11th Cir. 2019) (citing *Daniel v. Amicalola Elec. Membership Corp.*, 711 S.E.2d 709, 716 (Ga. 2011)). Where, as under the first circumstance, fraud is the gravamen of the action, that underlying fraud can constitute the requisite actual fraud for

the purposes of tolling.  To do so, however, the underlying fraud still must have "the effect of debarring and deterring the plaintiff from his action," and the plaintiff must not have been able to discover the cause of action through the exercise of ordinary diligence.  *See Shipman,* 267 S.E.2d at 245.

Finally, a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred.  *Omar v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003).

Here, the gravamen of Plaintiffs' complaint is actual fraud, and the alleged acts of fraud can operate to toll the statute of limitations.  For example, it is plausible that the alleged misrepresentations in the PPMs, in the appraisals, and in the various legal opinions all operated to deter Plaintiffs from discovering their causes of action arising out of their SCE Strategy transactions.  It is part of Plaintiffs' theory of the case that each of the scheme's actors, in committing what Plaintiffs allege to be various acts of fraud, lent legitimacy to the transactions and concealed the central fraud underlying the alleged scheme—the inflated appraisals.

Whether Plaintiffs exercised reasonable diligence to discover their claims generally presents an issue of fact.  *See, e.g.*, *RES-GA YPL, LLC v. Rowland*, 798 S.E.2d 315, 322 (Ga. Ct. App. 2017).  If Plaintiffs could have discovered their claims through such diligence—for example because they were put on notice of them—additional acts to deter them from filing suit could still

toll the statute of limitations.  *See Klopfenstein v. Deutsche Bank Securities, Inc.*, No. 1:14-CV-278-TCB, 2014 WL 12521383, at *5 (N.D. Ga. May 13, 2014), *aff'd*, 592 F. App'x 812 (11th Cir. 2014).  At this stage, however, the Court finds that Plaintiffs' allegations are sufficient to create a fact issue regarding their reasonable diligence.  On this point, it is instructive to examine the distinctions drawn by Judge Totenberg in *Lechter* and *Turk*, each of which reached different conclusions on the question of tolling.[33]

In *Lechter*, the court focused its analysis on the plaintiffs' allegations regarding the defendants' "continued assertions" that, despite the IRS audit notices, nothing "was amiss" and that the plaintiffs had little to worry about. *Lechter,* 593 F. Supp. 3d at 1306.  The *Lechter* court pointed to allegations like the following:

> In the January 12, 2015 letter to all members of the Mossy Rock Syndicate with which he enclosed the Mossy Rock RAR, the Tax Matters Partner continued to reassure the members that there was nothing to worry about.  He stated that he "does not agree with any of the conclusions reached in the report" and that he "plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC."  He further reassured the members of the Mossy Rock Syndicate that "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has advised us that the report marks only the beginning of the proceedings."

---

[33] Although Judge Totenberg found that many of the *Turk* plaintiffs' claims were time-barred, she ultimately granted them leave to amend their complaint in part to address their tolling allegations.  She found the pleading defects on this point were potentially curable.  *See Turk v. Morris, Manning & Martin, LLP*, No. 1:20-CV-2815-AT, 2023 WL 2359692, at *12 (N.D. Ga. Feb. 13, 2023).

*Id.* at 1305 (quoting Plaintiffs' Am. Compl., ¶ 128).  And the following:

> April 6, 2017 email from Lisa Cantrell of Forever Forests to
> Andrew Lechter informing the members of Oakhill Woods of their
> duty to file a Form 8886 and that the status of Oakhill Woods as a
> listed transaction "in no way makes this transaction illegal" and
> that the filing of the 8886 "should not significantly change the risk
> profile of your investment" which was false when made because
> once a transaction is designated as a listed transaction by the IRS,
> an audit is sure to ensue.

*Id.* at 1306 (quoting Plaintiffs' Am. Compl., ¶ 255).  Such allegations, and

others like them, were sufficient to create a factual question regarding the

plaintiffs' entitlement to fraudulent concealment tolling.

However, *Turk* distinguished *Lechter* and reached a contrary conclusion.

Like some of the Defendants in this case, the defendants in *Turk* relied on the

Eleventh Circuit's decision in *Curtis Investment Co. v. Bayerische Hypo-und*

*Vereinsbank, AG*, 341 F. App'x 487 (11th Cir. 2009).  *Curtis* held the statute of

limitations began to run on a tax-shelter investment fraud claim when the

plaintiff signed a loan agreement containing terms that were "wholly

inconsistent" with the defendant's prior representations and the plaintiff's

understanding of the deal.  341 F. App'x at 495.

*Turk,* in turn, held the risk disclosures and disclaimers in the PPMs to

be analogous to the loan agreement in *Curtis*.  *Turk* first distinguished *Lechter*

by noting that the Promotional Materials in *Turk* contained disclaimers that

were "ostensibly more clear and unequivocal than the disclaimers in *Lechter*."

*Turk*, 593 F. Supp. 3d at 1295.  Second, it noted that the pleading in *Turk* presented "no allegations of contemporaneous oral representations" comparable to those in *Lechter*, and that there were "virtually no allegations in the SAC that could support Plaintiffs' theory that they were fraudulently deterred from bringing suit despite the clear 'storm warnings' contained in the Investor Agreements." *Id.* at 1295-96.  "The closest Plaintiffs c[a]me," the court said, was an email following an audit notice that stated: "And please rest assured that we have complete confidence in the valuations and have the resources to defend through tax court if we have to." *Id.* at 1296 (quoting Pl. Sec. Am. Compl., ¶ 351).

Here, the allegations in the FAC and the disclaimers in the relevant PPMs are more like those in *Lechter* than in *Turk*.  With respect to the disclaimers, there are important differences between the language in the PPMs for the Turtle River and Vista Hill transactions and those for the later transactions.  The disclaimers and risk disclosures in the PPMs for the 2016 transactions (Bear Creek, DeSoto, Rock Spring) are generally more "clear and unequivocal."  But only the Turtle River and Vista Hill PPMs can be relevant to the tolling analysis, since only claims arising out of those transactions have potential timeliness issues.  For example, the PPMs for the Bear Creek, DeSoto, and Rock Spring transactions state: "If the Conservation Strategy is implemented, Members *should expect* Propco to be audited by the IRS.  If the

113

IRS audits Propco, Members *should expect* the IRS to challenge the amount of or valuation of the federal deduction arising out of the . . . donation." (Doc. 168-2 at 37, 300, 565) (emphasis added).   That is pretty "clear and unequivocal"—enough so that, although it might not have revealed the fraud, *see* Part III(D)(2) above, it could  have put a reasonable plaintiff on notice that she should investigate the possibility of fraud.  *Cf. Curtis*, 341 F. App'x at 496. But the Turtle River and Vista Hill PPMs are much more ambivalent. They merely observe that "[t]he Company's federal income tax returns may be audited by the IRS," and that "[a]ny audit of the Company could result in an audit of its Members' tax returns[.]"  (Doc. 168-2 at 815, 951.)  Consider also the language to which some of the Appraiser Defendants point in the 2016 transactions' PPMs, which says in part that "[t]he financial forecasts and appraisals provided to investors may be materially inaccurate."  (Doc. 168-2 at 42, 305, 569.)  So far as the Court has been shown, this language appears *only* in the 2016 transactions' PPMs.  Comparable language does not appear in the Turtle River or Vista Hill PPMs.

In addition, Plaintiffs have pled subsequent statements that could plausibly have deterred them from bringing suit roughly equivalent to those in *Lechter*, which is sufficient to plead fraudulent concealment tolling of the statute of limitations at this stage.  For example, like the plaintiffs in *Lechter*, Plaintiffs point to allegations that, following the IRS notice denying the Turtle

River Syndicate's claimed deduction, the Strategic and MMM Defendants sent a letter to Plaintiff Spratt stating that they "strongly disagree[d] with the IRS' determination" and that they suggested that Plaintiff Spratt "not be overly alarmed." (Doc. 109, FAC ¶ 231.) And, with respect to the Vista Hill transaction, the Strategic Defendants sent Plaintiff Agnew a photobook in September 2016 that made additional representations about the appraisal's legitimacy. The book stated that a "desk audit review of the [Van Sant and Wingard Defendants'] appraisal was performed . . . conclud[ing] that the appraisal is reasonable and in compliance with the IRS and US Treasury guidelines." (*Id.* ¶ 427(a).) These representations resemble those discussed by the court in *Lechter*, and each would have plausibly deterred the Vista Hill and Turtle River Plaintiffs from investigating their claims by renewing the representations about the legitimacy of the allegedly fraudulent transactions.

Finally, this Court notes that there is a question of fact as to Plaintiffs' confidential relationships with the Strategic Defendants,[34] which would have rendered their duty to inquire less stringent under Georgia law. *Coe v. Proskauer Rose, LLP*, 878 S.E.2d 235, 245 (Ga. 2022) (when a confidential relationship is present, "a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under

---

[34] See Part III(G)(3)(b) below.

a heightened duty to reveal fraud where it is known to exist") (citing *Hunter*, 507 S.E.2d at 414) (internal quotation marks and citation omitted).

At this stage, then, the Court finds that Plaintiffs' allegations are sufficient to create questions of fact regarding the tolling of the statute of limitations on the claims arising out of the Vista Hill and Turtle River transactions. As *Lechter* observed, "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Lechter*, 565 F. Supp. 3d at 1302 (N.D. Ga. 2021) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). This is, however, certainly an issue on which fact development will be necessary.

## F. Federal and Georgia RICO Claims

Plaintiffs assert an expansive theory of federal and Georgia RICO liability. The FAC endeavors to allege that about 20 defendants each formed a RICO enterprise and committed substantive RICO violations, with each of these "RICO Defendants"[35] committing at least two predicate acts of mail or wire fraud in connection with the SCE Strategy. The remaining defendants are alleged to have conspired with the RICO Defendants to commit those

---

[35] These include the Strategic Defendants, the Bridge Capital Defendants, the MMM Defendants, Nelson Mullins, the Langford Defendants, Bennett Thrasher, the VSW Defendants, the Clark Defendants, the ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D. (Doc. 109, FAC ¶ 479.)

substantive RICO violations.  Plaintiffs' RICO claims are well and plausibly pled against some defendants.  But, in many other cases, the schematic allegations that structure Plaintiffs' complaint cast a wider net than the well-pled factual allegations can support.

## 1.  Substantive RICO Claims (Counts I and III)

Plaintiffs bring their federal RICO claims under the RICO statute's private cause of action, 18 U.S.C. § 1964(c).  To state a claim for relief under § 1964(c), a plaintiff must plead facts establishing three elements: (1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) causation. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017).

As for the first element, Plaintiffs allege that the RICO Defendants violated 18 U.S.C. § 1962(c).  Plaintiffs must therefore allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (same).

Plaintiffs also bring claims under the Georgia RICO statute, O.C.G.A. § 16-4-4.  Plaintiffs raise claims under two separate provisions of Georgia RICO. The first is O.C.G.A. § 16-14-4(a) ("subsection (a)"), which states:

> It shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

The other provision, O.C.G.A. § 16-14-4(b) ("subsection (b)"), states:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

Federal RICO and Georgia RICO have many similarities, but they also have "a number of significant differences." *Chesapeake Emp'rs Ins. Co. v. Eades*, 77 F. Supp. 3d 1241, 1256 (N.D. Ga. 2015) (quoting *Dover v. State*, 385 S.E.2d 417, 419 (Ga. Ct. App. 1989)).  Several of these differences will matter to the Court's analysis, and the Court will note where this is the case at the appropriate times.  The most consequential of these differences—one therefore worth noting at the outset—is that there is no "enterprise" requirement under subsection (a) of Georgia RICO, making claims under this provision easier to plead and prove than claims under federal RICO or subsection (b) of Georgia RICO.  To establish a violation of subsection (a), in other words, a plaintiff must  show "proof that the defendant committed predicate offenses . . . at least twice." *Cobb County v. Jones Grp., P.L.C.*, 460 S.E.2d 516, 521 (Ga. Ct. App. 1995); *accord Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

Because Georgia RICO is modeled after federal RICO, Georgia courts consider federal authority to be persuasive in interpreting Georgia RICO. *Williams Gen. Corp. v. Stone*, 614 S.E.2d 758, 760 (Ga. 2005).

### a. Pattern of Racketeering Activity

The Court begins by considering whether Plaintiffs have alleged a pattern of racketeering activity. "A pattern of racketeering" activity requires at least two acts of racketeering activity. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215 (11th Cir. 2020) (citing 18 U.S.C. §§ 1962(c), 1961(5)). Qualifying acts of racketeering activity—often called "predicate acts"—include the commission of any of a list of offenses catalogued at 18 U.S.C. § 1961(1). *Cisneros*, 972 F.3d at 1215. "A plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime." *Id.* (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)). The same predicate acts, including mail and wire fraud, qualify as racketeering activity under both federal RICO and Georgia RICO. *See* O.C.G.A. § 16-14-3(5)(C).

Here, Plaintiffs base their substantive RICO claims on predicate acts of mail and wire fraud. (Doc. 109, FAC ¶¶ 502-04.) An act of mail or wire fraud "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n*, 605 F.3d at 1290; *see* 18 U.S.C. §§ 1341, 1343. Like any fraud allegations, Plaintiffs' mail and wire fraud allegations must comply with the heightened fraud pleading standard of Fed. R. Civ. P. 9(b), as

elaborated above.[36]  *Am. Dental Ass'n*, 605 F.3d at 1291; *see Burgess*, 600 F. App'x at 663 (noting that "like any other fraud action, a [Georgia] RICO claim based on fraud must be pleaded with specificity").  A defendant will not be found to have participated in a pattern of fraud unless the allegations show plausibly that the defendant did so "knowingly and intentionally."  *Allen v. Jones*, 604 S.E.2d 644, 647 (Ga. Ct. App. 2004) ("To be liable under RICO law for participation in fraud, a defendant must knowingly and intentionally participate in the fraud.  In the absence of any evidence that [defendant] knowingly distributed false or misleading information, he cannot be liable under the Georgia RICO Act.").  Reliance, however, is not an element of statutory mail or wire fraud.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 (2008) ("[M]ail fraud [is] a statutory offense that is distinct from common-law fraud and that does not require proof of reliance."); *Pollman v. Swan*, 716 S.E.2d 191, 193 (Ga. 2011) (citing *Bridge* and reversing the Court of Appeals on the ground that it "erred in making reliance an element of mail fraud and in affirming the grant of summary judgment to appellees based on the failure of appellants to establish reliance").

Generally speaking, the alleged factual basis for Plaintiffs' substantive RICO claims is that "Defendants . . . transmitted and received by wire and/or

---

[36] See Part II(C)(2) above.

mail matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals" for the purpose of defrauding Plaintiffs.   (Doc. 109, FAC ¶ 503.)   A distinct section of the complaint lists at least two allegedly fraudulent communications made by the mail and wires attributable to each of the RICO Defendants.   (*Id.* ¶¶ 505-518.) Plaintiffs allege that each of the RICO Defendants committed at least two related acts of mail or wire fraud, and that these acts were related because "[a]ll predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs."   (*Id.* ¶ 530.)

Determining whether Plaintiffs have adequately alleged a "pattern of racketeering" activity will require a defendant-by-defendant analysis.   This is so both because Plaintiffs argue that they have alleged at least two predicate acts per defendant and because subsection (a) of Georgia RICO requires *only* "proof that the defendant committed predicate offenses . . . at least twice." *Jones Grp.*, 460 S.E.2d at 521.   That means that it is possible that Defendants could plead Georgia RICO claims against some defendants even if it turned out that some defendants were not plausibly alleged to be members of a RICO enterprise, or even if no enterprise were found to exist.   *See Lechter*, 565 F. Supp. 3d at 1315-31 (finding that although the plaintiffs had not pled a RICO

enterprise, they had stated claims against a number of defendants under Georgia RICO subsection (a)).

### i. Preliminary Issues Regarding Fraud Pleading

Throughout the briefing, the parties engage in recurring disputes about the legal requirements for pleading fraud and the statements that may serve as the basis for fraud claims.  The Court addresses these recurring issues at the outset before proceeding to the allegations about the individual defendants and defendant groups.

**Fact and Opinion.**  Defendants contend that Plaintiffs fail to plead any fraudulent misrepresentations or omissions of fact, as opposed to opinions or predictions about future events, which generally cannot amount to fraud.  *See, e.g.*, *Burds v. Hipes*, 763 S.E.2d 887, 889 (Ga. Ct. App. 2014) ("An expression of opinion or expectation cannot form the basis for an action in fraud.") (citing *Buckner v. Mallett*, 264 S.E.2d 182, 183-84 (Ga. 1980)); *Fuller v. Perry*, 476 S.E.2d 793, 796 (Ga. Ct. App. 1996) ("It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event.  Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events.") (quotation marks and internal citation omitted); *Gignilliat v. Borg*, 205 S.E.2d 479, 480 (Ga. Ct. App. 1974) ("A misrepresentation as to the status of the law, or as a matter of law, or as to its effect upon the subject matter of a contract is a statement of opinion only

and can not afford a basis for a charge of fraud or deceit in the making of the contract."). Defendants argue that the PPMs "are filled with heavily qualified statements of *opinion* about what tax benefits *might* be achieved[.]" (Doc. 168-1 at 39.)[37]

While opinions and predictions may not generally provide the basis for fraud claims, the precise contours of the rules Defendants cite, and some recognized exceptions, must be clarified. First, with respect to legal opinions, though it is "generally" true that statements of legal opinion cannot serve as the basis for a fraud claim, there is an exception to this general rule when a confidential relationship exists between the parties. *Douglas v. Bigley*, 628 S.E.2d 199, 206 (Ga. Ct. App. 2006); *see Clinton v. State Farm Mut. Auto. Ins. Co.*, 138 S.E.2d 687, 691 (Ga. Ct. App. 1964) (stating that "a representation or expression of opinion as to a matter of law . . . is not actionable unless there is a fiduciary relationship between the parties"). As discussed below, the Plaintiffs have pled the existence of confidential relationships with a few

---

[37] The PPMs say, for example: "This Memorandum includes certain statements and estimates provided by the Company with respect to the Company's anticipated future performance. Such statements and estimates reflect various assumptions by the Company concerning anticipated results, which assumptions may or may not prove to be correct. No representations are made as to the accuracy of such statements or estimates. There can be no assurance that the Company will achieve its investment objectives." (Doc. 168-2 at 14, 278, 543, 803, 935.)

defendants,[38] and thus the Court will evaluate allegedly fraudulent statements of legal opinion by those defendants in light of this rule.

Second, with respect to statements regarding future events, "[f]alse representations of existing or current facts are actionable even if combined with promises as to future events." *Greenwald v. Odom*, 723 S.E.2d 305, 313 (Ga. Ct. App. 2012) (citing *Castleberry v. Wells*, 188 S.E. 349 (Ga. 1936)).  In addition, "a representation of a future event made with knowledge that it is false or intention not to perform may be actionable." *Fuller*, 476 S.E.2d at 796; *see also Williams v. Crispaire Corp.,* 483 S.E.2d 653, 656 (Ga. Ct. App. 1997) (recognizing a "well known exception[ ]" to general rule that representations about future events are not actionable in fraud for when the defendant made representations that were "either known at the time to be false, or recklessly made with intent of deceiving the opposite party"); *Mallayev v. Cohen*, No. 1:07-cv-94, 2009 WL 10697493, at *7 (N.D. Ga. Mar. 27, 2009) (recognizing an exception to the general rule that representations about future events are not actionable in fraud for when the defendant "knew the projected event would not occur").

**Omissions.**  In Georgia, "[s]uppression of a material fact is fraud only if there is a duty to disclose arising from a fiduciary relationship or the particular

---

[38] See Part III(G)(3)(b)–(c) below.

circumstances of the case." *Ledford v. Smith*, 618 S.E.2d 627, 634 (Ga. Ct. App. 2005); *see* O.C.G.A. § 23-2-53.  Plaintiffs contend that they are entitled to base their fraud claims on fraudulent omissions on the grounds that they have alleged fiduciary relationships with many of the defendants.  However, the Court finds below that Plaintiffs have not plausibly pled such relationships, except with respect to the Strategic Defendants and the Local Promoters.[39] Nor have Plaintiffs endeavored to explain how the "particular circumstances of the case" could give rise to a duty to disclose under Georgia law.  Plaintiffs will, therefore, be able to plead acts of fraud based on fraudulent omissions by the Strategic Defendants and Local Promoters, but not by any other defendants.

**Knowledge.**  "An essential element of any fraud claim is that the defendant knew his representation was false."  *Lechter*, 565 F. Supp. 3d at 1318; *see also Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991) ("[T]he defendant must have had a conscious knowing intent to defraud.") (internal quotation marks omitted).

While under Rule 9(b) "knowledge . . . may be alleged generally," "Plaintiffs' allegations regarding Defendants' knowledge of the fraud 'cannot be merely conclusory and unsupported by any factual allegations.'"  *Lechter*,

---

[39] See Part III(G)(3) below.

565 F. Supp. 3d at 1319 (quoting *Rowe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.*, 181 F. Supp. 3d 1161, 1190 (N.D. Ga. 2016), *rev'd on other grounds sub nom. Rowe v. Gary*, 703 F. App'x 777 (11th Cir. 2017)).  As the Supreme Court put it in *Iqbal*:

> It is true that Rule 9(b) requires particularity when pleading 'fraud or mistake,' while allowing '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.'  But 'generally' is a relative term.  In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake.  Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard.  It does not give him license to evade the less rigid—though still operative—strictures of Rule 8.

*Iqbal*, 556 U.S. at 686-87 (quoting Fed. R. Civ. P. 9(b)).  In the RICO context in particular, the Eleventh Circuit has held that "[a] RICO plaintiff's allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'"  *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 949 (11th Cir. 1997) (quoting *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989)).

Defendants contend that Plaintiffs have failed to offer any allegations that "support the assertion that Defendants possibly could have known that the partnerships' deductions would be denied years later," for "no one . . . could have known that, years later, the IRS would reverse itself regarding the tax consequences of donating land interests for conservation purposes or challenge the donations at issue here."  (Doc. 168-1 at 40.)

This issue will have to be determined on a defendant-by-defendant basis. While Defendants focus their arguments on whether they could have known about subsequent changes in the IRS's view of syndicated conservation easements, Plaintiffs' allegations, favorably construed, also concern knowing misrepresentations about other matters.  Most centrally, as in *Lechter* and *Turk,* "whether the Defendants knew that the representations they made were false largely depends on whether each Defendant knew that the appraisals of the properties were inflated[.]"  *Turk*, 593 F. Supp. 3d at 1302; *see Lechter*, 565 F. Supp. 3d at 1318 (same).

The Court now turns to the Defendants' specific alleged predicate acts.

## ii.   The Strategic Defendants

Plaintiffs allege that the Strategic Defendants had a thoroughgoing role in the SCE Strategy as the transaction's "sponsor."  (Doc. 109, FAC ¶¶ 89-90.) Plaintiffs allege that the Strategic Defendants prepared, alone or jointly, numerous documents incident to the SCE Strategy, including the Conservation Easement Deeds, Baseline Documentation Reports, Promotional Materials (including the PPMs), glossy photo books, and emails concerning the impact of IRS Notice 2017-10.  (*Id.* ¶ 505.)

