IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| C. JACKSON HOOVER, et al. on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>STRATEGIC CAPITAL PARTNERS, LLC, et al.,<br><br>*Defendants*. | No. 1:21-cv-01299-SEG |

## NOTICE OF SUPPLEMENTAL AUTHORITY – OCONEE LANDING TAX COURT CASE

Plaintiffs file this Notice of Supplemental Authority to inform the Court of a recent decision by the Tax Court, respecting a Strategic-sponsored SCE Strategy transaction ("Oconee Opinion" attached hereto as <u>Exhibit A</u>). The Tax Court disallowed the entire deduction claimed by Oconee Landing Property, LLC ("Oconee") and imposed a 40% gross valuation misstatement penalty. *See, e.g.,* Oconee Opinion at 4. Crucially and for the first time that Plaintiffs' counsel is aware, the Tax Court determined that the contributing landowner, sponsor/promoter (Strategic, Novak, and Freeman), and appraiser (Van Sant & Wingard) conspired to hit a predetermined and inflated valuation for the easement. Oconee Opinion at 43-

1

46. Because of this critical finding and the fact that many of the same Defendants in this case were players in the Oconee transaction, the Court should consider this opinion when deciding the pending motions for leave to amend and for reconsideration as well as future motions in this case.

**Background on Oconee transaction.** The 355-acre tract used in the Oconee transaction was part of a larger parent tract controlled by the Reynolds family, developer of Reynolds Plantation at Lake Oconee. *Id.* at 4-5. After numerous failed attempts to sell or develop the parent tract, the Reynolds family decided to pursue three separate SCE Strategies on a portion of the parent tract, one of which was the Oconee transaction.[1] *Id.* at 7-20. Prior to offering the investment, the Reynolds family worked with, among others, Novak and Freeman of Strategic and Pollock of Morris, Manning & Martin to ensure that the collective proceeds from the three SCE Strategy transactions would exceed $7 million. *Id.* at 17. Because the business model developed by Strategic typically offered investors a $4.35 tax deduction for every $1 invested and considering the fees necessary to effectuate the transaction, "Mr. Novak indicated that the Parent Tract would need to have an appraised value

---

[1] In this way, the Reynolds family was a "Landowner," as that term is used in the First Amended Complaint, and played a role similar to the Barrys in the Bear Creek Syndicate Transaction. *See, e.g.,* FAC ¶ 83(a); *see also, e.g., id.* ¶¶ 236-39. This role was distinct from Plaintiffs and class members who passively participated in SCE Strategy transactions.

of around $60 million." *Id.* at 18. This number contrasted dramatically with existing appraisals of the parent tract, all valuing the tract considerably lower. *Id.* at 12-14.[2] This number was also at odds with the Reynolds family's unsuccessful attempts to develop the property and later to sell it outright. *Id.* at 10-12.[3]

The Reynolds family engaged Tim Pollock of Morris, Manning & Martin to negotiate an agreement with Strategic under which "they would not have to proceed with a conservation easement unless the investors, in the aggregate received" a deduction of "$60-75M." *Id.* at 19; *accord id.* at 41.

Novak and Freeman forwarded documents to Van Sant & Wingard, suggesting a value of $65 million for the entire parent tract. Oconee Opinion at 42. As the Tax Court noted, "[t]hese documents made clear to the appraisers—if they did not know it already—the magnitude of appraised value that [Strategic] needed in order for the deal to close." *Id.* at 42. Ultimately, the Reynolds family decided to carve out certain valuable land from the SCE Strategy transactions, which reduced

---

[2] CBRE valued the parent tract at $11 million in 2011. *Id.* at 12. CBRE performed a later appraisal in 2014 that valued the parent tract at a little over $8 million. *Id.* at 13. Another appraiser valued the parent tract at $9.64 million in 2014. *Id.* at 14.
[3] In 2011, an internal analysis of the development potential of the parent tract produced a net present value of between $1.78 million and $4.27 million. *Id.* at 11. The Reynolds family ultimately rejected a development offer that valued the parent tract at $6.7 million. *Id.* at 12. The Reynolds family also marketed the parent tract for sale in 2014 and 2015, agreeing to list the tract with a broker for $7.7 million. *Id.* at 16. No buyer agreed to pay this amount. *Id.* at 16-17.