Among other things, the FAC alleges that the Strategic Defendants "spearheaded the recruitment and organization of the team members necessary to carry out the development, promotion, sale, and implementation

of the SCE Strategy," consistently advertised the same promised rates of return across their transactions, and that the appraisers performed their appraisals to reach these in order to satisfy the Strategic Defendants. (Doc. 109, FAC ¶¶ 439, 456, 89–91.) These assertions, among others, render plausible the allegation that the Strategic Defendants knew the appraisals to be unsupported and fraudulent. At the very least, then, Plaintiffs adequately allege predicate acts of mail and wire fraud against the Strategic Defendants when they allege that they sent Plaintiffs Promotional Materials incorporating the fraudulent appraisals. Other post-investment communications also adequately allege the requisite acts of mail and wire fraud. For example, Plaintiffs allege that Defendant Novak emailed Plaintiff Hoover on December 26, 2016, making false representations about the independence of the DeSoto appraisers (the Clark Defendants) and the existence of a second appraiser who conducted a "peer review" of the initial appraisal. (*Id.* ¶ 144.) The communication was allegedly intended to conceal the fraudulent nature of the appraisal and led Hoover to "reaffirm" his subscription, as he was asked to do. (*Id.*)

The Strategic Defendants vigorously dispute that any of the alleged communications were fraudulent, or at least that they are actionable. Their brief raises the issues of the disclaimers, of omissions, and of fraud claims based on statements about future-oriented events, all of which the Court has

128

already addressed.  They also argue that Plaintiffs cannot claim to have been injured by any communications received after they decided to invest in the Syndicates.  The Court disagrees, since such communications plausibly caused Plaintiffs to, for example, forge ahead with the SCE Strategy despite the IRS Notice, and to (as Plaintiffs say) "take erroneous tax positions."  (Doc. 245 at 11; *see, e.g.*, Doc. 109, FAC ¶¶ 17, 177, 227.)  Here, as in *Turk*, where the Court found that the plaintiffs had stated a claim against the analogous "sponsor" defendants, the Court finds that Plaintiffs have adequately pled predicate acts of mail and wire fraud against the Strategic Defendants.  *Cf. Turk*, 593 F. Supp. 3d at 1303-04.

### iii.    Bridge Capital

Bridge Capital argues that Plaintiffs have failed to state any claims against it, including fraud claims, because the allegations concerning Bridge throughout the complaint constitute impermissible group pleading.  Plaintiffs define the "Bridge Defendants" as including Bridge Capital Associates, Inc., Defendant Novak, and Defendant Freeman, who were allegedly principals of Bridge Capital as well as Strategic Capital Partners.  (Doc. 109, FAC ¶¶ 85, 92.)  As Bridge observes, Novak and Freeman are also classed with the Strategic Defendants, and almost every alleged action by Bridge also involves Strategic.  Indeed, aside from the two brief paragraphs describing Bridge's role as the "Placement Agent," the Court has not identified any allegation in the

complaint concerning Bridge that does not also involve Strategic and, in some cases, other defendants. (*See id.* ¶¶ 92–93.) It is thus difficult to discern what actions Plaintiffs allege were carried out by Bridge—or by Novak and Freeman in their capacity as Bridge principals—as opposed to what actions were carried out by Strategic—or by Novak and Freeman in their capacity as Strategic principals. That Novak and Freeman did some act and were, at the time, also principals of Bridge does not necessarily mean that Bridge is liable for that act. Nor does the addition of language that Novak and Freeman acted "on behalf of" Bridge Capital, without additional explanation at any point in the FAC.

"In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing and Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citing *Ambrosia Coal & Constr. Co.*, 482 F.3d at 1317, and *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)). "In a case involving multiple defendants the complaint should inform each defendant of the nature of his alleged participation in the fraud." *United States v. Zak*, 426 F. Supp. 3d 1365, 1369 (N.D. Ga. 2019). The Eleventh Circuit has endorsed the idea that "fair notice is perhaps the most basic consideration underlying Rule 9(b)." *Brooks*, 116 F.3d at 1381 (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)) (cleaned up). Simply

making Bridge an appendage to some of the allegations about the Strategic Defendants is not sufficient to give it notice, consistent with Rule 9(b), of its alleged misrepresentations and does indeed constitute impermissible "lumping."  *Cf. Lechter*, 565 F. Supp. 3d at 1326-27 (dismissing fraud claims against "placement agent" defendant on similar grounds); *Turk*, 593 F. Supp. 3d at 1303.[40]  Plaintiffs have therefore failed to properly plead any predicate acts by Bridge Capital.

### iv.   MMM Defendants

The MMM Defendants argue that the communications Plaintiffs contend constitute RICO predicate acts—including "the preparation of two fraudulent conservation easement deeds, two fraudulent legal opinions, and a fraudulent memorandum regarding IRS enforcement" (Doc. 285 at 5; *see also* Doc. 109, FAC ¶ 507)—are not plausibly alleged to be fraudulent.  Instead, the MMM Defendants say, the allegations are entirely consistent with the alternative

---

[40] To be sure, it is not necessarily fatal to allege that several defendants did something together, even when what they allegedly did was jointly prepare a fraudulent document.  Co-authorship is not a defense to fraud.  But when a given defendant's *only* alleged acts and representations in a 350-page complaint are ones vaguely said to have been "jointly" done with others or as part of an amorphous group of 30 Defendants, and the pleading otherwise gives little information regarding that Defendant's role in the fraudulent aspects of the scheme, Rule 9(b) is not satisfied.  The allegations regarding the Strategic Defendants, by contrast, do not suffer from this defect, because the complaint contains much more detailed allegations about their particular role in the alleged scheme.  Bridge appears only vaguely lumped in with others.

explanation that they were merely providing ordinary professional services.  In addition, the MMM Defendants argue that Plaintiffs impermissibly lump them together with others in alleging that they jointly prepared some of these documents, such as the Conservation Easement Deeds, with other defendants.

The Court finds, however, that Plaintiffs have adequately pled predicate acts of racketeering activity as  to the MMM Defendants.  To begin with, the Court notes that with respect to the MMM Defendants—unlike the other Attorney Defendants—Plaintiffs have pled sufficient facts to raise the plausible inference that the MMM Defendants had knowledge of the fraudulent nature of the appraisals and, therefore, of Strategic's SCE Strategy in general.  In particular, Plaintiffs allege that the MMM Defendants—and specifically Defendant Pollock—developed the idea of syndicated conservation easements and turned them into a lucrative line of business for the firm, became a "go to" law firm for the SCE Strategy, and was intimately involved with structuring the SCE Strategy transactions for the Strategic Defendants. (*See* Doc. 109, FAC ¶ 94(a).)  Beyond a general familiarity with SCE Strategy transactions, however, the FAC also alleges that Defendant Pollock "hand-picked" Defendant Keller of ACC to work on his transactions, evidently in part because Keller was willing to accept easements without questioning appraisers about their excessive valuations.  (*Id.* ¶ 101.)  Taken together, the MMM Defendants' deep familiarity with the SCE Strategy, which plausibly would

132

have included the appraisal process, along with their willing association with a land trust allegedly known for accepting excessively valued easements, renders it plausible—accepting the allegations as true and making inferences in Plaintiffs' favor—that the MMM Defendants knew the appraisal values were grossly inflated.[41]

In light of that alleged knowledge, Plaintiffs have pled at least two acts of wire and mail fraud by the MMM Defendants at this stage in the case. The two legal opinions prepared by the MMM Defendants for the DeSoto and Bear Creek Syndicates suffice for this purpose. (*See* Doc. 109, FAC ¶¶ 138; 272.) The letters were allegedly prepared solely by MMM and issued to the DeSoto and Bear Creek Syndicates after Plaintiffs signed the subscription documents. (*See id.*)

To be sure—as the MMM Defendants argue—not all of the alleged misrepresentations in these opinions rise to the level of fraud. Plaintiffs have

---

[41] It is worth recounting here the extraordinary degree of alleged inflation in the valuation of the Subject Properties in the SCE transactions in which MMM was heavily involved (DeSoto, Turtle River, Bear Creek). The DeSoto transaction involved property acquired by the Strategic Defendants for $709,207, sold to the Syndicate for $5 million, and soon thereafter valued for purposes of the conservation easement at $25 million. (Doc. 109, FAC ¶ 148(a).). The Bear Creek property had been purchased for about $1.3 million, sold to the Syndicate for over $5 million, and was valued for the conservation easement at over $24 million. (*Id.* ¶ 282.) The Turtle River transaction involved property appraised at over $29 million, representing an appreciation by a factor of 22 over its value ten years before. (*Id.* ¶ 220.)

not pled that they were in a confidential relationship with the MMM Defendants,[42] and thus matters of legal opinion cannot serve as the basis for fraud claims against them.  And some of the specific language Plaintiffs allege is fraudulent comprises highly qualified statements about the assumptions underlying the legal opinions, which do not constitute actionable fraud.  (*See id.*)  Each letter does, however, represent that the MMM Defendants reviewed the transaction documents and knew of "no facts inconsistent with" any of the letter's assumptions.  (*Id.*)  Those assumptions included the fact that the appraisals were "prepared in accordance with generally accepted standards within the meaning of" the relevant provisions of the Tax Code.  (*Id.*)  The letters further stated that "in the course of our representation nothing has come to our attention that would cause us to question the accuracy of the facts assumed for our opinions." (*Id.*)  Such representations clearly touch on matters of fact.  If it can be proven that the MMM Defendants did know that the appraisals were fraudulent, these letters could constitute the MMM Defendants' intentional participation in a scheme to defraud.

At this stage, then, the Court finds that Plaintiffs have adequately pled predicate acts of fraud against the MMM Defendants.

---

[42] See Part III(G)(3)(a) below.

v.   **Nelson Mullins**

A different conclusion is due for Nelson Mullins, however.  Plaintiffs allege that Nelson Mullins issued "Due Diligence Reports" for the DeSoto and Bear Creek Syndicates and a legal opinion letter for the Rock Spring transaction.  (Doc. 109, FAC ¶¶ 154-56, 277-79, 338-40, 508.)  Nelson Mullins attaches the Rock Spring Legal Opinion to its motion, and the Court has considered it here, as it is referred to in the pleading and is central to Plaintiffs' claims against Nelson Mullins.  (Doc. 206-2.)  Plaintiffs also allege that Nelson Mullins participated in "all aspects" of the scheme, agreed "to lend its name and reputation to the Strategic Defendants for promotional ends," and helped with other aspects of the SCE Strategy, such as creating the syndicate LLCs and helping to draft certain conservation easement deeds.  (*See, e.g.*, Doc. 109, FAC ¶¶ 94, 462.)

But, when conclusory and group-pled allegations are set aside, the FAC does not plausibly plead, in anything but a conclusory fashion, that Nelson Mullins knew the appraisal values were inflated or that it offered opinions it knew to be false.  As noted above, [w]hile under Rule 9(b) "knowledge . . . may be alleged generally," "[a] RICO plaintiff's allegations of scienter cannot be merely conclusory and unsupported by any factual allegations." *Republic of Panama*, 119 F.3d at 949 (internal quotation marks omitted); *see also Iqbal*, 556 U.S. at 686-87 ("Rule 9 merely excuses a party from pleading

discriminatory intent under an elevated pleading standard.  It does not give him license to evade the less rigid—though still operative—strictures of Rule 8.").  In contrast with the MMM Defendants, the FAC does not plead any facts or circumstances regarding Nelson Mullins that can support the plausible inference that it knew the appraisal values were fraudulent, or that it otherwise knew that the SCE Strategy was based on fraud.

Plaintiffs contend that it is enough that they allege that Nelson Mullins had worked on several of the transactions, and they also point to allegations that the legal opinions were boilerplate reused in numerous transactions.  But those facts do not suggest that Nelson Mullins knew that the SCE Strategy generally or the appraisals in particular were fraudulent.  This is particularly so where the opinions provided by Nelson Mullins expressly declined to offer any views about key aspects of the SCE Strategy itself, especially the appraisals.  It is consistent with the ordinary business activities of a large law firm to prepare opinions for tax-advantaged transactions.  The FAC does not show Nelson Mullins doing much more.  And again, because Plaintiffs have not alleged a confidential relationship with Nelson Mullins, matters of legal opinion in the letters cannot themselves constitute fraud.[43]  Thus, Plaintiffs have not plausibly alleged RICO predicate acts by Nelson Mullins.

---

[43] See Part III(G)(3)(a) below.

###### vi.   AquaFUSION

Plaintiffs allege that AquaFUSION prepared mining reports that falsely stated that mining on the subject properties was feasible, and that these mining reports were then incorporated into the allegedly fraudulent appraisals that served as the basis of the SCE Strategy.  As AquaFUSION emphasizes, none of its reports were allegedly provided to Plaintiffs directly.  Rather, AquaFUSION's alleged predicate acts involve sending the allegedly fraudulent mining reports to the Appraiser Defendants.  (Doc. 109, FAC ¶ 517.)  The FAC specifically points to three mining reports generated for the Rock Spring, DeSoto, and Bear Creek transactions.  (*Id.*)  As discussed earlier in this order, the FAC contains detailed allegations regarding the ways in which the conclusions reached in these reports were misleading and misrepresented material facts about the properties at issue and their purported feasibility for mining development.  (*See id.* ¶¶ 131-33; 261-64; 323-28.)  The FAC also alleges that AquaFUSION knew its reports outlined development plans that were "a ruse, intended to substantiate the overstated HBU."  (*Id.* ¶ 83(c)(ii).)  This allegation is plausible in light of the other allegations of fact in the complaint.

On the basis of these allegations, the Court finds that Plaintiffs have adequately pled AquaFUSION's commission of at least two predicate acts of mail or wire fraud—the sending through the mail or wires of the three mining reports.  The allegations regarding the mining reports are sufficiently specific,

and they plausibly allege that AquaFUSION would have known its reports contained affirmative misrepresentations that significantly overstated the appraisal value of the property so as to provide a return on investment promised by the Strategic Defendants in their alleged role as organizers of the SCE Strategy.

### vii.    The Land Trust Defendants

The Court considers the RICO allegations regarding GALT and the ACC Defendants (collectively the "RICO Land Trust Defendants") together.  Oddly, the individual motion to dismiss of Foothills—another Land Trust Defendant—and Plaintiffs' opposition to that motion contain argument about whether Plaintiffs have adequately alleged substantive RICO claims against Foothills.   But the FAC does not allege substantive RICO violations by Foothills—only GALT and the ACC Defendants.  (*See* Doc. 109, FAC ¶¶ 479, 541.)[44]  So the Court considers whether Plaintiffs have pled their Georgia RICO claim against GALT and ACC only.

---

[44] These paragraphs state:

> As used in this section and "Causes of Action" section, the "RICO Defendants" are the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D. These are Defendants against whom Plaintiffs make substantive RICO claims. Plaintiffs, however, make RICO conspiracy claims against all Defendants.

Generally speaking, the RICO predicate acts alleged against the RICO Land Trust Defendants involve their preparation of Baseline Documentation Reports ("BDRs") documenting the conditions of the subject properties; joint preparation of Conservation Easement Deeds with the Strategic Defendants, Bridge Defendants, and one of the law firm defendants; and their signature of the Form 8283 appraisal summaries.   GALT engaged in these acts in connection with the Turtle River Syndicate transaction (Doc. 109, FAC ¶ 514), the ACC Defendants in connection with the DeSoto and the Bear Creek Syndicate transactions (*id.* ¶ 513).   The ACC Defendants are also alleged to have provided letters to the DeSoto and Bear Creek Syndicates after the conveyance of the easements stating that those conveyances were "fully tax deductible."  (*Id.* ¶ 513(f).)

GALT attaches the Turtle River BDR and Form 8283 to its motion to dismiss and contends that these documents contain no actionable misrepresentations.[45]  It also points to disclaimer language on the Form 8283

---

(Doc. 109, FAC ¶ 479.)  The "predicate acts" section of the complaint does not list any alleged predicate acts by Foothills, though it does for the ACC Defendants and GALT.  The headings under Counts I and III of the FAC also list the same "RICO Defendants" and exclude Foothills.  (Doc. 109, FAC at 319.)

[45] The Court considers these documents, and the same ones introduced by the ACC Defendants, for they are incorporated by reference in the FAC and central to Plaintiffs' claims.  They are the documents that allegedly form the basis of the fraud claims against the RICO Land Trust Defendants.

document that states that GALT's acknowledgement "does not represent agreement with the claimed fair market value." (Doc. 199-1 at 90.) GALT also argues that the pleading fails to adequately allege that it knew that any of the alleged misrepresentations were false. On the contrary, GALT says, the only plausible inference that can be drawn from the allegations is that it was merely conducting "the ordinary functions of a non-profit land trust operating as donee for the easement" on the Turtle River property. (Doc. 199 at 8-9.) The ACC Defendants, who attach copies of BDRs and Forms 8283, raise similar arguments. They add that Plaintiffs have failed to plead their limited fraud allegations against the ACC Defendants in accordance with Rule 9(b).

Plaintiffs contend that the BDRs contain misrepresentations in that they affirm that subject properties met the conservation easement purposes of § 170(h) of the Internal Revenue Code, and that both the BDRs and Forms 8283 are also fraudulent in that they failed to disclose what the defendants allegedly knew—namely, that the appraisal values were fraudulently inflated. (Doc. 248 at 7-9.)

Considering nearly identical allegations in *Turk*, the court found that the plaintiffs had failed to plead any predicate acts of mail or wire fraud by the ACC Defendants or GALT. *See Turk*, 593 F. Supp. 3d at 1307-08; *see also Lechter*, 565 F. Supp. 3d at 1325-26 (dismissing substantive RICO claims against ACC Defendants and GALT based on similar allegations). The same

140

result is due here.  In the end, for both RICO Land Trust defendants, the trouble with the substantive RICO allegations is that Plaintiffs have failed to allege any actionable fraudulent representations with sufficient particularity to satisfy Rule 9(b).  The relevant allegations either entail impermissible lumping with other parties,[46] or they reflect the preparation of documents that simply do not contain any affirmative misrepresentations that could plausibly be characterized as fraudulent.  Plaintiffs allege, for example, that the DeSoto BDR prepared by the ACC Defendants made material omissions—that, for example, the BDR did not disclose neighboring tracts that impacted its conservation purpose.  (Doc. 109, FAC ¶ 160.)  But Plaintiffs have not alleged a confidential relationship with the ACC Defendants, so these omissions, standing alone, do not constitute actionable fraud.  In a similar vein, the notion that the RICO Land Trust Defendants affirmed the tax deductibility of the donations fails because it is a matter of legal opinion, and there is no basis in

---

[46] Many of the allegations concerning the ACC Defendants are subject to group pleading issues; Plaintiffs point to allegations that "Defendants jointly prepared" the Promotional Materials.  (Doc. 109, FAC ¶¶ 121-22, 245-55.) Such allegations inappropriately lump the ACC Defendants together with more than 30 other defendants as allegedly preparing a substantial package of documents.  More is needed to comply with Rule 9(b), as discussed above in connection with Bridge Capital.

the FAC to conclude that Plaintiffs were in a confidential relationship with any land trust.[47]

Thus, this Court reaches the same conclusion here as the court in *Lechter* and *Turk* regarding the Land Trust Defendants and the substantive RICO claims. Plaintiffs have not pled that these Defendants committed predicate acts of mail or wire fraud.

### viii.   The Langford Defendants and Frazier & Deeter

The Court next addresses Plaintiffs' substantive RICO claims against two of the Return Preparer defendants—Frazier & Deeter ("F&D") and the Langford Defendants.[48] Each of these entities is alleged to have performed tax preparation services for the LLCs, in particular by preparing the LLCs' tax

---

[47] Plaintiffs argue that they have pleaded that the ACC Defendants participated in numerous SCE Strategy transactions over nearly a decade, and that it is alleged that ACC had garnered a reputation as a land trust willing to accept easements with excessive valuations. (Doc. 246 at 3-4; Doc. 109, FAC ¶ 101.) This latter allegation renders plausible Plaintiffs' contention that the ACC Defendants would have known that the appraisal values were inflated, but the fraud claims still fail for the reasons stated in the foregoing paragraph—the ACC Defendants are not alleged to have made actionable misrepresentations about the inflated easements.

[48] Cherry Bekaert f/k/a Conexus is also alleged to have performed tax preparation services in connection with one of the SCE transactions, but Plaintiffs do not bring substantive RICO claims against it. (See Doc. 109, FAC ¶¶ 479, 541.) Even if they had, the factual allegations regarding Conexus would face the same difficulties as those regarding the Langford Defendants and F&D—namely, no factual allegations plausibly suggest it knew of the underlying fraud or was engaged in anything other than ordinary business activities.

returns and Schedule K-1 forms that they sent to Plaintiffs, the LLCs' members. The Langford Defendants performed these services for the Turtle River Syndicate (Doc. 109, FAC ¶¶ 225–27, 509), while F&D performed them for the Bear Creek Syndicate (*id.* ¶¶ 306–09, 518).

Here, as in *Turk*, the Court concludes that Plaintiffs' well-pled allegations about the tax preparation work of these two return preparers, which are generally quite limited, do not suffice to plead that each committed predicate acts of mail or wire fraud. *See Turk*, 590 F. Supp. 3d at 1306. Plaintiffs' theory of these defendants' racketeering activities is that they prepared the tax documents for the Syndicates knowing that the appraisals were fraudulent, and subsequently they provided the Schedule K-1 forms to Plaintiffs along with the documentation necessary to claim their share of the charitable contribution deductions on their tax returns, despite knowing that the value of the deductions was inflated and that the IRS would deny them.

The core issue with respect to the Langford Defendants and F&D is that "there are no allegations that would plausibly suggest that the [Return Preparer Defendants] *knew* that these representations"—those contained in the Schedule K-1 and the associated cover letters—"were fraudulent." *Turk*, 593 F. Supp. 3d at 1306. The best Plaintiffs can do is fall back on conclusory allegations about the role of these Return Preparers in the larger alleged scheme. (*See, e.g.*, Doc. 109, FAC ¶¶ 104, 462.) But these allegations, even if

143

they did not impermissibly lump the Return Preparers in with others, still fail to plead any facts showing how they would have known the appraisals were fraudulent.   Plaintiffs argue that the allegations show the value of the conservation easement deductions to have been so unreasonable that the Langford Defendants and F&D plausibly knew or should have known that they were bogus.   But there is nothing in the FAC to suggest that these two parties had experience with land appraisals such that they necessarily would have identified a bogus appraisal, or even that these parties, in performing their tax work, did more than report numbers that had been generated by other parties.[49]   To plead participation in the fraudulent scheme, Plaintiffs must plead facts giving rise to a plausible inference of something more than a negligent failure to discover the underlying fraud.   *See Am. Dental Ass'n*, 605 F.3d at 1290 (mail or wire fraud requires intentional participation in a scheme to defraud); *Allen v. Jones*, 604 S.E.2d 644, 647 (Ga. Ct. App. 2004) ("To be liable under RICO law for participation in fraud, a defendant must *knowingly and intentionally* participate in the fraud.   In the absence of any evidence that [defendant] knowingly distributed false or misleading information, he cannot be liable under the Georgia RICO Act.") (emphasis added).   In other words, the

---

[49] If the implication is that the numbers are so high that anyone without expertise in the appraisal process would have immediately recognized the appraisal values as bogus on their face, it is unclear how Plaintiffs themselves can claim to have been misled by the larger scheme.

very few paragraphs in the FAC about the Langford Defendants' and F&D's specific conduct do not plausibly support the notion that they were doing more than performing ordinary business services—that is, sending the necessary tax documents to an LLC member after being engaged to prepare a return for the LLC.