the amount of deduction needed for the transactions to be financially viable. *See id.* Excluding those carve-outs, the Reynolds only needed a net deduction of around $52 million for the parent tract. *Id.* At that point, Freeman was asked by the Landowner's agent to call the appraisers to get a "verbal value" so the Reynolds family could proceed with the transaction. Freeman responded, "[w]e all have the window and need to work within that window. The appraisers are pulling the exact figures together … The window you have is within the ballpark of reality." *Id.* In other words (and as the Tax Court found), the "window" was based on the $52 million number that the Reynolds family expected. *Id.*

Van Sant and Wingard ultimately produced an appraisal that valued the Oconee tract at $21.2 million. *Id.* at 24. When combined with the appraisals for the other two tracts from the parent tract, the collective appraised "before" value of the parent tract was $51.7 million—just shy of the $52 million that the Reynolds family and Strategic had requested. *See id.* Oconee used this Van Sant & Wingard appraisal to claim a charitable contribution deduction for the 2015 tax year. Oconee Opinion at 29-30.

**Audit and Tax Court.** The IRS audited and disallowed the deduction in 2019. *Id.* at 31. Oconee challenged that determination in Tax Court. The Tax Court disallowed the deduction in its entirety and imposed a 40% penalty.

4

The Tax Court found an illicit agreement between the Reynolds family, the Strategic Defendants, and Van Sant & Wingard "that the Parent Tract would be appraised at roughly $60 million (before carve-outs) and fairly close to the $52.8 million (after carve-outs)." *Id.* at 43. Oconee argued that there could not have been any "collusion" to inflate the appraisal because there were no communications between the Reynolds family and Van Sant & Wingard. *Id.* The Tax Court rejected that argument, finding that "there was a daisy chain of intermediaries," including Strategic and its principals, "who ensured that all critical information" was passed to Van Sant & Wingard. *Id.* 44. To the Tax Court, "collusion" simply meant "a secret agreement or cooperation, especially for an improper purpose." *Id.* at 44-45 (cleaned up). And the Tax Court concluded that "[a]s a result of the incessant communications among the Reynoldses, their agents, and the appraiser, a meeting of the minds was reached that the Parent Tract would be appraised (before carve-outs) very close to the $60 million figure that Mr. Novak had given the Reynoldses in February 2015." *Id.* at 44. The Tax Court further concluded that "this agreement was made for an improper purpose, i.e., to secure grossly inflated tax deductions for the Reynoldses, the promoters, and the investors." *Id.* at 45. Based on this "secret agreement," the Tax Court held that the Van Sant & Wingard appraisal was not a "qualified appraisal" under applicable Treasury regulations. *Id.* at 45.

5

**Importance of Oconee Opinion to this case.** The parallels between the Oconee transactions and the transactions described in the First Amended Complaint are striking. First, just as Plaintiffs allege here, the Tax Court found a conspiracy between Strategic, Van Sant & Wingard, and other players to inflate the appraised value of the conservation easement deduction. This reinforces this Court's decision to allow Plaintiffs' conspiracy claims to proceed against various defendants here, including the Strategic Defendants and Van Sant & Wingard Defendants. MTD Order, Doc. 383 at 192-202, 205-06. The conspiracy finding in the Oconee Opinion should also guide this Court when the parties begin discovery, litigate summary judgment motions, and ultimately proceed to trial.

Second, many of the players in the Oconee transaction are Defendants in the present action. Strategic, Novak, and Freeman were the sponsors and promoters for Oconee just as they were for all the transactions here. *E.g.,* Oconee Opinion at 17-18-28. Van Sant & Wingard was the appraiser for the Oconee transaction (and the other two transactions stemming from the same parent tract) and is also the appraiser for the Bear Creek, Turtle River, and Vista Hill transactions here. *Id.* at 19-21, 24-25, 29, 42-45. Morris, Manning & Martin and Pollock were the legal advisors for the Reynolds family and prepared an opinion letter for the Oconee transaction, which was similar to their role in the DeSoto, Turtle River, and Bear Creek transactions

here. *Id.* at 19, 21, 27, 41, 52 n.18, 54 n.19., 76. PCLG wrote a due diligence report for the Oconee transaction like it did for the Vista Hill transaction here. *Id.* at 29. And Georgia-Alabama Land Trust received the Oconee easement donation like it did with respect to the Turtle River transaction here. *Id.* 28-29.[4] The fact that the same characters seem to overlap is not a coincidence—Strategic deliberately agreed to work with only those whom it knew would be willing partners in the scheme. *E.g.,* FAC ¶ 8.