Such allegations were found insufficient to maintain RICO claims against the equivalent defendants in *Turk*.  The same result is due here.  *See Turk*, 593 F. Supp. 3d at 1306 ("As far as the Court can tell, the only material roles these Defendants played were preparing tax returns and performing various document review, and Plaintiffs have not plausibly alleged that they were engaged in anything more than ordinary business activities.").

### ix.   Bennett Thrasher

The Court reaches a different conclusion regarding Bennett Thrasher, another Return Preparer whose alleged predicate acts include preparation of the Schedule K-1s for the Rock Spring and DeSoto Syndicates.  (Doc. 109, FAC ¶¶ 175–77, 358–62, 510.)

As with the MMM Defendants, the FAC contains sufficient well-pled facts that render it plausible that Bennett Thrasher would have known that (1) it was incorporating fraudulent appraisal values into the tax documents it prepared for Plaintiffs and (2) that Plaintiffs would rely on those values in preparing their individual tax returns.  What sets Bennett Thrasher apart

145

from the other Return Preparers are factual allegations that it had been heavily involved in another line of SCE Strategy transactions predicated on inflated deductions.  The FAC alleges, for example, that Bennett Thrasher "had previously and aggressively referred many of its existing clients to participate in SCE Strategy transactions with a different sponsor than Strategic[.]" (Doc. 109, FAC ¶ 105.)  It is further alleged that Bennett Thrasher not only knew that the other sponsor's transactions involved inflated appraisals, but that it advised the sponsor of these other SCE transactions "about how to structure the transaction and value the underlying mineral assets and improperly inflate the appraisals." (*Id.* ¶ 105.)  Accepted as true, these allegations compel a different result for Bennett Thrasher than the more conclusory allegations of fraud made against the other Return Preparers.  For if Bennett Thrasher actively worked to inflate appraisal values in another set of SCE transactions, it is at least plausible that it would have known, or recognized, similar, improperly inflated appraisal values  in the SCE Strategy transactions in this case.  It is therefore plausibly pled that Bennett Thrasher knew the appraisal values were inflated, and thus that the SCE Strategy was fraudulent.

The two predicate acts alleged against Bennett Thrasher are its preparation of Schedule K-1s for Plaintiffs.  Bennett Thrasher contends that these documents did not explicitly endorse anything about the appraisal

values, and it introduces an affidavit from one of its representatives attesting that the firm's engagement letter with the relevant LLCs states that Bennett Thrasher "will not audit or otherwise verify the data [the LLCs] submit." (Doc. 230-1, 230-4.) But such extrinsic material as the affidavit and the engagement letter, neither of which are referred to in the FAC, are not properly considered at this stage, whatever their importance may be later. More to the point, although the K-1s may not have affirmatively endorsed the value of the deduction or the underlying appraisals, if Bennett Thrasher knew the information to be false, it might still be liable under the federal and Georgia RICO statutes. In *Allen v. Jones*, the court considered a defendant who "distributed fraudulent promotional materials and collected money from the" plaintiffs in connection with a fraudulent investment scheme, although he had no role in creating the promotional materials. 604 S.E.2d at 647. It was held, however, that precisely because there was "the absence of any evidence that Jones knowingly distributed false or misleading information, [Jones] cannot be liable under the Georgia RICO Act." *Id.* (citing *Jordan v. Tri County AG, Inc.*, 546 S.E.2d 528, 533 (Ga. Ct. App. 2001)). In other words, the trouble was that although Jones distributed fraudulent promotional materials, he did so *without knowing of their falsity*. It was not an issue, however, that Jones had not independently vouched for the false information.

Here, by contrast, Plaintiffs have raised the plausible inference that Bennett Thrasher knew the appraisal values underlying the K-1s were fraudulently inflated, and they distributed them to Plaintiffs knowing that Plaintiffs would report those inflated deductions on their tax returns. (*See* Doc. 109, FAC ¶¶ 105, 176, 359–61.) In *Lechter*, identical tax work by an accountant who had reason to know of the fraudulent appraisal values was found to plausibly support substantive liability under Georgia RICO. *See Lechter*, 565 F. Supp. 3d at 1323-24.  For the time being, the same result is due here: Plaintiffs have pled Bennett Thrasher's intentional participation in a scheme to defraud and the requisite pattern of racketeering activity.  Plaintiffs have pled sufficient facts to survive a motion to dismiss on their substantive RICO claims as to Bennett Thrasher.

### x.   The Appraiser Defendants

Plaintiffs' mail and wire fraud allegations regarding the Clark Defendants and the VSW Defendants are based on the preparation of appraisal documents used at different stages of the SCE transactions—the Initial Appraisal (provided to Plaintiffs with their PPMs), the Qualified Appraisal, and later these Defendants' endorsement of the "Appraisal Summary" forms. (Doc. 109, FAC ¶ 9–12, 442, 512.)  The Clark Defendants allegedly prepared these documents for the DeSoto and Rock Spring transactions, while the VSW

148

Defendants prepared them for the Turtle River, Bear Creek, and Vista Hill transactions.

As a preliminary matter, the complaint plausibly alleges that the appraisal values were fraudulently inflated; that the appraisals did not comply with the applicable professional standards, despite the Appraiser Defendants' assertions to the contrary; and that both the Clark and VSW Defendants knew their representations about these matters were false.  For example, the Clark Defendants' Initial Appraisal for the DeSoto transaction allegedly relied uncritically and without reasonable basis on the AquaFUSION mining report in violation of USPAP standards; declined to use "fair market value" analysis and instead used HBU analysis, without conducting or considering alternative methods of valuation, again in violation of USPAP standards; based its analysis on improbable assumptions that ignored neighboring tracts and comparable properties; and reached conclusions that they would have known were false, such as that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]." (Doc. 109, FAC ¶¶ 136, 148(h).)  The document also allegedly misrepresented the fact that the land had not even been acquired at the time of the alleged appraisal.  (*Id.* ¶ 136(g)).  Finally, the Clark Defendants' appraisals concluded that the DeSoto Property's conservation easement donation "had a fair market value of over $25 million," which reflected an appreciation by a factor of 35 in

149

less than two weeks, since the property had been acquired by the LLC for only $709,207. (*Id.* ¶ 165.) In addition, the later Qualified Appraisals allegedly repeated and incorporated these misrepresentations. (*See id.* ¶¶ 170–174.) Those documents contained certifications indicating that the Clark Defendants were independent and that their compensation was not contingent upon their reaching a predetermined valuation. (*Id.* ¶ 172.) Analogous allegations are made about the Clark Defendants' appraisal work for the Rock Spring transaction (*id.* ¶¶ 329–333) and the VSW Defendants' appraisal work for the Vista Hill (*id.* ¶¶ 387–391, 411–22) and Turtle River transactions (*id.* ¶¶ 219–224).[50]

It is plausible that the Clark and VSW Defendants would have known that these misrepresentations were false when made. At the most basic level, "if anyone would have known that the appraisals were inflated, it likely would have been the [Appraiser Defendants]; after all, they were the ones who actually performed the appraisals." *Turk*, 593 F. Supp. 3d at 1304; *see also Lechter,* 565 F. Supp. 3d at 1328–29 (substantive RICO claims pled against

---

[50] The FAC also alleges that these Defendants' work has come under criticism for being inflated. Defendant Clark allegedly had longstanding experience with SCE Strategy transactions and had been disciplined by the Alabama Real Estate Appraiser Board for producing a conservation easement appraisal with similar deficiencies to those alleged in this case. (Doc. 109, ¶ 98(b).) The VSW Defendants' appraisals allegedly have come under criticism for being inflated in Tax Court proceedings that have examined them. (*Id.* ¶ 99.).

appraiser defendants based on similar allegations).   The complaint also plausibly alleges that the appraisal values consistently hit similar valuation ranges—allegedly to satisfy the requirements of the organizers of the SCE Strategy—which, if true, constitutes   circumstantial   evidence   that   the Appraiser Defendants knew they were not performing accurate appraisals and that they were not, in fact, unbiased and independent.  *See Turk*, 593 F. Supp. 3d at 1304.

Both Appraiser Defendants contend that, under Georgia law, appraisals are merely opinions that cannot support fraud claims; both cite *Coote v. Branch Banking & Tr. Co.*, 664 S.E.2d 554, 556 (Ga. Ct. App. 2008), in support of this proposition.  *See id.* (finding that a given "appraisal was an opinion of the value of the real estate upon which Coote was not entitled to rely.").   The Clark Defendants, citing *In re Lehman Bros. Securities and Erisa Litig.*, 799 F. Supp. 2d 258, 303 (S.D.N.Y. 2011), contend that the same is true of any representations about their appraisal's compliance with professional appraisal standards.

The Court agrees with Plaintiffs that the Appraiser Defendants' arguments do not warrant dismissal of the RICO claims against them, at least at this stage.  *Coote* is distinguishable.  First, the appraisal value in *Coote* on which the plaintiff relied was merely a dollar value, communicated to the plaintiff by a third party who simply reported what the third party's appraiser

had found.  *See Coote*, 664 S.E.2d at 555-56.  Here, by contrast, the allegedly fraudulent Initial Appraisal and Qualified Appraisal go beyond a simple dollar value and clearly touch on detailed issues of fact ostensibly designed to substantiate their conclusions.  They also make representations about their compliance with certain professional standards that Plaintiffs have plausibly alleged were knowingly false.  Second, *Coote* involved an appraisal that was plainly not intended for the plaintiff—it stated on its cover page that it was for the third party, not the plaintiff.  *Id.* at 556.  Third, there is no indication that the appraisal in *Coote* was knowingly false, as is alleged here; instead, the court's analysis was based on a record that "contained neither a false representation nor any proof of scienter or intention to deceive."  *Id.*  Perhaps the case may be relevant later if fact discovery leads to a record that looks more like that on which *Coote* was decided at summary judgment, but the case does not bar Plaintiffs' claims at this stage.

Next, the *In re Lehman Bros.* case cited by the Clark Defendants, which concerned financial auditing professional standards, does not say that misrepresentations about such matters could never be actionable fraud.  On the contrary, it emphasized that the plaintiffs could have alleged fraud based on such matters if they had "allege[d] specific departures from GAAP [the applicable professional standards] and, in addition, set forth facts sufficient to warrant a finding that the auditor did not actually hold the opinion it

expressed or that it knew that it had no reasonable basis for holding it," but that they had not done so. *In re Lehman Bros.*, 799 F. Supp. 2d at 303. Here, the FAC contains the allegations found missing in *Lehman Bros.* For example, the FAC alleges that the Clark Defendants failed to comply with USPAP rules regarding the use of HBU analysis in lieu of other valuation methods, that the Clark Defendants lacked the qualifications necessary to be "qualified appraisers" of the type of property at issue under USPAP rules, and that they represented themselves as unbiased and independent, when in fact they sought to inflate the appraisals to achieve a predetermined value range. (*E.g.,* Doc. 109, FAC ¶¶ 136, 148, 172.) These are plausible allegations of "specific departures" from the standards with which the Appraiser Defendants claimed to be comporting. *See In re Lehman Bros.*, 799 F. Supp. 2d at 303. And, as discussed earlier in this section, it is also plausibly alleged that, in making these representations, the Appraiser Defendants "did not actually hold the opinion [they] expressed or . . . knew that [they] had no reasonable basis for holding it." *Id.* *In re Lehman Bros.* is, thus, distinguishable.

With this said, the Court concludes that Plaintiffs have adequately pled that the Clark Defendants and the VSW committed acts of mail or wire fraud, including the sending of their Initial Appraisals and Qualified Appraisals to Plaintiffs in connection with each of the representative transactions. *Cf. Turk*,

593 F. Supp. 3d at 1304 (same result based on similar allegations); *Lechter,* 565 F. Supp. 3d at 1328–29 (same).

### xi.    The Local Promoters

Credo, Oxygen, and the Dantin Defendants allegedly served as "Local Promoters" of Strategic's SCE Strategy transactions by marketing them to their clients or former clients.  For example, Credo allegedly urged Plaintiff Spratt to participate in the Turtle River Syndicate transaction, promised that he would receive a certain return on his investment in line with the numbers being promised by Strategic, and made other (ultimately unrealized) promises about the benefits of the SCE Strategy and Strategic's expertise in carrying them out.  (Doc. 109, FAC ¶¶ 189-93.)  Credo allegedly received referral fees for its  work referring clients to the Strategic Defendants.  (Doc. 109, FAC ¶¶ 108-09.)  Comparable allegations are made about Oxygen's representations to the Greiners and the Dantin Defendants' representations to Hebert, although neither Oxygen nor the Dantin Defendants are alleged to have received referral fees.  (*Id.* ¶¶ 195-203; 242–45, 254–52.)[51]

---

[51] Oxygen introduces an affidavit and email correspondence that it says contradict Plaintiffs' allegations about the Greiners' relationship with Oxygen. (Doc. 197-1.)  The Court disregards this extrinsic material at this stage and reads the FAC in the light most favorable to Plaintiffs, accepting their well-pled allegations as true.

Plaintiffs' mail and wire fraud allegations against Credo, Oxygen, and the Dantin Defendants fail because there is no factual basis in the FAC for inferring that these defendants knew that the underlying appraisals were fraudulent, and thus it is not plausibly alleged that these defendants knowingly and intentionally committed fraud. *See, e.g., Allen*, 604 S.E.2d at 647. As Plaintiffs acknowledge, their "allegations are not that conservation easements are inherently fraudulent; rather, Plaintiffs allege that the specific strategy at issue here 'was not properly and legitimately valued and implemented and was never intended to be.'" (Doc. 261 at 6) (quoting Doc. 109, FAC ¶ 5). Fair enough; but to allege the commission of predicate acts of fraud, the FAC must raise the plausible inference that the Local Promoters knew of the deficiencies in the specific strategies they were marketing. Otherwise, as with Defendants like Nelson Mullins, the Langford Defendants, and F&D, it is difficult to read the complaint as alleging more than that Local Promoters engaged in ordinary business activities. Without more, the FAC cannot state a plausible claim of mail or wire fraud against the Local Promoters.

### xii.   Relatedness and Continuity

Finally, the Court briefly addresses two additional requirements for pleading a pattern of racketeering activity. Under both federal and Georgia RICO, predicate acts must be "related" to constitute a "pattern" of racketeering activity. *See Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1283 (11th

Cir. 2006); *Wylie v. Denton*, 746 S.E.2d 689, 693 (Ga. Ct. App. 2013) (under Georgia RICO, predicate acts must be "interrelated" in that they "were done 'in furtherance of one or more incidents, schemes, or transaction'") (quoting O.C.G.A. § 16-14-3(4)(A)).   Furthermore, under federal RICO, "in addition to alleging the requisite number of individually chargeable predicate acts, a plaintiff must plausibly allege that the defendant is engaged in 'criminal conduct of a continuing nature.'" *Cisneros*, 972 F.3d at 1216 (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004)).[52]   A plaintiff can allege continuity "either by alleging 'a series of related predicates extending over a substantial period of time' or 'the threat of continuity.'" *Cisneros*, 972 F.3d at 1216 (quoting *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).   At this juncture, Defendants have not raised any significant challenge to either the relatedness of the alleged predicate acts or the continuity of the alleged pattern of racketeering activity.   The Court has little trouble finding that Plaintiffs have alleged that the well-pled predicate acts, discussed above, are sufficiently "related," given that each had the ostensible purpose of "misrepresent[ing] the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud

---

[52] Georgia RICO does not have a continuity requirement.  *See Lechter*, 565 F. Supp. 3d at 1317; *see also* 4 Ga. Jur. § 7:23 ("Georgia RICO plaintiffs need not show that the conduct will continue or that the defendants have been guilty of like conduct in the past.").

Plaintiffs." (Doc. 109, FAC ¶ 530.) As will be seen below, for those defendants who are plausibly alleged to have committed predicate acts of mail or wire fraud, the well-pled predicate acts all tend to involve misrepresentations about the inflated appraisal values, each in connection with multiple SCE Strategy transactions. Plaintiffs have also plausibly pled at least "closed" continuity because they have alleged that the RICO Defendants worked together on fraudulent SCE Strategy transactions over the course of years. *See H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 242 (1989) ("A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."); *see also Cisneros*, 972 F.3d at 1216 ("We measure a 'substantial period of time' in years, not in weeks.").

### xiii.   Conclusion

The Court has found in this section that Plaintiffs have adequately pled the commission of at least two related acts of racketeering activity by the Strategic Defendants, the MMM Defendants, Bennett Thrasher, AquaFUSION, the Clark Defendants, and the VSW Defendants. However, the Court has concluded that the remaining RICO Defendants—Bridge Capital, Nelson Mullins, ACC, GALT, the Langford Defendants, Frazier & Deeter, Credo, Oxygen, and the Dantin Defendants—are not adequately alleged to have committed any predicate acts of racketeering activity.

157

### b. Enterprise

The Court now turns to the "enterprise" element, which is a requirement of the federal RICO statute and subsection (b) of the Georgia RICO statute. Plaintiffs contend that Defendants constitute an "association-in-fact" enterprise. The Supreme Court has defined an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "[T]he very concept of an association in fact is expansive," *Boyle*, 556 U.S. at 944, but pleading one's existence still requires facts showing the following features: "(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting *Boyle*, 556 U.S. at 944, 946). The Georgia RICO statute defines "enterprise" to include association-in-fact enterprises in the same way as the federal RICO statute. *Compare* O.C.G.A. § 16-14-3(3) ("'Enterprise' means any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or *group of individuals associated in fact although not a legal entity*; and it includes illicit as well as licit enterprises and governmental as well as other entities.") (emphasis added), *with* 18 U.S.C. § 1961(4)

158

("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or *group of individuals associated in fact although not a legal entity*") (emphasis added).

An association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command,'" and its "decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 556 U.S. at 948.  The enterprise need not give its members fixed roles, nor need it have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*  Nevertheless, "the group must function as a continuing unit." *Id.*  Conclusory allegations that a given group of defendants agreed to associate for a given purpose do not suffice to plead a RICO enterprise. *See Almanza*, 851 F.3d at 1068.

With respect to the "common purpose" requirement, "[a]n abstract common purpose, such as a generally shared interest in making money, will not suffice." *Cisneros*, 972 F.3d at 1211 (citing *Ray*, 836 F.3d at 1352-53, 1352 n.3).  "Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *Id.*  For this reason, "[a]llegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest

a conspiracy." *Am. Dental*, 605 F.3d at 1294; *Almanza*, 851 F.3d at 1068 ("To cross the line from a possible to a plausible existence of an agreement, plaintiffs must allege a 'further circumstance pointing toward a meeting of the minds.'") (quoting *Twombly*, 550 U.S. at 557).

Defendants argue that Plaintiffs, rather than pleading the existence of an enterprise, merely plead "that each Defendant *worked on some aspect of a transaction*." (Doc. 168-1 at 42) (emphasis in original).  They argue that the same conclusion that was reached in *Lechter* is due here—namely, that Plaintiffs failed to plead an enterprise because they  failed to address the "'obvious alternative explanation' that instead of them each agreeing to perpetuate an elaborate conspiracy[,] Defendants were each independently pursuing their own economic self-interest by providing financial services." *Lechter*, 565 F. Supp. 3d at 1315 (quoting *Twombly*, 550 U.S. at 568).  Nothing in the FAC, they argue, shows a "common purpose" in anything other than making money in their respective professional endeavors.

Plaintiffs respond that they have alleged a common purpose beyond merely making money, namely that the common purpose was to "generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction." (Doc. 109, FAC ¶ 484.)  They argue that the FAC pleads facts sufficient to show an agreement among all Defendants to act as a

160

continuing unit and to pursue a common course of criminal conduct, in part because the allegations show how Defendants "deliberately sought out and agreed to work with only those whom they knew . . . to be willing partners in this improper endeavor." (*Id.* ¶ 8.)  Plaintiffs call the appraisal values "the central issue" in, and the "lynchpin of," the alleged scheme. (Doc. 109, FAC ¶ 9, 94(f).)

Like the court in *Turk*—and in contrast with the court in *Lechter*—this Court finds that Plaintiffs have adequately alleged a RICO enterprise including those defendants against whom they have plausibly alleged predicate acts of mail and wire fraud: the Strategic Defendants, the Clark Defendants, the VSW Defendants, AquaFUSION, the MMM Defendants, and Bennett Thrasher.  The FAC plausibly alleges a "common purpose" for these parties.  The alleged scheme is based on the idea that these Defendants associated with one another to make money through fraudulent SCE Strategy transactions while knowing that the appraisals at the heart of the Strategy were fraudulently inflated. (*E.g.*, Doc. 109, FAC ¶¶ 1–3.)  The allegations in the complaint about significant defects in the appraisals in each of the representative transactions are detailed; they give rise to a plausible inference that the appraisals were based on misrepresentations and omissions. (*See, e.g.*, *id.* ¶¶ 131–37; 261–64; 219–224; 323-28; 387–391, 411–22.)

161

Crucially, the allegations also give rise to the plausible inference that these defendants were aware of the misrepresentations and omissions in the appraisals or in the mining reports that underlay them.[53] As discussed above, the group of defendants plausibly alleged to have known the appraisals were bogus includes the Clark Defendants and the VSW Defendants, who prepared the appraisals, and AquaFUSION, which prepared the reports purporting to find that mining was a viable HBU on the DeSoto, Bear Creek, and Rock Spring properties. It also includes the Strategic Defendants, who promoted and facilitated the transactions, including by acquiring and subdividing the properties that would later be appraised at a dollar value greater by an order of magnitude than that for which they had been acquired mere days or weeks before. (*Id.* ¶¶ 89–91.) The Strategic Defendants also allegedly "worked on every aspect of each Syndicate's transaction" including reviewing the mining reports and appraisals and selecting the other participants in the alleged endeavor. (*Id.*) Next, the association-in-fact enterprise also includes the MMM Defendants, who are plausibly alleged to have known that the underlying appraisals were fraudulent, who allegedly worked on numerous transactions with the Strategic Defendants to prepare and review documents and otherwise structure the transactions, and who prepared legal opinions that allegedly

---

[53] See the discussion regarding each of these Defendants in Part III(F)(1)(a) above.

concealed and misrepresented the fraudulent appraisals and their consequences for the transaction. (*Id.* ¶¶ 94(a)–(e), 138, 231–32, 272.) Finally, the enterprise includes Bennett Thrasher, which also allegedly knew that the appraisals were fraudulently inflated and nevertheless associated with the Strategic Defendants to perform tax work for the syndicates that incorporated and affirmed the appraisal values in documents provided to Plaintiffs. (*Id.* ¶¶ 104–05, 175–76, 358–62.)