Third, as is the case with many SCE Strategy transactions, including in this case, the Oconee tract was one of several transactions that involved real estate subdivided from a larger parent tract. As Plaintiffs allege here, there are unique valuation problems associated with a sponsor attempting to do multiple transactions from one parent tract, including that it allows the sponsor to further conceal the gross overvaluation of the real estate. *See* FAC ¶¶ 3, 12, 115 n.13., 236-27, 368-69, 436; *see also* Oconee Opinion at 62 n.24, 63-66.

Fourth, the facts uncovered by the Tax Court with respect to the Oconee transactions are precisely the type of facts that professionals like F&D and Cherry Bekaert (as tax return preparers) and Nelson Mullins and PCLG (as the attorneys

---

[4] Defendant Bennett Thrasher was identified in the Petitioner's Opening Brief in the Oconee case as the tax return preparer.

who wrote due diligence reports for Plaintiffs and other class members) would have known or reasonably should have known.  As presented in Plaintiffs' Motion for Leave to Amend and in their proposed Second Amended Complaint, F&D and Cherry Bekaert were subject to various accounting standards that required them to look beyond the appraisal numbers given to them by others.  Doc. 390-1 at 11; Doc. 408 at 10, 12-13.  Had F&D and Cherry Bekaert fulfilled their duties, they would have discovered many of the facts buttressing the Oconee Opinion, including that many of the SCE Strategy transactions involved adjoining tracts subdivided from a parent tract in a way that significantly undermined the purported valuations, the appraisals always closely followed the tax-savings ratio desired and touted to investors by Strategic, and the appraised values were significantly more than the acquisition cost by the investors of the underlying property interest.  And the fact that, time after time, F&D and Cherry Bekaert ignored these duties and blindly copied the appraisal values into the tax documents they prepared gives rise to an inference that those Defendants chose to be willfully blind.

Moreover, as demonstrated in Plaintiffs' Motion for Reconsideration, Nelson Mullins and PCLG purported to investigate all aspects of the applicable SCE Strategy transactions for the benefit of the syndicate members.  Doc. 389-1 at 8-12, 15-17.  If Nelson Mullins and PCLG had fulfilled their ethical obligations to their

clients (the syndicate members), they would have discovered the same troubling facts about the transactions—and specifically the appraisals—described in the previous paragraph. And the fact that those law firms purportedly reviewed the appraisals and the legal requirements for a valid conservation easement transaction and failed to disclose even basic problems with the appraisals (and tried to disclaim their obligation to scrutinize the appraisals, which is prohibited by Circular 230) raises the inference that those Defendants knew the appraisals were inflated and hid that fact from Plaintiffs and the class members.

  In light of the foregoing authority, Plaintiffs request that the Court grant the pending motion for reconsideration and motion for leave to amend. Plaintiffs also request that the Court keep in mind the Tax Court's finding of a conspiracy involving the Strategic Defendants and the Van Sant & Wingard Defendants as this case proceeds.

This 8th day of March, 2024.

        Respectfully submitted,

        /s/ *Tyler M. Simpson*
        David R. Deary (admitted *pro hac vice*)
        W. Ralph Canada, Jr. (admitted *pro hac vice*)
        Jeven Sloan (GA Bar No. 652727)
        Donna Lee (admitted *pro hac vice*)
        Tyler M. Simpson (admitted *pro hac vice*)
        **SILVERA DEARY RAY PC**
        17070 Dallas Parkway, #100
        (214) 572-1700 Telephone
        (972) 715-1759 Facsimile
        davidd@silveradearyray.com
        ralphc@silveradearyray.com
        jevens@silveradearyray.com
        donnal@silveradearyray.com
        tylers@silveradearyray.com

        Edward J. Rappaport (GA Bar No. 594841)
        erappaport@saylorlaw.com
        **THE SAYLOR LAW FIRM LLP**
        1201 W. Peachtree Street
        Suite 3220
        Atlanta, GA 30309
        (404) 892-4400 Telephone

        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 8, 2024, a true and correct copy of the foregoing document was filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Tyler M. Simpson*
Tyler M. Simpson

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing document was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1

*/s/ Tyler M. Simpson*
Tyler M. Simpson