Together, these parties are alleged to have associated to work on numerous fraudulent transactions with the same alleged underlying flaws: grossly inflated appraisals. The appraisal values—the "lynchpin" of the scheme, according to Plaintiffs—allegedly shared common flaws across the transactions described in the complaint. (*Id.* ¶ 9.) For example, the HBU analysis ignored the effects of neighboring tracts that were themselves acquired and subdivided by the Strategic Defendants. Finally, it is alleged that the appraised values of the properties consistently matched the return on investment promised by the Strategic Defendants in their promotion of the SCE Strategy. (*Id.* ¶¶ 123(a), 126, 251, 257, 270, 307.) Given the many variables that enter into the appraisal calculations, it strikes the Court as implausible, accepting Plaintiffs' allegations as true, that this could be the result of mere parallel conduct, particularly when the same coincidence occurred over multiple transactions involving properties with different

features.  Rather, the appraisal values' alleged tendency to match a promised rate of return supports agreement on a "common purpose" to fraudulently inflate the appraisal values to create an apparently lucrative tax product, and then to "generate . . . fees and commissions" through selling that product while representing it as fundamentally legitimate.[54]  (*Id.* ¶ 481.)

This plausible common purpose distinguishes this case from *Ray v. Spirit Airlines, Inc.*, where the plaintiffs failed to "allege facts giving rise to a plausible inference that the various technology vendors and consultants . . . were in any way involved in the actual decisions of how to portray the Passenger Usage Fee, knew the true nature of the fee, or worked intentionally to misrepresent the fee."  *Ray,* 836 F.3d at 1353.  Here, by contrast, the allegations support a plausible inference that some of the defendants did work together to misrepresent the appraisal values, and they coordinated to set the appraisals at a fixed value to yield a certain return on investment.  The MMM Defendants and Bennett Thrasher, in turn, plausibly "knew the true nature" of the appraisals, *Ray,* 836 F.3d at 1353, but nevertheless associated with the other RICO defendants and produced legal opinions and tax documents that

---

[54] This is not to say that alternative explanations are not possible, but these need not be systematically ruled out.  At this stage, Plaintiffs just have to push their allegations of agreement on a common purpose into the realm of the plausible.

164

repeated and incorporated those values and affirmed that they were legitimate when, in fact, they were not.

A similar contrast can be drawn with the enterprise allegations rejected as insufficient by the Eleventh Circuit in *Cisneros v. Petland*. There, the court found the common purpose to be insufficiently pled because the plaintiffs had "alleged no facts that plausibly support the inference that the defendants were collectively trying to make money in pet sales by fraud, which is a common purpose sufficient to find a RICO enterprise, as opposed to the 'obvious alternative explanation' that they were simply trying to make money in pet sales, which is not[.]" *Cisneros*, 972 F.3d at 1212. The court underscored the plaintiffs' allegations that the enterprise essentially involved common standards imposed by a franchisor on its franchises. These were insufficient to show anything more than ordinary franchisor-franchisee relations because the plaintiff "would have had to allege concrete facts giving rise to the inference that the 'unique system' Petland used to train its franchisees was a fraudulent one." *Id.* at 1212. Here, by contrast, Plaintiffs have alleged "concrete facts" giving rise to the inference that the SCE Strategy was fraudulent, that its fraudulent nature was consistent across numerous transactions that used appraisals inflated by the same methods, and that a number of the defendants knew of that fraud when they associated to work together on transactions. Those defendants—the Strategic Defendants, the VSW Defendants, the Clark

Defendants, AquaFUSION, Bennett Thrasher, and the MMM Defendants—
are plausibly alleged to have associated for the common purpose of "trying to
make money [in syndicated conservation easement transactions] by fraud."
*Cisneros*, 972 F.3d at 1212.

Next, the Court  finds that Plaintiffs have alleged the "relationship"
component of the enterprise analysis.  "Proving sufficient relationships for an
associated-in-fact enterprise is not a particularly demanding task." *Almanza*,
851 F.3d at  1068.  Here, Plaintiffs have adequately alleged that the Strategic
Defendants, VSW Defendants, Clark Defendants, AquaFUSION, the MMM
Defendants,  and  Bennett  Thrasher  "function[ed]  as  a  continuing  unit,"
*Turkette*, 452 U.S. at 583.  As discussed above, these defendants allegedly
worked on a common strategy based on fraudulent appraisals, and they did so
on multiple transactions over several years.  This is not a case that, at this
stage, can plausibly be attributed to mere parallel or independent conduct.  In
carrying out the alleged scheme, these defendants allegedly relied on one
another's work, frequently and knowingly incorporating allegedly false or
unsubstantiated representations made by the others.  AquaFUSION's mining
reports, for example, were adopted uncritically into the Clark Defendants' and
VSW Defendants' appraisals, which were later incorporated by the Strategic
Defendants into Promotional Materials and the PPMs to advertise lucrative
returns, and later still into Bennett Thrasher and the MMM Defendants' work

products, which again affirmed the appraisal values produced by the others, despite knowledge that they were fraudulent.   These relationships were centered on executing the specific SCE Strategy transactions that Plaintiffs plausibly allege were based on appraisals known to the enterprise defendants to be fraudulent.   In addition, Strategic's marketing materials, as well as Defendant Novak himself, allegedly represented at various points that Strategic had a "team" of experts including "law firms, accounting firms, appraisers, and other consultants" who had "already done approximately eighty syndicates." (Doc. 109, FAC ¶¶ 107-08; 245-46; 315.)  Others allegedly on the further fringes of the SCE Strategy, such as the Dantin Defendants, were aware of the reputation of Strategic and its "team," which Defendant Dantin said included appraisers.  (*Id.* at ¶ 244.)  Of course, such talk about "teams" is arguably just marketing-speak, but it nevertheless adds plausible support to the existence of ongoing relationships among the Defendants, each playing a particular role in the alleged scheme.  *Cf. Turk,* 593 F. Supp. 3d at 1310; *see also Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 794–95 (6th Cir. 2012) (in RICO case alleging fraudulent tax-shelter scheme, finding the enterprise allegations sufficient where the complaint "delineates the specific roles and relationships of the Defendants, alleges the enterprise functioned at least five years, and alleges it functioned for the common purpose

of promoting a fraudulent welfare benefit plan to generate commissions and related fees.").

Finally, the Court finds that Plaintiffs have certainly pled the "longevity" requirement, as the allegations are sufficient to show that the specified defendants worked together on multiple SCE Transactions over the course of several years.

Plaintiffs have, therefore, pled a RICO enterprise encompassing the Strategic Defendants, VSW Defendants, Clark Defendants, AquaFUSION, the MMM Defendants, and Bennett Thrasher. The relevant allegations are largely analogous to those in *Turk,* 593 F. Supp. 3d at 1310, where the court determined that the plaintiffs had pled an association-in-fact enterprise against the mining consultant, the appraiser defendants, and the sponsor/promoter defendants. There, the court underscored the identification of a "Conservation Easement Team" in some of the promotional materials, and the "common tactic" underlying the allegedly fraudulent appraisals across numerous transactions. *See id.*[55] In this case, like in *Turk*, the FAC alleges the existence of a pattern of similarly inflated appraisals across the representative transactions, appraisal values that consistently tracked

---

[55] In *Lechter*, by contrast, the court found that the plaintiffs had failed to offer any well-pled factual allegations that plausibly indicated anything more than "parallel conduct" between the parties. *See Lechter*, 565 F. Supp. 3d at 1315-16.

promised returns, and self-description by the Strategic Defendants of other defendant entities as part of their SCE "team."  At the pleading stage, these allegations—as explained above—are enough to plead an association-in-fact enterprise regarding these defendants.   The Court reiterates that its discussion in this section is based only on factual *allegations*, accepted as true, and the plausible inferences that can be drawn from them in Plaintiffs' favor.

### c. Conduct

Liability under the federal RICO statute only extends to those who "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The Supreme Court has explained that "participation" means that one had "some part in directing [the enterprise's] affairs"—and "not just [one's] own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993) (emphasis in original). RICO liability "is not limited to those with primary responsibility for the enterprise's affairs," but it *is* required that a RICO defendant "participate[ ] in the operation or management of the enterprise itself."  *Id.* at 179, 183.

Defendants argue that even if Plaintiffs have pled the existence of an enterprise, Plaintiffs failed to allege that they "participate[d] in the operation or management of the enterprise."  Defendants contend that the provision of legal or other ordinary professional services cannot amount to the operation or management of an enterprise.  In their joint motion to dismiss, Defendants cite

*Mason v. Midland Funding LLC* for the proposition that "Courts following *Reves* have generally held that the provision of traditional legal services does not constitute the 'operation or management' of an enterprise for purposes of RICO liability." *Mason v. Midland Funding LLC*, No. 1:16-CV-02867-CC-RGV, 2017 WL 6994577, at *19 (N.D. Ga. July 27, 2017), *report and recommendation adopted as modified*, No. 1:16-CV-2867-CC, 2017 WL 8186866 (N.D. Ga. Sept. 29, 2017) (citing *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1382 (S.D. Fla. 2010)).

This argument is correct as far as it goes, and it provides an alternative basis for excluding from the enterprise defendants such as Nelson Mullins or the Langford Defendants, whom the Court has already said are not plausibly alleged to have known about the fraudulent aspects of the SCE Strategy. The allegations about such parties are arguably akin to the facts about the accountant in *Reves* itself, whose dereliction of his professional duties as an accountant—his "failure to tell the Co-op's board that the plant should have been given its fair market value"—could not constitute participation in the operation or management of an enterprise. *See Reves*, 507 U.S. at 186.[56]

---

[56] Indeed, in *Flagg v. First Premier Bank*, 257 F. Supp. 3d 1351, 1363 (N.D. Ga. 2017), the   court held that a bank alleged to have knowingly processed fraudulent charges in connection with a payday loan scheme did not meet the operation or management test.   For the ACC Defendants, whose ordinary business activities involve the acceptance of conservation easements, this case

170

But the cases do not support the existence of a bright-line rule that excludes professionals from RICO liability. *Mason*, for example, concerned an attorney whose alleged involvement in the RICO enterprise was connected with his in-court representations of his clients, other members of the alleged enterprise. *Mason*, 2017 WL 6994577, at *19. There, the plaintiffs alleged that "in representing [the other defendants] in state court, [the law firm defendant] knew it was engaging in fraudulent conduct by submitting false and misleading affidavits prepared by employees of the Encore defendants." *Id.* But as *Mason* acknowledged, "there is a 'distinction between acting in an advisory professional capacity (even if in a knowingly fraudulent way) and acting as a direct participant in [an enterprise's] affairs.'" *Id.* (quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997)). The Eighth Circuit has, for example, recognized that an attorney "who crosses the line between traditional rendition of legal services and active participation in directing the enterprise" can be part of that enterprise. *Handeen*, 112 F.3d at 1349. "The polestar," it emphasized, "is the activity in question, not the defendant's status." *Id.*

That distinction is both persuasive and relevant here, where the allegations are different in kind than those in *Mason*, or even in *Handeen*,

---

further explains why they fall outside the scope of substantive RICO liability, despite their alleged reputation for accepting inflated easements.

where the alleged scheme centered on a bankruptcy attorney's efforts to help a client conceal income from a bankruptcy trustee.  *See Handeen*, 112 F.3d at 1344.  There is a vital difference between holding a professional liable for representing an alleged enterprise in court—or simply advising it regarding matters within the purview of a lawyer's ordinary work—and the allegations in this case.  Here, the alleged common purpose around which the enterprise coalesced was to make money through a tax shelter scheme based on fraudulently inflated conservation easement appraisals.  The defendants included within the RICO enterprise are professionals, to be sure.  But they are not merely alleged to have been doing professional work for clients who are racketeers, or for clients who wished to use the professionals' services to perform racketeering activity.  Here, by and large, the professional services— the consultant reports, the appraisals, the legal opinions, and the tax documents—*are* the alleged racketeering activity.  While the Eleventh Circuit does not appear to have addressed a case like this, other courts have had no trouble holding that professionals allegedly engaged in similar schemes can conduct the affairs of a RICO enterprise.  *See Ouwinga*, 694 F.3d at 794-95 (finding RICO claims well-pled as to defendants including attorneys and other professionals allegedly promoting fraudulent tax-shelter scheme); *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094-95 (N.D. Ill. 2016) (finding

RICO enterprise in alleged fraudulent tax-shelter scheme involving professional defendants).

What the Eleventh Circuit has otherwise said about the "operation or management" test suggests that its requirements have been met here. Operation or management can include "implementing or making decisions related to [the enterprise's] affairs." *United States v. Godwin*, 765 F.3d 1306, 1321 (11th Cir. 2014). Thus, "an enterprise is operated also by lower-rung participants in the enterprise who are under the direction of upper management, or by others associated with the enterprise who exert control over it." *United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995). Plaintiffs' allegations about the Strategic Defendants, AquaFUSION, the Clark Defendants, the VSW Defendants, the MMM Defendants, and Bennett Thrasher are sufficient to plead that each of these defendants, through their distinct roles in carrying out the SCE Strategy transactions, conducted the affairs of the enterprise. *Cf. Menzies*, 197 F. Supp. 3d at 1103 (finding participants in alleged fraudulent tax shelter scheme operated or managed enterprise where the plaintiffs alleged conduct such as "1) luring Plaintiff into the bogus tax shelter plan; (2) referring business to other violators by convincing Plaintiff to hire co-conspirators; (3) participating in various telephone conversations (without Plaintiff) to plan the scheme; (4) structuring the legal instrumentalities of the scheme; (5) defrauding Plaintiff and

supporting the appearance of legitimacy of the scheme with false statements and opinion letters; and (6) otherwise controlling the instrumentalities of the scam through active service as a trustee for the relevant assets and legal instrumentalities used to injure Plaintiff").[57]

### d. Proximate Cause

The federal RICO statute provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added).  The Supreme Court has said that a civil

---

[57] The parties discuss only federal RICO case law with respect to the "conduct" requirement.  This is, however, an aspect of the statute in which Georgia RICO departs from the federal statute.  Subsection (b) of the Georgia RICO statute provides only that "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b).   That language—much less restrictive than the comparable language in the federal statute interpreted in *Reves*—has been read to contain "nothing . . . to suggest that each participant must hold a directorial or managerial position concerning that activity before [RICO] liability attaches." *Faillace v. Columbus Bank & Tr. Co.*, 605 S.E.2d 450, 454 (Ga. App. 2004).  "In this respect, the Georgia statute is significantly broader than the federal statute on which it was modeled," *id.* and Georgia courts have expressly distinguished the requirements of O.C.G.A. § 16-14-4 from the "operation or management" standard articulated in *Reves*.  *See Faillace*, 605 S.E.2d at 454 (distinguishing *Reves* in a parenthetical); *see also Chancey v. State,* 349 S.E.2d 717, 722 (Ga. 1986) ("In contrast [to the Georgia RICO statute], the federal RICO statute, 18 U.S.C. § 1962(a), only targets investors who participate in the pattern of racketeering activity as a principal.")  In other words, under Georgia RICO subsection (b), Plaintiffs need only allege that Defendants "participate[d] in, directly or indirectly, such enterprise through a pattern of racketeering activity."   Thus, insofar as Plaintiffs have met the requirements of *Reves*, they have also met this more lax requirement of the Georgia RICO statute.

RICO plaintiff is only entitled to recover under RICO "to the extent that[ ] he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Thus, "pleading a civil RICO claim requires that plaintiffs plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for *and* proximate cause of the plaintiffs' injuries." *Ray,* 836 F.3d at 1349 (emphasis in original). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "The injurious conduct need not be the sole cause of the plaintiffs' injuries, but there must be some direct relation between the conduct and the injury to sustain a claim." *Ray*, 836 F.3d at 1349 (internal quotation marks omitted). The Georgia RICO statute contains substantively the same requirement.[58]   *See also Lechter*, 565 F. Supp. 3d at 1307-08 (analyzing federal and Georgia RICO proximate cause together).

---

[58] That is, the Georgia RICO statute requires that a plaintiff "show that her injury flowed directly from at least one of the predicate acts." *Wylie*, 746 S.E.2d at 694. "Thus, to survive a motion to dismiss, a plaintiff asserting a RICO claim must allege more than that an act of racketeering occurred and that she was injured. Rather, she must show that her injury was the direct result of a predicate act targeted toward her, such that she was the intended victim." *Id.* (citing *Longino v. Bank of Ellijay*, 491 S.E.2d 81 (Ga. Ct. App. 1997); *Nicholson v. Windham et al.*, 571 S.E.2d 466 (Ga. Ct. App. 2002) (internal citation omitted). "This burden is not met where a plaintiff shows merely that his injury was an eventual consequence of the [predicate act] or that he would not

Generally, Plaintiffs allege that they were "injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions." (Doc. 109, FAC ¶ 523.) As already noted, Plaintiffs allege that they suffered injuries in that they "paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS." (*Id.* ¶ 533.)

The Court finds that Plaintiffs have plausibly alleged that their injuries were the direct result of the RICO predicate acts of the Defendants by whom

---

have been injured but for the [predicate act]." *Id.* (quotation marks omitted). While some defendants' briefing implies that there is a distinction between Georgia RICO's "proximate cause" requirement and what, in the federal RICO context, is usually called "RICO standing," the two requirements are one and the same. Both are glosses on the same statutory language requiring a civil RICO plaintiff to have been injured "by reason of" a RICO violation. *Compare* O.C.G.A. § 16-14-6(c), *with* 18 U.S.C. § 1964(c). For this reason, the Georgia RICO cases underlying the proximate cause requirement cite federal RICO standing case law. *See, e.g., Longino*, 491 S.E.2d at 85 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)); *Wylie*, 746 S.E.2d at 694 (describing the "proximate cause element" of Georgia RICO claims and citing *Longino* and federal RICO standing case law). And federal courts recognize that "RICO standing is really just a heightened proximate causation standard[.]" *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 n.14 (11th Cir. 2008).

they have plausibly alleged such acts: the Strategic Defendants, AquaFUSION, the Clark Defendants, the VSW Defendants, the MMM Defendants, and Bennett Thrasher. It is plausibly alleged that without receiving representations about the fraudulently inflated appraisal values from each of these defendants—including those incorporated into the PPMs—Plaintiffs would not have incurred their injuries because they would not have invested in the syndicates and used the syndicates to claim charitable contribution deductions on their individual tax returns. *Cf. Turk*, 593 F. Supp. 3d at 1309. It is also plausibly alleged that these Defendants' acts of mail or wire fraud, each of which involved misrepresentations about the fraudulent nature of appraisals under the SCE Strategy, caused Plaintiffs to incur the injuries discussed. *See id.*; *see also Lechter*, 565 F. Supp. 3d at 1310-11 (finding RICO standing on essentially identical allegations).[59]

On this point, it is not dispositive that some of the allegedly fraudulent communications were not provided directly to Plaintiffs. AquaFUSION, for example, contends that Plaintiffs have not pled that AquaFUSION's alleged misrepresentations proximately caused their injuries for this reason. But although the mining reports were not provided directly to Plaintiffs, the

---

[59] To the extent that Defendants assert that the disclaimers have significance for the proximate cause analysis, the disclaimers are not dispositive at this stage in the case for the reasons discussed above. *See* Part III(D) above.

reports played a central role in the alleged scheme insofar as they provided the foundation for the allegedly fraudulent appraisals. As discussed above, the allegations support the plausible inference that AquaFUSION would have understood the nature of the SCE Strategy, and thus that the purpose of their mining reports was to substantiate appraisals that would, in turn, substantiate conservation easement tax deductions. It is therefore plausible that AquaFUSION would have foreseen that the appraisers would use their reports in the appraisals, and that Plaintiffs would receive and rely on those appraisals when they decided to invest in the syndicates and report the charitable contribution deductions on their tax returns. *See Turk,* 593 F. Supp 3d at 1308-09. More than this, the fraudulent appraisal values underlay the scheme as a whole, and the AquaFUSION defendants' work allegedly underlay those reports. On very similar facts, the court in *Turk* found that Plaintiffs had adequately alleged that mining report preparers had committed the requisite predicate acts, and that those acts had proximately caused the plaintiffs' injuries. *See id*.

Whether Plaintiffs have pled that their injuries were the direct result of "racketeering activity that targeted [them]," *Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998), is a closer question. *See also Wylie*, 746 S.E.2d at 694 (Georgia RICO predicate acts must have been "targeted toward [plaintiffs], such that [they were] the intended victim[s].") It is at this point that

178

arguments about Plaintiffs attempting to assert claims that belong to the LLCs—advanced by defendants like ACC—become relevant.  At this stage, the Court agrees with the conclusions in *Lechter* and *Turk* that Plaintiffs have adequately pled this aspect of RICO standing.

In both *Lechter* and *Turk*, Judge Totenberg observed that the RICO case law draws a distinction between "acts of racketeering activity that target the plaintiff," *Harris v. Orange, S.A.*, 636 F. App'x 476, 481 (11th Cir. 2015) (citing *Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998)), and acts of racketeering activity that injure shareholder plaintiffs "only as a result of harm to the corporation."  *Id.* (quoting *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 908 (11th Cir. 1998)).  And, in both *Lechter* and *Turk*, the court concluded that Plaintiffs had sufficiently pleaded injuries to themselves that were "separate and distinct from the harm suffered by the corporation."  *Harris*, 636 F. App'x at 481; *see Turk*, 593 F. Supp. 3d at 1290; *Lechter*, 565 F. Supp. 3d at 1310-11.  The court reached those conclusions based on the plaintiffs' allegations that they had suffered individual injuries "such as back taxes, transactional costs, litigation expenses, and individual penalties" as a result of conduct that targeted them as individuals, not as members of the syndicates.  *Turk*, 593 F. Supp. 3d at 1290.  The same allegations are present here (*see, e.g.*, Doc. 109, FAC ¶ 17), and this Court adopts Judge Totenberg's reasoning in reaching the same conclusion.  Here, as

in *Lechter* and *Turk*, further factual development will be needed on the question of RICO standing and Plaintiffs' standing to bring their other claims. But at this stage, Plaintiffs have adequately pled that they suffered individual injuries as a result of the alleged predicate acts, that those acts were targeted toward them, and that they as individuals—not the LLCs or some other party, such as the government[60]—were the intended victims of the fraudulent scheme.

### e. PSLRA Bar

The Court next considers Defendants' argument that Plaintiffs' federal RICO claims are barred by the Private Securities Litigation Reform Act (PSLRA).[61]  The PSLRA amended the federal RICO statute to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation" of RICO.  18 U.S.C. § 1964(c); *see Licht v. Watson*, 567 F. App'x 689, 693 (11th Cir. 2014).  Although Plaintiffs plead predicate acts of mail and wire fraud, "courts have applied the

---

[60] *See, e.g., Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 874 (9th Cir. 2010) ("Here, the United States, not Rezner, was the immediate victim of HVB's fraud [pertaining to a tax shelter scheme] and better situated to sue HVB.  Therefore, we hold that Rezner cannot show proximate causation based on HVB's fraud against the United States.").

[61] The Court sought supplemental briefing from the parties on the question of the PSLRA bar's application and appreciates the parties' responses.  (Doc. 364; Doc. 367; Doc. 368.)

[PSLRA] bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim." *Licht*, 567 F. App'x at 693 (citing *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 331 (3d Cir. 1999); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011); and *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000)).

For the PSLRA bar to apply, the alleged fraudulent scheme must involve the purchase or sale of something qualifying as a "security." *See* 15 U.S.C. § 78j(b) (defining fraud "in connection with the purchase or sale of any security"). One form of "security" recognized under the securities laws—the only type of security relevant here—is the "investment contract." 15 U.S.C. §§ 77b(a)(1), 77c(a)(10). "The investment contract has been one of the means employed to bring instruments of more variable character within the scope of the federal securities laws." *Intelligent Inv. Int'l LLC v. Fu*, No. 1:17-CV-05296-RWS, 2019 WL 1281204, at *5 (N.D. Ga. Mar. 20, 2019) (quoting *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986)) (internal quotation marks omitted). In *S.E.C. v. W.J. Howey Co. ("Howey")*, 328 U.S. 293 (1946), the Supreme Court defined "investment contract" as follows: "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298–99.

181

Defendants argue that Plaintiffs' "purchases of securitized interests in the partnerships plainly satisfy" this definition.  (Doc. 168-1 at 48–49.)  Each plaintiff, they say, invested money in an interest in the "common enterprise" of a given LLC, and each plaintiff allegedly relied on the SCE Strategy promoters to "coordinate[ ] all aspects of the transaction."  (*Id.* at 49) (quoting Doc. 109, FAC ¶¶ 114, 183, 235, 312, 367).

Plaintiffs respond that tax benefits cannot satisfy *Howey*'s "profit" requirement, and thus the LLC interests do not qualify as investment contracts.  (Doc. 237 at 45.)  That turns out to be the critical issue.

The parties point the Court to some conflicting Circuit decisions on the question of whether tax benefits alone can constitute profits under *Howey*. *Compare Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir. 1989) ("[W]e agree . . . that tax benefits alone cannot satisfy the profit requirement."), *with Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 190 (5th Cir. 2010) ("Tax benefits may constitute an expectation of 'profits' under the *Howey* test.").  The Eleventh Circuit does not appear to have addressed this question, and the district courts in this circuit that have done so have reached conflicting conclusions.  *Compare Sunshine Kitchens v. Alanthus Corp.*, 403 F. Supp. 719, 722 (S.D. Fla. 1975) (tax benefits alone are not profits), *with Starks v. Chuhak & Tecson, P.C.*, No. 17-62366-CIV, 2018 WL 11182716, at *9-10 (S.D. Fla. June 6, 2018) (tax benefits may be profits),

*and S.E.C. v. Olive*, No. 13-CV-14047, 2013 WL 12091826, at *2 (S.D. Fla. July 17, 2013) (same).

At the root of these conflicting cases is the question of how broadly to read the Supreme Court's opinion in *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975).  In *Forman*, the Supreme Court reversed a Second Circuit decision that had held shares in a housing co-op to be "securities" under *Howey* in part because the payment of interest due on them was tax-deductible under a special provision of the tax code available to co-op members.  The Supreme Court rejected that tax benefit as a basis for meeting *Howey*'s profit requirement.  Justice Powell, writing for the majority, wrote: "We know of no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitutes income or profits.  These tax benefits are nothing more than that which is available to any homeowner who pays interest on his mortgage."  *Id.* at 855 (footnote omitted).

While subsequent courts have read *Forman*'s holding regarding tax benefits in divergent ways, the most persuasive reading is that the expectation of tax benefits that induced Plaintiffs to participate in the SCE Strategy transactions cannot, by itself, satisfy *Howey*'s profit requirement.  First, the paths not taken by the *Forman* majority are instructive.  In his dissent in *Forman*, Justice Brennan argued that the tax benefits available to co-op owners were sufficient to constitute profits under *Howey*.  *See id.* at 862–63

(Brennan, J., dissenting).  He contended that the Court should have regarded the co-op tax benefits differently than ordinary mortgage interest deductions. He reasoned that the co-op tax benefits—unlike ordinary mortgage interest deductions—"c[a]me solely from the efforts of others" because "[s]etting up and operating a corporation so as to take advantage of special tax provisions is a project requiring specialized skills."  *See id.* at 862.  The majority rejected this position, *see id.* at 855 & n.20, which closely resembles Defendants' theory of *Howey*'s application to this case.  Here, the charitable contribution deductions are allegedly the result of the entrepreneurial efforts of the organizers of the SCE Strategy.  But where, as in *Forman*, the returns to be gained from those efforts allegedly came solely in the form of tax deductions, *Howey*'s profit requirement is not satisfied.  Indeed, like the tax benefits in *Forman*, the charitable contribution deductions promised to Plaintiffs were no different than those available to individual landowners who donated easements on their land in accordance with the relevant provisions of the tax code.

Second, the Supreme Court's interpretation of *Forman* in the subsequent case of *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), lends further support to this understanding of *Forman*.  In *Randall*, the Supreme Court considered the meaning of 15 U.S.C. § 77l(2), which establishes the remedy for prospectus fraud as the plaintiff's actual damages incurred in purchasing the security "less the amount of any income received thereon."  *See Randall*, 478 U.S. at

655–56.  In *Randall*, the plaintiffs in a tax shelter investment argued that the meaning of "income received" should exclude "tax benefits received pursuant to a tax shelter investment[.]"  *Id.* at 656.  The Supreme Court agreed, reasoning that tax deductions or tax credits "have no value in themselves; the economic benefit to the investor—the true 'tax benefit'—arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income."  *Id.* at 657 (emphasis in original).  The Court found support for this conclusion in *Forman*.  *See id*.  It reasoned that, just as *Forman* had rejected the notion that the co-op owners' expected tax deductions constituted an "expectation of profit," the Court should "reject the analogous suggestion that the tax deductions petitioners were entitled to take by virtue of their partnership interests 'constitut[e] income or profits.'"  *Id.* (quoting *Forman*, 421 U.S. at 855).  To be sure, as Defendants point out, *Randall* is not directly on point; the Court's task was to interpret not *Howey* but statutory language in a separate provision of the securities laws.  Nevertheless, *Randall* is instructive of how the Supreme Court understood its own decision in *Forman*, a matter which certainly is relevant here.

Finally, this Court's reading of *Forman* is supported by the Sixth Circuit's decision in *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir. 1989).  *Newmyer*, considering whether an interest in a tax shelter scheme

constituted an investment contract, held "that there cannot be an investment contract without some hope of profits produced by the efforts of others, and . . . tax benefits alone cannot satisfy the profit requirement." *Id.* at 394 (citing *Forman*, 421 U.S. at 852–53; *Randall*, 478 U.S.  at 657 ).  This case is not binding on this court, of course, but its reasoning—centered on *Forman* and *Randall*—is persuasive.[62]

Defendants contend that the Supreme Court has indicated that *Forman* should not be read to unduly restrict the meaning of "profits."  They note that in *S.E.C. v. Edwards*, 540 U.S. 389 (2004), the Court cautioned against reading *Forman* to restrict the meaning of "profits" to "either capital appreciation resulting from the development of the initial investment" or "participation in earnings resulting from the use of investors' funds." *Edwards*, 540 U.S. at 395 (quoting *Forman*, 421 U.S. at 852).  Instead, the Court said, "*Forman* supports the commonsense understanding of 'profits' in the *Howey* test as simply 'financial returns on . . . investments.'" *Id.* (quoting *Forman*, 421 U.S. at 853). On the facts of *Edwards*, this meant that "an investment scheme promising a

---

[62] Plaintiffs have also pointed the Court to the decision of a Securities and Exchange Commission administrative law judge who held, based on *Newmyer*, that an LLC interest in an SCE transaction was not a security under *Howey*. *See In re Paul Edward "Ed" Lloyd, Jr., CPA*, 2015 SEC LEXIS 767, at *13–*14 (Feb. 27, 2015).

fixed rate of return"—a payphone sale-and-leaseback arrangement—satisfied *Howey*'s profit requirement.  *Id.* at 397.

To the extent that Defendants read *Edwards* to urge a flexible understanding of *Howey* so as to effectuate Congress' intent to regulate the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *id.* at 396 (quoting *Howey*, 328 U.S. at 299), they are correct.  The trouble is that *Edwards* is not on point.  It does not overturn *Forman*; it merely instructs courts not to read certain language in *Forman* as an exhaustive definition of "profits"—language that no party has argued is relevant here.  It remains the case that *Forman* rejected the position that tax benefits derived from the housing co-op shares constituted a form of profits, and that it declined to view those benefits as resulting from the efforts of the third parties who had established the housing cooperative.  The core distinction on which *Forman*'s holding rested was, as *Edwards* says, that between situations in which "the investor is 'attracted solely by the prospects of a return' on the investment" and those involving the "housing cooperative shares, regarding which the purchaser 'is motivated by a desire to use or consume the item purchased.'"  *Edwards*, 540 U.S. at 395–96 (quoting *Forman*, 421 U.S. 852–53).  But it was only possible for the *Forman* majority to conclude that the housing cooperative shares fell into the latter category because the majority had determined that the tax benefits were not "profits" under

*Howey*—or, in other words, that they did not qualify as "financial returns on . . . investments," *Edwards*, 540 U.S. at 395 (quoting *Forman*, 421 U.S. at 853).

Defendants also cite several other out-of-circuit cases in which courts have held that tax benefits can constitute profits under *Howey*. (*See* Doc. 367 at 14) (citing *Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 190 n.4 (5th Cir. 2010); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 133 n.2 (5th Cir. 1989); *S.E.C. v. Olive*, 2013 WL 12091826, at *2 (S.D. Fla. July 17, 2013); *Columbia Mut. Ins. Co. v. Ark. Valley Reg'l Indus. Dev. Co.*, 2006 WL 8444843, at *4 (E.D. Ark. Dec. 21, 2006); and *Kolibash v. Sagittarius Recording Co.*, 626 F. Supp. 1173, 1179 (S.D. Ohio 1986)). But the Fifth Circuit's decisions in *Affco* and *Long* do not persuade the Court that a different application of *Forman* and *Howey* is due here. *Affco* states that tax benefits can constitute profits under *Howey*, but it does so only in a brief footnote that cites to *Long*; in *Affco* itself, the question was not disputed on appeal. *See Affco*, 625 F.3d at 190 & n.4.

*Long*, in a footnote, said that the "inducement of tax benefits such as those offered by [the defendant's] program may constitute an expectation of 'profits' under the *Howey* test." *Long*, 881 F.2d at 132 n.2. However, *Long* is distinguishable for the same reason as Defendants' other cases: it involved a scheme with some prospect of non-tax-related returns. In *Long*, the plaintiffs had invested in a scheme whereby plaintiffs purchased interests in cattle,

giving them access to certain tax benefits but also allowing them to "hedge" their cattle by "buying futures on the commodities market or entering forward sale contracts" on the cattle.  The plaintiffs were therefore promised both tax benefits and the possibility of income from their cattle.  *See id.* at 131.  The Fifth Circuit emphasized this aspect of the transactions in its own conclusion that the *Howey* profits requirement had been satisfied.  *See id.* at 132 n.2 ("We note, moreover, that SCCI's promotional materials emphasized the potential for profits as well as tax benefits[.]").  That pairing of ordinary financial returns and tax benefits is not present in Plaintiffs' allegations.[63]

---

[63] *Long* relied primarily on several appellate cases whose holdings on the tax-benefit point are quite limited.  That is, those cases do not appear to support Defendants' position that tax benefits *alone* can constitute profits under *Howey*.  *See Long*, 132 n.2 (citing *Securities & Exchange Comm'n v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 464 (9th Cir. 1985); *Securities & Exchange Comm'n v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 583 (2d Cir. 1982); *Goodman v. Epstein*, 582 F.2d 388, 407 (7th Cir. 1978)).  In *Goodman,* the Seventh Circuit held only that "[t]he probability of initial 'tax losses' does nothing to change the underlying legal nature of the limited partnership interest nor to disturb the basic common sense presumption that business ventures are entered into for profit."  *Goodman,* 582 F.2d at 408.  In *Aqua-Sonic*, it was not contested that the scheme at issue "involve[d] an investment of money in a common enterprise with the expectation of profit," and the operative question was therefore only about whether those profits were expected "solely from the efforts of others."  *Aqua-Sonic*, 687 F.2d at 581–82 (internal quotation marks omitted).  Thus, the Second Circuit distinguished *Forman* precisely because in that case—unlike in *Aqua-Sonic* itself—"the Supreme Court was considering what constitutes an expectation of profits."  That case, in other words, did not consider the "profits" aspect of the *Howey* test relevant here.  Finally, in *Goldfield*, the Ninth Circuit held that "the prospect of tax benefits resulting from initial losses does not necessarily detract from an expectation of profits," and it noted that, at any rate,

Indeed, as Plaintiffs point out, essentially all the cases Defendants cite involved facts where the plaintiffs were promised both the expectation of conventional financial returns *and* tax benefits. *See Olive*, 2013 WL 12091826, at *2 (finding that the plaintiffs had alleged an expectation of profits where they alleged that they "expected to receive a periodic income stream, penalty free cash withdrawals, and tax benefits"); *Kolibash*, 626 F. Supp. 1173, 1175 (S.D. Ohio 1986) ("In addition to the tax benefits, the lessees would also receive a certain percentage of the net proceeds which they earned as a result of promoting and distributing the master recordings[.]"); *Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 489 F. Supp. 1209, 1221 (S.D. Fla. 1980) ("[T]he profits which the plaintiffs expected to receive were to come from the sale of the estimated two million tons of coal which were to be mined from the Jade property. The fact that the tax benefits to be derived from this investment were an important consideration to the plaintiffs is not surprising nor compelling.").

Here, while the PPMs and other Promotional Materials referred to other options by which the Syndicates could have developed their properties, one would have to read the FAC against the grain to regard these as real

---

"Goldfield's promotional literature evinced a clear expectation of eventual profit apart from any potential tax benefits." *Goldfield*, 758 F.2d at 464. The Court is not persuaded that these decisions justify the conclusion that tax benefits alone may constitute an expectation of profits under *Howey* and *Forman*.

possibilities.  On the contrary, the upshot of the allegations is that these supposed alternatives, where they appeared, were shams designed to shore up the fraudulent "highest and best use" appraisals of the property.  From the beginning, the transactions were allegedly marketed to Plaintiffs as tax shelters.  There is no indication in the FAC that Plaintiffs ever regarded the prospect that the properties might be developed for mining or real estate ventures as real ones, or that they expected to receive profits on their investment from such developments.  (*See* Doc. 109, FAC ¶¶ 83(g).)  To be sure, it is at least possible that fact development will dictate an alternative conclusion.  *See Newmyer*, 888 F.2d at 394 ("The presence or absence of a profit motive is a question of fact . . .").  But at this stage, reading the allegations in the light most favorable to Plaintiffs means reaching the conclusion that the tax benefits were the sole returns Plaintiffs expected from the LLC interests.  That being the case, the Court concludes that Plaintiffs' LLC interests do not qualify as "investment contracts" and are not securities under the meaning of 18 U.S.C. § 1964(c).  The PSLRA bar does not preclude Plaintiffs' federal RICO claims at this stage.[64]

---

[64] Because the Court finds that the pleadings do not show the LLC interests to be securities, it has no need to reach the secondary arguments advanced by both sides regarding whether Plaintiffs' allegations concern fraud "'in connection with' the sale of a security," *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019) (quoting 15 U.S.C. § 78j(b)), such that the alleged frauds are "actionable as fraud in the purchase or sale of securities" under the

### f.  Conclusion

In sum, Plaintiffs have adequately pled their substantive federal and Georgia RICO counts against the Strategic Defendants, the VSW Defendants, the Clark Defendants, the MMM Defendants, Bennett Thrasher, and AquaFUSION.  However, they have failed to plead those claims against the remaining defendants.  Counts I and III are therefore **DIMISSED** as to Bridge Capital, Nelson Mullins, the ACC Defendants, GALT, the Langford Defendants, F&D, Credo, Oxygen, and the Dantin Defendants.

## 2.  Conspiracy to Violate Federal and Georgia RICO (Counts II and IV)

Plaintiffs next bring claims for conspiracy to violate both the federal and Georgia RICO statutes.  Under Federal RICO, it is unlawful to "conspire" to violate that statute's substantive provisions. 18 U.S.C. § 1962(d).  A plaintiff can establish a conspiracy to violate Federal RICO claim by showing either (1) "that the defendant agreed to the overall objective of the conspiracy" or (2) "that the defendant agreed to commit two predicate acts."  *Am. Dental Ass'n*, 605 F.3d at 1293 (quoting *Republic of Panama*, 119 F.3d at 950).  "A plaintiff need not offer direct evidence of a RICO agreement; the existence of conspiracy

---

meaning of the PSLRA amendment to federal RICO, 18 U.S.C. § 1964(c).  *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1249 (11th Cir. 2016); *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 790-91 (6th Cir. 2012).

'may be inferred from the conduct of the participants.'"  *Id*. at 1293 (quoting *Republic of Panama*, 119 F.3d at 950).  At the same time, "[a]llegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy."  *Id.; see also Almanza*, 851 F.3d at 1068 ("To cross the line from a possible to a plausible existence of an agreement, plaintiffs must allege a 'further circumstance pointing toward a meeting of the minds.'") (quoting *Twombly*, 550 U.S. at 557).

Under the Georgia RICO statute, it is unlawful for any person to "conspire or endeavor to violate" Georgia RICO.   O.C.G.A. § 16-14-4(c). Violations of this section of the Georgia RICO statute occur when a defendant, "together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and any one or more of such persons commits any overt act to effect the object of the conspiracy," or when a defendant "endeavors to violate any of the provisions of subsection (a) or (b) of this Code section and commits any overt act to effect the object of the endeavor."  *Id.* § 16-14-4(c)(1)-(2); *see Benevolent Lodge No. 3 v. Davis*, 878 S.E.2d 760, 765 (Ga. Ct. App. 2022).  One is liable for conspiracy to violate Georgia RICO "if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts." *Wylie*, 746 S.E.2d at 693 (quoting *Rosen v. Protective Life Ins. Co.*, 817 F. Supp. 2d 1357, 1382 (N.D. Ga. 2011)).

Defendants argue that Plaintiffs have failed to plead a conspiracy because, again, the allegations are entirely consistent with the "obvious alternative explanation" of ordinary business activity. Plaintiffs contend that they have adequately pled their RICO conspiracy claims because their allegations present sufficient "further circumstance[s]" that point toward a meeting of the minds rather than, as Defendants argue, mere independent action. Plaintiffs argue that their allegations are sufficient to show much more than ordinary business activities by Defendants, because they have pled that various acts of the Defendants were fraudulent and are plausibly explained as efforts to contribute to the "common design" of the alleged fraudulent scheme. Defendants, Plaintiffs say, "engaged in such blatantly fraudulent conduct at the same time, in the same manner, and to achieve the same purpose of driving the promised tax benefits of the SCE Strategy"—and that is enough to plead a conspiracy. (Doc. 237 at 30.)

The Court finds that, for the same reasons that Plaintiffs have pled the existence of a RICO enterprise including the Strategic Defendants, the Clark Defendants, the VSW Defendants, AquaFUSION, the MMM Defendants, and Bennett Thrasher, Plaintiffs have also plausibly pled that these parties "agreed to the overall objective of the conspiracy," *Am. Dental Ass'n*, 605 F.3d at 1293, and thus that Plaintiffs have stated RICO conspiracy claims against them. These defendants, as discussed at greater length above, plausibly knew

194

of the underlying fraudulent nature of the appraisals, performed a role in the alleged scheme that involved either generating or making representations about those appraisals, and thus agreed to the common purpose of carrying out the alleged fraudulent scheme.[65]  *See Starrett*, 55 F.3d at  1544 (in a RICO conspiracy, agreement on an overall objective can be proven "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity"); *Almanza*, 851 F.3d at 1069 n.6 ("While an 'enterprise' and a 'conspiracy' are distinct RICO elements . . . the elements are analogous insofar as an enterprise may be premised on the existence of an agreement, and conspiracy requires an agreement.").

With respect to the other Defendants, a more individualized analysis is required.  Even if Plaintiffs have not pled that a given defendant falls within the RICO enterprise or has independently committed any predicate acts of mail or wire fraud, it remains possible that those Defendants may still have conspired with one another to violate Georgia RICO.  *See Turk*, 590 F. Supp. 3d at 1310–11.  Thus, the Court considers the conspiracy allegations involving the remaining defendants below.  In the end, the Court concludes that

---

[65] See Part III(F)(1)(b) above.

Plaintiffs have pled RICO conspiracy claims against the Bridge Capital and the ACC Defendants, but not the remaining defendants.

### a. Bridge Capital

While Plaintiffs have failed to plead predicate acts of mail or wire fraud by Bridge Capital with the requisite particularity, the Court finds that their allegations about Bridge Capital are sufficient to plead RICO conspiracy claims against it.  Plaintiffs allege that Defendants Novak and Freeman used Bridge, an entity with which they were affiliated as principals, to coordinate and carry out key aspects of the SCE transactions.  For example, it is alleged that Bridge Capital "coordinated the investment[s]," and that "each Syndicate paid Bridge Capital a commission based on the gross proceeds of the investment, which in most cases amounted to hundreds of thousands of dollars," that Novak and Freeman and other Bridge principals were entitled to receive those commissions, and that "Bridge Capital also received an interest in the Syndicate upon closing and could sell that interest or assign it to Bridge Capital principals, including Novak and Freeman." (Doc. 109, FAC ¶¶ 92–93.) The PPMs introduced by Defendants further name Bridge Capital and describe its role as "Placement Agent" in the transactions, *i.e.*, as the broker of the LLC interests.  (*E.g.*, Doc. 168-2 at 17.)

As to knowledge of the fraudulent scheme, Novak and Freeman are principals at both Bridge Capital and Strategic Capital Partners, the latter of

which is alleged to be the "architect" of the SCE Strategy.  As discussed above, Plaintiffs have plausibly pled that the Strategic Defendants (to include Novak and Freeman) knew the appraisals underlying the SCE Strategy transactions were unsupported and fraudulent.  Under Georgia law, Novak and Freeman's knowledge of the alleged fraud  must be imputed to Bridge.  *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008) ("Corporations, of course, have no state of mind of their own.  Instead, the scienter of their agents must be imputed to them.").   Thus, Bridge can also be said to have had knowledge of the fraudulent nature of the transactions in which it was taking part.

In short, then, Bridge (1) had principals that knew of the alleged fraudulent nature of the transactions, (2) coordinated investments with prospective investors and served as the broker of the LLC interests,  (3) received commissions and retained interests in the syndicates, and (4) was listed by name in the PPMs for each transaction.  These allegations are sufficient to present the "further circumstance pointing toward a meeting of the minds," *Twombly*, 550 U.S. at 557, necessary to allege Bridge's agreement to participate in the fraudulent scheme.  Additionally, Bridge's sale of the LLC interests and receipt of commissions and interests in the Syndicates could constitute the required overt acts.  Plaintiffs have therefore stated RICO conspiracy claims against Bridge Capital.

### b. Nelson Mullins, Bryan Cave, and the PCLG Defendants

The RICO conspiracy claims against the remaining law firm defendants—Nelson Mullins, Bryan Cave, and the PCLG Defendants—fail because the FAC does not contain more than conclusory allegations that these law firms agreed to a common fraudulent purpose with the other defendants. While Plaintiffs describe the legal opinions produced by these Defendants as lending a "further veneer of legitimacy" to the transactions (Doc. 109, FAC ¶ 395), the factual allegations regarding the actual conduct of the law firm defendants do not suffice to render plausible their agreement to participate in a conspiracy to defraud Plaintiffs.   Supporting the legal bona fides of transactions is something that law firms do; such acts do not show agreement to commit fraud unless, at the least, those defendants are plausibly alleged to have known they were helping to shore up fraudulent transactions.  And here, in contrast with the MMM Defendants, no plausible factual allegations permit the Court to infer that these law firms knowingly agreed to join in a fraudulent scheme.  For these defendants, as with most of the law firm defendants in *Lechter* and *Turk*, the "obvious alternative explanation" predominates: "that instead of them each agreeing to perpetuate an elaborate conspiracy[,] Defendants were each independently pursuing their own economic self-interest by providing [legal] services."  *Lechter*, 565 F. Supp. 3d at 1315 (quoting *Twombly*, 550 U.S. at 568); *see also Turk*, 593 F. Supp. 3d at 1312.

198

Counts II and IV are **DISMISSED** as to Nelson Mullins, the PCLG Defendants, and Bryan Cave.

### c. The Langford Defendants, F&D, and Cherry Bekaert

As noted above, the allegations are insufficient to render it plausible that the Langford Defendants or F&D committed predicate acts of mail or wire fraud. Nor are there are additional allegations about these defendants' knowledge of the fraudulent nature of the SCE Strategy, in contrast with Bennett Thrasher. Thus, the same dearth of factual allegations that makes it implausible that these defendants committed fraud also makes it implausible that they agreed with others to do so. No allegations allow the Court to infer anything other than the "obvious alternative explanation" that these defendants were engaged in ordinary business activities.

The same is true of the allegations regarding Cherry Bekaert f/k/a Conexus—against whom no substantive RICO claims were brought—which allegations are no more substantial or specific than those regarding the other Return Preparers. Counts II and IV are therefore **DISMISSED** as to the Langford Defendants, F&D, and Cherry Bekaert.

### d. The ACC Defendants

Although Plaintiffs have not plausibly alleged that the ACC Defendants committed predicate acts of mail or wire fraud, the Court finds that their allegations are sufficient to support a conspiracy claim against these

199

defendants.  In *Turk*, the Court found that the plaintiffs had stated a claim for conspiracy to violate Georgia RICO against ACC on the basis of allegations that ACC garnered a reputation as a land trust willing to accept easements with excessive valuations, that the ACC Defendants "appeared in the Promotional Materials as part of the 'Conservation Easement Team,'" that Defendant Keller appeared at seminars with other defendants to help recruit SCE Strategy participants, and that Defendant Keller "created a separate entity . . . to collect fees for the BDRs" he prepared.  *Turk*, 593 F. Supp. 3d at 1312-13.

Here, the Court finds that the allegations are sufficient to plausibly state a conspiracy claim against ACC at this stage.  As in *Turk*, Plaintiffs allege that ACC and Keller had a reputation for accepting inflated easement donations, that ACC's business from 2010–2018 was based on syndicated easements, and that ACC was excluded from the Land Trust Alliance "due to disagreements about ACC's failures to question appraisers about excessive valuations being done in a short period time on easements ACC had been accepting." (Doc. 109, FAC ¶ 101.)  They further allege that ACC had longstanding relationships with SCE Strategy organizers like the MMM Defendants and the Strategic Defendants centered on the SCE Strategy.  (*Id.*)  It is plausible, on the basis of these allegations, that the Strategic Defendants selected the ACC Defendants as part of their "team" precisely because they knew the ACC Defendants were

willing to accept the donation of easements with bogus appraisals. The same allegations also render it plausible—at this stage—that the ACC Defendants knew that the appraisals were fraudulently inflated or at least recklessly disregarded this fact. Finally, ACC was heavily involved in several of the representative transactions, and though Plaintiffs have not plead that it committed independent acts of fraud, the allegedly deficient, "boilerplate" nature of the BDRs and Deeds they produced also helps to support the inference that they agreed to the overall objective of the larger conspiracy. (*E.g. id.* ¶¶ 150, 157–66 (DeSoto); *id.* ¶¶ 283–85 (Bear Creek).)

Together, then, these allegations suffice to plead a "further circumstance" pointing toward agreement between the ACC Defendants and the Strategic Defendants rather than mere independent action. And the ACC Defendants' preparation of BDRs and Conservation Easement Deeds (*see id.*), could constitute overt acts necessary to further the alleged conspiracy. *See Turk*, 593 F. Supp. 3d at 1313. Thus, the Court concludes that Plaintiffs have plausibly alleged their RICO conspiracy claim against the ACC Defendants.

### e. GALT and Foothills

The allegations about the other Land Trust Defendants—GALT and Foothills—lack the additional factual detail offered about the ACC Defendants and discussed above. There is nothing in the FAC that can reasonably support the inference that these entities had agreed to defraud Plaintiffs, rather than

201

that they had merely agreed to accept the donation of easements and land as part of their ordinary activities.  Counts II and IV are  therefore **DISMISSED** as to GALT and Foothills.

### f.  The Local Promoters

Finally, Plaintiffs' RICO conspiracy claims against Credo, Oxygen, and the Dantin Defendants fail for the same reason as the substantive RICO claims against them: the FAC does not allege any facts suggesting that these promoters knowingly agreed to participate in a scheme to defraud Plaintiffs, rather than merely engaging in ordinary business activities.  Counts II and IV are **DISMISSED** as to each of the Local Promoters.

### G. State Common Law Claims

In addition to their RICO and RICO conspiracy claims, Plaintiffs bring an array of common law claims against Defendants.  The Court addresses each of these claims below.

### 1. Fraud (Count IX)

"The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff."  *Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 563 n.10 (Ga. 2020) (quoting *Crawford v. Williams*, 375 S.E.2d 223, 224 (Ga. 1989)).  As in *Lechter*, Plaintiffs' common-law fraud claims rely on the same alleged acts of mail and wire fraud as the

Georgia and federal RICO claims. *See Lechter*, 565 F. Supp. 3d at 1332. Thus, because Plaintiffs have pled RICO predicate acts committed by some defendants, they have also stated common-law fraud claims against them. *See id.* Conversely, for the same reason that Plaintiffs have failed to allege RICO predicate acts by some defendants, they have failed to state common-law fraud claims against them. *See id.*

Thus, Plaintiffs have pled common-law fraud claims against the Strategic Defendants, the VSW Defendants, the Clark Defendants, AquaFUSION, the MMM Defendants, and Bennett Thrasher. They have failed to plead such claims against the remaining RICO Defendants.

There are, however, a few Defendants against whom Plaintiffs bring their common law fraud claims but not their substantive RICO claims: Bryan Cave, the PCLG Defendants, Foothills, and Cherry Bekaert. The fraud allegations about Bryan Cave and the PCLG Defendants are substantively the same as those about the other law firm defendants. They depend on the legal opinions issued by these defendants in connection with the transactions. But, as with the analogous fraud claims against Nelson Mullins, the Court finds—for the same reasons—that Plaintiffs have either failed to point to actionable fraudulent statements in these letters or failed to plead facts rendering it plausible that the PCLG Defendants or Bryan Cave knew any of their

representations, to the extent those representations touch on issues of fact, to be false.[66]

With respect to Foothills, the Court reaches the same conclusion that it reached with respect to the other Land Trust Defendants, ACC and GALT. As with the other land trusts, the relevant allegations about Foothills entail impermissible lumping with other parties, or they reflect the preparation of documents that simply do not contain any affirmative misrepresentations that could plausibly be characterized as fraudulent. Plaintiffs' common law fraud claim against Foothills suffers from these same defects.[67]

Finally, the Court finds that Plaintiffs have failed to plead common law fraud claims against Cherry Bekaert for the same reason Plaintiffs failed to plead RICO predicate acts by the Return Preparer Defendants.[68]

Thus, Count IX is **DISMISSED** as to Bridge Capital, Nelson Mullins, Bryan Cave, the PCLG Defendants, the ACC Defendants, GALT, Foothills, Bennett Thrasher, Cherry Bekaert, the Langford Defendants, F&D, Credo, and Oxygen.

---

[66] See Part III(F)(1)(a)(v) above.

[67] See Part III(F)(1)(a)(vii) above.

[68] See Part III(F)(1)(a)(viii) above.

## 2.  Civil Conspiracy (Count XII)

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Patel v. Diplomat 1419VA Hotels, LLC*, 856 S.E.2d 340, 348 (Ga. Ct. App. 2021).  "To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy." *Id*. "The essential element of the alleged conspiracy is proof of a common design establishing 'that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design.'" *Tyler v. Thompson*, 707 S.E.2d 137, 141 (Ga. Ct. App. 2011) (quoting *Parrish v. Jackson W. Jones, P.C.*, 629 S.E.2d 468 (Ga. Ct. App. 2006)).

For the same reasons that Plaintiffs have pled plausible RICO conspiracy claims against the Strategic Defendants, the Clark Defendants, the VSW Defendants, AquaFUSION, Bridge Capital, Bennett Thrasher, the MMM Defendants, and the ACC Defendants, they have pled a plausible claim for civil conspiracy against the same defendants.  Conversely, Plaintiffs have failed to plead a plausible civil conspiracy claim against the remaining Defendants for the same reasons that they have not pled a conspiracy to violate Georgia RICO against them.  Thus, Count XII is **DISMISSED** as to Nelson Mullins, Bryan

Cave, the PCLG Defendants, GALT, Foothills, the Langford Defendants, F&D, Cherry Bekaert, Credo, and Oxygen.

### 3.  Breach of Fiduciary Duty (Count VIII)

Plaintiffs bring breach of fiduciary duty claims against the Strategic Defendants, the MMM Defendants, Nelson Mullins, the Langford Defendants, Bennett Thrasher, the VSW Defendants, the Clark Defendants, Credo, Oxygen, Cherry Bekaert, the PCLG Defendants, Bryan Cave, and F&D, whom Plaintiffs call the "Professional Defendants."  (Doc. 109, FAC at 338.)[69]  To establish a claim for breach of fiduciary duty, a plaintiff must show "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."  *Wimpy v. Martin*, 846 S.E.2d 230, 234 (Ga. Ct. App. 2020).

At this stage, most of the parties' argument addresses whether Plaintiffs have adequately alleged that the Professional Defendants owed them fiduciary duties in connection with the events described in the FAC.  The Court begins with the law governing this question.

---

[69] Although Plaintiffs denominate this count as one for "breach of fiduciary duty and disgorgement," the latter "is simply a remedy dressed up as a substantive count."  *Lechter*, 565 F. Supp. 3d at 1338.  Plaintiffs may request disgorgement as a remedy if they succeed on the merits, but  the Court does not treat it as a cause of action.

In Georgia, "fiduciary duties and obligations are owed by those in confidential relationships." *See Atlanta Mkt. Ctr. Mgt., Co. v. McLane*, 503 S.E.2d 278, 281 (Ga. 1998). "A confidential relationship may be created in two categories of circumstances. First, a confidential relationship is created 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another.'" *King v. King*, 888 S.E.2d 166, 169 (Ga. 2023) (quoting O.C.G.A. § 23-2-58). "Second, a confidential relationship may also be created 'where, from a similar relationship of mutual confidence, the law requires the utmost good faith.'" *Id.* (quoting O.C.G.A. § 23-2-58).[70] This second circumstance encompasses specific, legally defined relationships like the attorney-client relationship. *See id.*

"The mere fact that one reposes trust and confidence in another does not create a confidential relationship." *Arp v. United Community Bank*, 612 S.E.2d 534, 538 (Ga. Ct. App. 2005). Nor do arms-length business dealings or the mere fact that one has expertise in a matter that another does not. *See, e.g.,*

---

[70] The full statutory definition reads as follows:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

O.C.G.A. § 23-2-58.

207

*Hicks v. Sumter Bank & Tr. Co.*, 604 S.E.2d 594, 597 n.5 (Ga. Ct. App. 2004) (arms-length business dealings); *Dixie Diners Atlanta, Inc. v. Gwinnett Fed. Bank, FSB*, 439 S.E.2d 53, 56 (Ga. Ct. App. 1993) (expertise).

At the same time, Georgia courts have recognized that the "confidential relationship" is a relatively flexible concept. "[A]ll the law requires is a showing of a relationship which justifies the reposing of confidence by one party in another." *Gilmore v. Bell*, 478 S.E.2d 609, 611 (Ga. Ct. App. 1996) (citing *Cochran v. Murrah*, 219 S.E.2d 421, 424 (Ga. 1975)); *see also Forlaw v. Augusta Naval Stores Co.*, 52 S.E. 898, 903 (Ga. 1905) (holding that the equitable rules governing confidential relationships apply "not only to persons standing in a direct fiduciary relation towards others, such as trustees, executors, attorneys, and agents, but also to those who occupy every position out of which a similar duty ought, in equity and good morals, to arise"). "The existence of a confidential relationship depends heavily upon the circumstances of each case," *Gilmore*, 478 S.E.2d at 611, and "the existence of a fiduciary relationship is a question for the jury unless there is a complete absence of evidence of such a relationship[.]" *Scott v. State*, 810 S.E.2d 613, 615 (Ga. Ct. App. 2018) (quoting *Levine v. Suntrust Robinson Humphrey*, 740 S.E.2d 672, 683 (Ga. Ct. App. 2013)). At the same time, while the "confidential relationship" is a flexible and fact-sensitive legal device, it is not without limitation, and in some circumstances confidential relationships will be held

not to exist as a matter of law, including on the pleadings. *See Williams v. Dresser Industries, Inc.*, 120 F.3d 1163, 1168 (11th Cir. 1997); *Dover v. Burns*, 196 S.E. 785, 789-90 (Ga. 1938); *Lewis v. Alderman*, 162 S.E.2d 440, 441-42 (Ga. Ct. App. 1968).

Plaintiffs' general theory of the fiduciary duties owed them by the Professional Defendants is summarized in their allegation that "[a]s professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the [SCE Strategy Transactions,] the Professional Defendants . . . became fiduciaries of the Plaintiffs and the members of the Class. Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class." (Doc. 109, FAC ¶ 608.) The parties vigorously dispute whether this theory of the Professional Defendants' fiduciary duties is viable in light of the party-specific allegations throughout the complaint, the nature of the alleged services and advice, the entities to which those services and advice were provided, and certain disclaimers in the PPMs.

Ultimately, the Court concludes that Plaintiffs have alleged that they were owed fiduciary duties by the Strategic Defendants and the Local Promoters, but not the remaining professional defendants. And the Court concludes that Plaintiffs' breach of fiduciary duty claims against Credo and

Oxygen are implausibly pled for other reasons.  Thus, the Court dismisses this claim as to all but the Strategic Defendants.

### a. The Return Preparer, Attorney, and Appraiser Defendants

Plaintiffs' only alleged interactions with the Return Preparer, Attorney, and Appraiser Defendants involvedthe provision of professional services to the Syndicates and the Strategic Defendants after Plaintiffs received the PPMs. The Attorney Defendants provided Legal Opinions and/or Due Diligence Reports regarding the legal bona fides of the transactions and helped the Strategic Defendants structure them.  (*E.g.*, Doc. 109, FAC ¶¶ 94, 138, 272, 338, 394.)  The Appraiser Defendants provided various appraisal services "to each Syndicate." (*Id.* ¶ 96.)  The Return Preparers "prepared the partnership returns for each of the Syndicates used in the SCE Strategy" and the associated K-1s for each Syndicate member. (*Id.* ¶ 104.)  And Plaintiffs do not allege facts suggesting, directly or indirectly, that they independently engaged any of these professionals or had any independent relationships with them—certainly none that predated their decisions to invest in SCE Strategy transactions.  Thus, because Plaintiffs have not alleged any relationships with these Defendants outside of those mediated by the LLCs, the following disclaimer language, which appears in each PPM, is essentially dispositive of the fiduciary duty question:

> The Company has not engaged legal or other advisors for, or on behalf of, any investor.  Each investor should, and is expected to consult his or her personal legal counsel, accountant, and other professional advisors as to legal, tax, economic, and related aspects of the investment described in this Memorandum and its suitability for such investor based on his, her, or its particular circumstances.

(Doc. 168-2 at 14, 278, 543, 802, 935; *see also id.* at 31-32, 295, 559-60, 816-17, 953 (language clearly stating that legal counsel of the LLCs do not represent individual investors)).  In contrast with the disclaimers' ambiguous application to representations underlying the fraud-based claims, there can be little doubt that this language clearly warned Plaintiffs against the conclusion that professionals engaged by the Syndicates were also undertaking confidential relationships with respect to Plaintiffs—the "investors"—as individuals. Plaintiffs dispute the applicability of this language on the grounds that it merely states that "the Company"—that is, the Syndicate or LLC—had not engaged any legal or other advisors on the investors' behalf.  (Doc. 237 at 52.) But that is precisely the problem, for the FAC offers no plausible basis for Plaintiffs' relationship with the Attorney Defendants, Return Preparer Defendants,[71] and Appraiser Defendants that was not mediated by Plaintiffs' relationship to "the Company."

---

[71] The Court is unpersuaded by Plaintiffs' arguments based on *Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 629-30 (7th Cir. 1993), that the Return Preparer Defendants became Plaintiffs' accountants or were otherwise in a confidential relationship with Plaintiffs.  Plaintiffs contend that this case

Nor is the Court persuaded that Plaintiffs have pled that any of these defendants had a "controlling influence" over any interest of Plaintiffs' under the meaning of Georgia law.  As noted above, "the mere fact that one reposes trust and confidence in another does not create a confidential relationship." *Arp*, 612 S.E.2d at 538; *see also Dixie Diners Atlanta, Inc.*, 439 S.E.2d at  56 (finding no confidential relationship where "[a]t most, defendants' evidence in this regard showed that Barnes had experience, knowledge, and expertise in the area of SBA loans, that defendants did not, and consequently that they relied on Barnes in establishing and pursuing the SBA loan").  Plaintiffs have failed to point to any Georgia cases that found a confidential relationship with an attorney, accountant, or appraiser under circumstances at all comparable to those alleged here.

Plaintiffs also seem to suggest in several places that their reliance on the work of the Attorney, Appraiser, and Return Preparer Defendants by itself supports the existence of a confidential relationship.  To be sure, the Professional Defendants  plausibly  knew about  the SCE Strategy's ultimate purpose —to generate individual tax deductions for Plaintiffs—and thus they

---

compels the conclusion that the Return Preparers were Plaintiffs' "income tax return preparers" because the FAC alleges that the impact of the tax deduction on Plaintiffs' individual returns was substantial.  But *Adler & Drobny* presented the question of whether an accountant was liable to the *United States* for penalties assessed under I.R.C. § 6694(b); its connection with the instant state law issues is tenuous at best.

might have inferred on this basis that Plaintiffs would rely on their work in an individual capacity.  But the fact that a professional knows a third party will rely on her work cannot be enough in itself to show the existence of a confidential relationship.  If it were, every fraud or negligent misrepresentation claim against a professional service provider in Georgia would also be a breach of fiduciary duty claim—since, on Plaintiffs' theory, detrimental reliance on a defendant's work would essentially be enough to show a "controlling influence."  Cases like *Kirby v. Chester*, 331 S.E.2d 915 (Ga. Ct. App. 1985),  cited by Plaintiffs, do not support this theory.  Such cases show that professionals might owe *duties of reasonable care* to third parties they know will rely on their work—and thus that negligent misrepresentation or professional malpractice claims might lie in such contexts.  *See id.* at 919.  But they do not have anything to say about *fiduciary duties* or confidential relationships.

Thus, the Court finds that Plaintiffs have failed to plead that the Attorney Defendants, the Return Preparer Defendants, and the Appraiser Defendants owed them fiduciary duties.  The PPMs clearly and unambiguously warned Plaintiffs that the LLCs would not engage professional advisors on their behalf, and they urged Plaintiffs to consult their own advisors regarding the transaction and its tax consequences.  The FAC, moreover, contains little in the way of factual allegations that could support the existence of

213

relationships of confidence with the professionals at issue here.  Count VIII is **DISMISSED** as to the MMM Defendants, Nelson Mullins, the PCLG Defendants, Bryan Cave, the VSW Defendants, the Clark Defendants, Bennett Thrasher, the Langford Defendants, Cherry Bekaert, and F&D.

### b. The Strategic Defendants

The Court reaches a different conclusion with respect to the Strategic Defendants, at least at this stage.  The Strategic Defendants allegedly coordinated the transactions, repeatedly represented themselves to Plaintiffs as "experts" in conservation easement charitable deductions, explained how the transactions were structured to satisfy Tax Code requirements, and communicated with Plaintiffs about the possible consequences of IRS notices that implicated SCE Strategy transactions.  (*See, e.g., id.* ¶¶ 89-90, 117, 144.) The FAC also alleges that the Strategic Defendants advised Plaintiffs about the consequences of the tax strategy they were marketing and essentially assumed control over Plaintiffs' interests in the SCE Strategy transactions by engaging the various other professionals, setting up and managing the LLCs, acquiring the Subject Properties, and so forth.  (*See, e.g., id.* ¶¶ 84-91, 193, 83-84, 89, 456, 462.)[72]  In addition, Plaintiffs allege that the Strategic Defendants

---

[72] Strategic urges the Court to follow a decision of the Fulton County Superior Court finding that a member of the Vista Hill Syndicate had failed to plead a confidential relationship with the Strategic Defendants.  (*See* Doc. 200 at 8-9; Doc. 200-1) (citing *Hill v. Strategic Capital Partners, LLC*, No. 2021-cv-345934

were the architects of the SCE Strategy and induced Plaintiffs to invest in the syndicates and take erroneous tax positions both through misrepresentations and by concealing facts about the bogus nature of the appraisals from them. *See Boyd v. JohnGalt Holdings, LLC*, 755 S.E.2d 675, 681 (Ga. 2014) (confidential relationship can exist where a defendant "intentionally conceals facts from a plaintiff, 'hoping to obtain a benefit that could be secured only by silence and concealing the truth'"). The allegations regarding the Strategic Defendants are materially different from those concerning the Attorney, Return Preparer, and Appraiser Defendants because they plausibly suggest a direct *relationship* between the individual Plaintiffs and the Strategic Defendants, one that preceded Plaintiffs' investment decisions. The PPMs disclaim the possibility that the LLCs engaged any advisors for Plaintiffs individually, but the Strategic Defendants' relationship with Plaintiffs pre-dated the existence of the LLCs. The disclaimer language thus does not preclude the existence of a confidential relationship with the Strategic Defendants, at least at this stage.

The Court is, thus, unpersuaded by the Strategic Defendants' arguments that the FAC, construed in the light most favorable to Plaintiffs, shows the "complete absence of evidence" of any confidential relationship. *Scott*, 810

---

(Fulton Co. Sup. Ct. July 15, 2021)). But the allegations in that case appear to have been substantially less detailed than those presented to the Court here.

S.E.2d at 615. Presented with similar allegations, the Court in *Lechter* found that the plaintiffs had plausibly pled a breach of fiduciary duty claim against the analogous "Sponsor" defendants.  *See Lechter*, 565 F. Supp. 3d at 1337-38. The allegations about the Strategic Defendants—when properly viewed in the light most favorable to Plaintiffs—are sufficient, at this stage, to create a question of fact regarding the existence of a confidential relationship between those defendants and Plaintiffs.

Strategic does not raise any argument about the other elements of Plaintiffs' breach of fiduciary duty claim against them.  Thus, the Court will not dismiss Plaintiffs' breach of fiduciary duty claim against the Strategic Defendants at this stage.

### c.  The Local Promoters

Finally, Plaintiffs have also adequately pled the existence of confidential relationships with Defendants Credo and Oxygen.  Each of these defendants was a financial advisor to one of the plaintiffs prior to their decision to participate in the SCE Strategy, and each allegedly advised the plaintiff to participate in the SCE Strategy.  (Doc. 109, FAC ¶¶ 188, 195.)  At the pleading stage, these allegations about the relationships between Plaintiffs and the Local Promoters are sufficient to raise a question of fact as to whether there existed "a relationship which justifies the reposing of confidence by one party

in another," *Gilmore*, 478 S.E.2d at 611, between the Greiner Plaintiffs and Oxygen and Plaintiff Spratt and Credo.

However, given that the Court has found above that the allegations cannot support the inference that either Credo or Oxygen knew that the appraisals were fraudulent or otherwise agreed to participate in a fraudulent scheme, it is unclear what facts plausibly suggest a *breach* of any fiduciary duties owed to Plaintiffs. *See Lechter*, 565 F. Supp. 3d at 1337 (noting that resolution of the plaintiffs' breach of fiduciary duty claim "would depend on the resolution of Plaintiffs' fraud-based claims insofar as it depends on Plaintiffs proving that the Aprio Defendants had a conflict of interest because they were engaging in a fraudulent scheme"). If Credo and Oxygen did not know the SCE Strategy was fraudulent, the factual basis for Plaintiffs' breach of duty claims against them disappears. Credo and Oxygen could not have failed to disclose the fact that the appraisals were inflated, for they are not plausibly alleged to have known that fact. They could not have failed to disclose conflicts of interest, for there is no basis for inferring such a conflict without plausible allegations suggesting that these financial advisors were part of a fraudulent conspiracy. Thus, the Court **DISMISSES** Count VIII as to Credo and Oxygen.

### 4. Negligent Misrepresentation (Count VII)

Plaintiffs bring a claim for negligent misrepresentation in the alternative to their fraud claims. In Georgia, the elements of a claim for

217

negligent misrepresentation include: (1) the negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance. *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 479 S.E.2d 727, 729 (Ga. 1997). In other words, "one who supplied information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used." *Glob. Payments, Inc. v. InComm Fin. Services, Inc.*, 843 S.E.2d 821, 824 (Ga. 2020) (quoting *Badische Corp. v. Caylor*, 356 S.E.2d 198, 199-200 (Ga. 1987)). Liability for negligent misrepresentation, however, extends only to "the limited class of persons who the professional is *actually aware* will rely upon the information he prepared." *Badische Corp.*, 356 S.E.2d at 200; *see also Neidiger/Tucker/Bruner, Inc. v. SunTrust Bank*, 530 S.E.2d 18, 21 (Ga. Ct. App. 2000).

It is not necessary that one create false information to be liable for negligent misrepresentation. Instead, "one who did not create the false information may nevertheless be liable for supplying it *if* the supplier represented that the false information was legitimate, accurate, or

trustworthy." *Glob. Payments*, 843 S.E.2d at 824  (emphasis in original) (citing *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 300 S.E.2d 503, 504 (Ga. 1983); *Smiley v. S & J Investments, Inc.*, 580 S.E.2d 283, 287-88 (Ga. Ct. App. 2003)).   But, as indicated by the Georgia Supreme Court's emphasis, the presence of representations about the accuracy of third-party information is important in such cases.  In *Smiley,* the Georgia Court of Appeals concluded that sellers of real property were not liable for negligent misrepresentation where they merely "communicat[ed] exactly what [the engineering company] reported to them in turn to the plaintiffs without any additions, deletions, or opinions of their own." *Smiley*, 580 S.E.2d at 287.

Finally, Rule 9(b)'s particularity requirement applies to negligent misrepresentation claims, just as it applies to fraud claims.  *See Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1354 (N.D. Ga. 2017).

Here, the allegations underlying Plaintiffs' well-pled substantive RICO and fraud claims against the Strategic Defendants, the Clark Defendants, the VSW Defendants, the MMM Defendants, and AquaFUSION suffice to plead negligent misrepresentation claims against these defendants.  *See Lechter*, 565 F. Supp. 3d at 1333.   Each of these Defendants is alleged to have made affirmative representations of fact and represented, in one way or another, that

the false information they were communicating was true.  Thus, Plaintiffs have stated negligent misrepresentation claims against these parties.[73]

We turn next to the remaining defendants, against whom Plaintiffs have failed to plead fraud claims.  The Court considers, in turn, whether Plaintiffs have stated negligent misrepresentation claims against each  remaining defendant.

### a. Bridge Capital

Plaintiffs' negligent misrepresentation claim against Bridge Capital fails for the same reason that Plaintiffs' substantive RICO and common-law fraud claims fail: Plaintiffs' allegations do not comport with Rule 9(b), for the allegations about Bridge Capital's alleged misrepresentations suffer from group pleading issues.[74]  Count VII is **DISMISSED** as to Bridge Capital.

---

[73] The allegations underlying the fraud-based claims against Bennett Thrasher do not compel the same conclusion, given that, as discussed above—the K-1s are not alleged to have affirmatively endorsed the value of the deduction or the underlying appraisals.  As explained above, this does not preclude potential RICO liability, *see* Part III(F)(1)(a)(ix), but under Georgia law it is consequential for negligent misrepresentation liability.  Thus, the Court discusses the negligent misrepresentation claim against Bennett Thrasher in connection with those against the other Return Preparer defendants in Part III(G)(4)(c) below.

[74] See Part III(F)(1)(a)(iii) above.

### b. The Attorney Defendants

The Court found above that Plaintiffs have failed to plead their fraud claims against Nelson Mullins, the PCLG Defendants, and Bryan Cave. Generally speaking, Plaintiffs either pointed to purportedly fraudulent documents that they said were "jointly prepared" by several defendants including one of the Attorney Defendants without specifying who prepared what parts of the documents or how they were fraudulent—thus failing to comply with Rule 9(b)'s heightened pleading standards. Or, with respect to the Legal Opinions and Due Diligence Reports, Plaintiffs failed to point to any actionable misrepresentations because, to the extent that those representations touched on issues of fact, Plaintiffs had failed to plausibly plead knowledge of the alleged falsity of the statements. Knowledge is not an element of a claim for negligent misrepresentation, however, so Plaintiffs could still have alleged claims for negligent misrepresentation against Nelson Mullins, the PCLG Defendants, and Bryan Cave, even if fraud is off the table.

With respect to the first element of the claim—the negligent supply of false information—it is plausible that the Attorney Defendants, in the course of their work preparing the Legal Opinions and/or Due Diligence Reports, should have become aware of facts about the transactions that contradicted their representations about the likely tax deductibility of the donations or whether the appraisal was carried out in accordance with generally accepted

221

appraisal standards.  *See First Fin. Sav. & Loan Assn. v. Title Ins. Co. of Minn.*, 557 F. Supp. 654, 658-60 (N.D. Ga. 1982); *Lechter*, 565 F. Supp. 3d at 1334 ("The Court finds that Sirote's representations to Plaintiffs in the Maple Landing Legal Opinion that, among other things, it was more likely than not that the deductions would withstand IRS scrutiny, could plausibly support a negligent misrepresentation claim.  Even if Sirote did not actually know that the appraisals were inflated, the Amended Complaint at least creates a plausible inference that Sirote should have discovered this in the process of preparing the Legal Opinion.").   In other words, had these defendants comported with the applicable duty of care, they may plausibly have reached different conclusions about whether, for example, there was "anything out of the ordinary in the appraisal," or whether "the methodology that was used [in the appraisal] seem[ed] reasonable."  (Doc. 109, FAC ¶ 277.)

Plaintiffs have also plausibly pled that they were among "the class of persons who the professional is *actually aware* will rely upon the information he prepared," *Badische Corp.*, 356 S.E.2d 198, 200 (Ga. 1987).  The allegations in the FAC certainly render it plausible that the Attorney Defendants could have been "actually aware" that Plaintiffs would rely on their legal opinions.  *See, e.g., Kahn v. Britt*, 765 S.E.2d 446, 458 (Ga. Ct. App. 2014); *Rogers v. Hurt, Richardson, Garner, Todd & Cadenhead*, 417 S.E.2d 29, 32-33 (Ga. Ct. App. 1992).  The transactions were, in the end, designed to allocate *individual* tax

222

deductions to Plaintiffs, and the Legal Opinions and Due Diligence Reports rendered opinions consistent with this purpose.

In their individual briefs, the Attorney Defendants argue forcefully that disclaimer language in the PPMs forecloses the possibility, as a matter of law, the Plaintiffs were within the class of persons who would foreseeably rely on the Attorney Defendants' legal opinions and due diligence reports, as well as the possibility that Plaintiffs could have reasonably relied on the legal opinions. They note, correctly, that Georgia courts recognize that liability for negligent misrepresentation "may be . . . limited by appropriate disclaimers which would alert those not in privity with the supplier of information that they may rely upon it only at their peril." *Adams v. DeWitt*, 760 S.E.2d 191, 193 (Ga. Ct. App. 2014) (quoting *Robert*, 300 S.E.2d at 504). They point to language pulled from the following paragraphs in the PPMs:

> There is no separate counsel for the Company and its Managers, which could result in conflicts of interest. Mr. Tim Pollock with Morris, Manning & Martin, LLP, acts as legal counsel to the Company, Propco, Strategic, other related entities, and is also expected to represent its Managers from time to time. . . . Legal counsel for the Company does not and will not represent the individual interests of the accredited investors other than indirect representation of the accredited investors in general, through representation of the Company. In addition, such counsel has not independently verified the accuracy of the information contained within this Memorandum or any related documents, made any independent investigation, or been deemed to have acted on behalf of any individual accredited investor. Such legal counsel does not purport to have made any investigations or to have acted independently on behalf of any accredited investor. Such counsel

has not made any representation to any accredited investor. Each accredited investor should consult with their own legal counsel in connection with an investment in the Company. Morris, Manning & Martin, LLP is not providing securities law advice to the Company, Members, Managers or accredited investors relating to the Offering. The law firm of Morris, Manning & Martin, LLP is providing legal services to provide a tax opinion relating to the tax consequences of a potential conservation easement deduction and allocation of deductions related thereto.

(Doc. 168-2 at 31-32 (Rock Spring PPM); *see also id.* at 295 (substantively same language in DeSoto PPM); *id.* at 816-17 (substantively same language in Turtle River PPM)); *id.* at 559-60 (substantively same language in Rock Spring PPM regarding Nelson Mullins); *id.* at 953 (similar language in Vista Hill PPM regarding Bryan Cave)).

While this language may ultimately be relevant to whether Plaintiffs were alerted not to rely on the legal opinions, it does not preclude Plaintiffs from doing so as a matter of law. To be sure, the language is clear that Plaintiffs should not have regarded the Attorney Defendants as their own legal counsel; it clearly warns Plaintiffs that the Attorney Defendants did not represent them individually. That much is relevant to whether Plaintiffs could plausibly have been in a confidential relationship with the Attorney Defendants, a matter which the Court has decided in the negative above.[75] But, read in its full context, the quoted paragraph—and the analogous

---

[75] See Part III(G)(3)(a) above.

paragraphs in the other PPMs—does not unambiguously state Plaintiffs could not rely on the legal opinions provided to Plaintiffs.  On the contrary, the language states that while the MMM Defendants "ha[d] not made any representation to any accredited investor," they would be "providing legal services to provide a tax opinion relating to the tax consequences of a potential conservation easement deduction and allocation of deductions related thereto." (Doc. 168-2 at 32.)  And, indeed, the language states that MMM "does not and will not represent the individual interests of the accredited investors *other than indirect representation of the accredited investors in general, through representation of the Company.*"  (*Id.* at 31) (emphasis added).  But on the pleadings, the Court cannot read the language to clearly warn Plaintiffs that the legal opinions were rendered solely to the LLCs and Plaintiffs as individuals relied on them only at their peril.  In this respect, the quoted language is due for the same treatment as most of the other disclaimer language discussed above.[76]  The reasonableness of Plaintiffs' reliance presents

---

[76] In addition, these disclaimers do not have any apparent application to the Due Diligence Reports, which were prepared by Defendants not named in the PPMs.  Indeed, the FAC also contains additional allegations about the Due Diligence Reports that render it plausible that the defendants providing them might have been "actually aware" that Plaintiffs would rely on them in connection with their individual tax decisions.  For example, the Due Diligence Reports, rather than being provided to the Syndicates, were sent directly to individual Plaintiffs by the firms.  (Doc. 109, FAC ¶¶ 276, 402.)  And the PCLG Defendants' Due Diligence Report itself—which they introduce in connection with their briefing and which the Court has considered as incorporated by

factual questions better suited for disposition on summary judgment. Thus, the Court finds that Plaintiffs have plausibly alleged the elements of their negligent misrepresentation claims against the MMM Defendants, the PCLG Defendants, Nelson Mullins, and Bryan Cave at this juncture.

### c.  The Return Preparer Defendants

Above, the Court found that Plaintiffs have pled fraud-based claims against Bennett Thrasher, but not against the other Return Preparer Defendants. Here, however, Plaintiffs' standalone negligent misrepresentation claims fail with respect to all of the Return Preparer Defendants. In discussing the substantive RICO claims against Bennett Thrasher, F&D, and the Langford Defendants, the Court observed that the allegations regarding the fraudulent communications by these parties—the Schedule K-1s and, in some cases, associated cover letters—were not alleged to have made any representations that the appraisal values, and thus the values of the charitable contribution deductions, were accurate or had been verified. Instead, the essential function of the K-1s was to provide Plaintiffs with information they needed to complete their individual tax returns in light

reference in the FAC—contains language that plausibly suggests that it was understood that individual investors would rely on it. (*See* Doc. 191-2; *see also* Doc. 109, FAC ¶ 402.)

of decisions made by Plaintiffs and the LLCs and information prepared by other Defendants, such as the appraisals.

These facts could not support claims for negligent misrepresentation. As discussed above, the Georgia Supreme Court has permitted such claims against parties "who did not create the false information," but only "*if* the supplier represented that the false information was legitimate, accurate, or trustworthy." *Glob. Payments*, 843 S.E.2d at 824 (emphasis in original). Here, the alleged misrepresentations by the Return Preparers do not meet this requirement, and therefore Plaintiffs' negligent misrepresentation claims against the Return Preparers must fail.

In response to Bennett Thrasher's motion to dismiss, Plaintiffs argue that the Return Preparers were obligated to inquire about the appraisal values, regardless of whether they represented them to be accurate. But if such a duty existed—so that the Return Preparers could be held liable for negligence *without* representing "that the false information was legitimate, accurate, or trustworthy"—the claim would sound in professional malpractice, not negligent misrepresentation, which specifically requires that a defendant represent that the information is accurate. *See Glob. Payments*, 843 S.E.2d at 824; *Robert*, 300 S.E.2d at 504.

Thus, Count VII is **DISMISSED** as to Bennett Thrasher, F&D, the Langford Defendants, and Cherry Bekaert.

### d.  The Land Trust Defendants

Plaintiffs' negligent misrepresentation claims against the ACC Defendants, GALT, and Foothills fail for the same reasons that Plaintiffs have failed to plead any actionable fraud against these defendants with the requisite particularity.  As discussed above, the alleged misrepresentations by the Land Trust Defendants either entail impermissible lumping with other parties, reflect the preparation of documents that simply do not contain any affirmative misrepresentations that could plausibly be characterized as fraudulent, or depend on alleged fraudulent omissions when Plaintiffs have failed to show any basis for a duty to disclose.[77]  Because Rule 9(b)'s particularity requirement also applies to Plaintiffs' negligent misrepresentation claims, *see Jackson*, 325 F. Supp. 3d at 1354, these deficiencies have the same consequences for Plaintiffs' negligent misrepresentation claims as for their fraud claims.  Count VII is **DISMISSED** as to the ACC Defendants, GALT, and Foothills.

### e.  The Local Promoters

Plaintiffs' fraud claims against Credo and Oxygen failed primarily because Plaintiffs have failed to plead sufficient facts to allow the Court to plausibly infer that these defendants  knew their representations were false.

---

[77] See Part III(F)(1)(a)(vii) above.

Plaintiffs' negligent misrepresentation claims as to the local promoters, however, fail for a different reason—Plaintiffs cannot show reasonable reliance on the Local Promoters' statements as a matter of law. *See Hardaway*, 479 S.E.2d at 729 (reasonable reliance is an element of a claim for negligent misrepresentation).

The disclaimers present issues for Plaintiffs' negligent misrepresentation claims against the Local Promoters. For, to the extent that the pre-investment statements by Credo and Oxygen about the legitimacy of the SCE Strategy are pleaded with particularity and actionable, they constitute just the sort of statements that are squarely contradicted by the disclaimers.[78] For example, Plaintiffs allege that Credo and Oxygen assured the Greiner Plaintiffs and Plaintiff Spratt that they would receive tax deductions of a certain value by buying into the transaction. (*See* Doc. 109,

---

[78] The Court notes that the disclaimers have a dispositive effect on these claims against the Local Promoters, but not those against the other Defendants, for at least two reasons. First, unlike the claims against the Local Promoters, the claims against the other Defendants are based at least in part on representations concurrent with the PPMs, incorporated into the PPMs, or made after the investments were complete. Second, the only action that Plaintiffs might plausibly have taken in detrimental reliance on the Local Promoters' representations about the SCE Strategy is investing in an SCE transaction in the first place. That is not the case for many of the other alleged misrepresentations, which Plaintiffs sometimes plausibly allege caused them to take other steps, such as reporting the deductions on their tax returns. For a fuller discussion of the disclaimers' significance at this stage, see Part III(D) above.

FAC ¶¶ 190, 196.)  Given that Credo and Oxygen are not plausibly alleged to have known that the SCE Strategy was fraudulent, such representations are, at best, regarded as representations that the SCE Strategy was not risky and that a certain return was guaranteed.  After receiving the risk disclosures in the PPMs, Plaintiffs could not justifiably have relied on such statements about the purported risklessness of the SCE Strategy as a matter of law.  *See, e.g., Middleton v. Int'l Bus. Machines Corp.*, 787 F. App'x 619, 622 (11th Cir. 2019).  Count VII is, therefore, **DISMISSED** as to Defendants Credo and Oxygen.

### 5.  Professional Malpractice (Count V)

Plaintiffs also bring professional malpractice claims against the Professional Defendants.  (Doc. 109, FAC at 328.)  "Professional malpractice claims arise when a professional negligently fails to exercise 'ordinary care, skill and diligence' and 'such negligence was the proximate cause of damages to the plaintiff.'"  *Lechter*, 565 F. Supp. 3d at 1335 (quoting *Leibel v. Johnson*, 728 S.E.2d 554, 555 (Ga. 2012)).  There is some dispute in the briefing over whether Plaintiffs can maintain professional malpractice claims against professionals with whom they were not in a direct professional-client relationship.  Generally speaking, the Court agrees with *Lechter*'s analysis that a direct professional-client relationship is required; otherwise, the claim is for negligent misrepresentation.  *See id.* at 1335-36; *see also White v. BDO Seidman, LLP*, 549 S.E.2d 490, 492 (Ga. Ct. App. 2001) ("Georgia law . . .

provides only one cause of action to persons who are not clients of an accounting firm but who wish to sue the firm and any of its accountants for professional malpractice: an action for negligent misrepresentation.").

The cases that Plaintiffs cite to the contrary, such as *First Nat'l Bank of Newton County v. Sparkmon*, 442 S.E.2d 804 (Ga. Ct. App. 1994), are best understood as recognizing "professional liability" in the sense that professionals may be liable for negligent misrepresentation. *Sparkmon*'s language—"person who the accountant is actually aware will rely on the information provided"—clearly echoes the standard governing negligent misrepresentation claims set forth in *Badische*, discussed above. The same is true of the cases Plaintiffs cite regarding attorney negligence. *Kahn v. Britt*, 765 S.E.2d 446, 457-58 (Ga. Ct. App. 2014), for example, cites in turn to *Rogers v. Hurt, Richardson, Garner, Todd & Cadenhead*, 417 S.E.2d 29, 32-33 (Ga. Ct. App. 1992), which cites in turn to *Badische* and *Robert*—seminal Georgia cases recognizing the cause of action for negligent misrepresentation. A reasonable standard of care suited to the professional context may well apply in Plaintiffs' negligent misrepresentation claims against professional defendants. But to the extent that Plaintiffs seek to bring separate claims for professional malpractice, they will have to plead a professional-client relationship. *See Lechter*, 565 F. Supp. 3d at 1335-36.

### a. The Strategic Defendants

The parties' argument regarding the professional malpractice claim against the Strategic Defendants is very slight and confined entirely to footnotes. (*See* Doc. 200 at 13 n.8; Doc. 245 at 8 n.3.) The Strategic Defendants contend, correctly, that a professional-client relationship is required to maintain a malpractice claim. They assert that Plaintiffs have failed to plead any such relationship with any of the Strategic Defendants. In response, Plaintiffs simply say that "there is no basis to dismiss" their malpractice claim "for the same reason" that they argue that they have pled the existence of confidential relationships with the Strategic Defendants. (Doc. 245 at 8 n.3.)

This one-sentence note is insufficient to save the claim.[79] The existence of a confidential relationship does not necessarily imply the existence of a professional engagement. The Strategic Defendants are correct that Plaintiffs have failed to show that the allegations in the complaint state a professional malpractice claim. Indeed, it is unclear what the asserted factual and legal basis is for Plaintiffs' professional malpractice claim against the Strategic

---

[79] When an argument is raised that a claim is subject to dismissal and the non-moving party fails to respond, such claim is deemed abandoned. *See Wambua v. Wolf*, No. 1:20-CV-01459-ELR, 2021 WL 9386032, at * 1 (N.D. Ga. Mar. 26, 2021). Here, the Court dismisses the professional malpractice claim against the Strategic Defendants for the reasons discussed in this section. But an alternative ground for dismissal is that Plaintiffs' response to the motion to dismiss this claim was so slight as to constitute a failure to respond.

Defendants.  It is, for example, unclear what professional duties of care were purportedly breached by the Strategic Defendants and what factual allegations underlay the alleged breach.  Count V is, therefore, **DISMISSED** as to the Strategic Defendants.

### b. The Attorney Defendants

For the same reasons discussed above in connection with Plaintiffs' claims for breach of fiduciary duty, it is not plausible that Plaintiffs were in an attorney-client relationship with any of the Attorney Defendants.[80]  The language in the PPMs clearly and expressly precludes this possibility.  *See, e.g., Williams v. Fortson, Bentley & Griffin*, 441 S.E.2d 686, 688 (Ga. Ct. App. 1994) (disclaimers barred existence of attorney-client relationship).  Thus, Plaintiffs' professional malpractice claims against those defendants  fail.  *See Lechter*, 565 F. Supp. 3d at 1336.  Count V is **DISMISSED** as to the PCLG Defendants, Bryan Cave, Nelson Mullins, and the MMM Defendants.

### c. The Return Preparer Defendants

To sustain professional malpractice claims against the Return Preparer Defendants, Plaintiffs will have to prove that they were clients of the Return Preparers.  *See White*, 549 S.E.2d at 492.  Plaintiffs insist they have adequately alleged this relationship on the basis of their allegations that the Return

---

[80] See Part III(G)(3)(a) above.

Preparer Defendants, after preparing and filing the tax return for the relevant LLCs, provided Schedule K-1s to Plaintiffs and "advised" them to report the charitable contribution deductions on their individual returns. (Doc. 109, FAC ¶¶ 175-76, 225-26, 306-08, 358-62, 423-25.)   In some cases, the Return Preparers also provided cover letters to Plaintiffs with the K-1s that contained instructions for filing the K-1 information with Plaintiffs' individual returns. Defendants argue that the allegations merely show that they were employed by the LLCs to perform tax work and that the provision of the K-1s is part of that work, none of which reflects an independent accountant-client relationship with the individual plaintiffs.[81]

Professional-client relationships, while usually matters of contract, can be implied from the circumstances.  *See In re Dowdy*, 277 S.E.2d 36, 38 (Ga. 1981) ("Generally, the relation of attorney and client is a matter of contract but the contract may be express, or implied from the conduct of the parties.").  But here, the same disclaimer-based reasons that Plaintiffs fail to allege a confidential relationship with the Return Preparer Defendants also dictate the conclusion that they have failed to allege an accountant-client relationship with them.  It is not plausible that Plaintiffs could have reasonably regarded

---

[81] Some of the Return Preparers introduce extrinsic materials in connection with their motions.  The Court declines to consider these materials, which are either not central to Plaintiffs' claims or not incorporated by reference in the FAC.

the accountants for the LLCs as their own accountants after agreeing to PPMs that repeatedly urged Plaintiffs to consult their own tax and other advisors. Indeed, Plaintiff Spratt and the Greiner Plaintiffs allege that they did subsequently consult their own accountants—Defendants Credo and Oxygen— in connection with their individual tax returns.  (Doc. 109, FAC ¶¶ 228-229).

Even absent the disclaimers, the Court would be disinclined to allow this claim to proceed against the Return Preparers.  The sole authority that the parties have called to the Court's attention that is truly on point is *Richard B. LeVine, Inc. v. Higashi*, 32 Cal. Rptr. 3d 244, 258-259 (Cal. App. 4th Dist. 2005), a California case in which the court held that it could not "imply a contract [and thus a professional-client relationship] between an individual partner and the partnership's accountant from the mere provision of a Schedule K–1 to the individual partner."  Although the case is not binding authority, the Court is persuaded by its reasoning, which appears to be consistent with Georgia law. As the California court pointed out, pass-through entities are *required* to provide Schedule K-1s to individual partners or members.  *See id.* (citing I.R.C. § 6031).  This act is not plausibly regarded as constituting an independent professional engagement between Plaintiffs—the members of the LLC—and the Return Preparers responsible for the LLCs' tax returns.  Furthermore, as Plaintiffs themselves allege, they were "required by law" to "report[ ] the charitable deductions from the SCE Strategy based on the K-1 they received

from the respective Syndicate in which they were a member." (Doc. 109, FAC ¶ 82.)

Thus, the Court **DISMISSES** the professional malpractice claims against the Langford Defendants, Bennett Thrasher, F&D, and Cherry Bekaert.

### d. The Appraiser Defendants

Plaintiffs fail to allege professional malpractice claims against the Clark Defendants and VSW Defendants because they fail to allege the existence of a direct client relationship between the Appraiser Defendants and Plaintiffs. In their response to the Clark Defendants' motion to dismiss, Plaintiffs attempt to distinguish *Lechter*, which dismissed the malpractice claims against the appraiser on this basis. They argue that the fact that Plaintiffs received qualified appraisals and appraisal summaries after deciding to participate in the LLCs, and then relied on those appraisal documents in claiming their tax deductions, shows a direct client relationship between Plaintiffs and the Clark Defendants. Tellingly, however, Plaintiffs cite no law in support of this argument. (Doc. 252 at 14-15.) The argument is flawed in that it again attempts to parlay the fact that Plaintiffs' reliance on the appraisals would have been foreseeable to the Appraiser Defendants into an argument that Plaintiffs were clients of the Appraiser Defendants. That does not follow. That Plaintiffs' reliance on the Qualified Appraisal and Appraisal Summary was

236

foreseeable matters to the negligent misrepresentation claim, but it does not suffice to show a direct client relationship.  Thus, Count V is **DISMISSED** as to the Clark Defendants and the VSW Defendants.

### e.  The Local Promoters

The allegations in the FAC are sufficient to allege a direct client relationship between Plaintiff Spratt and Credo and the Greiner Plaintiffs and Oxygen.  Credo and Oxygen are alleged to have been the accountants/financial professionals who prepared Plaintiff Spratt and the Greiner Plaintiffs' individual tax returns in the year that they claimed their charitable contribution deductions from the Turtle River Syndicate transaction.  There is scant argument about the malpractice claim in the individual briefs of Credo and Oxygen, aside from a repetition of the statute of limitation arguments made in the joint motion to dismiss.  (*See* Doc. 194-1; Doc. 197.)  At this stage, then, the Court has not been shown any reason to dismiss this claim against Credo and Oxygen.

### 6.  Negligence (Count VI)

Plaintiffs bring a claim for negligence against the Bridge Capital Defendants, the ACC Defendants, GALT, AquaFUSION, and Foothills (the "Negligence Defendants").  (Doc. 109, FAC ¶¶ 591-98.)  Plaintiffs allege that these defendants owed Plaintiffs "a duty to comply with the applicable standards of care" and failed to do so.  (*Id.* ¶¶ 592-93.)  Plaintiffs' theory of this

alleged duty is that it was owed to Plaintiffs in connection with information provided to them by the Negligence Defendants.  Thus, the FAC states that Plaintiffs were "foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Negligence Defendants." (*Id.* ¶ 592.)  In other words, "Plaintiffs allege that each Defendant gave false and misleading information to Plaintiffs in connection with the SCE Strategy and intended that Plaintiffs would rely [on] it." (Doc. 237 at 54.)

This claim is duplicative of Plaintiffs' negligent misrepresentation claim.[82]   Faced with such duplicative negligence and negligent misrepresentation claims, Georgia courts dismiss the duplicative negligence claim.  *See Incomm Fin. Servs., Inc. v. Glob. Payments, Inc.*, 825 S.E.2d 839,

---

[82] Given the allegations, the duty Plaintiffs allege was breached by the negligence defendants can only be the duty first recognized in Georgia in *Robert & Co. Associates v. Rhodes-Haverty Partn.*, 300 S.E.2d 503, 504 (Ga. 1983), which held that "one who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used." *Id.*  This is the duty that underlies actions for negligent misrepresentation.  *See, e.g., BDO Seidman, LLP v. Mindis Acq. Corp.*, 578 S.E.2d 400, 401 (Ga. 2003) ("In *Robert & Co. v. Rhodes-Haverty Partn.*, this Court first recognized a claim for negligent misrepresentation and adopted the liability standard set forth in section 552 of the Restatement (Second) of Torts.").

843 (Ga. Ct. App. 2019), *rev'd on other grounds*, 843 S.E.3d 821 (Ga. 2020).

Count VI is therefore **DISMISSED**.

### 7.   Aiding and Abetting Breaches of Fiduciary Duty (Count X)

Plaintiffs bring claims for aiding and abetting breaches of fiduciary duties against every defendant.  To state a claim under Georgia law for aiding and abetting a breach of fiduciary duty, a plaintiff must show that "(1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Cottrell v. Smith*, 788 S.E.2d 772, 786 (Ga. 2016).  O.C.G.A. § 51-12-30 is the statutory basis for this cause of action.  It provides: "In all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury."  O.C.G.A. § 51-12-30.  In this context, "improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and

239

unwarranted criminal prosecutions." *White v. Shamrock Bldg. Sys., Inc.*, 669 S.E.2d 168, 172-73 (Ga. Ct. App. 2008).

"The word 'procure' as . . . used [in O.C.G.A. § 51-12-30], does not require the lending of assistance in the actual perpetration of the wrong done by another; but if one, acting only *through advice, counsel, persuasion, or command*, succeeds in procuring any person to commit an actionable wrong, the procurer becomes liable for the injury, either singly or jointly, with the actual perpetrator." *See Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 379 n.12 (Ga. Ct. App. 2006) (quoting *Melton v. Helms*, 62 S.E.2d 663, 665 (Ga. Ct. App. 1950)) (emphasis added).  In other words, procuring a breach of duty means *inducing* it in some way, not merely having some role in the breach.  *See Curry v. TD Ameritrade, Inc.*, No. 1:14-CV-1361-LMM, 2015 WL 11251449, at *15 (N.D. Ga. June 30, 2015) (dismissing aiding and abetting breach of fiduciary duty claim where the allegations "may support a claim that Defendants assisted Alleca in breaching his duties to Plaintiffs," but the complaint was "devoid of any evidence or allegation that Defendants *induced* Alleca to breach his duties to Plaintiffs").

As discussed above, Plaintiffs have alleged only that the Strategic Defendants, Credo, and Oxygen owed them fiduciary duties, and they have failed to allege how Credo and Oxygen breached those duties.  Only the breach of fiduciary duty claim against the Strategic Defendants remains.

240

Under such circumstances, the trouble for Plaintiffs is with the requirement that they plead the "procurement" of a breach.  Plaintiffs' theory of this claim, so far as it can be discerned, depends on the Professional Defendants' alleged failures to disclose the conflicts of interest of the Professional Defendants.  (Doc. 109, FAC ¶ 626.)  For example, in their response to AquaFUSION's motion, Plaintiffs argue that AquaFUSION is liable for this claim because the Strategic Defendants "had instructed the appraisers to hit a predetermined value range based on a bogus HBU," so AquaFUSION "procured" the Strategic Defendants' breach of duty by providing the mining reports that purported to substantiate the HBUs.  (Doc. 259 at 12-13.)  Or, to take the case of the Bridge Defendants, Plaintiffs allege that they procured a breach by "helping to disseminate materially false information to Plaintiffs about the purported independence of the various advisors involved in the transaction."  (Doc. 251 at 17.)  Neither of these allegations makes much sense, likely because Plaintiffs are attempting here to squeeze facts into a legal rubric that does not fit them.

The further problem with such allegations is that they fail to show how Defendants "procured" a breach in the relevant sense of the word.  Instead, Plaintiffs appear to argue that Defendants all engaged in conduct in some way related to the purported breaches.  But that is not the same as showing that every defendant acted to *induce* a breach of duty.  *See Curry*, 2015 WL

241

11251449, at *15; *see also Lechter*, 565 F. Supp. 3d at 1338-39 (dismissing aiding and abetting claim on the grounds that the allegations "could conceivably support a claim of aiding and abetting fraudulent representations or omissions," but no such cause of action exists). This is particularly the case when the only parties plausibly alleged to have breached a fiduciary duty to Plaintiffs—the Strategic Defendants—are those who were themselves allegedly at the center of the scheme. Thus, without a plausible factual basis for this claim in the FAC, the Court **DISMISSES** it as to all defendants.[83]

### 8. Rescission (Count XI)

Plaintiffs "seek rescission of all agreements and all documents they received in connection with entering into the SCE Strategy transactions, including the Purported Disclaimers." (Doc. 109, FAC ¶ 630.) "In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Ekeledo v. Amporful*, 642 S.E.2d 20, 22 (Ga. 2007). "An announcement of the intent to rescind the

---

[83] A secondary ground for dismissing the claim as brought by Plaintiff Hebert is that, "absent a conspiracy, Louisiana law does not recognize a distinct cause of action for aiding and abetting." *Thomas v. N. 40 Land Dev., Inc.*, 894 So. 2d 1160, 1174 (La. Ct. App. 4th Cir. 2005). Plaintiffs concede that, given the applicable choice of law analysis and this principle of Louisiana law, Plaintiff Hebert cannot maintain aiding and abetting claims against any Defendants. (*See, e.g.*, Doc. 259 at 13.)

contract must be made in a timely fashion, as soon as the facts supporting the claim for rescission are discovered." *Holloman v. D.R. Horton*, 524 S.E.2d 790, 795 (Ga. Ct. App. 1999).

"Under Georgia law, to preserve one's right to rescind the contract, a party must do two things: (1) timely announce its intention to rescind . . . and (2) tender back the contractual consideration." *Partner Services, Inc. v. Avanade, Inc.*, No. 1:13-CV-0001-AT, 2013 WL 12180442, at *4 (N.D. Ga. Aug. 26, 2013). Failing to timely announce one's intention to rescind risks waiver of the right to rescind. *See Boyd v. JohnGalt Holdings, LLC*, 755 S.E.2d 675, 680 (Ga. 2014) (citing *Conway v. Romarion*, 557 S.E.2d 54, 57 (Ga. Ct. App. 2001)). The requirement to announce the intent to rescind and the tender back requirement are distinct rules. *See Turk*, 593 F. Supp. 3d at 1315 ("the tender back rule is a separate requirement for rescission that may have 'nothing to do with the application of the doctrine of waiver'") (quoting *Denim N.A. Holdings, LLC v. Swift Textiles, LLC*, 532 F. App'x 853, 861 (11th Cir. 2013)). Because the waiver rule and the tender back rule are distinct, "[a] party is not 'relieved of its obligation to announce its intention to rescind' based on the fact that application of the tender back rule 'would be unreasonable.'" *Turk*, 593 F. Supp. 3d at 1315 (quoting *Partner Servs.*, 2013 WL 12180442, at *4); *see also Weinstock v. Novare Group, Inc.*, 710 S.E.2d 150, 155 n.5 (Ga. Ct. App. 2011)

("Assuming, but not deciding, that no tender was required, this does not excuse an unreasonable delay in electing the remedy of rescission.").

With respect to the doctrine of waiver, Georgia law requires that "w[here a party elects to rescind the contract, he must do so prior to filing the lawsuit." *Novare Group, Inc. v. Sarif*, 718 S.E.2d 304, 307 (Ga. 2011). *Novare* held that where the plaintiffs sent a letter purporting to rescind their agreements the same day that they filed their lawsuit, they failed to give the defendants "the opportunity to correct any wrong before being served with a lawsuit," and thus because their "demand for rescission [was] served contemporaneously with the filing of their lawsuit," they failed to properly elect rescission as a remedy. *See id.* at 308; *see also Partner Servs.*, 2013 WL 12180442, at *3 ("Georgia law requires, at a minimum, that attempts at rescission occur prior to the filing of a lawsuit.")  "Rescission 'is not favored under the law, and courts are quick to find that the right to rescind has been waived.'" *Napier v. Kearney*, 855 S.E.2d 78, 81 (Ga. Ct. App. 2021) (quoting *Conway*, 557 S.E.2d at 530).

Defendants argue that Plaintiffs' rescission claim fails both because they failed to announce their intention to rescind prior to filing and failed to tender back the consideration received in the contract.  Plaintiffs assert that announcing an intent to rescind contemporaneously with the filing of a lawsuit is sufficient, but the Georgia Supreme Court's decision in *Novare* is squarely

244

to the contrary.  *See Novare*, 718 S.E.2d at 307.[84]  Plaintiffs also contend that tendering back their interests in the LLCs would be unreasonable, and that it is a less rigid requirement that may be waived under certain circumstances. This is correct as far as it goes,[85] but, as the Court has stated above, the tender back  requirement is best understood as distinct from the requirement that the rescission remedy be timely elected.

Plaintiffs have  failed to allege that they timely announced their intent to rescind, and therefore they have failed to plausibly plead an entitlement to rescission.  *Cf. Turk*, 593 F. Supp. 3d at 1315-16 (holding that the plaintiffs' rescission claim failed because they signaled their intent to rescind for the first time in an amended complaint).

## IV. Conclusion

As will be evident to those with the patience—or, more likely, the obligation—to read the foregoing order, the Court's rulings on the pending

---

[84] Even if Plaintiffs were not required to announce their intent to rescind prior to filing suit, the Court would find their delay to have been unreasonable as a matter of law.  *See, e.g., Payne v. Doco Credit Union*, 734 F. App'x 623, 628 (11th Cir. 2018) ("Georgia courts have found a delay of six months to be unreasonable.")

[85] "[R]estoration by the purchaser is not an absolute rule," *Crews v. Cisco Bros. Ford–Mercury, Inc.*, 411 S.E.2d 518, 519 (Ga. Ct. App. 1991), and a party need not "restore or tender back the benefits received under the contract" if he can "show a sufficient reason for not doing so," *id*.  A party claiming rescission, for example, "need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable.'" *Id*.

motions to dismiss are mixed.  Plaintiffs' complaint casts a wide net, and despite its length—perhaps too much of which is dominated by schematic allegations and nonspecific references to "Defendants"—it lacks sufficient well-pled facts to maintain some of its claims under the operative pleading standards.  Other claims simply have legal deficiencies.  In the end, the results are as follows.

Plaintiffs' claims for negligence, aiding and abetting a breach of fiduciary duty, and rescission, are **DISMISSED** as to all Defendants.  Plaintiffs' federal and Georgia RICO and RICO conspiracy claims, as well as their claims for civil fraud, civil conspiracy, breach of fiduciary duty, negligent representation, and professional malpractice survive as to some defendants.  The following table records the Court's disposition of the pending motions.[86]

| Doc. No. | Motion | Disposition |
|---|---|---|
| 168 | Defendants' Joint Motion to Dismiss | **GRANTED** as to Counts VI, X, and XI; **DENIED** as to other claims.[87] |

---

[86] Some of Defendants' individual motions to dismiss appear on the docket as "responses in support" of the joint motion to dismiss.  The Court treats these "responses" as motions to dismiss.

[87] Defendant Cherry Bekaert f/k/a Conexus did not file an individual motion to dismiss but joined in the Defendants' joint motion.  For reasons discussed above —particularly in those sections addressing  other Return Preparer Defendants—all claims against Cherry Bekaert are due to be **DISMISSED**.

| 263 | Plaintiffs' Motion to Exclude or Disregard Extrinsic Evidence | **GRANTED IN PART AND DENIED IN PART** as discussed in Section III(A) above. |
|---|---|---|
| 180 | AquaFUSION Motion to Dismiss | **GRANTED** as to Counts VI, X and XI; **DENIED** as to other claims. |
| 181 | Langford Defendants' Motion to Dismiss | **GRANTED** in full. |
| 184 | MMM Defendants' Motion to Dismiss | **GRANTED** as to Counts V, VI, VIII, X, and XI; **DENIED** as to other claims. |
| 186 | Frazier & Deeter's Motion to Dismiss | **GRANTED** in full. |
| 187 | Bryan Cave's Motion to Dismiss | **GRANTED** as to all claims except Count VII; **DENIED** as to Count VII. |
| 191 | PCLG Defendants' Motion to Dismiss | **GRANTED** as to all claims except Count VII; **DENIED** as to Count VII. |

| 192 | Sean Honeywill's Motion to Dismiss | **GRANTED** as to all claims except Count VII; **DENIED** as to Count VII. |
| --- | --- | --- |
| 193 | Van Sant & Wingard Defendants' Motion to Dismiss | **GRANTED** as to Counts V, VI, VIII, X, and XI; **DENIED** as to other claims. |
| 194 | Credo's Motion to Dismiss | **GRANTED** as to all claims except Count V; **DENIED** as to Count V. |
| 197 | Oxygen's Motion to Dismiss | **GRANTED** as to all claims except Count V; **DENIED** as to Count V. |
| 198 | Clark Defendants' Motion to Dismiss | **GRANTED** as to Counts V, VI, VIII, X, and XI; **DENIED** as to other claims. |
| 199 | GALT's Motion to Dismiss | **GRANTED** in full. |
| 200 | Strategic Defendants' Motion to Dismiss | **GRANTED** as to Counts V, VI, X, and XI; **DENIED** as to other claims. |
| 201 | Bridge Capital's Motion to Dismiss | **GRANTED** as to all claims except Counts II, IV and XII; **DENIED** as to Counts II, IV and XII. |
| 203 | Foothills' Motion to Dismiss | **GRANTED** in full. |

| 206 | Nelson Mullins' Motion to Dismiss | **GRANTED** as to all claims except Count VII; **DENIED** as to Count VII. |
|-----|-----------------------------------|---------------------------------------------------------------------------|
| 207 | ACC Defendants' Motion to Dismiss | **GRANTED** as to all claims except Counts II, IV and XII; **DENIED** as to Counts II, IV and XII. |
| 230 | Bennett Thrashers' Motion to Dismiss | **GRANTED** as to Counts V, VI, VII, VIII, X, and XI; **DENIED** as to other claims |
| 234 | Dantin Defendants' Motion to Dismiss | **GRANTED** in full. |

A table appended to the order collects the remaining causes of action and the defendants against whom those claims survive.

**SO ORDERED** this 21st day of August, 2023.

SARAH E. GERAGHTY
United States District Judge

## Appendix A: Remaining Defendants and Causes of Action

| Cause of Action | Remaining Defendants |
|---|---|
| Violations of Federal RICO (Count I) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, MMM Defendants, Bennett Thrasher |
| Conspiracy to Violate Federal RICO (Count II) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, Bridge Capital, MMM Defendants, Bennett Thrasher, ACC Defendants |
| Violations of Georgia RICO (Count III) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, MMM Defendants, Bennett Thrasher |
| Conspiracy to Violate Georgia RICO (Count IV) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, Bridge Capital, MMM Defendants, Bennett Thrasher, ACC Defendants |

| Professional Malpractice (Count V) | Credo and Oxygen |
|---|---|
| Negligent Misrepresentation (Count VII) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, MMM Defendants, Bryan Cave, PCLG Defendants, Nelson Mullins |
| Breach of Fiduciary Duty (Count VIII) | Strategic Defendants |
| Fraud (Count IX) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, MMM Defendants, Bennett Thrasher |
| Civil Conspiracy (Count XII) | Strategic Defendants, Clark Defendants, Van Sant and Wingard Defendants, AquaFUSION, Bridge Capital, MMM Defendants, Bennett Thrasher, ACC Defendants |